UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
GUY T. MITCHELL and ROYAL PALM SENIOR :
INVESTORS, LLC,                               :
                                              :   08 Civ. 4319 (JES)
              Plaintiffs,                     :
                                              :
         - against -                          :
                                              :
                                              :
CARBON CAPITAL II, INC.,                      :
                                              :
              Defendant.                      :
                                              :
------------------------------------------------X

**PRE-HEARING BRIEF OF DEFENDANT CARBON CAPITAL II, INC.**

SIDLEY AUSTIN LLP

Nicholas P. Crowell
Isaac S. Greaney
Alex J. Kaplan
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant*
*Carbon Capital II, Inc.*

Defendant Carbon Capital II, Inc. ("Carbon") submits this pre-hearing brief in opposition to the motion of Plaintiffs Royal Palm Senior Investors, LLC ("RP Senior") and Guy T. Mitchell ("Mitchell") for a preliminary injunction restraining Carbon from exercising any remedies as a result of plaintiffs' undisputed default of their obligations under a loan agreement, forbearance agreement and related guaranty agreement between the parties.

## PRELIMINARY STATEMENT

In February 2005, Carbon loaned more than $24.5 million to RP Senior to purchase the Royal Palm Hotel (the "Hotel") in Miami. Mitchell, who is indirectly the majority owner and controlling member of RP Senior, guaranteed payment of the loan. The collateral for the loan is 100% of the membership interests in Royal Palm Hotel Property, LLC ("RP Property"), which is the owner of the Hotel. The loan matured in March 2007. Plaintiffs defaulted. Faced with imminent foreclosure, RP Senior entered into a forbearance agreement with Carbon, and Mitchell reaffirmed his guaranty. In consideration for Carbon's forbearance, Plaintiffs promised to repay the outstanding debt by March 31, 2008. They also agreed to an automatic conveyance of the collateral to Carbon in the event of a default. On March 31, 2008, Plaintiffs defaulted again.

Plaintiffs do not dispute that they are in default under the loan agreement, forbearance agreement and guaranty. Nor do Plaintiffs dispute that Carbon is entitled to repayment of the entire outstanding debt, approximately $40 million. Instead, Plaintiffs argue that the Court should allow them more time to repay the debt on the grounds that Carbon breached the forbearance agreement by (i) interfering with their agreement to sell the Hotel to Hyatt; and (ii) failing to make certain interest payments on the senior mortgage on behalf of RP Senior. Plaintiffs also claim that Carbon waived RP Senior's numerous breaches of the forbearance agreement. Each of these arguments is baseless.

1

First, Plaintiffs do not have a single piece of evidence to suggest that Carbon interfered with any deal to sell the Hotel to Hyatt. Mitchell testified at his deposition that he has never seen a document indicating that Carbon interfered with the Hyatt deal, that nobody has ever told him that Carbon interfered with the Hyatt deal, and that nobody has ever told him that anyone told them that Carbon interfered with the Hyatt deal. David Tarr, a Senior Vice President at Hyatt that worked on the deal team, has sworn in an affidavit that he is not aware of any contact between Carbon and Hyatt and that Hyatt terminated the deal because it needed more time to review the transaction. Second, RP Senior (not Carbon) was required to make the interest payments on the senior mortgage from "available funds from operations after payment of items contemplated by the Cash Management Agreement." Carbon agreed only to pay the deficiency. RP Senior did not set up a Cash Management Agreement. RP Senior did not make a single payment during the months at issue. RP Senior never notified Carbon of any deficiency. In fact, throughout this time, Mitchell was siphoning millions of dollars of the Hotel's operating revenue to a family trust in the Cook Islands. Third, Plaintiffs' contention that Carbon waived its rights under the forbearance agreement is eviscerated by a December 6, 2007 e-mail from Carbon expressly informing Mitchell that Carbon did not waive any of its rights under the agreement. Moreover, the parties' agreements require that any waiver must be in writing. No such writing exists.

Plaintiffs' motion is all the more frivolous because they cannot articulate any basis for irreparable injury. Mitchell testified in his deposition that the only harm he would suffer from Carbon exercising its remedies is a reduction in the sale price of the Hotel which may increase his monetary obligations as a guarantor. When asked, Mitchell could not identify any other type of harm. As for RP Senior, it is a single purpose entity with no other assets beyond the collateral.

2

Finally, the balance of the equities overwhelmingly favors Carbon. Carbon is a secured lender that has forbeared from exercising its rights for 12 months and has been blocked from doing so an additional 3 months. Carbon, by absolutely no fault of its own, has been placed at significant risk that its security will be rendered worthless through a foreclosure by the senior mortgage lender. On the other hand, Plaintiffs have been in default on their obligations to Carbon and the senior mortgage lender for 15 months. Mitchell has admittedly siphoned funds from the Hotel to the detriment of Carbon, in violation of orders of this Court and the New York State Supreme Court, and likely in criminal violation of federal and state laws.

In sum, Plaintiffs' claims are meritless, they cannot articulate any irreparable harm, and it would be fundamentally unfair to require Carbon to continue to forbear from exercising its rights while its collateral is at risk of being rendered worthless.

## THE EVIDENCE

### A.   The Mezzanine Loan Agreement

On or about February 17, 2005, RP Senior entered into a Mezzanine Loan Agreement with Carbon (the "Mezz Agreement"), evidenced by a promissory note executed in favor of Carbon, pursuant to which Carbon loaned RP Senior approximately $24.5 million (the "Loan"). (See Compl. at ¶ 9); (Mitchell Dep. 77:5-23, June 2 & 10, 2008; Ex. 3.) The Maturity Date of the Loan was March 9, 2007. (Mitchell Dep. 84:5-10; Ex. 20 at 10.) In connection with the Mezz Agreement, RP Senior also entered into a Pledge Agreement, pledging as the only collateral for the Loan 100% of the Membership Interests in RP Property. (Mitchell Dep. 79:11–80:4; 80:14-24; 81:17-82:9; Ex. 4.) On February 17, 2005, RP Senior received the principal amount of the Loan, and used it to fund the purchase of the Hotel by RP Property. (Mitchell Dep. 83:8-23.)

As consideration for the Loan, Mitchell also entered into a Guaranty Agreement

3

with Carbon on February 18, 2005 (the "Guaranty"). (Mitchell Dep. 84:13-25; 87:21-24; Ex. 5); (Compl. at ¶ 10.) Per the Guaranty's terms, if RP Senior were to default under the Mezz Agreement, Mitchell would immediately be liable to Carbon for the entire amount of the Guaranteed Obligations. (Compl. at ¶¶ 11, 57); (Mitchell Dep. 85:13-21; 85:22-86:5.)[1]

### B. Plaintiffs Failed to Perform Under the Loan Agreements

When the Loan matured on March 9, 2007, RP Senior defaulted on the Mezz Agreement by failing to repay all outstanding amounts due to Carbon.[2] (Mitchell Dep. 89:16-19; 92:7-10; 93:19-22.) Therefore, Carbon noticed a foreclosure sale of the Membership Interests of RP Senior. (Mitchell Dep. 99:16-100:3.) Upon RP Senior's failure to repay the Loan, Mitchell became liable for the entire amount pursuant to the Guaranty. (Mitchell Dep. 96:9-14.) On June 11, 2007, Carbon sought payment from Mitchell, but Mitchell failed to pay. (Mitchell Dep. 96:24-97:11; 97:12-22; Ex. 7.)

### C. The Settlement Agreement

After Plaintiffs defaulted, the parties negotiated various forms of forbearance. (Mitchell Dep. 104:19-105:11.) Plaintiffs were represented by four different lawyers from three different law firms. (Mitchell Dep. 107:18-108:8.) One day prior to a scheduled foreclosure sale, on October 24, the parties entered into the Settlement Agreement. (Mitchell Dep. 100:12-23; Ex. 9); (Compl. at ¶ 12.) Plaintiffs acknowledged that as of the date of the Settlement Agreement, they had no basis to challenge the scheduled foreclosure sale. (Mitchell Dep.

---

[1] Also, on or about February 18, 2005, RP Property entered into a Mortgage Loan Agreement with Column Financial, Inc. ("Mortgage Agreement"), pursuant to which RP Property was loaned approximately $ 112,804,873.00 (the "Mortgage Loan"). The Mortgage Loan, which is collateralized by the Hotel, is serviced by Wachovia on behalf of a trust that holds the rights of the mortgage lender. It matured on March 9, 2007, and Wachovia has noticed certain defaults and could seek to exercise remedies at any time.

[2] Similarly, when the Mortgage Loan matured, RP Property defaulted under the Mortgage Agreement by failing to repay the Mortgage Loan. (Mitchell Dep. 89:11-15.)

4

101:17-23; Ex. 9.)

The Settlement Agreement sets forth all terms agreed to by the parties, (Mitchell Dep. 110:12-15), and in it, RP Senior expressly acknowledged that it was in default under the Mezz Agreement by failing to repay all outstanding amounts due to Carbon. (Mitchell Dep. 113:3-7; Ex. 9 at 1.) Moreover, Carbon agreed to forbear from exercising its rights against RP Senior in exchange for RP Senior's promise that, by March 31, 2008, it would pay to Carbon the amount set forth in the Settlement Agreement, or cause the sale of the Hotel, or refinance the Loan. (Compl. at ¶ 13); (Mitchell Dep. 113:8-19; Ex. 9 at § 3.1.) If RP Senior failed to perform, RP Senior agreed that 99.9% of its Membership Interests in RP Property would automatically convey to Carbon (a/k/a the Membership Conveyance). (Mitchell Dep. 114:4-115:6; Ex. 9 at § 3.1.)

In § 3.1 of the Settlement Agreement, RP Senior agreed that, in the event that the Membership Conveyance occurred, RP Senior would cooperate with Carbon in documenting the conveyance. (Mitchell Dep. 124:15-19; Ex. 9 at § 3.1.) In connection with that provision, Mitchell executed on behalf of RP Senior a Limited Power of Attorney (the "POA") for the assignment and transfer of the Membership Interest, and, at the time Mitchell signed the POA, Mitchell believed it to be a valid and legally binding document, and understood that RP Senior's attorneys had reviewed it prior to execution. (Mitchell Dep. 119:18-120:23; 121:21-25; 123:11-124:6; Ex. 10.) Moreover, per § 4.3, the parties agreed that, upon the earlier of either a default or maturity under the Settlement Agreement, Carbon would have the right to foreclose on RP Senior's Membership Interests.

D.     **RP Senior Breaches the Settlement Agreement**

On March 25, 2008, Carbon sent a letter to RP Senior providing formal notice of certain defaults under the Settlement Agreement. (Mitchell Dep. Ex. 14.) Specifically, the letter

stated that RP Senior defaulted on, inter alia, its obligation to enter into a replacement Cash Management Agreement (or "lock-box" agreement) with Wachovia, (Mitchell Dep. 179:25-180:4; Ex. 9), and its obligation under § 8 to enter into a Replacement Management Agreement, (Mitchell Dep. 180:5-7). Section 3.1 provides that, upon the occurrence of a default (or Termination Event), the automatic conveyance of 99.9% of the Membership Interests increases to 100%. (Mitchell Dep. 127:12-128:8; Ex. 9 at §§ 3.1, 3.3.)

By March 31, 2008, RP Senior failed to either refinance the outstanding debt to Carbon, or sell the Hotel, or pay the outstanding debt owed to Carbon. (Mitchell Dep. 131:11-21.) On April 1, 2008, Carbon sent a letter to RP Senior that the Membership Conveyance had occurred and requested that it document the automatic assignment and transfer of the Membership Interests to Carbon. (Mitchell Dep. 132:2-10; Ex. 12.) However, Mitchell refused to cooperate, claiming, inter alia, that the POA that he executed in connection with the Settlement Agreement was somehow defective (even though at the time he executed it, Mitchell and his attorneys believed it to be valid). (Mitchell Dep. 121:21-25; 135:9-136:17.) Instead, Mitchell continued to hold RP Senior out as the managing member of the Hotel. (Mitchell Dep. 136:21-25.)

## ARGUMENT

As set forth below, Plaintiffs are not entitled to an order enjoining Carbon from exercising its remedies under the Settlement Agreement and the Mezz Agreement with respect to the only collateral on its approximately $40 million of outstanding (and increasing) debt, nor is Mitchell entitled to an order enjoining Carbon from exercising its remedies under the Guaranty.

A.   **Plaintiffs Have No Chance of Success on the Merits**

Plaintiffs do not dispute that they have been in default under the Mezz Agreement and the Guaranty since March 2007, and that Carbon is entitled to repayment. Nor do they

dispute that they failed to perform under the Settlement Agreement. Instead, based on frivolous claims of breach and waiver, Plaintiffs argue that they should be given yet more time to satisfy their obligations.

### 1. Carbon Did Not Breach the Settlement Agreement

First, Plaintiffs allege, on "information and belief," that Carbon "either directly or indirectly informed Hyatt of the confidential terms of the Settlement Agreement or otherwise interfered with the completion of the sale to Hyatt." On January 28, 2008, pursuant to its bargained-for rights, Hyatt terminated the Purchase and Sale Agreement. (Compl. at ¶ 18.) Just prior to terminating the deal, Hyatt employee David Tarr informed Mitchell by email and voicemail of Hyatt's need for an extension on the time to complete the purchase of the Hotel. (Mitchell Dep. 298:11-15.) The basis for Hyatt's actions were not expressed, but in a sworn affidavit, Tarr stated, inter alia, that, to his knowledge, neither Carbon, nor the Settlement Agreement, had anything to do with Hyatt's decision. (Mitchell Dep. Ex. 24 at ¶¶ 5-11.)

At his deposition, Mitchell could not identify a single page of the more than 31,000 pages of documents produced in this matter that evidence Carbon directly or indirectly interfered with the Hyatt deal. (Mitchell Dep. 205:6-9.) Mitchell testified that no one ever told him that Carbon interfered directly or indirectly with the completion of RP Senior's proposed sale to Hyatt, (Mitchell Dep. 204:24-205:5), and Mitchell did not even ask anyone whether Carbon interfered with the Hyatt transaction, (Mitchell Dep. 205:10-13).

It is not surprising that Plaintiffs can point to no evidence that Carbon interfered with any proposed deal between RP Senior and Hyatt, as that allegation makes no sense whatsoever. Carbon's interest is in being repaid in full, and would have welcomed a deal with Hyatt that could have accomplished that. Moreover, if the closing date for the proposed deal with Hyatt had been pushed back to April 1, 2008, per the Settlement Agreement, RP Senior still

would have been entitled to 100% of the excess proceeds and Mitchell would have remained involved in the sales process.

Second, Plaintiffs claim that Carbon breached § 3.6 of the Settlement Agreement, which provides that if "available funds from operations after payment of items contemplated by the Cash Management Agreement are insufficient to fully pay" the monthly debt service on the Mortgage Loan for the months of October 2007 through January 2008, Carbon will "cause the payment" of that monthly debt service. (Mitchell Dep. Ex. 9 § 3.6.)

RP Senior did not enter into a replacement Cash Management Agreement as required under the Settlement Agreement. (Mitchell Dep. 179:25-180:4; Ex. 9 § 6.3.2.) RP Senior did not provide to Carbon documents or information to demonstrate any deficiency in available funds from operations. In fact, instead of making the requisite monthly debt service payments with the revenues from the Hotel's operations, Mitchell improperly transferred millions of dollars from RP Senior to a family trust in the Cook Islands. (Mitchell Dep. 337:24-338:11.)[3]

### 2. Carbon Did Not Waive RP Senior's Defaults

On March 25, 2008, Carbon notified Plaintiffs that RP Senior had breached the Settlement Agreement by failing (i) to enter into a Cash Management Agreement under § 6.3.2 of the Settlement Agreement, (ii) to enter into a Replacement Management Agreement under § 8 of the Settlement Agreement and (iii) to deliver certain opinions of counsel as required under §§ 6.3.2 and 7.1 of the Settlement Agreement. These breaches resulted in a Termination Event,

---

[3] Even if there was a breach, it is not material. Wachovia, as servicer of the Mortgage Loan, made the interest payments through a Servicer Advance, and never took any remedial action with respect to the missing payments. Moreover, if the interest payments had been made by Carbon (which it was under no obligation to do), RP Senior still would be obligated to repay the money – to Carbon instead of Wachovia. Indeed, Mitchell acknowledged that if Carbon, rather than Wachovia, made the mortgage payments, the interest on those payments would accrue at the higher rate. (Mitchell Dep. 305:11-16.)

8

and the automatic conveyance of 100% of the Membership Interests. Plaintiffs admit that they were obligated to enter into a Cash Management Agreement and a Replacement Management Agreement, and that they failed to do so. Instead, Plaintiffs assert that Carbon waived its rights to enforce those requirements of the Settlement Agreement. This argument is baseless on the facts and the law.

<u>First</u>, in New York, waiver is defined as the "intentional relinquishment and abandonment of a known right or privilege." <u>Chapman v. ChoiceCare Long Island Term Disability Plan</u>, 288 F.3d 506, 510 (2d Cir. 2002) (citations omitted). Plaintiffs cannot point to a single piece of evidence that Carbon intentionally relinquished its rights. In fact, in a December 6, 2007 email from Frank Pomar of Carbon to Mitchell, Pomar wrote, "Guy, this email is intended to put you on notice that CCII has not and does not waive any of your obligations under the Settlement Agreement." (Mitchell Dep. Ex. 18.)

<u>Second</u>, § 10.4 of the Mezz Agreement provides that any waiver, in order to be effective, must be in writing and "signed by the party against whom enforcement is sought," and § 10.5 provides that any delay by Carbon "in insisting upon strict performance of any term" of the Loan Documents is not a waiver. (Mitchell Dep. Ex. 20.) Likewise, the "no waiver" clauses set forth in the Mezz Agreement were incorporated into the Settlement Agreement, which also provides that "Borrower and Guarantors acknowledge that the Debt and the Loan Documents are valid and binding liabilities and obligations of Borrower and Guarantors." (Mitchell Dep. Ex. 9 at § 2.2.)

**B.    <u>Plaintiffs Cannot Demonstrate Any Imminent, Irreparable Harm</u>**

Plaintiffs are not at any risk of suffering imminent, irreparable harm in the event Carbon exercises its remedies. RP Senior claims that it will suffer monetary injury through a reduced purchase price for the Hotel. (Mitchell Dep. 223:14-19.) Mitchell claims that, if the

sale price is below the outstanding amount owed under the Settlement Agreement, he will be subject to greater monetary liability under the Guaranty. (Mitchell Dep. 223:20-224:8.) These are quintessential claims for monetary damage that cannot support a motion for preliminary injunction. At his deposition, Mitchell could not identify any other type of harm that he would suffer if Carbon exercised its remedies. (Mitchell Dep. 224:9-10.) Thus, because Plaintiffs "can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary equitable remedy of a preliminary injunction should be granted." Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 934 F.2d 30, 34 (2d Cir. 1991) (citation omitted).

C. **Balance of the Equities Tips Decidedly In Carbon's Favor**

The balance of equities and hardships weighs heavily in favor of Carbon. Carbon is a secured lender that has forbeared from exercising its rights for 12 months and has been blocked from doing so an additional 3 months. Carbon, by absolutely no fault of its own, has been placed at significant risk that its security will be rendered worthless through a foreclosure by the senior mortgage lender. Exacerbating Carbon's risk is the indisputable fact that the Hotel, and thus the Membership Interests that constitute Carbon's collateral, is a deteriorating asset. On the other hand, Plaintiffs have been in default on their obligations to Carbon and the senior mortgage lender for 15 months, and Mitchell admittedly has siphoned funds from the Hotel to the detriment of Carbon, in violation of orders of this Court and the New York State Supreme Court, and likely in criminal violation of federal and state laws.

## CONCLUSION

For the reasons stated herein, Defendant Carbon Capital II, Inc. respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction.

10

Dated: New York, New York
      June 11, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _____
Nicholas P. Crowell
Isaac S. Greaney
Alex J. Kaplan
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant Carbon Capital II, Inc.*