UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GUY T. MITCHELL and
ROYAL PALM SENIOR INVESTORS, LLC,

                No. 08 Civ. 4319 (JES)

            Plaintiffs,

    - against -              **DECLARATION OF**
                           **NICHOLAS P. CROWELL**

CARBON CAPITAL II, INC.,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Pursuant to 28 U.S.C. § 1746, NICHOLAS P. CROWELL declares:

1.     I am a member of the law firm of Sidley Austin LLP, counsel to Carbon Capital II, Inc. ("Carbon II") in this action.  I make this declaration in support of Carbon II's motion to dismiss the claims in Plaintiff Royal Palm Senior Investors, LLC's Notice of Appearance, Response to Pleadings, and Claims.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Loan Agreement, Dated as of February 18, 2005, Between Royal Palm Senior Investors, LLC, as Borrower, and Carbon Capital II, Inc., as Lender.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Pledge Agreement, dated as of February 18, 2005, by Royal Palm Senior Investors, LLC, for the benefit of Carbon Capital II, Inc.

4.    Attached hereto as Exhibit 3 is a true and correct copy of the Settlement Agreement Among Carbon Capital II, Inc., as Lender, Royal Palm Senior Investors, LLC, as Borrower, and Robert D. Falor, Guy T. Mitchell, and Geoffrey L. Hockman, each as a Guarantor, Dated as of October 24, 2007.

Nicholas P. Crowell

LOAN AGREEMENT

Dated as of February 18, 2005

Between

ROYAL PALM SENIOR INVESTORS, LLC,
as Borrower

and

CARBON CAPITAL II, INC.,
as Lender

NY\992308.9

# Table of Contents

**Page**

ARTICLE I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION..............................................1

    Section 1.1.    Definitions ...........................................................................................1
    Section 1.2.    Principles of Construction ...........................................................25
    Section 1.3.    Mortgage Loan Documents ..........................................................25

ARTICLE II. GENERAL TERMS.......................................................................................25

    Section 2.1.    Loan Commitment; Disbursement to Borrower ......................25
    Section 2.2.    Interest Rate ................................................................................26
    Section 2.3.    Loan Payments ............................................................................29
    Section 2.4.    Prepayments.................................................................................31
    Section 2.5.    Release of Membership Interests...............................................32
    Section 2.6.    Cash Management .......................................................................32
    Section 2.7.    Extension of the Initial Maturity Date.....................................35

ARTICLE III. CONDITIONS PRECEDENT.........................................................................36

    Section 3.1.    Conditions Precedent to Closing ..............................................36

ARTICLE IV. REPRESENTATIONS AND WARRANTIES .....................................................41

    Section 4.1.    Borrower Representations ...........................................................41
    Section 4.2.    Survival of Representations........................................................50

ARTICLE V. BORROWER COVENANTS............................................................................50

    Section 5.1.    Affirmative Covenants ................................................................50
    Section 5.2.    Negative Covenants ....................................................................65

ARTICLE VI. INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS ......72

    Section 6.1.    Insurance.......................................................................................72
    Section 6.2.    Casualty and Condemnation.......................................................74

ARTICLE VII. RESERVE FUNDS .....................................................................................74

    Section 7.1.    Mortgage Loan Reserves ............................................................74
    Section 7.2.    Interest Reserve ...........................................................................75
    Section 7.3.    Conversion Work Reserve...........................................................76
    Section 7.4.    [Intentionally omitted.].................................................................76
    Section 7.5.    [Intentionally omitted.].................................................................76
    Section 7.6.    RMA Expenses Reserves.............................................................76
    Section 7.7.    Reserve Funds Generally.............................................................76

ARTICLE VIII. DEFAULTS .................................................................................................. 77

Section 8.1.    Event of Default .................................................................................... 77
Section 8.2.    Rights and Remedies of Lender ............................................................ 80

ARTICLE IX. SPECIAL PROVISIONS ............................................................................... 82

Section 9.1.    Sale of Note and Securitization ........................................................... 82
Section 9.2.    Securitization Indemnification ............................................................. 83
Section 9.3.    Restructuring of Loan .......................................................................... 87
Section 9.4.    Exculpation .......................................................................................... 87
Section 9.5.    Matters Concerning Manager .............................................................. 90
Section 9.6.    Servicer ................................................................................................ 90
Section 9.7.    Additional Provisions Relating to the Condominium ........................... 90

ARTICLE X. MISCELLANEOUS ........................................................................................ 91

Section 10.1.    Survival ............................................................................................... 91
Section 10.2.    Lender's Discretion ............................................................................. 92
Section 10.3.    Governing Law .................................................................................... 92
Section 10.4.    Modification, Waiver in Writing ......................................................... 94
Section 10.5.    Delay Not a Waiver ............................................................................. 94
Section 10.6.    Notices ................................................................................................ 94
Section 10.7.    Trial by Jury ........................................................................................ 95
Section 10.8.    Headings ............................................................................................. 95
Section 10.9.    Severability ......................................................................................... 95
Section 10.10.   Preferences .......................................................................................... 95
Section 10.11.   Waiver of Notice ................................................................................. 96
Section 10.12.   Remedies of Borrower ......................................................................... 96
Section 10.13.   Expenses; Indemnity ........................................................................... 96
Section 10.14.   Schedules Incorporated ....................................................................... 97
Section 10.15.   Offsets, Counterclaims and Defenses .................................................. 97
Section 10.16.   No Joint Venture or Partnership; No Third Party Beneficiaries ........... 98
Section 10.17.   Publicity .............................................................................................. 98
Section 10.18.   No Reliance ......................................................................................... 98
Section 10.19.   Waiver of Offsets/Defenses/Counterclaims ........................................ 98
Section 10.20.   Conflict; Construction of Documents; Reliance .................................... 99
Section 10.21.   Brokers and Financial Advisors .......................................................... 99
Section 10.22.   Prior Agreements ................................................................................ 99
Section 10.23.   Joint and Several Liability ................................................................... 99
Section 10.24.   Counterparts ........................................................................................ 99
Section 10.25.   Certain Additional Rights of Lender (VCOC) ...................................... 99

## SCHEDULES AND EXHIBITS

Schedule I      -      Minimum Release Price Schedule
Schedule II     -      Rent Roll
Schedule III    -      [Intentionally Omitted]
Schedule IV     -      Organizational Chart
Schedule V      -      Borrower's Agreements

Exhibit A       -      Legal Description of the Land
Exhibit B       -      Conversion Work Budget and Schedule
Exhibit C       -      Instructions to Register Pledge
Exhibit D       -      Confirmation of Mortgage Borrower

NY\992308.9

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of February 18, 2005 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between CARBON CAPITAL II, INC., a Maryland corporation, having an address at c/o BlackRock Financial Management, Inc., 40 East 52nd Street, 7th Floor, New York, New York 10022 (together with its successors and assigns, "**Lender**"), and ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company, having its principal place of business at c/o The Falor Companies, Inc., 8609 W. Bryn Mawr Ave., Suite 209, Chicago, Illinois 60631 ("**Borrower**").

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I.
## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1.    Definitions.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Acceptable Counterparty**" shall mean any counterparty to the Interest Rate Cap Agreement that has, as of the date hereof, a long-term unsecured debt rating of at least "AAA" by S&P and "Aaa" from Moody's, which rating shall not include a "t" or otherwise reflect a termination risk, and which counterparty shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, a long-term unsecured debt rating of at least "AA-" by S&P and "Aa3" from Moody's, which rating shall not include a "t" or otherwise reflect a termination risk.

"**Account Collateral**" means, collectively, (a) the Mezzanine Cash Management Account, (b) following full payment of the Mortgage Loan, the proceeds of the Cash Management Account transferred to Lender in accordance with the Loan Documents, and (c) all sums at any time held, deposited or invested in any other accounts maintained in the sole dominion and control of Lender with respect to the Loan, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or

securities, but excluding amounts withdrawn from the Mezzanine Cash Management Account in accordance herewith.

"**Additional Condominium**" shall have the meaning set forth in Section 9.7.5 of the Mortgage Loan Agreement.

"**Additional Insolvency Opinion**" shall have the meaning set forth in Section 4.1.30(c) hereof.

"**Advance**" or "**Advances**" shall mean any disbursement by Mortgage Lender Conversion Work Reserve Funds from the Conversion Work Reserve Account in accordance with the terms of Section 7.3 of the Mortgage Loan Agreement, subject to the approval rights of Lender provided for in this Agreement.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) directly or indirectly owns twenty percent (20%) or more of all equity interests in such Person, and/or (ii) is in control of, is controlled by or is under common control with such Person, and/or (iii) is a director, officer or employee of such person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction, management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Affiliated Manager**" shall mean any Manager in which Mortgage Borrower, Borrower, Principal or any Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures and all known or anticipated Assessments, for the Property for the applicable Fiscal Year or other period.

"**Applicable Interest Rate**" shall mean the rate or rates at which the Outstanding Principal Balance bears interest from time to time in accordance with the provisions of Section 2.2.3 hereof.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(k) hereof.

"**Approved Sales Contract**" shall have the meaning set forth in Section 5.1.25(a) of the Mortgage Loan Agreement.

"**Assessments**" shall mean any common charges or other recurring expenses, or any regular or special assessments, or any other fees or charges due and payable by Mortgage Borrower under any or all of the Declaration of Condominium or any other Condominium Documents.

- 2 -

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Mortgage Borrower, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person and such action is not dismissed within 90 days of such filing; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person seeking, consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; or (f) such Person taking any action in furtherance of any of the foregoing.

"**Bankruptcy Code**" shall mean 11 U.S.C. § 101 *et seq.*, as the same may be amended from time to time.

"**Base Management Fee**" shall have the meaning set forth in Section 3.1.18 hereof.

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a) Taxes, (b) Other Charges, and (c) Insurance Premiums.

"**BlackRock**" shall mean BlackRock Financial Management, Inc. and its successors in interest.

"**Board**" shall have the meaning set forth in Section 5.1.24(a).

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York or in the city where the Mezzanine Cash Management Bank maintains the Mezzanine Cash Management Account or the city where Servicer maintains its principal office are not open for business.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP, including expenditures for replacements and alterations to the Property (but excluding tenant improvements).

- 3 -

"**Cash Management Account**" shall have the meaning set forth in <u>Section 2.6.2(a)</u> of the Mortgage Loan Agreement.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Mortgage Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall have the meaning given to it in the Mortgage Loan Agreement.

"**Casualty**" shall have the meaning set forth in <u>Section 6.2</u>.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall mean, collectively, the Membership Interests, the Account Collateral, all other collateral under the Pledge and all other tangible and intangible property in respect of which Lender is granted a security interest or pledge under the Loan Documents.

"**Collateral Assignment of Interest Rate Cap Agreement**" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement, dated as of the date hereof, executed by Mortgage Borrower in connection with the Mortgage Loan for the benefit of Mortgage Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Commitment Fee**" shall mean an amount equal to one percent (1%) of the amount of the Loan funded on the Closing Date.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.4(b)</u> of the Mortgage Loan Agreement.

"**Condominium**" shall have the meaning set forth in <u>Section 5.1.23(a)</u> of the Mortgage Loan Agreement.

"**Condominium Act**" shall mean NRS Chapter 116 and all modifications, supplements and replacements thereof and all regulations with respect thereto, now or hereafter enacted or promulgated.

- 4 -

"**Condominium Approval**" shall mean the approval by the Florida Division of Condominiums of the Offering Plan (and all exhibits thereto required by Legal Requirements) for the sale of Units within the Condominium and of all other Condominium Documents to be filed therewith.

"**Condominium Approval Extension Period**" shall mean, with respect to each submission made by Mortgage Borrower to Mortgage Lender for Mortgage Lender's approval pursuant to Section 5.1.23(b)(i) of the Mortgage Loan Agreement, the positive difference, if any, determined by subtracting (a) ten (10) Business Days from (b) the aggregate number of Business Days that elapse from the Business Day on which Mortgage Lender receives such submission until the Business Day on which Mortgage Lender delivers to Mortgage Borrower comments on or approval of said submission.

"**Condominium Conversion**" shall have the meaning set forth in Section 5.1.23(a) of the Mortgage Loan Agreement.

"**Condominium Declaration**" shall mean the declaration of covenants, conditions and restrictions and reservation of easements creating the Units as provided in the Condominium Act.

"**Condominium Documents**" shall mean all documents necessary for the operation of the Property as a Condominium, with a total of at least one hundred sixty (160) individual Units, with a condominium association to administer the general common elements, and for the sale of Units within the Property, all in accordance with the Condominium Act and all other applicable Legal Requirements including the Offering Plan, Condominium Declaration, articles of incorporation, by-laws, rules and regulations, management agreement (if applicable), the Rental Management Agreement, the form of contract for the sale of the Units, estimated operating and reserve budgets for the Condominium Association, notice of conversion, and all other reports, disclosure statements and documents relating to the creation in the Property of a valid condominium regime, and the regulation and administration thereof, and all exhibits, amendments or supplements thereto from time to time, to the extent that the foregoing are in existence and applicable to the Property.

"**Contingency Reserve Funds**" shall have the meaning set forth in Section 7.3.9 of the Mortgage Loan Agreement.

"**Contract Vendee**" shall have the meaning set forth in Section 5.1.25(a)(i) of the Mortgage Loan Agreement.

"**Conversion Work**" shall have the meaning set forth in Section 7.3.1 of the Mortgage Loan Agreement.

"**Conversion Work Budget and Schedule**" shall mean the budget for the Conversion Work prepared by Borrower and approved by Lender, setting forth on a line item basis the work to be performed and the date by which such work is to be completed, a copy of which is attached hereto as Exhibit B.

"**Conversion Work Reserve Account**" shall have the meaning set forth in Section 7.3.1 of the Mortgage Loan Agreement.

NY\992308.9

"**Conversion Work Reserve Funds**" shall have the meaning set forth in <u>Section 7.3.1</u> of the Mortgage Loan Agreement.

"**Counterparty**" shall mean, with respect to the Interest Rate Cap Agreement, IXIS Financial Products Inc., and with respect to any Replacement Interest Rate Cap Agreement, any substitute Acceptable Counterparty.

"**Covered Disclosure Information**" shall have the meaning set forth in <u>Section 9.2(b)</u> hereof.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums (including, if applicable, any Non-Approval Fees) due to Lender in respect of the Loan under the Note, this Agreement, the Pledge and the other Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled interest payments due under this Agreement and the Note.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Applicable Interest Rate.

"**Deferred Interest Fee**" means a sum equal to the amount that, after the return of all principal due under the Loan and all accrued interest, represents the additional amount that would be due to Lender if the principal outstanding balance of the Loan from time to time were accruing interest at a rate of twelve percent (12.0%) per annum, compounded monthly, and calculated in accordance with Section 2.2.2. The Deferred Interest Fee shall be due and payable on the Maturity Date (or on such earlier dates that prepayments of principal are made in accordance with the terms and conditions of this Agreement). For the avoidance of doubt, upon the earlier of the Maturity Date or such earlier date as the Loan is repaid in full, payments of interest (inclusive of the Deferred Interest) hereunder shall be required so as to yield an Internal Rate of Return equal to twenty-two percent (22%).

"**Disclosure Document**" shall mean a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents or marketing materials, in each case in preliminary or final form, used to offer Securities in connection with a Securitization.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus

- 6 -

of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

"**Embargoed Person**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning ascribed to such term in the Environmental Indemnity.

"**Environmental Report**" shall mean that certain Phase I Environmental Site Assessment prepared by Spectrum Analytical Services, Inc. with respect to the Property delivered to Lender by Borrower in connection with the origination of the Loan.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 2.6.4 of the Mortgage Loan Agreement.

"**Excess Sales Proceeds**" shall mean, with respect to each Unit conveyed, the positive difference, if any, obtained by subtracting Sales Expenses relating to the sale of such Unit from an amount equal to ten percent (10%) of the Gross Sales Proceeds generated from the sale of such Unit.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.7 hereof.

"**Extension Option**" shall have the meaning set forth in Section 2.7 hereof.

"**FF&E**" shall mean, with respect to the Property, furnishings, fixtures and equipment in the guest rooms, hallways, lobbies, restaurants, lounges, meeting and banquet rooms, parking

- 7 -

facilities and other public areas or otherwise at the Property, in each case to the extent constituting the property of Mortgage Borrower.

"**First Condo Approval Date**" shall mean the September 15, 2005; provided that such date shall be extended by the total aggregate number of days in all Condominium Approval Extension Periods occurring prior to such date.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Florida Division of Condominiums**" shall mean the Florida Division of Land Sales, Condominium and Mobile Homes.

"**Foreign Taxes**" shall have the meaning set forth in Section 2.2.3(b) hereof.

"**Fourth Condo Approval Date**" shall mean the date that is ninety (90) days after the Third Condo Approval Date, provided that such date shall be extended by the total aggregate number of days in all Condominium Approval Extension Periods occurring after the Third Condo Approval Date and prior to such date.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP as modified by the Uniform System of Accounts (or such other accounting basis acceptable to Lender), derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature, but excluding Insurance Proceeds and Condemnation Proceeds to the extent the same are used to pay the costs of Restoration of the Property and any disbursements to Mortgage Borrower from the Tax and Insurance Escrow Funds, the Interest Reserve Funds, Operating Expense Reserve Funds, the Conversion Work Reserve Funds or any other escrow fund established by the Loan Documents.

"**Gross Sales Proceeds**" shall mean, with respect to each Unit conveyed the aggregate value of all consideration received by Mortgage Borrower in connection with the sale of such Unit including the price for the sale of any parking spaces, cabanas or other appurtenances and all cash, notes, assumed indebtedness, deferred payments (contingent or otherwise), prepaid expenses and non-customary pro-rations in favor of Mortgage Borrower.

- 8 -

"**Guarantor**" shall mean individually and collectively, Robert D. Falor, Guy T. Mitchell and Geoffrey L. Hockman.

"**Guaranty**" shall mean that certain Guaranty Agreement, dated as of the date hereof, from Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Guaranteed Obligations**" shall have the meaning set forth in Section 9.4 hereof.

"**Hard Costs**" shall mean the aggregate costs of all labor, materials, equipment, fixtures and furnishings necessary to complete the Conversion Work.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Indemnified Person**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Indemnifying Person**" shall mean each of Mortgage Borrower, Borrower, Principal and Guarantor.

"**Independent Director**" or "**Independent Manager**" shall mean a natural person who is reasonably satisfactory to Lender and who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director or manager (with the exception of serving as the Independent Director or Independent Manager of Mortgage Borrower, Borrower or Principal), officer, employee, partner, member, attorney or counsel of Mortgage Borrower, Borrower, Principal or any Affiliate of any of them; (b) a customer, supplier or other person who derives any of its purchases or revenues from its activities with Mortgage Borrower, Borrower, Principal or any Affiliate of any of them; (c) a Person controlling, controlled by or under common control with any such stockholder, director, manager, officer, partner, member, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, manager, officer, partner, member, customer, supplier or other person. As used in this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. An entity that provides independent directors as a service for a fee and/or other corporate filing services is not prohibited

- 9 -

under this definition from providing one or more Independent Directors or Independent Managers.

"**Initial Maturity Date**" shall mean March 9, 2007.

"**Insolvency Opinion**" shall mean that certain non-consolidation opinion letter dated the date hereof delivered by Troutman Sanders LLP in connection with the Loan.

"**Insurance Premiums**" shall have the meaning set forth in <u>Section 6.1(b)</u> hereof.

"**Insurance Proceeds**" shall, as applicable, (i) have the meaning set forth in <u>Section 6.4(b)</u> of the Mortgage Loan Agreement, or (ii) mean the net amount of all insurance proceeds received by Lender in respect of any insurance policies required to be maintained pursuant to the terms of this Agreement, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same.

"**Intended Use**" shall mean the use of the Property as a hotel and all other permitted and/or accessory uses (including retail use and all applicable parking and amenities).

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement of even date herewith among Mortgage Lender and Lender, as the same may be amended, restated, replaced or supplemented or otherwise modified from time to time.

"**Interest Period**" shall mean, with respect to any Payment Date, the period commencing on the ninth (9th) day of the preceding calendar month and terminating on the eighth (8th) day of the calendar month in which such Payment Date occurs; provided, however, that no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and the initial Interest Period shall begin on the Closing Date and shall end on March 8, 2005.

"**Interest Rate Cap Agreement**" shall mean, as applicable, an Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto) in form and substance reasonably satisfactory to Lender between Mortgage Borrower and an Acceptable Counterparty or a Replacement Interest Rate Cap Agreement.

"**Interest Reserve Account**" shall have the meaning set forth in <u>Section 7.2.1</u> hereof.

"**Interest Reserve Funds**" shall have the meaning set forth in <u>Section 7.2.1</u> hereof.

"**Land**" shall mean the land more particularly described on <u>Exhibit A</u> attached hereto and includes all rights appurtenant thereto, including all development rights, if any, acquired by Borrower.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such

- 10 -

lease, sublease, subsublease, or other agreement and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, the conversion to condominiums thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including the Americans with Disabilities Act of 1990, as amended, the Condominium Act, the Interstate Land Sales Full Disclosure Act and the regulations promulgated thereunder and the securities laws of the State of Florida and the rules and regulations pertaining thereto, if applicable, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Liabilities**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Licenses**" shall have the meaning set forth in Section 4.1.22 hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting Mortgage Borrower, Borrower, the Property or any portion thereof or any interest therein, or any direct or indirect interest in Borrower or Principal, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of Twenty-Four Million, Five Hundred Forty-Five Thousand, Eight Hundred Thirteen and No/100 Dollars ($24,545,813.00), made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge, the Environmental Indemnity, the Guaranty, the Mezzanine Cash Management Agreement, the Assignment of Management Agreement, and all other documents now or hereafter executed and/or delivered in connection with the Loan.

"**Loan-to-Value Ratio**" shall mean the ratio, as of a particular date, the numerator of which is an amount equal to the sum of (a) the "Outstanding Principal Balance" (as defined in the Mortgage Loan Agreement) as of such date and (b) the Outstanding Principal Balance as of such date and the denominator of which is an amount equal to the appraised value of the Property as of such date as determined by Lender in its sole discretion.

- 11 -

"**Lockbox Account**" shall have the meaning set forth in <u>Section 2.6.1(a)</u> hereof.

"**Lockbox Bank**" shall mean Citibank, F.S.B. or any successor or permitted assigns thereof.

"**Management Agreement**" shall mean the management agreement entered into by and between Mortgage Borrower and Manager, as the same has been and may be amended, modified or supplemented from time to time, pursuant to which Manager is to provide management and other services with respect to the Property, or, if the context requires, the Replacement Management Agreement.

"**Manager**" shall mean InterContinental Hotels Group Resources, Inc., a Delaware corporation, LH Miami, LLC, a Delaware limited liability company, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"**Material Contract**" shall mean any of the following (a) the Management Agreement, (b) all covenants, agreements, restrictions and encumbrances contained in any instruments, either of recorded or otherwise a matter of public record, affecting the Property or any part thereof, (c) the Leases described on Schedule II and any lease or sublease entered into after the date hereof for greater than 2,000 rentable square feet at the Property, and (d) any contract, license or other agreement pursuant to which any goods or services are provided to, or in respect of, Mortgage Borrower, Borrower or the Property and which (i) is not terminable upon sixty (60) days notice or less or requires payment of a termination fee, (ii) requires the payment of an amount per year in excess of $100,000 or (iii) is with an Affiliate of Mortgage Borrower or Borrower, as any of the foregoing described in clauses (a), (b), (c) and (d) may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement; <u>provided</u>, that (A) advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management and operation of the Property, (B) the mere purchase of goods on a non-forward commitment basis (e.g., purchase of a good for cash) in the ordinary course of the management and operation of the Property and (C) any other agreement entered into with a Person that is not an Affiliate of Mortgage Borrower or Borrower pursuant to which goods or services are provided to, or in respect of, the Property entered into in the ordinary course of the management and operation of the Property, as the same is managed and operated on the date hereof, and which requires the payment of an amount per year that is less than $500,000, shall not constitute a Material Contract (it being understood that the carveout from the definition of "Material Contracts" contained in the foregoing <u>clause (C)</u> shall not override any approval rights over contracts relating to Alterations, Required Repairs or Restoration that Lender may have pursuant to the terms of this Agreement). Notwithstanding the foregoing, so long as an Event of Default exists, all contracts, licenses and other agreements whether or not oral or in writing pursuant to which any goods or services are provided to or in respect of Mortgage Borrower, Borrower or the Property (other than advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management an operation of the Property) shall be deemed to be Material Contracts.

"**Maturity Date**" shall mean the Initial Maturity Date or, if applicable, the Extended Maturity Date, or such other date on which the final payment of principal of the Note becomes

- 12 -

due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Membership Interests**" shall mean the 100% sole membership interest in Mortgage Borrower, representing all equity ownership of Mortgage Borrower.

"**Mezzanine Cash Management Account**" shall have the meaning set forth in Section 2.6.1.

"**Mezzanine Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Mezzanine Cash Management Bank**" shall mean PNC Bank, NA or any other bank designated by Lender.

"**Minimum Balance**" shall have the meaning set forth in Section 7.2.3.

"**Minimum Release Price**" shall mean, on any date of determination and with respect to any Unit in respect of which a release is requested under the terms of the Mortgage Loan Documents, the minimum release consideration amount allocated to such Unit in Lender's sole discretion, as the same may be set forth on Schedule I attached to the Mortgage Loan Agreement which amounts have been determined on the basis of an average sale price of $1,450 per square foot and the representation contained in Section 4.1.37 hereof as to the gross saleable square feet of the portion of the Property to be converted to a Condominium and, if such representation shall not be true, such prices shall be subject to adjustment by Lender, in Lender's sole discretion.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Monthly Interest Payment**" shall have the meaning set forth in Section 2.3.1.

"**Mortgage**" shall mean that certain first priority Mortgage, Security Agreement and Fixture Filing, dated the date hereof, executed and delivered by Mortgage Borrower as security for the Mortgage Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Mortgage Borrower**" shall mean Royal Palm Hotel Property, LLC, a Delaware limited liability company.

"**Mortgage Lender**" shall mean Column Financial, Inc.

"**Mortgage Loan**" shall mean that certain loan of even date herewith made by Mortgage Lender to Mortgage Borrower in the maximum principal amount of One Hundred Twelve Million, Eight Hundred Four Thousand, Eight Hundred Seventy-Three and No/100 Dollars ($112,804,873.00).

"**Mortgage Loan Agreement**" shall mean that certain loan agreement of even date herewith between Mortgage Lender and Mortgage Borrower with respect to the Mortgage Loan.

"**Mortgage Loan Documents**" shall mean the "Loan Documents" as defined in the Mortgage Loan Agreement.

"**Net Cash Flow**" shall mean, for any period, the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period, and shall mean, as the context requires, Net Cash Flow of Mortgage Borrower or Borrower.

"**Net Cash Flow Schedule**" shall have the meaning set forth in Section 5.1.11(i) hereof.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period and shall mean, as the context requires, Net Operating Income of Mortgage Borrower or Borrower.

"**Net Proceeds**" shall have the meaning set forth in Section 6.4(b) of the Mortgage Loan Agreement.

"**Non-Approval Fee**" shall mean the fees, if any, payable to Lender pursuant to Section 2.3.4 hereof.

"**Note**" shall mean that certain Promissory Note dated of even date herewith in the principal amount of Twenty-Four Million, Five Hundred Forty-Five Thousand, Eight Hundred Thirteen and No/100 Dollars ($24,545,813.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Notice**" shall have the meaning set forth in Section 10.6 hereof.

"**O&M Agreement**" shall mean that certain Operations and Maintenance Agreement, dated as of the date hereof, between Mortgage Borrower and Mortgage Lender given in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**Offering Plan**" shall mean, collectively, the offering plan or prospectus for the Condominium to be established with respect to the Property, approved by Lender and the Florida Division of Condominiums, together with all amendments thereto, prepared in accordance with all applicable Legal Requirements pursuant to the Condominium Conversion.

- 14 -

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower that is signed by a Responsible Officer.

"**Operating Expenses**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP as modified by the Uniform System of Accounts (or such other accounting basis acceptable to Lender), of whatever kind relating to the operation, maintenance and/or management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including utilities, ordinary repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes (including hourly employees for contracted services), equipment lease payments and management fees payable under the Management Agreement, but excluding depreciation, Debt Service, Capital Expenditures, and contributions to the Reserve Funds, and shall mean, as the context requires, Operating Expenses of Mortgage Borrower or Borrower.

"**Operating Expenses Reserve Funds**" shall have the meaning set forth in Section 7.6.1 of the Mortgage Loan Agreement.

"**Other Charges**" shall mean all ground rents, if any, maintenance charges, impositions other than Taxes and Assessments, and any other charges payable by Borrower or which could result in a Lien on the Property if not timely paid, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Obligations**" shall mean (a) the performance of all obligations of Borrower contained herein; (b) the performance of each obligation of Borrower contained in any other Loan Document; and (c) the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of this Agreement, the Note or any other Loan Documents.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Payment Date**" shall mean the ninth (9th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day. The first Payment Date shall be April 9, 2005.

"**Permitted Encumbrances**" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) Liens if any, on the Collateral for Taxes imposed by any Governmental Authority but not yet delinquent and (c) such other liens as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Investments**" shall have the meaning set forth in the Mezzanine Cash Management Agreement.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

- 15 -

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Physical Conditions Report**" shall mean a report prepared by a company satisfactory to Lender regarding the physical condition of the Property, satisfactory to Lender in form and substance to Lender in its sole discretion, which report shall, among other things, (i) confirm that the Property and its use comply, in all material respects, with all applicable Legal Requirements (including zoning, subdivision and building codes and laws), and (ii) include a copy of a final certificate of occupancy (or such equivalent certificate as may be issued by the jurisdiction in which the Property is located) with respect to all Improvements (unless previously delivered to Lender).

"**Pledge**" shall mean the Pledge Agreement of even date herewith from Borrower to Lender.

"**Policies**" shall have the meaning specified in <u>Section 6.1(b)</u> hereof.

"**Principal**" shall mean the Special Purpose Entity that is the sole member of Borrower.

"**Property**" shall mean the Land, the Improvements thereon and all personal property owned by Mortgage Borrower and encumbered by the Mortgage, together with all rights pertaining to the Land and Improvements, as more particularly described in the granting clause of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, any Indemnifying Person with respect to the Property, Mortgage Borrower, Borrower, Principal, Guarantor and/or Manager.

"**Qualified Manager**" shall mean either (a) Manager or (b) in the reasonable judgment of Lender, a reputable and experienced hotel management organization (which may be an Affiliate of Borrower) possessing experience in managing hotel properties similar in size, scope, use and value as the Property, reasonably approved by Lender, <u>provided</u> that if the Loan has been included in a Securitization, Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that management of the Property by such Person will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof.

"**Rating Agencies**" shall mean each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been approved by Lender.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rental Management Agreement**" shall mean the form of agreement to be entered into by a Qualified Manager and Mortgage Borrower, with certain of the individual owners of the Units, with respect to the rental of each of such owners' Units to guests of the hotel, a copy of which is attached as Exhibit K to the Mortgage Loan Agreement.

- 16 -

"**Rents**" shall mean all rents (including percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgage Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all revenues from telephone services, laundry, vending, television and all receivables, customer obligations now existing or hereafter arising or created out of the lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Mortgage Borrower, Manager, or any of their respective agents or employees, and proceeds, if any, from business interruption or other loss of income insurance, but specifically excluding Gross Sales Proceeds.

"**Replacement Interest Rate Cap Agreement**" shall mean an interest rate cap agreement from an Acceptable Counterparty with terms identical to the Interest Rate Cap Agreement, except that the same shall be effective in connection with the supplementation or replacement, as applicable, of the Interest Rate Cap Agreement (a) on extension of the maturity date thereof in connection with the extension of the Maturity Date, and/or (b) following a downgrade below the level required in the definition of Acceptable Counterparty or a withdrawal or qualification of the long-term unsecured debt rating of the Counterparty; provided that to the extent any such interest rate cap agreement does not meet the foregoing requirements, a "**Replacement Interest Rate Cap Agreement**" shall be such interest rate cap agreement approved in writing by Lender or, after a Securitization of the Loan, each of the Rating Agencies with respect thereto.

"**Replacement Management Agreement**" shall mean, collectively, either (a) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (b) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance; provided that with respect to the preceding subclause (b), Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not cause a downgrade, withdrawal or qualification of the then current rating of the Securities or any class thereof; and provided further that, in either case, Borrower shall obtain and deliver to Lender an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Required Mezzanine Interest Reserve Payments**" shall mean any payment required to be made to the Interest Reserve Account to maintain the Minimum Balance pursuant to Section 7.2.3 hereof.

"**Required Release Price**" shall mean, with respect to each Unit, an amount equal to the greater of (a) the Minimum Release Price for such Unit and (b) ninety percent (90%) of the Gross Sales Proceeds from the sale of such Unit.

- 17 -

"**Reserve Funds**" shall mean, collectively, the Interest Reserve Funds and any other escrow fund established pursuant to the Loan Documents.

"**Responsible Officer**" shall mean with respect to Borrower, the chairman of the board, chief operating officer, chief financial officer, treasurer, vice president-finance, or other authorized representative of Borrower.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" shall mean, collectively (a) Mortgage Borrower, Borrower, Principal, any Guarantor and any Affiliated Manager and (b) any shareholder, partner, member, non-member manager, direct or indirect legal or beneficial owner, agent or employee of Mortgage Borrower, Borrower, Principal, any Guarantor, any Affiliated Manager or any non-member manager.

"**Revenues**" shall mean all income and revenues derived from the ownership and operation of the Property from whatever source, including, but not limited to, room revenues, food and beverage revenues, telephone revenues, Rents, utility charge, forfeited security and reservation deposits, interest on credit accounts, service fees or charges, license fees, parking fees, sales of FF&E, rent concessions or credits and other pass-through or reimbursements paid by tenants under Leases, and any interest income, but excluding (i) refunds and uncollectable accounts, (ii) Insurance Proceeds and Condemnation Proceeds (other than business interruption or other loss of income insurance), (iii) Rents from month-to-month tenants or tenants that are included in any Bankruptcy Action, (iv) sales, use and occupancy or other taxes on receipts required to be accounted for by Mortgage Borrower to any Governmental Authority, (v) amounts refunded to guests or patrons and uncollectable accounts, (vi) sales of furniture, and equipment and (vii) any disbursements to Mortgage Borrower from any of the Reserve Funds or any other escrow or reserve fund established by the Loan Documents.

"**RICO**" shall mean Racketeer Influenced and Corrupt Organizations Act.

"**RMA Expenses**" shall have the meaning set forth in Section 7.6.1. of the Mortgage Loan Agreement

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance or pledge of a legal or beneficial interest.

"**Sale Expenses**" shall mean, with respect to each Unit conveyed, brokers or sales commissions (not to exceed six percent (6%) of the gross proceeds received from the sale of such Unit), other reasonable and usual third party sales costs and expenses, including legal fees (but excluding any and all expenses payable to any Affiliate of Borrower), recording fees and transfer taxes incurred by Mortgage Borrower in connection with the sale of such Unit, all of which costs and expenses shall be subject to Lender's prior reasonable approval and shall not exceed ten

percent (10%) of the Gross Sales Price for such Unit in the aggregate except that, the cap on brokers and sales commissions shall be increased from 6% to 9% and the aggregate cap on "Sale Expenses" shall be increased from 10% to 12% in connection with the sale of a Unit to a member of a "Buying Club" but, in each case, only if Borrower delivers evidence reasonably satisfactory to Lender that all Sales Expenses have been paid in connection with the closing for the Unit in question.

"**Sales Agency Agreement**" shall mean the sales agency agreement, which shall be subject to Lender's prior approval, which approval shall not be unreasonably withheld or delayed, entered into by and between Mortgage Borrower and Sales Agent, as the same may be amended, modified or supplemented from time to time, pursuant to which Sales Agent is to provide marketing and other sales-related services with respect to sales of the Units.

"**Sales Agent**" shall mean the Person chosen by Mortgage Borrower, reasonably acceptable to Lender, to perform the duties of sales agent under the Sales Agency Agreement, which Person may be an investor of Mortgage Borrower.

"**Second Condo Approval Date**" shall mean the date that is thirty (30) days after the First Condo Approval Date, <u>provided</u> that such date shall be extended by the total aggregate number of days in all Condominium Approval Extension Periods occurring after the First Condo Approval Date and prior to such date.

"**Securities**" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"**Securities Act**" shall have the meaning set forth in <u>Section 9.2(a)</u> hereof.

"**Securitization**" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"**Servicer**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Servicing Agreement**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Severed Loan Documents**" shall have the meaning set forth in <u>Section 8.2(b)</u> hereof.

"**Soft Costs**" shall mean all costs of completion of the Conversion Work, other than Hard Costs, including costs of contractors' and subcontractors' fees, architects' fees, attorneys' fees, engineering fees, survey costs, title insurance premiums, permit or filing fees, fees of expediters and like costs.

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the date hereof:

(a)    was, is and will be organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property or the Collateral, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) acting as the general partner of the limited partnership that owns the Property or as the sole member or the managing member

- 19 -

of the limited liability company that owns the Property, or (iii) acting as the general partner of the limited partnership or as the sole member or the managing member of the limited liability company that owns the equity interests of the limited partnership or limited liability company that satisfies clause (ii) above;

        (b)    has not been, is not, and will not be engaged in any business unrelated to (i) the acquisition, development, ownership, leasing, management, operation or sale of the Property or the Collateral, (ii) acting as the general partner of the limited partnership that owns the Property, (iii) acting as the sole member or the managing member of the limited liability company that owns the Property, as applicable, or (iv) acting as the general partner of the limited partnership or as the sole member or the managing member of the limited liability company that owns the equity interests of the limited partnership that satisfies clause (ii) above or the limited liability company that satisfies clause (iii) above;

        (c)    has not had, does not have, and will not have, any assets other than those related to the Property or the Collateral or its partnership interest in the limited partnership or the membership interest in the limited liability company that owns the Property or acts as the general partner or managing member thereof, as applicable;

        (d)    has not engaged, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is the general partner in a limited partnership or the sole member or managing member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

        (e)    if such entity is a limited partnership, has had, now has, and will have as its only general partner, a Special Purpose Entity that is a corporation, limited partnership or limited liability company;

        (f)    if such entity is a corporation, has had, now has and will have at least two (2) Independent Directors, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any Bankruptcy Action unless two (2) Independent Directors shall have participated in such vote;

        (g)    if such entity is a limited liability company with more than one member, has had, now has and will have one managing member that is a Special Purpose Entity that is a corporation that has at least two (2) Independent Directors and that owns at least one percent (1.0%) of the equity of the limited liability company;

        (h)    if such entity is a limited liability company with only one member, has been, now is, and will be a limited liability company organized in the State of Delaware that has (i) as its only member a managing member that is a Special Purpose Entity, (ii) at least two (2) Independent Managers and has not caused or allowed, and will not cause or allow, the board of managers of such entity to take any Bankruptcy Action unless two (2) Independent Managers shall have participated in such vote, and (iii) at least one (1) springing member that will become

- 20 -

the non-managing member of such entity upon the dissolution of the existing non-managing member;

(i)     if such entity is (i) a limited liability company, has had, now has, and will have an operating agreement, (ii) a limited partnership, has had, now has, and will have a limited partnership agreement, or (iii) a corporation, has had, now has, and will have a certificate of incorporation that, in each of the foregoing cases, provides that such entity will not, so long as the Debt is outstanding: (A) dissolve, merge, liquidate or consolidate; (B) sell all or substantially all of its assets or the assets of Borrower (as applicable); (C) engage in any other business activity or amend its organizational documents with respect to the matters set forth in this definition; or (D) without the affirmative vote of two (2) Independent Directors or Independent Managers and of all other directors or managers of such entity, take any Bankruptcy Action with respect to itself or any other entity in which it has a direct or indirect legal or beneficial ownership interest;

(j)     has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and has maintained, is maintaining and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)     has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(l)     has maintained and will maintain its accounts, books and records separate from any other Person, and has filed and will file its own tax returns, except to the extent that it has been or is required to file consolidated tax returns by law;

(m)     has maintained and will maintain its own records, books, resolutions and agreements;

(n)     other than as provided in the Mezzanine Cash Management Agreement and the other Loan Documents, in the case of Borrower, and in the Cash Management Agreement and the other Mortgage Loan Documents, in the case of Mortgage Borrower, (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

(o)     has held and will hold its assets in its own name;

(p)     has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (ee) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

- 21 -

(q)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such financial statement consolidated with that of another Person shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(r)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets;

(s)    has maintained and will maintain a sufficient number of employees in light of its contemplated business operations;

(t)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(u)    has had no and will have no Indebtedness other than (i) the obligations and indebtedness evidenced and secured by the Loan Documents, in the case of Borrower, and the obligations and indebtedness evidenced and secured by the Mortgage Loan Documents, in the case of Mortgage Borrower (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the Collateral and the routine administration of Mortgage Borrower and Borrower, respectively, in amounts not to exceed one percent (1%) of the outstanding principal balance of the Mortgage Loan or the Outstanding Principal Balance, respectively, which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are permitted pursuant to this Agreement;

(v)    has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person;

(w)    has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(x)    has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(y)    has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name.  The stationery, invoices, and checks utilized by the Special Purpose Entity, or utilized to collect its funds or pay its expenses, have borne and shall bear its own name, and have not borne and shall not bear the name of any other entity, unless such entity is clearly designated as being the Special Purpose Entity's agent;

(z)    has not pledged and will not pledge its assets for the benefit of any other Person other than pursuant to the Loan Documents;

- 22 -

(aa)    has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (ee) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(bb)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(cc)    has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(dd)    has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(ee)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates, except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with a third party that is not an Affiliate, and (ii) in connection with this Agreement and the other Loan Documents;

(ff)    has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors (other than Independent Directors) or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation to indemnify;

(gg)    if such entity is a corporation, it has considered and shall consider the interests of its creditors in connection with all corporate actions;

(hh)    does not and will not have any of its obligations guaranteed by any Affiliate, except pursuant to the Loan Documents; and

(ii)    has complied and will comply with all of the terms and provisions contained in its organizational documents. The statement of facts contained in its organizational documents are true and correct and will remain true and correct.

"Standard Statements" shall have the meaning set forth in Section 5.1.11(f)(i) hereof.

- 23 -

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Strike Price**" shall mean, as applicable: (a) with respect to the period commencing on the Closing Date through and including the Initial Maturity Date, five percent (5%); and (b) with respect to the term of each Extension Option, shall mean the "strike price" determined by Lender.

"**Subcontractors**" shall have the meaning set forth in Section 7.3.3(h) hereof.

"**Survey**" shall mean a survey of the Property prepared pursuant to the requirements contained in Section 3.1.3(c) hereof.

"**Tax and Insurance Escrow Account**" shall have the meaning set forth in Section 7.1 of the Mortgage Loan Agreement.

"**Tax and Insurance Escrow Funds**" shall have the meaning set forth in Section 7.1 of the Mortgage Loan Agreement.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Third Condo Approval Date**" shall mean the date that is thirty (30) days after the Second Condo Approval Date, provided that such date shall be extended by the total aggregate number of days in all Condominium Approval Extension Periods occurring after the Second Condo Approval Date and prior to such date.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.21 hereof.

"**Title Company**" shall mean Fidelity National Title Insurance Company.

"**Title Insurance Policy**" shall mean (a) an ALTA mortgagee title insurance policy in favor of Mortgage Lender satisfying the requirements described in the Mortgage Loan Documents and otherwise in form and substance acceptable to Lender; and (b) with respect to the interest of Lender, an ALTA owner's title insurance policy with a Mezzanine Lender Endorsement (if available) and otherwise in form and substance acceptable to Lender.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(b) hereof.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**UCC Insurance Policy**" shall mean an insurance policy insuring the perfection and priority of the security interests under the Pledge and Mezzanine Cash Management Agreement.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels as approved by the American Hotel and Motel Association (as in effect from time to time).

- 24 -

"**Unit**" shall mean each individual condominium unit (including any appurtenant interest in the common elements) in the Land and the Improvements created by submission of the portion of the Property comprising the Shorecrest Tower to the provisions of the Condominium Act in accordance with the Condominium Documents.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

Section 1.2.    **Principles of Construction**.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement and the word "including" shall mean "including but not limited to".  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

Section 1.3.    **Mortgage Loan Documents**.  All references to the terms and provisions of the Mortgage Loan Agreement, the Mortgage or other Mortgage Loan Documents in the foregoing defined terms and throughout this Agreement shall mean the Mortgage Loan Agreement, the Mortgage or other Mortgage Loan Documents, as applicable, as in effect on the date hereof, or as amended, restated, modified or supplemented with Lender's express written consent.

## ARTICLE II.
## GENERAL TERMS

Section 2.1.    **Loan Commitment; Disbursement to Borrower**.

2.1.1.    **Agreement to Lend and Borrow**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make, and Borrower hereby agrees to accept, the Loan on the Closing Date.

2.1.2.    **Single Disbursement to Borrower**.  Borrower may request and receive only one disbursement hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3.    **The Note, Pledge and Loan Documents**.  The Loan shall be evidenced by the Note and secured by the Pledge and the other Loan Documents.

2.1.4.    **Use of Proceeds**.  Borrower shall use the proceeds of the Loan (together with any proceeds of the Mortgage Loan) to pay for certain Lender-approved costs associated with the closing of the Loan and to capitalize Mortgage Borrower with funds to be used by Mortgage Borrower (a) to acquire the Property and/or repay and discharge any existing loans relating to the Property, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) make initial deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the

- 25 -

Mortgage Loan, as approved by Mortgage Lender, (e) fund any working capital requirements of the Property, and (f) commence and complete the Conversion Work.

Section 2.2.    **Interest Rate**.

**2.2.1.    Interest Generally**.  Interest on the Outstanding Principal Balance shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate. Borrower shall pay to Lender on each Payment Date the interest accrued on the Loan for the preceding Interest Period.

**2.2.2.    Interest Calculation**.  Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance.

**2.2.3.    Determination of Interest Rate**.

(a)    The Applicable Interest Rate with respect to the Loan shall be a fixed rate of interest equal to ten percent (10%) per annum.

(b)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof (such non-excluded taxes being referred to collectively as "Foreign Taxes"), excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (including Puerto Rico).  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(c)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)    shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender;

- 26 -

(ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(c), Lender shall provide Borrower with not less than ninety (90) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.  This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(d)    Lender shall not be entitled to claim compensation pursuant to this Section 2.2.3 for any Foreign Taxes, increased cost or reduction in amounts received or receivable hereunder, or any reduced rate of return, which was incurred or which accrued more than ninety (90) days before the date Lender notified Borrower of the change in law or other circumstance on which such claim of compensation is based and delivered to Borrower a written statement setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.2.3, which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(e)    For purposes of this Section 2.2.3, the term "Lender" shall be deemed to include Lender's present and future participants in the Loan to the extent of the Foreign Taxes imposed by reason of such participant's interest in the Loan and each such participant's increased costs or reduction in amount received or receivable hereunder or any reduced rate of return, in each case payable by Borrower under this Section 2.2.3.

2.2.4.    **Additional Costs**.  Lender will use reasonable efforts (consistent with legal and regulatory restrictions) to avoid or reduce any increased or additional costs payable by Borrower under Section 2.2.3, including, if requested by Borrower, a transfer or assignment of the Loan to a branch, office or Affiliate of Lender in another jurisdiction, or a redesignation of its lending office with respect to the Loan, in order to avoid or reduce such increased or additional costs, provided that the transfer or assignment or redesignation (a) would not result in any additional costs, expenses or risk to Lender that are not reimbursed by Borrower and (b) would not be disadvantageous in any other material respect to Lender as determined by Lender in its reasonable discretion.

- 27 -

**2.2.5.**   **Default Rate**. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

**2.2.6.**   **Usury Savings**.   This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**2.2.7.**   **Interest Rate Cap Agreement**.

(a)     Prior to or contemporaneously with the Closing Date, Borrower shall cause Mortgage Borrower to enter into an Interest Rate Cap Agreement in a form and substance reasonably acceptable to Lender and in accordance with the terms and conditions of the Mortgage Loan Agreement.

(b)     Borrower shall cause Mortgage Borrower to comply with all of Mortgage Borrower's obligations under the terms and provisions of the Interest Rate Cap Agreement. All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Mortgage Borrower, or Mortgage Lender shall be deposited immediately into the Lockbox Account or if the Lockbox Account is not then required to be in effect, into such account as specified by Mortgage Lender. Borrower shall cause Mortgage Borrower to take all actions reasonably requested by Lender to enforce the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(c)     In the event (i) Borrower exercises an Extension Option, or (ii) Lender notifies Borrower in writing that the Counterparty no longer qualifies as an Acceptable Counterparty, Borrower shall cause Mortgage Borrower to replace (or supplement, as applicable), or shall cause the Counterparty to replace or supplement, the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with a LIBOR strike price equal to the applicable Strike Price (x) prior to or on the commencement date of the Extension Option with respect to the foregoing clause (i), which Replacement Interest Rate Cap Agreement shall extend the maturity date set forth in the Interest Rate Cap Agreement to the then applicable Extended Maturity Date, or (y) not later than thirty (30) days following receipt of notice from

- 28 -

Lender that the Counterparty no longer qualifies as an Acceptable Counterparty with respect to the foregoing clause (ii).

(d)     In connection with each Interest Rate Cap Agreement, Borrower shall, or shall cause Mortgage Borrower to, obtain and deliver to Lender an opinion from counsel (which counsel may be in-house counsel for the Counterparty) for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)     the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)     the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)     all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)     the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 2.3.     **Loan Payments.**

2.3.1.     **Interest Payments.**  Borrower shall simultaneously herewith make a payment to Lender of interest only in the amount of $136,365.63 for the period from the Closing Date through and including the next succeeding eighth (8th) day of a calendar month, whether such eighth (8th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the ninth day of a calendar month, in which case no such separate payment of interest shall be due).  Borrower shall pay to Lender on each Payment Date, commencing on April 9, 2005, the interest accrued on the Loan for the preceding Interest Period (the "Monthly Interest Payment").  The first interest accrual period hereunder shall commence on and include

- 29 -

the Closing Date and end on March 8, 2005. Each interest accrual period thereafter shall commence on the ninth (9th) day of each calendar month during the term of the Loan and shall end on and include the eighth (8th) day of the next occurring calendar month. With respect to payments of principal due on the Maturity Date, interest shall be payable at the Applicable Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding the Maturity Date.

### 2.3.2.    Principal Payments.

(a)    Subject to the terms and provisions of the Mortgage Loan Agreement, concurrently with the closing of the sale of each Unit at the Property, Borrower shall cause Mortgage Borrower to pay to Mortgage Lender an amount equal to the Required Release Price for such Unit, which amount shall be applied to reduce the outstanding principal balance of the Mortgage Loan in accordance with the terms of the Mortgage Loan Documents. In addition, if Mortgage Borrower is entitled to retain the escrow deposit or receives any other monies from a Contract Vendee of a Unit who defaults under its purchase agreement with respect thereto, the entire amount of all such deposits and other monies actually received by Mortgage Borrower shall be immediately remitted to Mortgage Lender and applied to the Outstanding Principal Balance.

(b)    If the Mortgage Loan has been fully paid, Borrower shall pay, or cause Mortgage Borrower to pay, to Lender all amounts that would otherwise be due to Mortgage Lender pursuant to Section 2.3.2(a) above, which amounts shall be applied to reduce the Outstanding Principal Balance, and the applicable Deferred Interest Fee; provided, however, that if such payment occurs on a day other than a Payment Date and the Loan has been included in a Securitization, Borrower shall also pay, or cause to be paid, to Lender interest at the Applicable Interest Rate (plus the applicable Deferred Interest Fee) on the amount so paid through, but not including, the next succeeding Payment Date.

(c)    If the Condominium Approval has not occurred prior to July 9, 2006 (the "Outside Condo Approval Date"), then Lender may, at its option, exercised in its sole discretion at any time thereafter by delivery of written notice to Borrower, declare the entire Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Pledge and the other Loan Documents to be due and payable in full on the date that is thirty (30) days following the date of said notice.

(d)    All payments of principal pursuant to this Section 2.3.2 shall be applied to the last payments of principal due under the Loan.

### 2.3.3.    Payment on Maturity Date. Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest, the Deferred Interest Fee and all other amounts due hereunder and under the Note, the Pledge and the other Loan Documents.

### 2.3.4.    Payment of Non-Approval Fees. If the Condominium Approval has not occurred on or before the First Condo Approval Date, then Borrower shall pay to Lender on the First Condo Approval Date, a fee in an amount equal to one-twelfth ($^1/_{12}$) of one percent of

- 30 -

the then Outstanding Principal Balance. If the Condominium Approval has not occurred on or before the Second Condo Approval Date, the Borrower shall pay to Lender on the Second Condo Approval Date, a fee in an amount equal to one-twelfth ($^1/_{12}$) of one percent of the then Outstanding Principal Balance. If the Condominium Approval has not occurred on or before the Third Condo Approval Date, then Borrower shall pay to Lender on the Third Condo Approval Date, a fee in an amount equal to one twelfth ($^1/_{12}$) of one percent of the then Outstanding Principal Balance. If the Condominium Approval has not occurred on or before the Fourth Condo Approval Date, then Borrower shall pay to Lender on the Fourth Condo Approval Date, a fee in an amount equal to one-half ($^1/_2$) of one percent (.5%) of the then Outstanding Principal Balance. On each 90-day anniversary of the Fourth Condo Approval Date (*i.e.*, quarterly thereafter), if the Condominium Approval has not occurred on or before each such date, Borrower shall pay to Lender on each such date, a fee in an amount equal to one-half (½) of one percent (.5%) of the then Outstanding Principal Balance on each of such dates. The fees paid to Lender pursuant to this Section 2.3.4 shall be deemed earned by Lender and shall be non-refundable and shall not be deemed to be in payment of the Outstanding Principal Balance.

2.3.5.    Late Payment Charge.  If any principal, interest or any other sums due under the Loan Documents, including the payment of principal due on the Maturity Date, is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum and (b) the maximum amount permitted by applicable law, in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such late payment charge shall be secured by the Pledge and the other Loan Documents to the extent permitted by applicable law.

2.3.6.    Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)    For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day.

(c)    All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

Section 2.4.    Prepayments.

2.4.1.    Voluntary Prepayments.  Borrower shall not be entitled to prepay the Outstanding Principle Balance in whole or in part, except pursuant to Section 2.3.2(b) and Section 2.4.2.

- 31 -

2.4.2. **Mandatory Prepayments**. On the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated to make such Net Proceeds available to Borrower for Restoration, Borrower shall prepay, or authorize Lender to apply Net Proceeds as a prepayment of, the Outstanding Principal Balance together with the applicable Deferred Interest Fee, in an amount equal to one hundred percent (100%) of such Net Proceeds, and if such prepayment occurs on any date other than a Payment Date, then if the Loan has been included in a Securitization, such prepayment shall include interest at the Applicable Interest Rate (plus the applicable Deferred Interest Fee) that would have accrued on such amounts through the next Payment Date. Any partial prepayment under this Section 2.4.2 shall be applied to the last payments of principal due under the Loan.

**Section 2.5.** **Release of Membership Interests**. Except as set forth in this Section 2.5, no repayment or prepayment of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Membership Interests.

2.5.1. **Release on Payment in Full**. Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, deliver to Borrower a release of the Pledge and any other security documents.

**Section 2.6.** **Cash Management**.

2.6.1. **Lockbox Account and Cash Management Account**: On or prior to the Closing Date, Borrower shall cause Mortgage Borrower and/or Manager, as applicable, (i) to establish and maintain the Lockbox Account, Cash Management Account and all other accounts and sub-accounts required under the Mortgage Loan Agreement, (ii) to deposit all amounts required under the terms of the Mortgage Loan Agreement to be deposited in such accounts, and (iii) to deliver all instructions and notices and take all action required with respect to such accounts, in each case in accordance with the terms and conditions of the Mortgage Loan Documents.

2.6.2. **Mezzanine Cash Management Account**.

(a) On or prior to the Closing Date, Borrower shall establish and maintain with the Mezzanine Cash Management Bank an account (the "Mezzanine Cash Management Account") for the collection of all Required Mezzanine Interest Reserve Payments, Excess Cash Flow and any other sums to be transferred to such account in accordance with the Mortgage Loan Agreement and this Agreement. The Mezzanine Cash Management Account shall be an Eligible Account established in the name of Lender. In connection with a Securitization, Lender shall have the right to cause the Mezzanine Cash Management Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Mezzanine Cash Management Account. The Mezzanine Cash Management Account shall be under the sole dominion and control of Lender (which may be exercised through Servicer). Lender (and its agents, including Servicer) shall have the sole right to make withdrawals from the Mezzanine Cash Management Account in accordance with the terms and conditions of this Agreement and the other Loan Documents. All costs and expenses

- 32 -

for establishing and maintaining the Mezzanine Cash Management Account (and any sub-account thereof) shall be at Borrower's sole cost and expense.

(b)    Lender shall establish the following sub-accounts (which may be ledger-entry sub-accounts) of the Mezzanine Cash Management Account, each in the name of Lender, into which funds on deposit in, or other financial assets credited to, the Cash Management Account shall be deposited, credited or otherwise allocated in accordance with the provisions of <u>Section 2.6.4</u>: the Interest Reserve Account into which Interest Reserve Funds shall be deposited under <u>Section 7.2</u>.

2.6.3.    **Accounts Generally.** (a) Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest or income earned on the Mezzanine Cash Management Account and any sub-account thereof. The Mezzanine Cash Management Account and any sub-account thereof shall be assigned the federal tax identification number of Borrower which is 20-2262077. Borrower shall provide Lender, at any time upon request of Lender, with a Form W-8 or W-9 to evidence that Borrower is not subject to any back-up withholding under the Code.

(b)    Without limiting the provisions of the Pledge, Borrower hereby grants to Lender a continuing, first priority security interest in the Mezzanine Cash Management Account, all sub-accounts thereof and all security entitlements, deposits and other financial assets at any time credited to or contained therein and the proceeds of the foregoing (as such terms are defined in Articles 8 and 9 of the UCC) to secure the full and timely payment and performance of the Debt and Other Obligations. Borrower will at its sole cost and expense take all actions necessary to maintain in favor of Lender a first priority perfected security interest in the Mezzanine Cash Management Account, including entering into an Acknowledgement Agreement with Mezzanine Cash Management Bank and filing (and Borrower hereby irrevocably authorizes Lender to file) UCC-1 financing statements and continuations thereof. Borrower will not in any way alter or modify the Mezzanine Cash Management Account. Borrower shall not, without obtaining the prior consent of Lender, further pledge, assign or grant any security interest the Mezzanine Cash Management Account, any sub-account thereof or any monies deposited therein or other financial assets credited thereto or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(c)    Lender may exercise in respect of the Mezzanine Cash Management Account or any or all of the sub-accounts thereof all rights and remedies available to Lender hereunder or under the other Loan Documents or otherwise available at law or in equity. The remedies provided in this Agreement, the Pledge and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

2.6.4.    **Application of Funds in the Mezzanine Cash Management Account.**

(a)    So long as the Mortgage Loan is outstanding, and provided no Event of Default has occurred and is continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day), Borrower shall cause Mortgage

- 33 -

Borrower to enforce the cash distribution priorities and procedures set forth in Section 2.6.4 of the Mortgage Loan Agreement.

(b)     On each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day), Borrower shall cause to be remitted to the Mezzanine Cash Management Account all Required Mezzanine Interest Reserve Payments and, if applicable, Excess Cash Flow. So long as the Loan is outstanding, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day), and provided no Event of Default has occurred and is continuing, Mezzanine Cash Management Bank shall transfer amounts from the Mezzanine Cash Management Account to make the following payments in the following order of priority:

(i)     First, payment to Lender of (or reimbursement of Lender for) any miscellaneous fees or expenses (including any "protective advances" made by Lender in respect of the Collateral) then due and payable pursuant to the terms of the Loan Documents, including the Deferred Interest Fee;

(ii)     Next, payment to Lender of the Monthly Interest Payment due on such Payment Date if and to the extent there are insufficient funds in the Interest Reserve Account with which to pay the same;

(iii)     Next, at Lender's election, payment to Lender of any deficiency determined by Lender in its sole but reasonable discretion in the amount on deposit in the Interest Reserve Account in accordance with the terms and conditions of Section 7.2.3 hereof;

(iv)     Lastly, payment to Lender of the Excess Cash Flow as a payment of principal under the Loan to be applied to the reduction of the Outstanding Principal Balance.

(c)     Provided no Event of Default shall have occurred and be continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) all Gross Sales Proceeds on deposit in the Mezzanine Cash Management Account shall be applied by Lender to the reduction of the Outstanding Principal Balance; provided that, in Lender's sole discretion, any Excess Sale Proceeds on deposit in the Cash Management Agreement may be applied by Lender to (i) the reduction of the Outstanding Principal Balance or (ii) any deficiency determined by Lender in its sole discretion in any of the items specified in Section 2.6.4(b) above.

(d)     In the event the Mortgage Loan is repaid in full, all sums on deposit in the Cash Management Account shall be transferred to the Mezzanine Cash Management Account and held and disbursed as otherwise provided herein and in the Mezzanine Cash Management Agreement. In addition, Borrower agrees that it shall, and shall cause Mortgage Borrower and Manager, as applicable, to establish a lockbox account on similar terms and conditions as the Lockbox Account, from which funds shall be transferred to the Mezzanine Cash Management Account on terms substantially similar to those contained in the Mortgage Loan Agreement.

- 34 -

(e)    The insufficiency of funds on deposit in the Mezzanine Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(f)    Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, all funds on deposit in the Mezzanine Cash Management Account following the occurrence of an Event of Default may be applied by Lender in such order and priority as Lender shall determine in its sole discretion.

Section 2.7.    **Extension of the Initial Maturity Date.**    Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for two successive terms (each, an "Extension Option") of one (1) year each (the Maturity Date following the exercise of each such option is hereinafter the "Extended Maturity Date") upon satisfaction of the following terms and conditions:

(a)    no Event of Default, and no circumstances that, with notice or the passage of time, or both, would become an Event of Default, shall have occurred and be continuing at the time the Extension Option is exercised and on the date on which the extension term commences;

(b)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than six (6) months, and no later than two (2) months, prior to (i) with respect to the first Extension Option, the Initial Maturity Date and (ii) with respect to the second Extension Option, the end of the first Extension Option;

(c)    If the Mortgage Loan has not been repaid in full, Borrower shall cause Mortgage Borrower to obtain and deliver to Mortgage Lender not later than five (5) Business Days prior to the first day of each Extension Option, one or more Replacement Interest Rate Cap Agreements from an Acceptable Counterparty together with the opinion of counsel required under Section 2.2.7(e) hereof, which Replacement Interest Rate Cap Agreement shall (i) be effective commencing on the first date of such Extension Option and, (ii) have a maturity date not earlier than the Extended Maturity Date;

(d)    on the Initial Maturity Date or the first Extended Maturity Date, as applicable, Borrower (i) shall deposit with Lender, in immediately available funds, sums sufficient in the estimation of Lender to replenish the Interest Reserve Account so that it covers estimated Debt Service until the Extended Maturity Date, and (ii) shall cause Mortgage Borrower to deposit with Mortgage Lender, in immediately available funds, sums sufficient in the estimation of Lender to replenish the "Interest Reserve Account" (as defined in the Mortgage Loan Agreement) so that it covers estimated "Debt Service" (as defined in the Mortgage Loan Agreement) and such other sums as are necessary to replenish any other reserve accounts in accordance with and as required by the terms and conditions of the Mortgage Loan Agreement;

(e)    Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender that there is sufficient capital available to Mortgage Borrower to pay for necessary Capital Expenditures;

- 35 -

(f)    In connection with each Extension Option Borrower shall have delivered to Lender together with its notice pursuant to subsection (b) of this Section 2.7 and as of the commencement of the applicable Extension Option, an Officer's Certificate in form acceptable to the Lender certifying that each of the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct in all material respects as of the date of such Officer's Certificate to the extent such representation and warranties are not matters which by their nature can no longer be true and correct as a result of the passage of time;

(g)    Mortgage Borrower shall (i) with respect to the initial Extension Option, as of the Initial Maturity Date, have closed sales of Units representing at least 50% of all Units, and (ii) with respect to the second Extension Option, as of the Extended Maturity Date for the first Extension Option, have closed sales of Units constituting 75% of all Units, and in each case such sales shall collectively have an average sales price of $1,450 per square foot and otherwise have been made in accordance with the terms and conditions of this Agreement and the Mortgage Loan Agreement;

(h)    With respect to (i) the initial Extension Option, the Loan-to-Value Ratio shall be 80% as of the Initial Maturity Date, and (ii) the second Extension Option, the Loan-to-Value Ratio shall be 65% as of the Extended Maturity Date. Solely for purposes of this Section 2.7(h), the denominator used for purposes of the Loan-to-Value Ratio shall be an amount equal to the net cash flow on a trailing twelve-month basis with respect to all unsold hotel rooms as of the date of determination (adjusted by Lender to reflect only those rooms that remain unsold), capitalized at a rate of 9.0%; and

(i)    In connection with each Extension Option, Borrower shall have delivered to Lender, together with its notice pursuant to subsection (b) of this Section 2.7, a non-refundable extension fee in an amount equal to (i) with respect to the first Extension Option, one-half of one percent (0.50%) of the Outstanding Principal Balance on the date of such notice and (ii) with respect to the second Extension Option, one-half of one percent (0.50%) of the Outstanding Principal Balance on the date of such notice.

Notwithstanding the foregoing, upon written request from Borrower, Lender may, in its sole and absolute discretion, agree to permit Borrower to exercise an Extension Option notwithstanding that one or more or the foregoing conditions is or has not been satisfied as and when required. Any such agreement by Lender shall be in writing and subject to the terms and conditions of the Loan Documents, including the Guaranty.

## ARTICLE III.
## CONDITIONS PRECEDENT

Section 3.1.    Conditions Precedent to Closing.  The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower, or waiver by Lender, of the following conditions precedent no later than the Closing Date:

3.1.1.    Representations and Warranties; Compliance with Conditions.  The representations and warranties of Borrower contained in this Agreement and the other Loan

- 36 -

Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default or Event of Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

**3.1.2.** <u>Loan Agreement and Note</u>. Lender shall have received a copy of this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

**3.1.3.** <u>Delivery of Loan Documents</u>.

(a)    <u>Loan Documents</u>.    Lender shall have received from Borrower fully executed and acknowledged counterparts of the Pledge and delivery of the Membership Interests so as to effectively create valid, enforceable and perfected Lien upon the Membership Interests, of the requisite priority, in favor of Lender. Lender shall have also received from Borrower fully executed counterparts of the other Loan Documents, including the Environmental Indemnity, Guaranty, the Assignment of Management Agreement and Subordination of Management Fees, the Instructions to Register Pledge in the form of <u>Exhibit C</u> hereto and the Confirmation of Mortgage Borrower in the form of <u>Exhibit D</u> hereto.

(b)    <u>Title Insurance</u>. Lender shall have received a Title Insurance Policy and a UCC Insurance Policy issued by a title company acceptable to Lender and dated as of the Closing Date, with reinsurance and direct access agreements acceptable to Lender. The Title Insurance Policy and UCC shall be assignable, to the extent permitted under applicable state law. Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy and UCC Insurance Policy have been paid.

(c)    <u>Survey</u>. Lender shall have received a current Survey, certified to the Title Company and Lender and their respective successors and assigns, in form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the Accuracy Standards for ALTA/ACSM Land Title Surveys as adopted by ALTA, American Congress on Surveying & Mapping and National Society of Professional Surveyors in 1999. The Survey shall reflect the same legal description contained in the Title Insurance Policy and shall include, among other things, metes and bounds descriptions of the real property comprising part of the Property reasonably satisfactory to Lender. The surveyor's seal shall be affixed to the Survey and the surveyor shall provide a certification for the Survey in form and substance acceptable to Lender.

(d)    <u>Insurance</u>. Lender shall have received valid certificates of insurance for the Policies required hereunder, satisfactory to Lender in its sole discretion, and evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)    <u>Environmental Reports</u>.    Lender shall have received a Phase I environmental report (and, if recommended by the Phase I environmental report, a Phase II environmental report) in respect of the Property, satisfactory in form and substance to Lender.

(f)    <u>Zoning</u>.    Lender shall have received, at Lender's option, either (i) (A) letters or other evidence with respect to the Property from the appropriate municipal

- 37 -

authorities (or other Persons) concerning applicable zoning and building laws, or (B) an ALTA 3.1 zoning endorsement for the Title Insurance Policy, or (ii) a zoning opinion letter, in each case in substance reasonably satisfactory to Lender and indicating that the Property is zoned for the Intended Use.

(g)    Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first priority Lien as of the Closing Date with respect to all of the Collateral, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(h)    Public Record Searches.  Lender shall have received UCC, bankruptcy, judgment lien, pending litigation, bankruptcy and state and federal tax lien public record searches for Mortgage Borrower, Borrower, Principal, Manager and Guarantor reasonably satisfactory to Lender.

**3.1.4.    Related Documents.**    Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

**3.1.5.    Delivery of Organizational Documents.**

(a)    Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower and/or its formation, structure, existence, good standing and/or qualification to do business, as Lender may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.

(b)    Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Mortgage Borrower, Principal, Guarantor, and other members and/or partners of Borrower, and/or the formation, structure, existence, good standing and/or qualifications to do business of any of the foregoing, as Lender may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, authorizing resolutions and incumbency certificates as may be requested by Lender.

(c)    Borrower shall deliver or cause to be delivered to Lender evidence reasonably satisfactory to Lender that Manager is validly formed and in good standing in its State of formation and is qualified to do business in the State of Florida.

**3.1.6.    Opinions of Borrower's Counsel.**  Lender shall have received opinions from Borrower's counsel with respect to non-consolidation and the due execution, authority, enforceability of the Loan Documents, perfection of security interests and such other matters as Lender may require, including the opinions required under Section 2.2.7(e) hereof, all such

- 38 -

opinions in form, scope and substance satisfactory to Lender and Lender's counsel in their sole discretion.

**3.1.7.  Budgets.**  Borrower shall have delivered, and Lender shall have approved, the Annual Budget for the current Fiscal Year.

**3.1.8.  Basic Carrying Costs.**  Borrower shall have caused Mortgage Borrower to pay all Basic Carrying Costs relating to the Properties which are in arrears, including (a) accrued but unpaid Insurance Premiums, (b) currently due Taxes (including any in arrears), and (c) currently due Other Charges (including any in arrears), which amounts shall be funded with proceeds of the Loan.

**3.1.9.  Completion of Proceedings.**  All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and the other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Lender, and Lender shall have received all such counterpart originals or certified copies of such documents as Lender may reasonably request.

**3.1.10.  Payments; Commitment Fee.**  All payments, deposits or escrows required to be made or established by Mortgage Borrower or Borrower under this Agreement, the Mortgage Loan Documents, the Note and the other Loan Documents on or before the Closing Date shall have been paid, including payment by Borrower to Lender of the Commitment Fee (or any remaining balance thereof).

**3.1.11.  Tenant Estoppels.**  Lender shall have received an executed tenant estoppel letter, which shall be in form and substance satisfactory to Lender, from each commercial tenant in the Improvements as of the Closing Date.

**3.1.12.  Transaction Costs.**  Borrower shall have paid or reimbursed Lender for all title insurance premiums, recording and filing fees, costs of environmental reports, Physical Conditions Reports, appraisals and other reports, the fees and costs of Lender's counsel and all other third party out-of-pocket expenses incurred in connection with the origination of the Loan.

**3.1.13.  Material Adverse Change.**  There shall have been no material adverse change in the financial condition or business condition of Mortgage Borrower, Borrower, Principal, Guarantor or the Property since the date of the most recent financial statements delivered to Lender. The income and expenses of the Property, the occupancy thereof, and all other features of the transaction shall be as represented to Lender without material adverse change. None of Mortgage Borrower, Borrower, Principal or any of their respective constituent Persons shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

**3.1.14.  Leases and Rent Roll.**  Lender shall have received copies of all Leases and certified copies of any Leases as requested by Lender. Lender shall have received a current certified rent roll of the Property, reasonably satisfactory in form and substance to Lender.

**3.1.15.**  [Intentionally Omitted.]

NY\992308.9

**3.1.16.  Tax Lot.**  Lender shall have received evidence that the Property constitutes one (1) or more separate tax lots, which evidence shall be satisfactory in form and substance to Lender.

**3.1.17.  Physical Conditions Report.**  Lender shall have received a Physical Conditions Report, which report shall be satisfactory in form and substance to Lender.

**3.1.18.  Management Agreement.**  Lender shall have received a copy of the Management Agreement, which shall be satisfactory in form and substance to Lender.  The base fee (the "Base Management Fee") payable to the Manager shall not exceed three percent (3%) of Gross Income from Operations per annum.  The Management Agreement shall also provide that all of Manager's rights under the Management Agreement, other than payment to Manager of the Base Management Fee, are subordinate to the Loan Documents and the rights of Lender.

**3.1.19.  Appraisal.**  Lender shall have received an appraisal of the Property, which shall be satisfactory in form and substance to Lender.

**3.1.20.  Construction Documents.**  To the extent obtained by Mortgage Borrower prior to the Closing Date, Borrower shall deliver or cause to be delivered to Lender copies, certified by Borrower as being true, correct and complete, of all plans and specifications, architectural and engineering agreements, construction contracts and other material agreements entered into or to be entered into by Mortgage Borrower in connection with the Conversion Work.

**3.1.21.  Condominium Documents.**  To the extent obtained by Mortgage Borrower prior to the Closing Date, Borrower shall deliver or cause to be delivered to Lender copies, certified by Borrower as being true, correct and complete, of the proposed Offering Plan for the sale of Units (with all exhibits required by Legal Requirements) and all other Condominium Documents.  Notwithstanding the foregoing, on or prior to the Closing Date, Borrower shall deliver or cause to be delivered to Lender a copy of the Rental Management Agreement, certified by Borrower as being true, correct and complete.

**3.1.22.  Acquisition.**  Mortgage Borrower shall have acquired good and marketable fee simple title to the Property subject to no Liens other than "Permitted Encumbrances" (as defined in the Mortgage Loan Agreement).

**3.1.23.  Mortgage Loan Documents.**  Lender shall have received and approved all Mortgage Loan Documents and the Intercreditor Agreement and the Mortgage Loan shall have been contemporaneously funded with the Loan..

**3.1.24.  Equity Contribution.**  Mortgage Borrower shall have received a cash equity contribution from Borrower, Guarantor or Principal in the amount of at least Fifteen Million, Two Hundred Seventy-Eight Thousand, Six Hundred Forty-Six and No/100 Dollars ($15,278,646.00).

**3.1.25.  Further Documents.**  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may

- 40 -

have reasonably requested including the Loan Documents in form and substance satisfactory to Lender and its counsel.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES

Section 4.1.   **Borrower Representations**. Borrower represents and warrants as of the date hereof and as of the Closing Date that:

**4.1.1.**   **Organization**. Each of Mortgage Borrower and Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged.  Each of Mortgage Borrower and Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Each of Mortgage Borrower and Borrower possess all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership of the Membership Interests in Mortgage Borrower, and the sole business of Mortgage Borrower is the ownership, management and operation of the Property.   The ownership interests of Borrower are as set forth on the organizational chart attached hereto as Schedule IV.

**4.1.2.**   **Proceedings**. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**4.1.3.**   **No Conflicts**.   The execution, delivery and performance of this Agreement and the other Loan Documents by Mortgage Borrower, Borrower, Principal and/or Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any such Governmental Authority required for the execution, delivery and performance by Mortgage Borrower, Borrower, Principal and/or Guarantor, as applicable, of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

- 41 -

**4.1.4.    Litigation**.  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened against or affecting Mortgage Borrower, Borrower, Principal, Guarantor the Property or the Collateral, which actions, suits or proceedings, if determined against Mortgage Borrower, Borrower, Principal, Guarantor, the Property or the Collateral, might materially adversely affect the condition (financial or otherwise) or business of Mortgage Borrower, Borrower, Principal, Guarantor or the condition or ownership of the Property or the Collateral.

**4.1.5.    Agreements**.  Attached hereto as Schedule V is a true, correct and complete list of each agreement or instrument to which Mortgage Borrower or Borrower is a party or by which Mortgage Borrower or Borrower or the Property is bound.  Borrower has delivered, or caused to be delivered, to Lender a true, correct and complete copy of each agreement or instrument specified on Schedule V.  Neither Mortgage Borrower nor Borrower is a party to any agreement or instrument or subject to any restriction that might materially and adversely affect Mortgage Borrower, Borrower or the Property, Mortgage Borrower's or Borrower's business, properties or assets, operations or condition, financial or otherwise.  Neither Mortgage Borrower nor Borrower is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Mortgage Borrower or Borrower or the Property are bound.  Neither Mortgage Borrower nor Borrower has any material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Mortgage Borrower or Borrower, respectively, is a party or by which Mortgage Borrower or Borrower or the Property is otherwise bound, other than (a) any obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (u) of the definition of "Special Purpose Entity" set forth in Section 1.1 hereof, (b) the obligations under the Mortgage Loan Documents and (c) the obligations under the Loan Documents.

**4.1.6.    Title**.  Borrower has good title to its properties and assets, including the Membership Interests, in each case free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  Mortgage Borrower has by book entry registered the Membership Interests in the name of the registered pledgee on or before February 17, 2005.  No other pledge is currently registered on the books and records of Mortgage Borrower with respect to the Membership Interests.  The Pledge and the other Loan Documents, upon filing of UCC financing statement in the applicable jurisdiction and/or delivery into possession of the Lender any certificated interest, create and constitute valid and perfected Liens on the Collateral.  Mortgage Borrower has good, marketable and insurable fee simple title to the Property, free and clear of all Liens whatsoever except the "Permitted Encumbrances" (as defined in the Mortgage Loan Agreement).  The "Permitted Encumbrances" permitted under the Mortgage Loan Documents in the aggregate do not materially and adversely affect the value, operation or use of the Property (as currently used) or Mortgage Borrower's ability to fulfill its obligations under the Mortgage Loan Documents.  Mortgage Borrower has paid in full for, and is the owner of, all FF&E (other than the equipment listed on Schedule VI attached to the Mortgage Loan Agreement which is subject to equipment financing incurred in the ordinary course of operation of the Property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except Permitted Encumbrances.

### 4.1.7. Solvency.

(a)     Borrower has (a) not entered into the transaction contemplated by this Agreement or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).

(b)     Mortgage Borrower has (a) not entered into the transaction contemplated by the Mortgage Loan Agreement or executed any other Mortgage Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Mortgage Loan Documents. Giving effect to the Mortgage Loan, the fair saleable value of Mortgage Borrower's assets exceeds and will, immediately following the making of the Mortgage Loan, exceed Mortgage Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Mortgage Borrower's assets is and will, immediately following the making of the Mortgage Loan, be greater than Mortgage Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Mortgage Borrower's assets do not and, immediately following the making of the Mortgage Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Mortgage Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Mortgage Borrower and the amounts to be payable on or in respect of the obligations of Mortgage Borrower).

(c)     No petition in bankruptcy has been filed against Mortgage Borrower, Borrower, Principal, or Guarantor, except as indicated in writing to Lender prior to the date hereof, and none of Mortgage Borrower, Borrower, Principal, or Guarantor, except as indicated to Lender in writing prior to the date hereof, has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. None of Mortgage Borrower, Borrower, Principal, or Guarantor are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of their respective assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Mortgage Borrower, Borrower, Principal, or Guarantor.

**4.1.8.    Full and Accurate Disclosure**. No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents or in the Provided Information contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Mortgage Borrower or Borrower.

**4.1.9.    No Plan Assets**. Neither Borrower nor Mortgage Borrower is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Mortgage Borrower or Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (a) Neither Mortgage Borrower nor Borrower is a "governmental plan" within the meaning of Section 3(32) of ERISA, and (b) transactions by or with Mortgage Borrower or Borrower are not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

**4.1.10.    Compliance**. Mortgage Borrower, Borrower and, except as shown in the Title Insurance Policy, the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including building and zoning ordinances and codes. Neither Borrower nor Mortgage Borrower is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Mortgage Borrower or Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Mortgage Borrower's obligations under any of the Mortgage Loan Documents or Borrower's obligations under any of the Loan Documents. The Property may be used for the Intended Use under applicable Legal Requirements (including building and zoning ordinances and codes), subject only to obtaining Condominium Approval.

**4.1.11.    Financial Information**. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan (with respect to Mortgage Borrower, Borrower, the Property or otherwise) (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Mortgage Borrower, Borrower, and the Property as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP as modified by the Uniform System of Accounts (or such other accounting basis acceptable to Lender) throughout the periods covered, except as disclosed therein. Except for "Permitted Encumbrances" (as defined in the Mortgage Loan Agreement) (in the case of Mortgage Borrower) and Permitted Encumbrances (in the case of Borrower), Neither Mortgage Borrower nor Borrower has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on Mortgage Borrower, Borrower or the Property or the operation thereof as a hotel and as a hotel condominium, except as referred to or reflected in said financial statements. Since the

- 44 -

date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Mortgage Borrower, Borrower or the Property from that set forth in said financial statements.

      **4.1.12.** <u>**Condemnation**</u>. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

      **4.1.13.** <u>**Federal Reserve Regulations**</u>. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

      **4.1.14.** <u>**Utilities and Public Access**</u>. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

      **4.1.15.** <u>**Not a Foreign Person**</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

      **4.1.16.** <u>**Separate Lots**</u>. The Property is comprised of one (1) or more parcels, each of which constitutes a separate tax lot or lots and none of which constitutes a portion of any other tax lot not a part of the Property.

      **4.1.17.** <u>**Assessments**</u>. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to Borrower's knowledge, are there any contemplated improvements to the Property that may result in such special or other assessments.

      **4.1.18.** <u>**Enforceability**</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Mortgage Borrower, Borrower, Principal or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and Mortgage Borrower, Borrower, Principal and Guarantor have not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

<div align="center">- 45 -</div>

4.1.19. **Mortgage Loan Representations**.  All of the representations and warranties contained in the Mortgage Loan Documents are hereby incorporated by reference herein and are deemed made hereunder as and when made thereunder.

4.1.20. **Insurance**.  Borrower has obtained and has delivered to Lender certified copies of all Policies, with all premiums paid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any such Policies, and no Person, including Mortgage Borrower and Borrower, has done, by act or omission, anything which would impair the coverage of any such Policies.

4.1.21. **Use of Property**.  As of the Closing Date, the Property is used exclusively for hotel and other permitted and/or accessory uses (including retail use).

4.1.22. **Certificate of Occupancy; Licenses**.  As of the Closing Date, all certifications, permits, licenses and approvals, including certificates of use, certificates of completion and occupancy permits required for the legal use, occupancy and/or operation of the Property for retail and hotel purposes with appurtenant amenities (collectively, the "Licenses"), have been obtained and are in full force and effect.  Borrower shall, or shall cause Mortgage Borrower to, keep and maintain all Licenses necessary for the operation of the Property as a hotel.  The current use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

4.1.23. **Flood Zone**.  None of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to Section 6.1(a)(i) hereof is in full force and effect with respect to the Property.

4.1.24. **Physical Condition**.  Except as set forth in the Physical Conditions Report, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, is in good condition, order and repair in all material respects.  Except as set forth in the Physical Conditions Report, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Neither Mortgage Borrower nor Borrower has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

4.1.25. **Boundaries**.  Except as shown on the Survey, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy.

- 46 -

**4.1.26.    Leases**.  The Property is not subject to any Leases other than the Leases described in <u>Schedule II</u> attached hereto and made a part hereof.  Mortgage Borrower is the owner and holder of landlord's interest in the Leases.  No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases.  The current Leases are in full force and effect, there are no defaults thereunder by Mortgage Borrower, and to Borrower's knowledge, there are no defaults thereunder by any tenant and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder.  The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto.  No Rent (excluding security deposits) has been paid more than one (1) month in advance of its due date.  All work be performed by Mortgage Borrower under each Lease has been performed as required in such Lease and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Mortgage Borrower to any tenant has already been received by such tenant.  There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is still in effect.  To Borrower's knowledge, no tenant listed on <u>Schedule II</u> has assigned its Lease or sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises.  Except for a right of first offer that tenants may have in connection with the conversion of the Property to a condominium, no tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part.  No tenant under any Lease has any right or option for additional space in the Improvements.  The expiration date of each Lease is as set forth on Schedule II attached hereto.

**4.1.27.    Survey**.  The Survey for the Property delivered to Lender in connection with this Agreement has been prepared in accordance with the provisions of <u>Section 3.1.3(c)</u> hereof, and does not fail to reflect any material matter affecting the Property or the title thereto.

**4.1.28.    Principal Place of Business; State of Organization**.  Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  Borrower is organized under the laws of the State of Delaware.  Mortgage Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of the Mortgage Loan Agreement.  Mortgage Borrower is organized under the laws of the State of Delaware.

**4.1.29.    Filing and Recording Taxes**.    All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Mortgage Borrower have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Pledge, have been paid or are being paid simultaneously herewith, and the Pledge and the other Loan Documents have been validly executed and delivered and are enforceable in accordance with their respective terms by Lender (or any subsequent holder thereof), subject to principles of

- 47 -

equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.

### 4.1.30. Special Purpose Entity/Separateness.

(a)    Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that (i) Mortgage Borrower is, shall be and shall continue to be a Special Purpose Entity, (ii) Borrower is, shall be and shall continue to be a Special Purpose Entity, and (ii) Principal is, shall be and shall continue to be a Special Purpose Entity.

(b)    The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)    All of the assumptions made in the Insolvency Opinion, including, but not limited to, any exhibits attached thereto, are true and correct in all respects and any assumptions made in any subsequent non-consolidation opinion required to be delivered in connection with the Loan Documents (an "Additional Insolvency Opinion"), including, but not limited to, any exhibits attached thereto, will have been and shall be true and correct in all respects. Each of Mortgage Borrower and Borrower has complied and will comply with, and Principal has complied and Borrower will cause Principal to comply with, all of the assumptions made with respect to Mortgage Borrower, Borrower and Principal in the Insolvency Opinion. Each of Mortgage Borrower and Borrower will have complied and will comply with, and Principal has complied and Borrower will cause Principal to comply with, all of the assumptions made with respect to Mortgage Borrower, Borrower and Principal in any Additional Insolvency Opinion. Each entity other than Mortgage Borrower, Borrower and Principal with respect to which an assumption shall be made in the Insolvency Opinion or any Additional Insolvency Opinion will have complied and will comply with all of the assumptions made with respect to it in the Insolvency Opinion or any Additional Insolvency Opinion.

### 4.1.31.  Management Agreement. The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

### 4.1.32.  Illegal Activity. No portion of the Property or the Membership Interests has been or will be purchased or acquired with proceeds of any illegal activity.

### 4.1.33.  No Change in Facts or Circumstances; Disclosure. All information submitted by Borrower to Lender, including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof, and all statements of fact made by Borrower in this Agreement or in any other Loan Document are accurate, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or the business operations and/or the financial condition of Borrower. Borrower has disclosed to Lender all material facts and has not failed to

- 48 -

disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

4.1.34.  <u>Investment Company Act</u>.  Neither Mortgage Borrower nor Borrower is (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.35.  <u>Embargoed Person</u>.  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Mortgage Borrower, Borrower, Principal or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the Patriot Act), and any Executive Orders or regulations promulgated under any such United States laws, with the result that the investment in Mortgage Borrower, Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law (each, an "<u>Embargoed Person</u>") or the Loan made by Lender is or would be in violation of law; (b) no Embargoed Person shall have any interest of any nature whatsoever in Mortgage Borrower, Borrower, Principal or Guarantor, as applicable, with the result that the investment in Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law; and (c) none of the funds of Mortgage Borrower, Borrower, Principal or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Mortgage Borrower, Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law.

4.1.36.  <u>Cash Management Account</u>.

(a)  This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the Uniform Commercial Code of the State of New York in the Mezzanine Cash Management Account in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Mezzanine Cash Management Account;

(b)  The Mezzanine Cash Management Account constitutes a "deposit account" within the meaning of the Uniform Commercial Code of the State of New York;

(c)  Pursuant and subject to the terms hereof, the Mezzanine Cash Management Bank has agreed to comply with all instructions originated by Lender, without

- 49 -

further consent by Borrower, directing disposition of the Mezzanine Cash Management Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

(d)    The Mezzanine Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.

**4.1.37.    Individual Units; Gross Square Feet.**  The Property contains not less than 160,321 hotel rooms, which, in the aggregate, comprise not less than 417 gross saleable square feet.  The portion of the Property which will be subject to the Condominium Declaration contains not less than 160 hotel rooms, which, in the aggregate, comprise not less than 85,165 gross saleable square feet.

**4.1.38.    Labor Matters.**  Each of Mortgage Borrower and Borrower have no employees.  No organized work stoppage or labor strike is pending or threatened by employees or other laborers at the Property and none of Mortgage Borrower, Borrower or Manager (a) is involved in or threatened with any labor dispute, grievance or litigation relating to labor matters involving any employees and other laborers at the Property, including violation of any federal, state or local labor, safety or employment laws (domestic or foreign) and/or charges of unfair labor practices or discrimination complaints; (b) has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or the Railway Labor Act; or (c) is a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and other laborers at the Property (except as set forth on Schedule VII of the Mortgage Loan Agreement) and no such agreement or contract is currently being negotiated by Mortgage Borrower, Borrower, Manager or any of their Affiliates.

**4.1.39.    Mortgage Taxes.**  Borrower represents that Mortgage Borrower has paid all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Mortgage.

**Section 4.2.    Survival of Representations.**  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 hereof and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

<div align="center">

ARTICLE V.
BORROWER COVENANTS

</div>

**Section 5.1.    Affirmative Covenants.**  From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Pledge (and all related obligations) in accordance with the terms of this

<div align="center">- 50 -</div>

Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

        **5.1.1.**    **Existence; Compliance with Legal Requirements.**  Borrower shall, and shall cause Mortgage Borrower to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to Mortgage Borrower, Borrower and the Property. There shall never be committed by Mortgage Borrower or Borrower, and Mortgage Borrower and Borrower shall not permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government or any state or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall, and shall cause Mortgage Borrower to, at all times maintain, preserve and protect all franchises and trade names, preserve all the remainder of its property used or useful in the conduct of its business, and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage. Borrower shall, or shall cause Mortgage Borrower to, keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement. Borrower shall cause Mortgage Borrower to operate the Property in accordance with the terms and provisions of the O&M Agreement in all material respects. After prior written notice to Lender, Borrower may permit Mortgage Borrower, at its own expense, to contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Mortgage Borrower or the Property or any alleged violation of any Legal Requirement, provided that (a) no Default or Event of Default has occurred and remains uncured; (b) Mortgage Borrower is permitted to do so under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Mortgage Borrower shall, upon final determination thereof, promptly comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Mortgage Borrower and the Property; and (g) Borrower shall, or shall cause Mortgage Borrower to, furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

- 51 -

**5.1.2.    Taxes and Other Charges.**  Borrower shall, or shall cause Mortgage Borrower to, pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable; provided, however, Borrower's obligation to pay or cause Mortgage Borrower to pay Taxes shall be suspended for so long as Mortgage Borrower complies with the terms and provisions of Section 7.2 of the Mortgage Loan Agreement and Borrower's obligation to pay or cause Mortgage Borrower to pay Assessments shall be suspended for so long as Mortgage Borrower complies with the terms and provisions of Section 7.4 Mortgage Loan Agreement.  Borrower will, or will cause Mortgage Borrower to, deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid.  Borrower shall, or shall cause Mortgage Borrower to, furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent provided, however, that Borrower is not required to furnish or cause Mortgage Borrower to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 7.2 of the Mortgage Loan Agreement and Borrower is not required to furnish or cause Mortgage Borrower to furnish such receipts for payment of Assessments in the event that such Assessments have been paid by Mortgage Lender pursuant to Section 7.4 of the Mortgage Loan Agreement.  Neither Mortgage Borrower nor Borrower shall suffer and Borrower shall, or shall cause Mortgage Borrower to, promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property and that is prohibited in accordance with Section 5.2.2 hereof, and shall promptly pay for all utility services provided to the Property.  After prior written notice to Lender, Borrower may permit Mortgage Borrower, at its own expense, to contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (a) no Default or Event of Default has occurred and remains uncured; (b) Mortgage Borrower is permitted to contest same under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall, or shall cause Mortgage Borrower to, promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (g) Borrower shall, or shall cause Mortgage Borrower to, furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

- 52 -

**5.1.3.    Litigation.** Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Mortgage Borrower, Borrower, Principal and/or Guarantor which might materially adversely affect Mortgage Borrower's, Borrower's, Principal's or Guarantor's condition (financial or otherwise) or business or the Property.

**5.1.4.    Access to Property.** Borrower shall, and shall cause Mortgage Borrower to, permit agents, representatives and employees of Lender to inspect the Property or any part thereof, subject to the rights of tenants, at reasonable hours upon reasonable advance notice (which may be given verbally).

**5.1.5.    Notice of Default.** Borrower shall promptly advise Lender in writing of any material adverse change in Mortgage Borrower's, Borrower's, Principal's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**5.1.6.    Cooperate in Legal Proceedings.** Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**5.1.7.    Performance of Material Contracts.** Borrower shall, and shall cause Mortgage Borrower to, observe and perform in all material respects, the terms of all Material Contracts to be observed and performed by Mortgage Borrower and/or Borrower pursuant to the terms of such Material Contracts, and Borrower shall, and shall cause Mortgage Borrower to, exercise all commercially reasonable efforts to preserve and enforce all of Mortgage Borrower's and/or Borrower's rights and remedies under such Material Contracts.

**5.1.8.    Award and Insurance Benefits.** Borrower shall, and shall cause Mortgage Borrower to, cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Mortgage Borrower or Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

**5.1.9.    Further Assurances.** Borrower shall, and shall cause Mortgage Borrower to, at Mortgage Borrower's, and/or Borrower's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished (or caused to be furnished) by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

- 53 -

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts as are necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

**5.1.10.    Licenses.**    After the Closing Date, Borrower shall, and shall cause Mortgage Borrower to, not permit any certificate of use applicable to the Property to expire without the renewal thereof and shall diligently take all actions as may be necessary to obtain, maintain in effect and renew, as required, all Licenses necessary for the operation and occupancy of the Property for its Intended Use.

**5.1.11.    Financial Reporting.**

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP, as modified by the Uniform System of Accounts (or such other accounting basis reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Mortgage Borrower, Borrower and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice (which may be verbal) to examine such books, records and accounts at the office of Mortgage Borrower, Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay, or shall cause to be paid, any costs and expenses incurred by Lender to examine Mortgage Borrower's and/or Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    within ten (10) days after the end of each calendar month, a monthly operating statement for the Property showing the results of operations of the Property for both the applicable calendar month and the prior trailing 12-month period, and including the Revenues, Operating Expenses, Gross Income from Operations, Net Operating Income and Net Cash Flow (before and after Debt Service) and capital improvements for such month and the prior trailing 12-month period together with an Officer Certificate which certifies that such statements are true, correct and complete in all material respects and fairly present the matters referred to therein;

(c)    within ten (10) days after the end of each calendar month, a revenue report, an occupancy report including the occupancy percentage, an average daily room rate and Revenues per available room for the applicable month and an advance booking report, together with an Officer Certificate which certifies that such reports are true, correct and complete in all material respects and fairly present the matters referred to therein;

- 54 -

(d)      within ten (10) days after the end of each calendar month, a monthly Smith Travel Research STR Report (or other industry standard equivalent publication acceptable to Lender); provided, that Borrower shall not be in default hereunder if Smith Travel Research fails to timely deliver such report to Mortgage Borrower so long as Mortgage Borrower continues its subscription to such report and Borrower or Mortgage Borrower delivers same to Lender within seven (7) days after receipt thereof by Mortgage Borrower;

(e)      within ten (10) days after the end of each calendar month, a monthly comparison of the budgeted total income and total expenses to the actual total income and total expenses for the subject quarter (or month, as applicable), with a reasonably detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts (on an aggregate basis for each major category of expense), together with an Officer Certificate which certifies that such reports are true, correct and complete in all material respects and fairly present the matters referred to therein;

(f)      within ninety (90) days after the close of each Fiscal Year of Mortgage Borrower, an annual comparison of the budgeted total income and total expenses to the actual total income and total expenses for such Fiscal Year, prepared by a Responsible Officer of Mortgage Borrower, with a reasonably detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts (on an aggregate basis for each major category of expense), together with an Officer Certificate which certifies that such reports are true, correct and complete in all material respects and fairly present the matters referred to therein; provided, however, that if and for so long as Lender determines that as a result of the then existing Loan-to-Value Ratio, the Loan should be reported based on the equity method, Borrower agrees that the ninety (90) day period in this Section 5.1.11(f) shall be shortened to a seventy-five (75) day period; and

(g)      Borrower will furnish, or cause to be furnished, to Lender quarterly, within thirty-five (35) days following the end of each fiscal quarter of Mortgage Borrower (i) a quarterly update to the Conversion Work Budget and Schedule (it being understood that any changes to the Conversion Work Budget and Schedule shall be subject to Lender's approval to the extent provided in Section 5.1.23(c) of the Mortgage Loan Agreement), accompanied by an Officer's Certificate stating that the same is true, correct, accurate and complete and which must reflect all change orders, and if any such update includes changes to the Conversion Work Schedule.

(h)      (A)      Borrower will furnish, or cause to be furnished, to Lender annually, within 90 days following the end of each Fiscal Year of Guarantor, the annual statement of financial position and the statements of income and retained earnings and of changes in financial position of Guarantor, prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) and audited by a "Big Four" accounting firm or other independent certified public accountant approved by Lender, and accompanied by a certification from an authorized officer of Guarantor certifying that each such statement presents fairly the financial condition of Guarantor, which statement shall be in such form and contain such detail as Lender may reasonably require; provided, however, that if and for so long as Lender determines that as a result of the then existing Loan-to-Value Ratio, the Loan should be reported based on

- 55 -

the equity method, Borrower agrees that the ninety (90) day period in this Section 5.1.11(h)(A) shall be shortened to a seventy-five (75) day period.

(B)    Borrower will furnish, or cause to be furnished, to Lender quarterly, within thirty-five (35) days following the end of each fiscal quarter of Guarantor, unaudited quarterly statements of financial position and the unaudited quarterly statements of income and retained earnings and of changes in financial position for each of the first three fiscal quarters, and showing year-to-date results, of Guarantor, prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) and accompanied by a certification from an authorized officer of such Guarantor certifying that such statements present fairly the financial condition of such Guarantor, which statements shall be in such form and contain such detail as Lender may reasonably require, including a certification that Guarantor satisfies the "Net Worth" test set forth in Section 8.1(a)(xxvii).

(C)    Borrower will furnish, or cause to be furnished, to Lender the annual federal tax returns of Mortgage Borrower, Borrower and Guarantor, certified by an authorized officer of Mortgage Borrower, Borrower or Guarantor, as applicable, which tax returns shall be delivered to Lender no later than 10 days after their respective timely filings (provided that nothing herein shall prohibit each such entity from legally seeking extensions of the filing deadlines with respect to such tax returns). The tax returns required to be delivered under this <u>Section 5.1.11(h)(C)</u> shall include the Forms K-1 distributed to Mortgage Borrowers, Borrower's or Guarantor's respective partners or members, as applicable.

(D)    Notwithstanding the provisions of this Section 5.1.11(h) and Section 5.1.11(i) below, financial statements of each of Guy T. Mitchell and Geoffrey L. Hockman that are required to be delivered to Lender pursuant to such Sections are not required to be audited.

(i)    Borrower will furnish, or cause to be furnished, to Lender annually, within ninety (90) days following the end of each Fiscal Year of Mortgage Borrower, a complete copy of Mortgage Borrower's, Borrower's and Guarantor's annual financial statements audited by a "Big-Four" accounting firm or other independent certified public accountant reasonably acceptable to Lender in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Mortgage Borrower, Borrower, Guarantor and the Property and a balance sheet for Mortgage Borrower, Borrower and Guarantor. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Net Cash Flow, Net Operating Income, Gross Income from Operations and Operating Expenses. Mortgage Borrower's, Borrower's and Guarantor's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year, (ii) an unqualified opinion of a "Big-Four" accounting firm or other independent certified public accountant reasonably acceptable to Lender, (iii) INTENTIONALLY OMITTED, (iv) a breakdown showing the year in which each Lease then in effect expires and the percentage of total floor area of the Improvements and the percentage of base rent with respect to which Leases shall expire in each

- 56 -

such year, each such percentage to be expressed on both a per year and cumulative basis, (v) a schedule audited by such independent certified public accountant reconciling Net Operating Income to Net Cash Flow (the "Net Cash Flow Schedule"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by such independent certified public accountant, and (vi) an Officer's Certificate certifying that each annual financial statement presents fairly the financial condition and the results of operations of Mortgage Borrower, Borrower, Guarantor and the Property being reported upon and that such financial statements have been prepared in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender) and as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Mortgage Borrower, Borrower or Guarantor, and if such Default or an Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(j)    Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month and on or before forty-five (45) days after the end of each calendar quarter, the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Mortgage Borrower, Borrower and the Property (subject to normal year-end adjustments) as applicable:

(i)    a rent roll for the subject month (or quarter, as applicable);

(ii)    monthly (or quarterly, as applicable) and year-to-date operating statements (including Capital Expenditures) prepared for each calendar month (or quarter, as applicable), noting Net Operating Income, Gross Income from Operations, and Operating Expenses, and, upon Lender's request, other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such period, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender;

(iii)    a Net Cash Flow Schedule; and

(iv)    a monthly and year to date sales report with respect to the sale of Units at the Property reflecting (A) all such Units under contract for sale, the gross sales price thereof, the amount of the deposit thereunder, and the Minimum Release Price therefor, and (B) all Units for which a sale has closed, the Gross Sales Proceeds, Sale Expenses and Excess Sales Proceeds thereof and the amount of the release consideration paid to Lender with respect thereto, and (C) any and all terminations of any Approved Sales Contracts, including the reason for such termination, the amount of the deposit thereunder and whether the deposit was retained by Mortgage Borrower or returned to the Contract Vendee.

In addition, such Officer's Certificate shall also state that the representations and warranties of Borrower set forth in Section 4.1.30 are true and correct as of the date of such certificate and that there are no trade payables outstanding for more than sixty (60) days.

(k)     For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit, or cause to be submitted, to Lender an Annual Budget not later than sixty (60) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's reasonable approval (each such Annual Budget approved by Lender being referred to herein as an "Approved Annual Budget").  In the event that Lender objects to a proposed Annual Budget submitted (or caused to be submitted) by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise or cause to be revised such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise or cause to be revised the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget that requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses.

(l)     Borrower shall promptly deliver or cause to be delivered to Lender a copy of any budget received by Borrower from any owner's association or condominium association established under the Condominium Documents.

(m)     Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).  Borrower agrees that Lender may disclose information regarding the Property, Mortgage Borrower and Borrower that is provided to Lender pursuant to this Section 5.1.11 in connection with the Securitization to such parties requesting such information in connection with such Securitization.

5.1.12.    **Business and Operations**.  Borrower will, and will cause Mortgage Borrower to, continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Each of Mortgage Borrower and Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

5.1.13.    **Title to the Collateral and Property**.  Borrower will warrant and defend (a) the title to the Collateral and (b) the validity and priority of the Lien of the Pledge, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case

- 58 -

against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Collateral, other than as permitted hereunder, is claimed by another Person. In addition, Borrower will cause Mortgage Borrower to warrant and defend the title to the Property and every part thereof, subject only to Liens permitted under the Mortgage Loan Agreement (including Permitted Encumbrances).

**5.1.14.    Costs of Enforcement.** In the event (a) that the Pledge is foreclosed in whole or in part or that the Pledge is put into the hands of an attorney for collection, suit, action or foreclosure, or (b) of the foreclosure of any pledge prior to or subsequent to the Pledge in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Mortgage Borrower, Borrower or any of their constituent Persons or an assignment by Mortgage Borrower or Borrower or any of their constituent Persons for the benefit of their creditors, Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

**5.1.15.    Estoppel Statements.**

(a)    After request by Lender from time to time, Borrower shall within ten (10) days furnish or caused to be furnished Lender with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan, (ii) the Outstanding Principal Balance, (iii) the Applicable Interest Rate, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment or performance of the Obligations, if any, (vi) that the Note, this Agreement, the Pledge and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified or if modified, giving particulars of such modification, (vii) each of the items set forth in clauses (i) through (vi) above as it relates to the Mortgage Loan and (viii) such other matters as Lender may reasonably request. Any prospective purchaser of any interest in a Loan or any direct or indirect interests in Borrower shall be permitted to rely on such certificates upon consummation of such purchase.

(b)    Borrower shall request and use all commercially reasonable efforts to deliver or cause to be delivered to Lender, within ten (10) Business Days after any request by Lender, tenant estoppel certificates from each commercial tenant leasing space at the Property in form and substance reasonably satisfactory to Lender; provided that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

(c)    Borrower shall request and use all commercially reasonable efforts to deliver or cause to be delivered to Lender, within ten (10) Business Days after any request by Lender, estoppel certificates from the condominium association under any Condominium Documents then in effect; provided that such certificates may be in the form required under the Condominium Documents, and provided, further that Borrower shall not be required to deliver such certificates more frequently than once per calendar year (or twice during any calendar year in which a Securitization occurs).

- 59 -

(d)    Borrower shall request, and shall use reasonable efforts to deliver or cause to be delivered, within ten (10) Business Days following written request by Lender, an estoppel certificate from Manager stating that (i) the Management Agreement is in full force and effect and has not been modified, amended or assigned, (ii) neither Manager nor, to Manager's knowledge, Mortgage Borrower is in default under any of the terms, covenants or provisions of the Management Agreement and Manager knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Management Agreement, (iii) neither Manager nor, to Manager's knowledge, Mortgage Borrower has commenced any action or given or received any notice for the purpose of terminating the Management Agreement and (iv) all sums due and payable to Manager under the Management Agreement have been paid in full.

**5.1.16.    Loan Proceeds.**  Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4 hereof.

**5.1.17.    Performance by Borrower.**  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior consent of Lender.

**5.1.18.    Confirmation of Representations.**  Borrower shall deliver, in connection with any Securitization, (a) one or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower and Principal as of the date of the Securitization.

**5.1.19.    No Joint Assessment.**  Borrower shall not, and shall cause Mortgage Borrower to not, suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

**5.1.20.    Leasing Matters.**  Without Lender's prior written consent, except as provided in Section 5.1.23, Borrower shall not, and shall cause Mortgage Borrower to not, cancel, terminate (except, in the case of any residential lease, in the event of a tenant's material default thereunder), abridge or materially modify the terms of any Lease, renew or extend the term of any Lease, enter into a new Lease, or (when landlord consent is required pursuant to the terms of such Lease) permit the assignment of any Lease. Upon request, Borrower shall furnish, or cause to be furnished, to Lender executed copies of all Leases. All renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates. All proposed Leases shall be on commercially reasonable terms and shall not contain any terms that would materially affect Lender's rights under the Loan Documents. Borrower shall ensure that Mortgage Borrower (a) shall observe and perform the obligations imposed upon the landlord

- 60 -

under the Leases in a commercially reasonable manner; (b) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed in a commercially reasonable manner and in a manner not to impair the value of the Property involved; (c) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (d) shall not execute any other assignment of landlord's interest in the Leases or the Rents (except as contemplated by the Loan Documents); and (e) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding the foregoing, Borrower agrees to cause Mortgage Borrower to cause the termination of (i) the undated Lease between Town Park Hotel Corporation, as agent for RDP Royal Palm Hotel Limited Partnership ("RDP"), and Precious Gift Shops, Inc., such termination to be effective on or before July 1, 2005 and (ii) the Sublease Agreement dated June 22, 2000 between RDP and Quik Park of Florida, Inc., such termination to be effective on or before April 1, 2005; further, failure to terminate such leases in accordance with the provisions of the foregoing sentence shall be an Event of Default.

      **5.1.21.  Alterations.**  Except for alterations to the Improvements in connection with the Conversion Work as approved by Lender and performed in accordance with Section 7.3 of the Mortgage Loan Agreement, Lender's prior written approval shall be required in connection with any alterations to any Improvements. Notwithstanding the foregoing, Lender's consent shall not be required in connection with any alterations that will not have a material adverse effect on Mortgage Borrower's or Borrower's financial condition, the value of the Property, the Collateral or the Net Operating Income, provided that such alterations are either (a) performed in connection with Restoration after the occurrence of a Casualty in accordance with the terms and provisions of this Agreement or (b) are not part of the Conversion Work, do not adversely affect any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, and do not have an aggregate cost in excess of One Hundred Thousand and 00/100 Dollars ($100,000) (the "Threshold Amount"). If the total unpaid amounts due and payable with respect to alterations to the Improvements at the Property shall at any time exceed the Threshold Amount, Mortgage Borrower promptly shall deliver or cause to be delivered to Mortgage Lender as security for the payment of such amounts and as additional security for Mortgage Borrower's obligations under the Mortgage Loan Documents any of the following: (i) cash, (ii) U.S. Obligations, (iii) other securities having a rating acceptable to Mortgage Lender and that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned to any Securities or any class thereof in connection with any Securitization, or (iv) a completion and performance bond or an irrevocable letter of credit (payable on sight draft only) issued by a financial institution (A) having a rating by S&P of not less than "A-1+" if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Mortgage Lender, and (B) that the applicable Rating Agencies have confirmed in writing will not, in and of itself, result in a downgrade, withdrawal or qualification of the initial, or, if higher, then current ratings assigned to any Securities or any class thereof in connection with any Securitization. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to alterations to the Improvements on the Property over the Threshold Amount and Mortgage

- 61 -

Lender may apply such security from time to time at the option of Mortgage Lender to pay for such alterations.

### 5.1.22. Operation of Property.

(a)    Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement or Replacement Management Agreement, as applicable. In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly cause Mortgage Borrower to enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable. Notwithstanding the foregoing, Borrower may allow Mortgage Borrower to terminate the Management Agreement or any Replacement Management Agreement without entering into a Replacement Management Agreement, and Lender shall consent to such termination, if management of the Property shall be provided thereafter by a master association pursuant to the Master Association Documents and/or by one or more condominium associations pursuant to the Condominium Documents.

(b)    Borrower shall, or shall cause Mortgage Borrower to: (i) promptly perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Management Agreement; and (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner.

### 5.1.23. Condominium Conversion.
Borrower shall cause Mortgage Borrower to conduct and complete the Condominium Conversion in accordance with the terms and conditions of the Mortgage Loan Agreement, and Lender shall have the right to approve all aspects of the Condominium Conversion (and all matters related thereto) and receive similar assurances (e.g. opinions of counsel, endorsements to Title Insurance Policies) or other deliverables to the same extent that Mortgage Lender may do so or be entitled to under the Mortgage Loan Agreement.

### 5.1.24. Matters Concerning Associations and Condominiums.

(a)    Borrower shall ensure that neither Mortgage Borrower nor its designees on the board of directors (a "Board") of any condominium association established under any Condominium Documents shall consent to any amendment, modification or supplement to or termination of any Condominium Documents (including the Rental Management Agreement), without the prior written consent of Lender.

- 62 -

(b)    Unless and to the extent that Mortgage Borrower is lawfully excused from the obligation to pay Assessments and similar charges attributable to any of the Property owned by Mortgage Borrower or sufficient funds have been deposited with Mortgage Lender for such purpose pursuant to Section 7.4 of the Mortgage Loan Agreement, Borrower shall pay or caused to be paid timely all Assessments levied against the portion of the Property then owned by Mortgage Borrower pursuant to any Condominium Documents as the same shall become due and payable.

(c)    Borrower will cause Mortgage Borrower to comply in all respects with all of the terms, covenants and conditions on Mortgage Borrower's part to be complied with pursuant to the Condominium Documents and any rules and regulations that may be adopted pursuant thereto, as the same shall be in force and effect from time to time. Without limiting the foregoing, Borrower shall cause Mortgage Borrower to promptly pay all Operating Expenses when the same become due and payable with respect to the Units for which title is held by Mortgage Borrower. Borrower shall promptly notify Lender of the imposition of any special assessments levied or assessed under the Condominium Documents. Borrower shall furnish to Lender such information and such other evidence as Lender may reasonably request from time to time concerning Mortgage Borrower's due observance, performance and compliance with the terms, covenants and provisions of the Condominium Documents, including evidence that such common charges and special assessments have been so paid or are not then delinquent with respect to the Units for which title is held by Mortgage Borrower.

(d)    Borrower shall cause Mortgage Borrower to take all actions as may be necessary from time to time to preserve and maintain the Property and for the sale or solicitation of the Units and any rental program offered to purchasers or prospective purchasers of the Units in accordance with the securities and condominium laws of the State of Florida and the rules and regulations pertaining thereto.

(e)    Borrower shall not, without the prior written consent of Lender, permit Mortgage Borrower to take any action to terminate any condominium property regime of all or any portion of the Property, withdraw all or any portion of the Property from the condominium laws of the State of Florida and the rules and regulations pertaining thereto, or cause a partition of any portion of the Property.

(f)    Borrower shall not permit Mortgage Borrower, without the prior written consent of Lender, except as expressly provided in the Mortgage Loan Documents, to exercise any right it may have to vote for (i) the expenditure of Insurance Proceeds or Condemnation Proceeds for the Restoration of all or any portion of the Property, (ii) any additions or improvements to the common elements of the Condominium, except to the extent such additions or improvements are required by law or are contemplated under Section 7.3 hereof, or (iii) any borrowing on behalf of the master association or any condominium association established under any Master Association Documents or any Condominium Documents.

(g)    Borrower shall seek Lender's review and obtain Lender's prior written approval, such approval not to be unreasonably withheld or delayed, of Mortgage Borrower's agreement (as evidenced by the actions of Mortgage Borrower's designees on any Board or by any vote of Mortgage Borrower in its capacity as the developer of the Condominium or as a Unit

- 63 -

owner) to any engagement of or change of managing agent and any amendment to the management agreement for the operation of the Property or any part thereof, as well as the original and any revision of any operating and/or capital budgets (provided that any manager of the Property approved by Lender shall be deemed to be approved for this purpose). Lender shall have the right to receive notice of and attend all meetings of any Board.

(h)     Borrower shall cause Mortgage Borrower to obtain comprehensive all risk insurance (A) in an amount equal to one hundred percent (100%) of the "Unit Full Replacement Cost", which for purposes of this Agreement shall mean, with respect to any Units owned by Mortgage Borrower, actual replacement value of the improvements, betterments and personal property located in such Units; (B) containing an agreed amount endorsement with respect to the improvements, betterments and personal property at the Units waiving all co-insurance provisions; and (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000.00) for all such insurance coverage.

(i)     Borrower shall promptly send to Lender a copy of (i) any notice received or sent by Mortgage Borrower alleging any default by Mortgage Borrower or any other Person under, or noncompliance with, any of the Condominium Documents and, in the case of any such default or alleged default by Mortgage Borrower, do all such acts and undertake all reasonable such steps and institute all such proceedings as shall be reasonably necessary to cure or avert such default and (ii) any responses, demands or further notice received or sent by Borrower in regard to any of the foregoing matters. Borrower shall promptly notify Lender in writing of the initiation of any litigation, arbitration or other proceeding affecting Mortgage Borrower or the Property under or in connection with the Condominium Documents and shall enforce its rights under the Condominium Documents.

(j)     Borrower shall cause Mortgage Borrower to attend each duly called meeting or special meeting of the owners of the Units, and shall cause its representatives on any board of the Condominium to attend each duly called meeting or special meeting of such board, required in order to avoid Mortgage Borrower's absence therefrom or such representative's absence therefrom to be deemed consent to any proposals put forth at such meeting in accordance with the Condominium Documents.

5.1.25.   **Sales of Units**.

(a)     Borrower shall cause Mortgage Borrower to comply with the terms and conditions of Section 5.1.25 of the Mortgage Loan Agreement relating to the sale of Units within the Condominium, and Lender shall have the right to approve all aspects of the sale of Units to the same extent that Mortgage Lender may do so under to the Mortgage Loan Agreement; provided, however, that Lender shall have no right to approve the sales price of any Unit if the sales price for such unit is not less than the greater of (i) $1,450 per gross square foot or (ii) $612,000 per room.

5.1.26.   **Conversion Work**.  Notwithstanding anything contained in this Agreement to the contrary, Borrower shall cause Mortgage Borrower to commence the Conversion Work promptly after the Closing Date and thereafter to proceed with all due

- 64 -

diligence and continuity to complete the Conversion Work pursuant to the terms and conditions of the Mortgage Loan Agreement.

### 5.1.27. Sales Agency.

(a)    Prior to the Condominium Conversion, Borrower shall cause Mortgage Borrower to enter into, and promptly thereafter forward to Lender a copy of, a Sales Agency Agreement, which Sales Agency Agreement shall comply with the terms and conditions of the Mortgage Loan Agreement and otherwise be satisfactory in form and substance to Lender.

(b)    Borrower shall cause Mortgage Borrower to: (i) promptly perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Sales Agency Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Sales Agency Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each business plan received by it under the Sales Agency Agreement; and (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the Sales Agent under the Sales Agency Agreement in a commercially reasonable manner.

Section 5.2.    **Negative Covenants.**    From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, and will cause Mortgage Borrower not to do, directly or indirectly, any of the following:

### 5.2.1. Operation of Property.

(a)    Mortgage Borrower shall not, without Lender's prior consent (which consent shall not be unreasonably withheld): (i) subject to Sections 5.1.22 and 9.5 hereof, surrender, terminate or cancel the Management Agreement; provided, that Mortgage Borrower may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges or fees under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

(b)    Following the occurrence and during the continuance of an Event of Default, Mortgage Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior consent of Lender, which consent may be withheld in Lender's sole discretion.

### 5.2.2. Liens. Borrower shall not, and shall not permit Mortgage Borrower to, create, incur, assume or suffer to exist (i) any Lien on any portion of the Collateral except Permitted Encumbrances, and (ii) any Lien on the Property other than "Permitted Encumbrances" (as defined in the Mortgage Loan Agreement).

**5.2.3.    Dissolution**. Borrower shall not, and shall cause Mortgage Borrower to not: (a) engage in any dissolution, liquidation, consolidation or merger with or into any other business entity, (b) engage in any business activity not related to (i) in the case of Mortgage Borrower, the ownership and operation of the Property, and (ii) in the case of Borrower, the ownership of the Membership Interests, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Mortgage Borrower or Borrower except to the extent permitted by the Loan Documents, (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, or (e) cause Principal to (i) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which Principal would be dissolved, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the certificate of incorporation or bylaws of Principal, in each case, without obtaining the prior written consent of Lender.

**5.2.4.    Change in Business**. Borrower shall not, and shall cause Mortgage Borrower to not, enter into any line of business other than (i) in the case of Mortgage Borrower, the ownership and operation of the Property, and (ii) in the case of Borrower, the ownership of the Membership Interests, or make any material change in the scope or nature of their respective business objectives, purposes or operations, or undertake or participate in activities other than the continuance of their respective present business.

**5.2.5.    Debt Cancellation**. Borrower shall not, and shall cause Mortgage Borrower to not, cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Mortgage Borrower or Borrower, as applicable, by any Person, except for adequate consideration and in the ordinary course of Mortgage Borrower's or Borrower's business, as applicable.

**5.2.6.    Zoning**. Borrower shall not, and shall cause Mortgage Borrower to not, initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior written consent of Lender.

**5.2.7.    No Joint Assessment**. Borrower shall not, and shall cause Mortgage Borrower to not, suffer, permit or initiate the joint assessment of all or any portion of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.2.8.    Principal Place of Business and Organization**. Borrower shall not, and shall cause Mortgage Borrower to not, change its principal place of business set forth in the introductory paragraph of this Agreement or the Mortgage Loan Documents without first giving Lender at least thirty (30) days prior notice. Borrower shall not, and shall cause Mortgage Borrower to not, change the place of its organization as set forth in Section 4.1.28 hereof or the Mortgage Loan Agreement without the prior written consent of Lender, which consent shall not

- 66 -

be unreasonably withheld. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments that may be necessary to effectively evidence or perfect Lender's security interest in the Collateral as a result of such change of principal place of business or place of organization.

### 5.2.9.   ERISA.

(a)      Borrower shall not engage in any transaction that would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)      Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one or more of the following circumstances is true:

> (A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

> (B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

> (C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

### 5.2.10.   Transfers.

(a)      Borrower acknowledges that Lender has examined and relied on the experience of Mortgage Borrower, Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Mortgage Borrower's ownership of the Property as a means of maintaining the value of the Membership Interests and other Collateral as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Collateral so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Collateral.

(b)      Without the prior written consent of Lender and except for Permitted Encumbrances and to the extent otherwise set forth in this Section 5.2.10, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or

NY\992308.9

indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or the Membership Interests or any part thereof or any legal or beneficial interest therein, or (ii) permit a Sale or Pledge of an interest in all or any portion of the Property, the Membership Interests or in any Restricted Party (collectively, a "Transfer"), other than (x) pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 5.1.20 hereof, (y) the disposition of Equipment and other Personal Property pursuant to the replacement thereof or otherwise in the ordinary course of the operation of the Property, and (z) the approved sale of Units in accordance with the terms and provisions of this Agreement, including Section 5.1.25 hereof.

(c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Mortgage Borrower agrees to sell the Property or Borrower agrees to sell the Membership Interests, or any part thereof, for a price to be paid in installments; (ii) an agreement by Mortgage Borrower leasing all or substantially all of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent (including an Affiliated Manager) other than in accordance with Section 5.1.22 hereof.

(d)     Notwithstanding the provisions of this Section 5.2.10, the sale or transfer, in one or a series of transactions, of an interest in a Restricted Party other than Mortgage Borrower or Borrower shall not be deemed to be a Transfer provided that: (i) Borrower shall provide Lender with at least thirty (30) days written notice of any Transfer in such Restricted Party; (ii) if any Person that, as of the date hereof, directly or indirectly owns less than 49% of Mortgage Borrower or Borrower acquires, in one or a series of transactions, 49% or more of the direct or indirect interests of Mortgage Borrower or Borrower, a non-consolidation opinion and the prior approval of the Rating Agencies shall be required in connection therewith; and (iii) at all times, (x) Robert D. Falor and Guy T. Mitchell must continue to control Mortgage Borrower, Borrower, Principal and any Affiliated Manager (y) Robert D. Falor, Jennifer Falor, Guy T. Mitchell and Geoffrey L. Hockman must own, directly or indirectly, at least a twenty five percent (25%) common equity interest based on the balance of each member's capital account in Mortgage Borrower, Borrower, Principal and any Affiliated Manager and (z) Robert D. Falor

- 68 -

and Jennifer Falor must own, directly or indirectly, at least a five percent (5%) common equity interest based on the balance of each member's capital account in Mortgage Borrower, Borrower, Principal and any Affiliated Manager.

(e)    Notwithstanding the provisions of this <u>Section 5.2.10</u>, the following transfers shall not be deemed to be a Transfer: (i) the sale or transfer, in one or a series of transactions, of not more than twenty-five percent (25%) of the stock in a Restricted Party; provided, however, no such sales or transfers shall result in the change of voting control in such Restricted Party (other than Mortgage Borrower), and as a condition to each such sale or transfer, Lender shall receive not less than thirty (30) days prior notice of such proposed sale or transfer, and (ii) the sale or transfer, in one or a series of transactions, of not more than twenty-five percent (25%) of the limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party (other than Mortgage Borrower); provided, however, no such sales or transfers shall result in the change of voting control in such Restricted Party, and as a condition to each such sale or transfer, Lender shall receive not less than thirty (30) days prior notice of such proposed sale or transfer. In addition, at all times, (x) Robert D. Falor and Guy T. Mitchell must continue to control Mortgage Borrower, Borrower, Guarantor, Principal and any Affiliated Manager and own, directly or indirectly at least a fifty percent (50%) common equity interest in Mortgage Borrower, Borrower, Principal and any Affiliated Manager and (y) Robert D. Falor must own, directly or indirectly, at least a five percent (5%) common equity interest in Borrower, Principal and any Affiliated Manger.

(f)    At Lender's election, in its sole discretion, Lender may consent to a Transfer (other than a Transfer made in accordance with the foregoing <u>Section 5.2.10(d)</u>) upon:

(i)    a modification of the terms hereof and of the Note, the Pledge or the other Loan Documents (or the execution of additional security documents) to, among other things, reflect the substitution of the proposed transferee as the Borrower, the implementation of a new Mezzanine Cash Management Account and other similar factual matters associated with the Transfer;

(ii)    an assumption of this Agreement, the Note, the Pledge and the other Loan Documents as so modified by the proposed transferee, subject to the provisions of <u>Section 9.4</u> hereof;

(iii)    payment of all of fees and expenses incurred in connection with such Transfer, including the cost of any third party reports, legal fees and expenses, Rating Agency fees and expenses or required legal opinions;

(iv)    the payment to Lender of a non-refundable $5,000 application fee;

(v)    the payment to Lender of an assumption fee equal to one percent (1%) of the Outstanding Principal Balance;

(vi)    the delivery of a new non-consolidation opinion regarding the proposed Transfer satisfactory in form and substance to Lender;

- 69 -

(vii)    the proposed transferee's continued compliance with the representations and covenants set forth in Section 4.1.30 and Section 5.2.9 hereof;

(viii)    the delivery of evidence satisfactory to Lender that the single purpose nature and bankruptcy remoteness of each of Mortgage Borrower and Borrower, its shareholders, partners or members, as the case may be, following such Transfers are in accordance with the then current standards of Lender and the Rating Agencies;

(ix)    the delivery to Lender of evidence reasonably satisfactory to Lender that management of the Property shall be provided by a Qualified Manager pursuant to the Management Agreement or a Replacement Management Agreement;

(x)    prior to any release of any Guarantor, a substitute guarantor reasonably acceptable to Lender shall have assumed the Guaranty or have executed replacement guaranties reasonably satisfactory to Lender;

(xi)    the delivery to Lender of opinions regarding the due formation, valid existence and good standing of the proposed transferee, authorization, execution, delivery and enforceability of the assumption documents and the Loan Documents as modified, perfection of Lender's security interest in the new Mezzanine Cash Management Account and such other matters as are reasonably and customarily required by Lender in similar transactions, all in form and substance reasonably satisfactory to Lender;

(xii)    the delivery to Lender of an endorsement to each Title Insurance Policy and UCC Insurance Policy insuring against intervening liens by reason of modification and assumption of the Pledge and insuring that title to the Property is vested in the proposed transferee;

(xiii)    if required by Lender and if the Loan has been Securitized, confirmation in writing from the Rating Agencies to the effect that such Transfer will not result in a re-qualification, reduction or withdrawal of the then current rating assigned to the Securities or any class thereof in any applicable Securitization; and

(xiv)    such other conditions as Lender shall determine in its reasonable discretion to be in the interest of Lender, including the creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the Membership Interests.

(g)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Lender's consent. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

(h)    Sale of Personal Property and FF&E. Notwithstanding anything contained herein to the contrary, Mortgage Borrower may Transfer Personal Property and FF&E which is being replaced with Personal Property or FF&E, as applicable, of at least equal value and utility, or which is obsolete and no longer necessary in connection with the operation of the Property

- 70 -

free from the Lien of the Security Instrument; provided, that (a) any new or replacement Personal Property and FF&E acquired by Mortgage Borrower shall be subject to the Lien of such Security Instrument and (b) either (i) such replacement or Transfer is made in the ordinary course of the management and operation of the Property and, if an Event of Default then exists, the Personal Property or FF&E being Transferred has a value of less than $1,000,000 or (ii) Borrower otherwise obtains Lender's prior consent thereto, which consent shall not be unreasonably withheld.

5.2.11.   **Filing of Declaration of Condominium**.   Mortgage Borrower shall not record any Condominium Document until such time that all of the following conditions have been satisfied:   (i) Borrower shall have delivered or caused to be delivered to Lender in accordance with Section 5.1.25(vi) hereof fully executed Approved Sales Contracts (which shall not be subject to a statutory or other right of rescission and under which any and all financing and other contingencies have expired, except for the contingency relating to recordation of the (Condominium Declaration) covering at least twenty percent (20%) of the aggregate Units; (ii) no default shall have occurred and remain outstanding with respect to any of such Approved Sales Contracts; (iii) all such Approved Sales Contract shall be in full force and effect; (iv) each of the deposits required to be made in connection with such Approved Sales Contracts shall have been delivered to escrow agent in accordance with Section 5.1.25(vii), such deposits shall become non-refundable to the Contract Vendee upon the recordation of the Condominium Documents and such deposits shall then be held by the escrow agent in accordance with Section 5.1.25(e); and (v) Borrower shall have received Lender's prior written approval to the filing of such Condominium Document, which approval shall not be unreasonably withheld, conditioned or delayed.

5.2.12.   **No Amendments**.   Borrower shall not, without Lender's prior written consent (which Lender shall not unreasonably withhold), amend, modify or terminate, or permit the amendment, modification or termination of the limited liability company agreement, limited partnership agreement, certificate of incorporation/articles of incorporation and by-laws, or other corporate documents of Mortgage Borrower, Borrower, Principal or Guarantor.

5.2.13.   **No Modification**.   (a) Borrower shall not enter into, or amend, modify, terminate or supplement, any Conversion Plans and Specifications without the consent of Lender.

(b)      Upon execution, Borrower shall deliver or cause to be delivered to Lender a certified copy of any Conversion Plans and Specifications or any amendment or modification of or supplement to any Conversion Plans and Specifications.

(c)      Without the consent of Lender in each case, Borrower shall not, and shall cause Mortgage Borrower to not, amend, modify or supplement, or permit or suffer any amendment or modification of or supplement to, the Conversion Work Budget and Schedule.

(d)      Without the consent of Lender in each case (which consent shall not be unreasonably withheld, conditioned or delayed), Borrower shall cause Mortgage Borrower to not amend, modify or supplement, or permit or suffer any amendment or modification of or supplement to, the Rental Management Agreement.  Borrower shall cause Mortgage Borrower to

- 71 -

not, and to cause the operator of the rental management program with respect to the Condominium to not, enter into a rental management agreement with an owner of a Unit other than on the terms and conditions contained in Rental Management Agreement. Borrower shall cause Mortgage Borrower to implement all modifications and amendments to the Rental Management Agreement that Lender may require in its reasonable discretion.

<div align="center">

ARTICLE VI.
INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

</div>

Section 6.1.    <u>Insurance</u>.

(a)    Borrower shall at all times obtain and maintain, or cause to be maintained, with respect to Mortgage Borrower and the Property, the policies of insurance required pursuant to Section 6.1 of the Mortgage Loan Agreement, regardless of whether the Mortgage Loan is outstanding and/or the Mortgage Loan Agreement has terminated.

(b)    Borrower shall obtain and maintain, or cause to be maintained, at all times for the mutual benefit of Mortgage Borrower, Borrower and Lender, the following policies of insurance with respect to Mortgage Borrower and Borrower:

(i)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million and No/100 Dollars ($2,000,000) in the aggregate and One Million and No/100 Dollars ($1,000,000) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; (C) to contain no deductible, and (D) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 8 of the Mortgage to the extent the same is available;

(ii)    if the Property includes commercial property, worker's compensation insurance with respect to any employees of Mortgage Borrower and Borrower, as required by any Governmental Authority or Legal Requirement;

(iii)    umbrella liability insurance in an amount not less than Fifty Million and No/100 Dollars ($50,000,000.00) per occurrence and Fifty Million and No/100 Dollars ($50,000,000.00) annual aggregate on terms consistent with the commercial general liability insurance policy required under <u>subsection (ii)</u> above;

(iv)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000.00);

<div align="center">

- 72 -

</div>

(v)    upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(c)    All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or in the singular, the "Policy"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "AAA" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies rating the Securities (one of which must be S&P if S&P is rating the Securities, and one of which must be Moody's if Moody's is rating the Securities), or if only one Rating Agency is rating the Securities, then only by such Rating Agency. The Policies described in Section 6.1(a) (including those required by the Mortgage Loan Agreement, but other than those strictly limited to liability protection) shall designate Mortgage Lender as mortgagee and loss payee and Lender as additional named insured. In addition, all Policies shall contain an endorsement providing that neither Borrower nor Lender nor any other party shall be a co-insurer under said Policies, shall contain a waiver of subrogation against Lender. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums"), shall be delivered by Borrower to Lender. Within thirty (30) days after Lender's request, Borrower shall deliver to Lender certified copies of all Policies then in effect (including all endorsements thereto since inception of such Policies).

(d)    Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).

(e)    All Policies provided for or contemplated by Section 6.1(a) (including those required by the Mortgage Loan Agreement), except for the Policy referenced in Section 6.1(a)(ii), shall name Mortgage Borrower or Borrower as the insured and Lender (and its affiliates) as the additional insured.

(f)    All Policies provided for in Section 6.1 shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Mortgage Borrower, Borrower, or anyone acting for Mortgage Borrower, Borrower, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

- 73 -

(ii)    the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' written notice to Lender and any other party named therein as an additional insured;

(iii)    the issuers thereof shall give written notice to Lender if the Policies have not been renewed fifteen (15) days prior to its expiration; and

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(g)    If at any time Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Pledge and shall bear interest at the Default Rate.

Section 6.2.    **Casualty and Condemnation**. Borrower shall provide, or cause to be provided, prompt notice to Lender of any Casualty or Condemnation, and Lender shall have the right to approve all restoration and repair work to the same extent as the Mortgage Lender under the Mortgage Loan Documents. In the event of any Casualty or Condemnation in respect of which the Mortgage Lender applies Net Proceeds toward the prepayment of the Mortgage Loan, all excess Net Proceeds remaining after the Mortgage Loan has been repaid in accordance with Section 2.4.2 of the Mortgage Loan Agreement shall be applied toward prepayment of the Loan in accordance with Section 2.4.2 herein and shall be accompanied by the amount of interest theretofore accrued but unpaid in respect of the principal amount so prepaid, plus the amount of interest which would have accrued on the principal amount so prepaid had it remained outstanding through the end of the Interest Period in which such prepayment is made. In the event the Mortgage Loan is paid in full, the provisions of Sections 6.2 through 6.4 of the Mortgage Loan Agreement as in effect on the date hereof shall apply herein and Mortgage Borrower shall have the same obligations to Lender and Lender shall have the same rights, including but not limited to, with respect to Net Proceeds, claims adjustments and the restoration of the Property, as provided therein to Mortgage Lender. Borrower shall, and shall cause Mortgage Borrower to, cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property to which Lender is entitled pursuant to the provisions of this Section 6.2 hereof, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds or Awards, as the case may be.

## ARTICLE VII.
## RESERVE FUNDS

Section 7.1.    **Mortgage Loan Reserves**. Notwithstanding, and without limitation to, any other provisions of this Agreement, Borrower shall cause Mortgage Borrower to comply

- 74 -

with all of the terms and conditions of Article VII of the Mortgage Loan Agreement and any other provisions of the Mortgage Loan Documents relating to the establishment and maintenance of "Reserve Funds" (as defined in the Mortgage Loan Agreement).

Section 7.2.    **Interest Reserve.**

7.2.1.    **Deposit of Interest Reserve Funds.** On the Closing Date, Borrower shall deposit with Lender the amount of One Million, Eight Hundred Twenty-Five Thousand and No/100 Dollars ($1,825,000.00) for the purpose of establishing a reserve fund in an amount that is anticipated to be sufficient to pay all Debt Service that will be due and payable by Borrower under this Agreement and the Note during the initial term of the Loan, which amount shall be transferred by the Mezzanine Cash Management Bank into a sub-account of the Mezzanine Cash Management Account established to hold such funds (the "Interest Reserve Account"). Amounts deposited from time to time in the Interest Reserve Account pursuant to this Section 7.2.1 are referred to herein as the "Interest Reserve Funds" and shall be disbursed to fund the Monthly Interest Payments from time to time in accordance with Section 7.2.2 hereof.

7.2.2.    **Release of Interest Reserve Funds.** So long as no Event of Default shall have occurred and be continuing, subject to Section 7.2.3 below, Lender shall, without the necessity of notifying Borrower, disburse a portion of the Interest Reserve Funds on each Payment Date, commencing on April 9, 2005 and continuing thereafter through and including the Maturity Date, in an amount equal to the Monthly Interest Payment due and payable on such Payment Date, and the same shall be applied pursuant to the terms of this Agreement. Borrower agrees and acknowledges that neither the insufficiency of the amount of, nor the unavailability of, the Interest Reserve Funds is intended to, and shall therefore not, constitute a limitation on the obligation of Borrower to pay the Monthly Interest Payments under this Agreement. Borrower shall promptly upon the written demand of Lender, make additional deposits to the Interest Reserve Account as Lender may from time to time reasonably require due to the underestimation of the amounts of the Monthly Interest Payments. Upon full payment of the Debt in accordance with the Loan Documents, the balance of the Interest Reserve Funds then in Lender's possession, if any, shall be promptly paid over to Borrower and no other party shall have any right or claim thereto.

7.2.3.    **Minimum Balance.** Notwithstanding anything contained in this Section 7.2 to the contrary, the Interest Reserve Funds on deposit in the Interest Reserve Account shall at all times be in an amount at least equal to three (3) times the then Monthly Interest Payment (the "Minimum Balance"), and if at any time the balance of the Interest Reserve Funds contained in the Interest Reserve Account shall be equal to or less than the Minimum Balance, Lender shall cease making disbursements of Interest Reserve Funds as contemplated by Section 7.2.2 above until the earliest of the following dates, whereupon Lender shall resume making such disbursements: (i) the date on which additional funds have been deposited into the Interest Reserve Account so that the balance thereof exceeds the Minimum Balance (provided that the foregoing provisions of this Section 7.2.3 shall be applicable if the balance in the Interest Reserve Account is again reduced to the Minimum Balance), (ii) the date that is three (3) months prior to the Initial Maturity Date if Borrower has not exercised the Extension Option, and (iii) the date that is three (3) months prior to the Extended Maturity Date if Borrower has exercised the Extension Option. Nothing contained in this Section 7.2 shall relieve Borrower of its absolute

- 75 -

and unconditional obligation to pay to Lender each Monthly Interest Payment when due pursuant to this Agreement.

        **7.2.4.**    **Payment Obligation.**    Notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the monthly payment of Debt Service required to be paid by Borrower hereunder shall be deemed satisfied to the extent sufficient amounts in excess of the Minimum Balance are contained in the Interest Reserve Account to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

      **Section 7.3.**    **Conversion Work Reserve.**  In connection with and without limitation to the approval rights granted to Lender pursuant to Section 5.1.23, Lender shall have right to approve (i) the amount of the Conversion Work Reserve Funds and Contingency Reserve Funds and (ii) all Advances to the same extent and on the same terms and conditions as Mortgage Lender under the Mortgage Loan Documents.

      **Section 7.4.**    **[Intentionally omitted.]**

      **Section 7.5.**    **[Intentionally omitted.]**

      **Section 7.6.**    **RMA Expenses Reserves.**  Borrower shall cause Mortgage Borrower to fully comply with the terms of Section 7.6 of the Mortgage Loan Agreement, and to deliver to Lender copies of all statements, reports and certificates required to be delivered to Mortgage Lender at such times and in such manner as provided therein.

      **Section 7.7.**    **Reserve Funds Generally.**

        **7.7.1.**    Borrower grants to Lender a first-priority perfected security interest in all of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for the Obligations. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for payment of the Obligations. Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the reduction of the Outstanding Principal Balance in any order in its sole discretion. The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

        **7.7.2.**    Borrower shall not, without obtaining the prior consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

        **7.7.3.**    The Reserve Funds shall be held in an Eligible Account and shall bear interest at a money market rate selected by Lender. All interest or other earnings on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund. Borrower shall have the right to

direct Lender to invest sums on deposit in the Eligible Account in Permitted Investments provided that (a) such investments are then regularly offered by Lender for accounts of this size, category and type, (b) such investments are permitted by applicable federal, state and local rules, regulations and laws, (c) the maturity date of the Permitted Investment is not later than the date on which the applicable Reserve Funds are required for payment of an obligation for which such Reserve Fund was created, and (d) no Event of Default shall have occurred and be continuing. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest or income earned on the Reserve Funds. No other investments of the sums on deposit in the Reserve Funds shall be permitted except as set forth in this Section 7.7. Borrower shall bear all reasonable costs associated with the investment of the sums in the account in Permitted Investments. Such costs shall be deducted from the income or earnings on such investment, if any, and to the extent such income or earnings shall not be sufficient to pay such costs, such costs shall be paid by Borrower promptly on demand by Lender. Lender shall have no liability for the rate of return earned or losses incurred on the investment of the sums in Permitted Investments.

7.7.4.    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

<div align="center">

**ARTICLE VIII.**
**DEFAULTS**

</div>

Section 8.1.    <u>Event of Default</u>.

(a)    Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)    if any portion of the Debt is not paid when due;

(ii)    [Intentionally omitted];

(iii)    if any of the Taxes or Other Charges are not paid prior to delinquency;

(iv)    if the Policies are not kept in full force and effect;

(v)    if certified copies of the Policies are not delivered to Lender upon request;

(vi)    if any Transfer shall occur without Lender's prior consent in violation of the provisions of this Agreement or the Pledge;

<div align="center">- 77 -</div>

(vii)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(viii)    if Mortgage Borrower, Borrower, Principal or any Guarantor shall make an assignment for the benefit of creditors;

(ix)    if a receiver, liquidator or trustee shall be appointed for Mortgage Borrower, Borrower, Principal or Guarantor, or if Mortgage Borrower, Borrower, Principal or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Mortgage Borrower, Borrower, Principal or Guarantor, or if any proceeding for the dissolution or liquidation of Mortgage Borrower, Borrower, Principal or Guarantor shall be instituted; provided, however, that if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Mortgage Borrower, Borrower, Principal or Guarantor, the same shall constitute an Event of Default only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(x)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(xi)    if Borrower breaches any of its respective negative covenants contained in Section 5.2 or any covenant contained in Section 4.1.30, Section 5.1.11, Section 5.1.24, Section 5.1.25 or Section 5.1.26 hereof;

(xii)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xiii)    if any of the assumptions contained in the Insolvency Opinion delivered to Lender in connection with the Loan, or in any Additional Insolvency Opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(xiv)    if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement), which default permits the Manager to terminate or cancel the Management Agreement (or such Replacement Management Agreement), and a new Qualified Manager is not appointed pursuant to a Replacement Management Agreement in accordance with the terms of this Agreement prior to the termination or cancellation of the Management Agreement (or such Replacement Management Agreement);

- 78 -

(xv)    if the Offering Plan is abandoned or withdrawn for any reason, is rejected for any reason and Borrower does not refile to comply with any comments of deficiencies within the appropriate time period pursuant to the Legal Requirements or is not finally approved or accepted or if any filings required by the Legal Requirements to maintain the validity of the Offering Plan on a current basis are not timely made;

(xvi)    [intentionally omitted];

(xvii)    if, without the prior written consent of Lender, any of the terms or provisions of the Condominium Documents, including the form of Rental Management Agreement, are amended or otherwise modified;

(xviii)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or with respect to any Other Obligations not specified in subsections (i) to (xvi) above, for ten (10) days after written notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days;

(xix)    if there shall be a default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Mortgage Borrower, Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xx)    [intentionally omitted];

(xxi)    if any provision of the Condominium Act or any section, sentence, clause, phrase or word, or the application thereof in any circumstance is held invalid and such invalidity shall have a material adverse effect on Mortgage Borrower or Borrower, Borrower's ability to repay the Loan, or the value of the Property;

(xxii)    [intentionally omitted];

(xxiii)    [intentionally omitted];

(xxiv)    if Mortgage Borrower shall enter into any amendment, restatement, modification, or supplement to the Mortgage Loan Documents without obtaining Lender's prior written consent;

- 79 -

(xxv)   if an "Event of Default" under the Mortgage Loan Documents shall occur, regardless of whether Mortgage Lender has issued a notice of default;

(xxvi)  if the Collateral is Transferred, changed, modified or moved by Borrower without the Lender's prior written consent or the Liens created pursuant to the Pledge and other Loan Documents shall cease to be a fully perfected, enforceable first priority security interest in favor of Lender or if the direction instruction letter to Mortgage Lender to deposit Required Mezzanine Interest Reserve Payments and, when applicable, Excess Cash Flow into the Mezzanine Cash Management Account is revoked or modified without Lender's prior written consent;

(xxvii)  if, at the end of any fiscal quarter of Borrower, the collective "Net Worth" (defined as the excess of aggregate total assets over aggregate total liabilities, provided that aggregate total assets may be reduced by the cumulative amount of any obligations other than the Mortgage Loan or Loan for which any assets are pledged, secured or encumbered) of Guarantor, as evidenced pursuant to the statements delivered pursuant to Section 5.1.11(h)(B), shall be less than Eighty Million and No/100 Dollars ($80,000,000).

(b)   Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (viii), (ix) or (x) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to all or any portion of the Collateral, including declaring the Obligations to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and all or any portion of the Collateral, including all rights or remedies of a secured party under the UCC in the state in which the Collateral is located and in which Borrower is organized and all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (viii), (ix) or (x) above, the Debt and all Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 8.2.**    **Rights and Remedies of Lender.**

**8.2.1.**    **Remedies.**

(a)   Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively,

- 80 -

together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral and the Pledge has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full.

(b)    Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, that Lender shall not make or execute any such documents under such power until three (3) days after written notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. Except as may be required in connection with a Securitization pursuant to Section 9.1 hereof, (i) Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and (ii) the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(c)    Lender shall have the right from time to time to partially foreclose the Pledge in any manner and for any amounts secured by the Pledge then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Lender may foreclose the Pledge to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Pledge to recover so much of the Debt as Lender may accelerate and such other sums secured by the Pledge as Lender may elect. Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge to secure payment of sums secured by the Pledge and not previously recovered.

(d)    Any amounts recovered from the Collateral for the Loan after the occurrence of an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

NY\992308.9

(e)    Upon the occurrence of an Event of Default, Lender may accelerate maturity of the Note and any other indebtedness of Borrower to Lender, and demand payment of the principal sum due thereunder, with interest, advances, costs and reasonable attorneys' fees and expenses (including those for appellate proceedings), and enforce collection of such payment by foreclosure of the Pledge or the enforcement of the Collateral, or other appropriate action.

8.2.2.    <u>Remedies Cumulative; Waivers</u>.    The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX.
## SPECIAL PROVISIONS

Section 9.1.    <u>Sale of Note and Securitization</u>.    Borrower acknowledges and agrees that Lender may sell all or any portion of the Loan and the Loan Documents, or require Borrower to restructure the Loan into multiple notes (which may include component notes and/or senior and junior notes) and/or issue one or more participations therein, which restructuring may include reallocation of principal amounts of the Loan or consummate one or more private or public securitizations of rated single- or multi-class securities (the "<u>Securities</u>") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and the Loan Documents (such sales, participations and/or securitizations, collectively, a "<u>Securitization</u>"). At the request of Lender, and to the extent not already required to be provided by Borrower under this Agreement, Borrower shall use reasonable efforts to provide, or cause to be provided, information not in the possession of Lender or which may be reasonably required by Lender in order to satisfy the market standards to which Lender customarily adheres or which may be reasonably required by prospective investors and/or the Rating Agencies in connection with any such Securitization including to:

(a)    provide additional and/or updated Provided Information, together with appropriate verification and/or consents related to the Provided Information through letters of auditors or opinions of counsel of independent attorneys reasonably acceptable to Lender and the Rating Agencies;

(b)    assist in preparing descriptive materials for presentations to any or all of the Rating Agencies, and work with, and if requested, supervise, third-party service providers engaged by Mortgage Borrower, Borrower, Principal and their respective affiliates to obtain, collect, and deliver information requested or required by Lender or the Rating Agencies;

- 82 -

(c)    deliver (i) updated opinions of counsel as to non-consolidation, due execution and enforceability with respect to the Property, Mortgage Borrower, Borrower, Principal and their respective Affiliates and the Loan Documents, including a so-called "10b-5" opinion and (ii) revised organizational documents for Borrower, which counsel opinions and organizational documents shall be reasonably satisfactory to Lender and the Rating Agencies;

(d)    if required by any Rating Agency, use commercially reasonable efforts to deliver such additional tenant estoppel letters (from commercial tenants), subordination agreements or other agreements from parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be reasonably satisfactory to Lender and the Rating Agencies;

(e)    make such representations and warranties as of the closing date of the Securitization with respect to the Property, Mortgage Borrower, Borrower, Principal and the Loan Documents as may be reasonably requested by Lender or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents;

(f)    execute such amendments to the Loan Documents as may be requested by Lender or the Rating Agencies to effect the Securitization and/or deliver one or more new component notes to replace the original note or modify the original note to reflect multiple components of the Loan (and such new notes or modified note shall have the same initial weighted average coupon of the original note, but each such new note or modified note may change the interest rate and amortization of the Loan as to that note only), and modify the Mezzanine Cash Management Agreement with respect to the newly created components such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum rating levels for the Loan; provided, however, that none of such amendments or modifications shall increase Borrower's obligations or decrease Borrower's rights under the Loan Documents;

(g)    if requested by Lender, review any information regarding the Property, Mortgage Borrower, Borrower, Principal, Guarantor, the Manager and the Loan which is contained in a preliminary or final private placement memorandum, prospectus, prospectus supplement (including any amendment or supplement to either thereof), or other disclosure document to be used by Lender or any affiliate thereof; and

(h)    supply to Lender such documentation, financial statements and reports concerning Mortgage Borrower, Borrower, Principal, Guarantor, the Loan and/or the Property in form and substance required in order to comply with any applicable securities laws.

All reasonable third party costs and expenses incurred by Mortgage Borrower, Borrower, Principal or Guarantor, or in connection with Borrower's complying with requests made under this Section 9.1 (including the fees and expenses of the Rating Agencies) shall be paid, or caused to be paid, by Borrower.

Section 9.2.    Securitization Indemnification.

- 83 -

(a)    Borrower understands that certain of the Provided Information may be included in Disclosure Documents in connection with the Securitization and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate, with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    The Indemnifying Persons agree to provide, in connection with the Securitization, an indemnification agreement (i) certifying that (A) the Indemnifying Persons have carefully examined the Disclosure Documents, including the sections entitled "Risk Factors" and "Special Considerations," and (B) such sections and such other information in the Disclosure Documents (to the extent such information relates to or includes any Provided Information or any information regarding the Property, Mortgage Borrower, Borrower, Manager and/or the Loan) (collectively with the Provided Information, the "Covered Disclosure Information") do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (ii) jointly and severally indemnifying Lender, BlackRock (whether or not it is Lender), any Affiliate of BlackRock that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of BlackRock that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, any other co-underwriters, co-placement agents or co-initial purchasers of Securities issued in the Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates and each Person or entity who controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Indemnified Persons"), for any losses, claims, damages, liabilities, costs or expenses (including legal fees and expenses for enforcement of these obligations (collectively, the "Liabilities")) to which any such Indemnified Person may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Covered Disclosure Information or arise out of or are based upon the omission or alleged omission to state in the Covered Disclosure Information a material fact required to be stated therein or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (iii) agreeing to reimburse each Indemnified Person for any legal or other expenses incurred by such Indemnified Person, as they are incurred, in connection with investigating or defending the Liabilities. This indemnity agreement will be in addition to any liability which Borrower may otherwise have. Moreover, if the Disclosure Documents have been delivered to the Indemnifying Persons, the indemnification provided for in clauses (ii) and (iii) above shall be effective whether or not an indemnification agreement described in clause (i) above is provided. In no event will the Indemnifying Persons be required to guaranty the accuracy of, or (when such inaccuracy is known to the Indemnifying Person) indemnify any Indemnified Person with respect to any inaccuracy of the information contained in third party reports (e.g. engineering and environmental reports), and all certifications by the Indemnifying

- 84 -

Persons in an indemnification agreement with respect to information contained in third party reports may be qualified to the best of such Indemnifying Person's knowledge.

(c)     In connection with filings under the Exchange Act, the Indemnifying Persons jointly and severally agree to indemnify (i) the Indemnified Persons for Liabilities to which any such Indemnified Person may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact in the Covered Disclosure Information, or the omission or alleged omission to state in the Covered Disclosure Information a material fact required to be stated therein or necessary in order to make the statements in the Covered Disclosure Information, in light of the circumstances under which they were made, not misleading and (ii) reimburse each Indemnified Person for any legal or other expenses incurred by such Indemnified Persons, as they are incurred, in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an Indemnified Person of notice of any claim or the commencement of any action, the Indemnified Person shall, if a claim in respect thereof is to be made against any Indemnifying Person, notify such Indemnifying Person in writing of the claim or the commencement of that action; provided, however, that the failure to notify such Indemnifying Person shall not relieve it from any liability which it may have under the indemnification provisions of this Section 9.2 except to the extent that it has been materially prejudiced by such failure and provided further that the failure to notify such Indemnifying Person shall not relieve it from any liability which it may have to an Indemnified Person otherwise than under the provisions of this Section 9.2. If any such claim or action shall be brought against an Indemnified Person, and it shall notify any Indemnifying Person thereof, such Indemnifying Person shall be entitled to participate therein and, to the extent that it wishes, assume the defense thereof with counsel reasonably satisfactory to the Indemnified Person. After notice from any Indemnifying Person to the Indemnified Person of its election to assume the defense of such claim or action, such Indemnifying Person shall not be liable to the Indemnified Person for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof except as provided in the following sentence; provided, however, that if the defendants in any such action include both an Indemnifying Person, on the one hand, and one or more Indemnified Persons on the other hand, and an Indemnified Person shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Persons that are different or in addition to those available to the Indemnifying Person, the Indemnified Person or Persons shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Person or Persons. The Indemnified Person shall instruct its counsel to maintain reasonably detailed billing records for fees and disbursements for which such Indemnified Person is seeking reimbursement hereunder and shall submit copies of such detailed billing records to substantiate that such counsel's fees and disbursements are solely related to the defense of a claim for which the Indemnifying Person is required hereunder to indemnify such Indemnified Person. No Indemnifying Person shall be liable for the expenses of more than one (1) such separate counsel unless any Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to any Indemnifying Person.

- 85 -

(e)    Without the prior written consent of Lender (which consent shall not be unreasonably withheld), no Indemnifying Person shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such claim, action, suit or proceeding) unless the Indemnifying Person shall have given Lender reasonable prior notice thereof and shall have obtained an unconditional release of each Indemnified Person hereunder from all liability arising out of such claim, action, suit or proceeding.  As long as an Indemnifying Person has complied with its obligations to defend and indemnify hereunder, such Indemnifying Person shall not be liable for any settlement made by any Indemnified Person without the consent of such Indemnifying Person (which consent shall not be unreasonably withheld).

(f)    The Indemnifying Persons agree that if any indemnification or reimbursement sought pursuant to this Section 9.2 is finally judicially determined to be unavailable for any reason or is insufficient to hold any Indemnified Person harmless (with respect only to the Liabilities that are the subject of this Section 9.2), then the Indemnifying Persons, on the one hand, and such Indemnified Person, on the other hand, shall contribute to the Liabilities for which such indemnification or reimbursement is held unavailable or is insufficient: (x) in such proportion as is appropriate to reflect the relative benefits to the Indemnifying Persons, on the one hand, and such Indemnified Person, on the other hand, from the transactions to which such indemnification or reimbursement relates; or (y) if the allocation provided by clause (x) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (x) but also the relative faults of the Indemnifying Persons, on the one hand, and all Indemnified Persons, on the other hand, as well as any other equitable considerations.  Notwithstanding the provisions of this Section 9.2, (A) no party found liable for a fraudulent misrepresentation shall be entitled to contribution from any other party who is not also found liable for such fraudulent misrepresentation, and (B) the Indemnifying Persons agree that in no event shall the amount to be contributed by the Indemnified Persons collectively pursuant to this paragraph exceed the amount of the fees (by underwriting discount or otherwise) actually received by the Indemnified Persons in connection with the closing of the Loan or the Securitization.

(g)    The Indemnifying Persons agree that the indemnification, contribution and reimbursement obligations set forth in this Section 9.2 shall apply whether or not any Indemnified Person is a formal party to any lawsuits, claims or other proceedings.  The Indemnifying Persons further agree that the Indemnified Persons are intended third party beneficiaries under this Section 9.2.

(h)    The rights, liabilities and obligations of the Indemnified Persons and the Indemnifying Persons under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Obligations.

(i)    Notwithstanding anything to the contrary contained herein, Borrower shall have no obligation to act as depositor with respect to the Loan or an issuer or registrant with respect to the Securities issued in any Securitization.

- 86 -

**Section 9.3.**    **Restructuring of Loan.**  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into multiple notes (which may include component notes and/or senior and junior notes) and/or to create participation interests in the Loan, which restructuring may include reallocation of principal amounts of the Loan, the establishment of different interest rates, floor interest rates and debt service payments for the Loan and the payment of the Loan in such order of priority as may be designated by Lender; provided that (a) the total amount of the Loan shall equal the amount of the Loan immediately prior to the restructuring, (b) except in the case of an Event of Default under the Loan, the weighted average spread above LIBOR of the Loan shall, in the aggregate, equal to the Spread in effect from time to time, and (iii) except in the case of an Event of Default under the Loan, the debt service payments on the Loan shall equal the debt service payments which would have been payable under the Loan had the restructuring not occurred; provided, further, that, notwithstanding anything to the contrary contained in this Section 9.3, Lender may, in its sole and absolute discretion, reallocate the application of principal payments to any portion of the Loan regardless of whether such reallocation results in any adverse effect, economic or otherwise, with respect to the Loan.  Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Loan, and shall, upon ten (10) Business Days written notice from Lender, which notice shall include the forms of documents for which Lender is requesting execution and delivery, (i) execute and deliver such documents, and (ii) cause Borrower's counsel to deliver such legal opinions.  Except as may be required in connection with a Securitization pursuant to Section 9.1 hereof, Borrower shall not be obligated to pay any costs or expenses incurred in connection with any such restructuring as set forth in this Section 9.3.  In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such written notice by Lender, and Lender sends a second notice to Borrower with respect to the delivery of such documents containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "POWER OF ATTORNEY IN FAVOR OF LENDER DEEMED EFFECTIVE FOR EXECUTION AND DELIVERY OF DOCUMENTS IF NO RESPONSE WITHIN 10 BUSINESS DAYS", Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof, if Borrower fails to execute and deliver such documents within ten (10) Business Days of receipt of such second notice.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.3 after the expiration of ten (10) Business Days after the second notice thereof.

**Section 9.4.**    **Exculpation.**  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Pledge or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Pledge and the other Loan Documents, or in the Property or the Collateral; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property or the Collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Pledge and the other Loan Documents, agrees that it shall not sue for, seek or

- 87 -

demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Pledge or the other Loan Documents. The provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Pledge; (c) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) [intentionally omitted;] (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Pledge or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Collateral; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i)     fraud or misrepresentation of a material fact in written material by Mortgage Borrower, Borrower or any Guarantor in connection with the Loan, including by reason of any claim under RICO;

(ii)     the gross negligence or willful misconduct of Mortgage Borrower or Borrower;

(iii)     the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity Agreement concerning environmental laws, hazardous substances or asbestos and any indemnification of Lender with respect thereto in either document;

(iv)     the wrongful removal or destruction of any portion of the Property after the occurrence of an Event of Default;

(v)     any Legal Requirement (including RICO) mandating the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Mortgage Borrower, Borrower or any Restricted Party or any agent or employee thereof in connection therewith;

(vi)     any material misrepresentation, material miscertification or material breach of warranty by Mortgage Borrower or Borrower with respect to any representation, warranty or certification contained in this Agreement or any other Loan Document or in any document executed in connection therewith, pursuant to any of the Loan Documents or otherwise to induce Lender to make the Loan, or any advance thereof, or to release monies from any account held by Lender (including any reserve or escrow) or to take other action with respect to the Collateral;

(vii)     the misappropriation or conversion by or on behalf of Mortgage Borrower or Borrower of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Awards received in connection with a Condemnation, (C) any Rents following

the occurrence of an Event of Default, or (D) any Rents paid more than one (1) month in advance;

(viii)    failure to pay charges for labor or materials or other charges which become Liens on any portion of the Property;

(ix)    any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Pledge or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(x)    the breach by Mortgage Borrower, Borrower, Manager, any Restricted Party or any agent or employee thereof of any Legal Requirements (including, without limitation, any Federal, state or local securities laws) in connection with the sale of Units and solicitation or operation of any rental management program offered to owners or prospective owners of Units; or

(xi)    the failure of Borrower to permit or cause to be permitted on-site inspections of the Property, to provide or cause to be provided financial information, or to appoint or cause to be appointed a new property manager upon the request of Lender, each as required by, and in accordance with, the terms and provisions of this Agreement.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Pledge or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower (1) in the event of: (a) Mortgage Borrower or Borrower filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against Mortgage Borrower or Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any Affiliate of Mortgage Borrower or Borrower, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against Mortgage Borrower or Borrower from any Person; (c) Mortgage Borrower or Borrower filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) Mortgage Borrower or Borrower consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Mortgage Borrower or Borrower or any portion of the Property; or (e) Mortgage Borrower or Borrower making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (2) INTENTIONALLY OMITTED; (3) if Mortgage Borrower or Borrower fails to maintain its status as a Special Purpose Entity as required by, and in accordance with, the terms and provisions of this Agreement and such failure results in a consolidation of Mortgage Borrower's

- 89 -

or Borrower's assets and another entity in connection with a bankruptcy, Insolvency or similar proceeding; (4) if Mortgage Borrower or Borrower fails to obtain Lender's prior consent to any Indebtedness or voluntary Lien encumbering the Property as required by this Agreement; (5) if Mortgage Borrower or Borrower fails to obtain Lender's prior consent to any Transfer as required by this Agreement; or (6) if all of the terms and conditions required to be satisfied in order to extend the Loan pursuant to Section 2.7 shall not be satisfied (regardless of whether Lender elects in its sole and absolute discretion to waive any of such terms and conditions and permit the Loan to be extended or whether Borrower has requested such an extension) and Borrower shall not pay and satisfy the Debt and all Other Obligations on the then applicable Maturity Date. All of the obligations of Borrower contained in this Section 9.4 are collectively referred to as the "Guaranteed Obligations".

Section 9.5.    Matters Concerning Manager. If (a) an Event of Default occurs and is continuing, (b) at the Maturity Date, the Debt is not repaid in full, (c) the Manager shall become bankrupt or insolvent, or (d) a material default occurs under the Management Agreement beyond any applicable grace and cure periods, then, in any such event, Borrower shall, at the request of Lender, cause Mortgage Borrower to terminate the Management Agreement and replace the Manager with a manager approved by Lender on terms and conditions satisfactory to Lender, it being understood and agreed that the management fee for such replacement manager shall not exceed then prevailing market rates.

Section 9.6.    Servicer. At the option of Lender, the Loan may be serviced by a servicer or trustee (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender and Servicer. Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement; provided, however, that Borrower shall not be responsible for payment of the monthly servicing fee due to the Servicer under the Servicing Agreement.

Section 9.7.    Additional Provisions Relating to the Condominium.

9.7.1.    No Release. Borrower acknowledges and agrees that no release or forbearance of any of Mortgage Borrower's obligations under the Condominium Documents or otherwise shall release Borrower from any of its obligations under this Agreement, including its obligations with respect to causing the payment of any Operating Expenses in respect of the Property required to be paid under the Condominium Documents and the performance of all of the terms, provisions, covenants, conditions and agreements contained in the Condominium Documents, to be kept, performed and complied with by Mortgage Borrower.

9.7.2.    [Intentionally omitted.]

9.7.3.    Cure Rights. Upon the occurrence and during the continuance of a default by Mortgage Borrower under the Condominium Documents, Lender may (but shall not be obligated to), in its sole discretion, cause such default by Mortgage Borrower to be remedied and otherwise take or perform such other actions as Lender may deem necessary or desirable in connection therewith. Borrower shall, or shall cause Mortgage Borrower to, on demand,

- 90 -

reimburse Lender for all advances made and expenses incurred by Lender in curing any such default (including, without limitation, reasonable attorneys' fees), together with interest thereon at the Default Rate from the date expended by Lender to the date repaid in full to Lender. The provisions of this <u>Section 9.7.3</u> are in addition to any cure rights or other rights or remedies granted to Lender under the Condominium Documents, the Loan Documents or otherwise.

   9.7.4. <u>No Liability.</u> Notwithstanding anything contained herein or otherwise to the contrary, Lender shall not have any liability or obligation under the Condominium Documents by virtue of this Agreement.

   9.7.5. <u>Additional Conversion of Condominium.</u> Borrower shall cause Mortgage Borrower to use its best efforts to convert the portion of the Property other than the Shorecrest Tower to a condominium regime (an "<u>Additional Condominium</u>"); provided, that Mortgage Borrower shall not be required to pay the City of Miami Beach a fee that is commercially unreasonable in connection with the removal of the restriction on converting such portion of the Property to an Additional Condominium. If Mortgage Borrower obtains the approval of the applicable Governmental Authorities to convert the remaining portion of the Property to an Additional Condominium, all of the terms and conditions of this Agreement and the other Loan Documents that pertain to the conversion of the Shorecrest Tower to the Condominium shall apply with the same force and effect with respect to such Additional Condominium, including, without limitation, all of the terms and provisions of <u>Sections 5.1.23</u>, <u>5.1.24</u>, <u>5.1.25</u>, <u>5.1.26</u>, <u>5.1.27</u>, <u>5.2.11</u> and <u>5.2.13</u> hereof and this <u>Section 9.7</u> (including in all cases the provisions in the Mortgage Loan Agreement referenced thereby). Lender shall have the right to establish in its sole but good faith discretion the "Minimum Release Price" for each unit in an Additional Condominium and to require Mortgage Borrower to post additional Conversion Work Reserve Funds under the Mortgage Loan Agreement to perform any required work in connection with the conversion of an Additional Condominium. Without duplication, in connection with an Additional Condominium, Borrower will cause Mortgage Borrower to obtain all consents that are required to be obtained from Lender in connection with the Condominium and Lender shall have the all of the same rights of approval that it has in connection with the Condominium. In addition, Borrower shall reasonably, or shall cause Mortgage Borrower to, deliver all additional documents that Lender requests in connection with an Additional Condominium, including, without limitation, an updated title report, an appraisal, an environmental report, a zoning analysis, opinions of counsel and approvals from the Rating Agencies. Without limiting the foregoing, if requested by Lender, Borrower shall enter into an amendment to this Agreement or any other Loan Document to effectuate the intent of this <u>Section 9.7.5</u>. All reasonable costs and expenses (including travel expenses) incurred by Lender in connection with its review and approval of an Additional Condominium (including reasonable attorneys fees and expenses) shall be paid by Borrower.

<div align="center">

ARTICLE X.
MISCELLANEOUS
</div>

  **Section 10.1.** <u>Survival.</u> This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding

<div align="center">- 91 -</div>

and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2.    Lender's Discretion.

(a)    Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Whenever this Agreement expressly provides that Lender may not unreasonably withhold its consent or its approval of an arrangement or term, such provisions shall also be deemed to prohibit Lender from unreasonably delaying or conditioning such consent or approval.

(b)    Lender may, in Lender's sole and absolute discretion, accept or reject any proposed cure of an Event of Default. In no event shall any portion of this Agreement or any of the other Loan Documents which provides that Lender shall have certain rights and/or remedies only during the continuance of an Event of Default be construed so as to require Lender to accept a cure of any such Event of Default. Unless and until Lender expressly accepts any proposed cure of an Event of Default in writing, such Event of Default shall be deemed to be continuing for purposes of this Agreement and the other Loan Documents.

Section 10.3.    Governing Law.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, UNLESS OTHERWISE EXPRESSLY STATED IN ANY LOAN

- 92 -

DOCUMENT, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON-CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

CAPITAL CORPORATE SERVICES, INC.
1333 N. DUVEL STREET
TALLAHASSEE, FLORIDA 32303

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

- 93 -

**Section 10.4.    Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5.    Delay Not a Waiver**.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or under any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 10.6.    Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (each, a "Notice"), shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a Notice to the other parties hereto in the manner provided for in this Section 10.6):

|  |  |
|---|---|
| If to Lender: | Carbon Capital II, Inc.<br>c/o BlackRock Financial Management, Inc.<br>New York, New York 10022<br>Attention: Richard Shea<br>Facsimile No.  (212) 754-8758 |
| with a copy to: | BlackRock Financial Management Inc.<br>One PNC Plaza, 19th Floor<br>Mailstop P1-P0PP-19-2<br>249 Fifth Avenue<br>Pittsburgh, PA 15222<br>Attention: Janice DeJulio<br>Facsimile No. (412) 768-3930 |

- 94 -

If to Borrower:      Royal Palm Senior Investors, LLC
c/o The Falor Companies, Inc.
8609 W. Bryn Mawr Ave. – Suite 209
Chicago, Illinois 60631
Attention : Mr. Robert D. Falor, President
Facsimile No.: (773) 380-6410

with a copy to:      Troutman Sanders LLP
Bank of America Plaza
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308-2216
Attention: John E. Buehner, Esq.
Facsimile No.: (404) 962-6517

A Notice shall be deemed to have been given in the case of hand delivery or delivery by a reputable overnight courier, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery and telecopy, upon the first attempted delivery on a Business Day; or in the case of telecopy, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a telecopy Notice is forthcoming.

**Section 10.7.    Trial by Jury.**  BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 10.8.    Headings.**  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 10.9.    Severability.**  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.10.    Preferences.**  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations

- 95 -

of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11.   **Waiver of Notice.**   Borrower hereby expressly waives, and shall not be entitled to, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

Section 10.12.   **Remedies of Borrower.**   In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 10.13.   **Expenses; Indemnity.**

(a)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, either in response to third party claims or in prosecuting or defending any action or proceeding or other litigation, in each case against, under

- 96 -

or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any of Lender's costs and expenses with respect to a Securitization pursuant to Section 9.2 or of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Any cost and expenses due and payable to Lender may be paid, at Lender's option, from any amounts in the Mezzanine Cash Management Account.

(b)    Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Indemnified Liabilities"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by such Indemnified Person.

(c)    Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

Section 10.14.    Schedules Incorporated.  The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15.    Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose

- 97 -

or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16.  No Joint Venture or Partnership; No Third Party Beneficiaries.**

(a)    Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan (or any disbursement of Reserve Funds) in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 10.17.  Publicity.**  All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, BlackRock, or any of their Affiliates shall be subject to the prior approval of Lender.

**Section 10.18.  No Reliance.**  Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other party to select, review, inspect, examine, supervise, pass judgment upon or inform Borrower or any third party of (a) the existence, quality, adequacy or suitability of any appraisal of the Property or the other Collateral, (b) any environmental report, or (c) any other matters or items, including, but not limited to, engineering, soils and seismic reports which are contemplated in the Loan Documents. Any such selection, review, inspection, examination and the like, and any other due diligence conducted by Lender, is solely for the purpose of protecting Lender's rights under the Loan Documents, and shall not render Lender liable to Borrower or any third party for the existence, sufficiency, accuracy, completeness or legality thereof.

**Section 10.19.  Waiver of Offsets/Defenses/Counterclaims.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any Obligations under the Loan Documents. No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

- 98 -

**Section 10.20.   Conflict; Construction of Documents; Reliance.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 10.21.   Brokers and Financial Advisors.**  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim that any person or entity acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.   The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the payment of the Debt..

**Section 10.22.   Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and Lender are superseded by the terms of this Agreement and the other Loan Documents.

**Section 10.23.   Joint and Several Liability.**   The representations, covenants, warranties, liabilities and obligations of Borrower hereunder are joint and several.

**Section 10.24.   Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

**Section 10.25.   Certain Additional Rights of Lender (VCOC).**

Notwithstanding anything which may be contained in this Agreement to the contrary, so long as the Loan is outstanding, Lender shall have:

- 99 -

(i)      the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lender under this Agreement or the other Loan Documents;

(ii)      the right to consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(iii)      the right to examine the books and records of Borrower, at Borrower's principal office, at any time upon reasonable notice;

(iv)      the right to receive the financial reports as provided in Section 5.1.11 of this Agreement;

(v)      the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of voting interests in Borrower held by its members or partners (as the case may be), and the right to restrict the transfer of interests in such member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

In addition to the foregoing, Borrower agrees that, upon reasonable request by Lender, Borrower shall deliver a "VCOC Letter" in form and substance reasonably acceptable to Lender to any future participant or other interest holder in the Loan.

[Remainder of page intentionally left blank]

- 100 -

NY\992308.9

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

ROYAL PALM SENIOR INVESTORS, LLC,
a Delaware limited liability company

By:    _____
       Name:  Robert D. Falor
       Title:    Authorized Signatory

LENDER:

CARBON CAPITAL II, INC.,
a Maryland corporation

By:    _____
       Name:  Robert Friedberg
       Title:    Vice President and Secretary

[Loan Agreement Signature Page]

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

ROYAL PALM SENIOR INVESTORS, LLC,
a Delaware limited liability company

By: _____
        Name:  Robert D. Falor
        Title:   Authorized Signatory

LENDER:

CARBON CAPITAL II, INC.,
a Maryland corporation

By: _____
        Name:  Robert Friedberg
        Title:   Vice President and Secretary

[Loan Agreement Signature Page]

## SCHEDULE I

**(Minimum Release Price Schedule)**

Schedule 1

NY\992308.9

| Building | Room # | Sq. Ft. | Purchase Price |
|---|---|---|---|
| Shorecrest | 401 | 575 | $878,314.50 |
| Shorecrest | 402 | 575 | $852,169.50 |
| Shorecrest | 403 | 300 | $472,311.00 |
| Shorecrest | 404 | 300 | $458,451.00 |
| Shorecrest | 405 | 595 | $857,813.25 |
| Shorecrest | 406 | 595 | $832,875.75 |
| Shorecrest | 407 | 595 | $867,788.25 |
| Shorecrest | 408 | 595 | $842,850.75 |
| Shorecrest | 409 | 1220 | $2,115,414.00 |
| Shorecrest | 501 | 575 | $881,464.50 |
| Shorecrest | 502 | 575 | $855,319.50 |
| Shorecrest | 503 | 300 | $475,461.00 |
| Shorecrest | 504 | 300 | $461,601.00 |
| Shorecrest | 505 | 595 | $860,963.25 |
| Shorecrest | 506 | 595 | $836,025.75 |
| Shorecrest | 507 | 595 | $870,938.25 |
| Shorecrest | 508 | 595 | $846,000.75 |
| Shorecrest | 509 | 1220 | $2,118,564.00 |
| Shorecrest | 601 | 575 | $884,614.50 |
| Shorecrest | 602 | 575 | $738,882.00 |
| Shorecrest | 603 | 300 | $478,611.00 |
| Shorecrest | 604 | 300 | $464,751.00 |
| Shorecrest | 605 | 595 | $864,113.25 |
| Shorecrest | 606 | 595 | $839,175.75 |
| Shorecrest | 607 | 595 | $874,088.25 |
| Shorecrest | 608 | 595 | $849,150.75 |
| Shorecrest | 609 | 1220 | $1,824,714.00 |
| Shorecrest | 701 | 575 | $887,764.50 |
| Shorecrest | 702 | 575 | $861,619.50 |
| Shorecrest | 703 | 300 | $415,989.00 |
| Shorecrest | 704 | 300 | $467,901.00 |
| Shorecrest | 705 | 595 | $867,263.25 |
| Shorecrest | 706 | 595 | $842,325.75 |
| Shorecrest | 707 | 595 | $877,238.25 |
| Shorecrest | 708 | 595 | $852,300.75 |
| Shorecrest | 709 | 1220 | $2,124,864.00 |
| Shorecrest | 801 | 575 | $766,692.00 |
| Shorecrest | 802 | 575 | $744,282.00 |
| Shorecrest | 803 | 300 | $484,911.00 |
| Shorecrest | 804 | 300 | $471,051.00 |
| Shorecrest | 805 | 595 | $870,413.25 |
| Shorecrest | 806 | 595 | $845,475.75 |
| Shorecrest | 807 | 595 | $757,669.50 |
| Shorecrest | 808 | 595 | $855,450.75 |
| Shorecrest | 809 | 1220 | $2,128,014.00 |
| Shorecrest | 901 | 575 | $894,064.50 |
| Shorecrest | 902 | 575 | $867,919.50 |
| Shorecrest | 903 | 300 | $421,389.00 |

| | | | |
|---|---|---|---|
| Shorecrest | 904 | 300 | $474,201.00 |
| Shorecrest | 905 | 595 | $751,819.50 |
| Shorecrest | 906 | 595 | $730,444.50 |
| Shorecrest | 907 | 595 | $883,538.25 |
| Shorecrest | 908 | 595 | $858,600.75 |
| Shorecrest | 909 | 630 | $1,064,007.00 |
| Shorecrest | 910 | 630 | $1,037,862.00 |
| Shorecrest | 1001 | 575 | $772,092.00 |
| Shorecrest | 1002 | 575 | $749,682.00 |
| Shorecrest | 1003 | 300 | $491,211.00 |
| Shorecrest | 1004 | 300 | $412,209.00 |
| Shorecrest | 1005 | 595 | $876,713.25 |
| Shorecrest | 1006 | 595 | $851,775.75 |
| Shorecrest | 1007 | 595 | $763,069.50 |
| Shorecrest | 1008 | 595 | $741,694.50 |
| Shorecrest | 1009 | 630 | $1,067,157.00 |
| Shorecrest | 1010 | 630 | $1,041,012.00 |
| Shorecrest | 1101 | 575 | $900,364.50 |
| Shorecrest | 1102 | 575 | $874,219.50 |
| Shorecrest | 1103 | 300 | $426,789.00 |
| Shorecrest | 1104 | 300 | $480,501.00 |
| Shorecrest | 1105 | 595 | $757,219.50 |
| Shorecrest | 1106 | 595 | $735,844.50 |
| Shorecrest | 1107 | 595 | $889,838.25 |
| Shorecrest | 1108 | 595 | $864,900.75 |
| Shorecrest | 1109 | 630 | $1,070,307.00 |
| Shorecrest | 1110 | 630 | $1,044,162.00 |
| Shorecrest | 1201 | 575 | $777,492.00 |
| Shorecrest | 1202 | 575 | $755,082.00 |
| Shorecrest | 1203 | 300 | $497,511.00 |
| Shorecrest | 1204 | 300 | $417,609.00 |
| Shorecrest | 1205 | 595 | $883,013.25 |
| Shorecrest | 1206 | 595 | $858,075.75 |
| Shorecrest | 1207 | 595 | $768,469.50 |
| Shorecrest | 1208 | 595 | $747,094.50 |
| Shorecrest | 1209 | 630 | $923,157.00 |
| Shorecrest | 1210 | 630 | $1,047,312.00 |
| Shorecrest | 1401 | 575 | $906,664.50 |
| Shorecrest | 1402 | 575 | $880,519.50 |
| Shorecrest | 1403 | 300 | $432,189.00 |
| Shorecrest | 1404 | 300 | $486,801.00 |
| Shorecrest | 1405 | 595 | $762,619.50 |
| Shorecrest | 1406 | 595 | $741,244.50 |
| Shorecrest | 1407 | 595 | $896,138.25 |
| Shorecrest | 1408 | 595 | $871,200.75 |
| Shorecrest | 1409 | 630 | $925,857.00 |
| Shorecrest | 1410 | 630 | $903,447.00 |
| Shorecrest | 1501 | 575 | $782,892.00 |
| Shorecrest | 1502 | 575 | $883,669.50 |
| Shorecrest | 1503 | 300 | $503,811.00 |
| Shorecrest | 1504 | 300 | $423,009.00 |
| Shorecrest | 1505 | 595 | $889,313.25 |

| | | | |
|---|---|---|---|
| Shorecrest | 1506 | 595 | $864,375.75 |
| Shorecrest | 1507 | 595 | $773,869.50 |
| Shorecrest | 1508 | 595 | $752,494.50 |
| Shorecrest | 1509 | 630 | $1,079,757.00 |
| Shorecrest | 1510 | 630 | $906,147.00 |
| Shorecrest | 1601 | 575 | $912,964.50 |
| Shorecrest | 1602 | 575 | $886,819.50 |
| Shorecrest | 1603 | 300 | $506,961.00 |
| Shorecrest | 1604 | 300 | $493,101.00 |
| Shorecrest | 1605 | 595 | $768,019.50 |
| Shorecrest | 1606 | 595 | $746,644.50 |
| Shorecrest | 1607 | 595 | $902,438.25 |
| Shorecrest | 1608 | 595 | $877,500.75 |
| Shorecrest | 1609 | 630 | $931,257.00 |
| Shorecrest | 1610 | 630 | $1,056,762.00 |
| Shorecrest | 1701 | 575 | $916,114.50 |
| Shorecrest | 1702 | 575 | $889,969.50 |
| Shorecrest | 1703 | 300 | $510,111.00 |
| Shorecrest | 1704 | 300 | $428,409.00 |
| Shorecrest | 1705 | 595 | $895,613.25 |
| Shorecrest | 1706 | 595 | $870,675.75 |
| Shorecrest | 1707 | 595 | $905,588.25 |
| Shorecrest | 1708 | 595 | $757,894.50 |
| Shorecrest | 1709 | 630 | $1,086,057.00 |
| Shorecrest | 1710 | 630 | $1,059,912.00 |
| Shorecrest/Lanai | 165 | 437 | $561,629.25 |
| Shorecrest/Lanai | 166 | 437 | $604,107.00 |
| Shorecrest/Lanai | 167 | 437 | $607,257.00 |
| Shorecrest/Lanai | 251 | 437 | $512,048.25 |
| Shorecrest/Lanai | 252 | 437 | $516,442.50 |
| Shorecrest/Lanai | 253 | 437 | $520,836.75 |
| Shorecrest/Lanai | 254 | 437 | $525,231.00 |
| Shorecrest/Lanai | 255 | 437 | $529,625.25 |
| Shorecrest/Lanai | 256 | 437 | $534,019.50 |
| Shorecrest/Lanai | 257 | 437 | $538,413.75 |
| Shorecrest/Lanai | 258 | 437 | $542,808.00 |
| Shorecrest/Lanai | 259 | 437 | $547,202.25 |
| Shorecrest/Lanai | 260 | 437 | $551,596.50 |
| Shorecrest/Lanai | 261 | 437 | $555,990.75 |
| Shorecrest/Lanai | 262 | 437 | $560,385.00 |
| Shorecrest/Lanai | 263 | 437 | $564,779.25 |
| Shorecrest/Lanai | 264 | 437 | $569,173.50 |
| Shorecrest/Lanai | 265 | 437 | $912,019.50 |
| Shorecrest/Lanai | 266 | 437 | $966,357.00 |
| Shorecrest/Lanai | 351 | 437 | $444,649.50 |
| Shorecrest/Lanai | 352 | 437 | $445,716.00 |
| Shorecrest/Lanai | 353 | 437 | $520,836.75 |
| Shorecrest/Lanai | 354 | 437 | $453,249.00 |
| Shorecrest/Lanai | 355 | 437 | $457,015.50 |
| Shorecrest/Lanai | 356 | 437 | $534,019.50 |
| Shorecrest/Lanai | 357 | 437 | $464,548.50 |
| Shorecrest/Lanai | 358 | 437 | $542,808.00 |

| | | | |
|---|---|---|---|
| Shorecrest/Lanai | 359 | 437 | $472,081.50 |
| Shorecrest/Lanai | 360 | 437 | $475,848.00 |
| Shorecrest/Lanai | 361 | 437 | $555,990.75 |
| Shorecrest/Lanai | 362 | 437 | $483,381.00 |
| Shorecrest/Lanai | 363 | 437 | $487,147.50 |
| Shorecrest/Lanai | 364 | 437 | $490,914.00 |
| Shorecrest/Lanai | 365 | 437 | $912,019.50 |
| Shorecrest/Lanai | 366 | 437 | $834,057.00 |

## SCHEDULE II

(Rent Roll)


[See Attached Document]

Schedule II

## SCHEDULE II

### (Rent Roll)

| Lease | Monthly Rent | Expiration Date |
|---|---|---|
| | | |
| Lease with Collins Avenue Association, LLC for Suite Number 509 for the use as The Bath Club sales office | $3,100.00 | May 31, 2005 |
| Space Lease fully executed March 13, 2002 between Seller and Precious Gift Shops, Inc. | $2,916.67 | February 28, 2007[1] |
| Sublease fully executed as of June 22, 2000 between Seller and Quik Park of Florida, Inc. | $350,000.00 | February 28, 2005[2] |

[1] Gift Shop Lease subject to termination upon payment of the unamortized leasehold improvements costs, if the lease is not approved by Lender. Lender has approved the Gift Shop lease only on a month-to-month basis.

[2] Quik Park Lease is subject to early termination pursuant to a Termination Agreement providing for the payment to Tenant of a $350,000 fee.

[1] Gift Shop Lease subject to termination upon payment of the unamortized leasehold improvements costs, if the lease is not approved by Lender. Lender has approved the Gift Shop lease only on a month-to-month basis.

[2] Quik Park Lease is subject to early termination pursuant to a Termination Agreement providing for the payment to Tenant of a $350,000 fee.

## SCHEDULE III

**[Intentionally omitted.]**

Schedule III

<u>SCHEDULE IV</u>

(Organizational Chart)

[See Attached Document]

Schedule IV

ORGANIZATIONAL CHART

# Royal Palm Hotel Organizational Chart

**Columbn Financial, Inc.**
**First Mortgagee**
**[$112,804,873]**

**Royal Palm Hotel Property, LLC**
Manager:
Royal Palm Senior Investors, LLC

Member:
Royal Palm Senior Investors, LLC (100%)

Independent Directors:
John R. Hosmer, Jr. and Stephen G. Weigand

100%

**Carbon Capital II, Inc.**
**Jr. Mezzanine Lender**
**[$24,545,813]**

**Royal Palm Senior Investors, LLC**
Manager:
Royal Palm Junior Investors, LLC
Member:
Royal Palm Junior Investors, LLC (100%)

Independent Director:
John R. Hosmer, Jr.

100%

**Royal Palm Junior Investors, LLC**
Manager:
Robert D. Falor

Member:
Royal Palm Investors, LLC

Independent Director:
John R. Hosmer, Jr.

100% Member

**Royal Palm Investors, LLC**

| Member | Initial Capital Contribution | Capital Interest | Membership Interest |
|---|---|---|---|
| Mitchell Hotel Group, LLC | 5,415,737 | 34.408% | 34.000% |
| Robert Falor | 405,702 | 2.578% | 1.000% |
| Jennifer Falor | 405,703 | 2.578% | 1.000% |
| MSD Investment Co., LLC | 811,405 | 5.155% | 2.000% |
| Royal Palm Manager, LLC | 1,000 | 0.006% | 22.000% |
| PADC Royal Palm Holdings, LLC | 8,500,000 | 54.004% | 40.000% |
| Total | 15,739,547 | 100.000% | 100.000% |

**Royal Palm Investors, LLC**
Manager:
Royal Palm Manager, LLC

Members – ($15,739,547 Equity):
Royal Palm Manager, LLC
Mitchell Hotel Group, LLC
Robert D. Falor
Jennifer Falor
MSD Investment Co., LLC
PADC Royal Palm Holdings, LLC

22% Member and Sole Manager

**Royal Palm Manager, LLC**
Managers:
Robert D. Falor
MSD Investment Co., LLC

Members: [$1,000 Equity]
Mitchell Hotel Group, LLC – 50.00%
Robert D. Falor - 10.09%
MSD Investment Co., LLC - 14.85 %
National DF Investments LLC - 8.15 %
PFI Holdings LLC - 8.15%
J.C.R. Group P.A. - 5.57%
Omni Mobile Communications Consultants LLC –1.60%
Anwalt Hotel Holdings LLC – 1.60%



## SCHEDULE V

### (Borrower's Agreements)

Schedule V

NY\992308.9

<div align="center">

## SCHEDULE V

### (Borrower's Agreements)

</div>

Loan Documents (as defined in the Loan Agreement)
Management Agreement (as defined in the Loan Agreement)
Asset Management Agreement (as defined in the Loan Agreement)
Cash Management Agreement (as defined in the Loan Agreement)
Interest Rate Cap Agreement (as defined in the Loan Agreement)
Independent Director Agreements (as defined in the Loan Agreement)
Management Agreement (as defined in the Loan Agreement) between Borrower and
International Hotel Group Resources, Inc.
Management Agreement (as defined in the Loan Agreement) between Borrower and
 LH Miami, LLC
O&M Agreement (as defined in the Loan Agreement)

Declaration of Restrictions and Reciprocal Easement Agreement executed by Jefferson Plaza,
Ltd., a Florida limited partnership, recorded March 6, 1995 in Official Records Book 16703,
page 1171, Public Records Miami-Dade County, Florida.

Tri-Party Agreement and Release of Easement by and between Worldinvest Joint Venture, a
Florida general partnership, Jefferson Plaza Limited, a Florida limited partnership, and The City
of Miami Beach, a municipal corporation in the State of Florida, recorded February 21, 1996 in
Official Records Book 17103, page 959, Public Records Miami-Dade County, Florida.

Garage Easement Agreement by and between MB Redevelopment, Inc., a Florida corporation, and Miami
Beach Redevelopment Agency, a Florida public body corporate and politic, recorded September 23, 1996
in Official Records Book 17362, page 130; as amended by First Amendment to Garage Easement
Agreement recorded February 25, 1997 in Official Records Book 17540, page 2204, all of the Public
Records Miami-Dade County, Florida.

Declaration of Covenants and Restriction by Miami Beach Redevelopment Agency recorded July 1, 1998
in Official Records Book 18170, page 883, as amended

Garage Easement Agreement by and between RDP Royal Palm Hotel Limited Partnership, a Florida
limited partnership, and Miami Beach Redevelopment Agency, a Florida public body corporate and
politic, recorded July 1, 1998 in Official Records Book 18170, page 1082; as amended

Reciprocal Access, Use, Development and Easement Agreement by and between RDP Royal Palm Hotel
Limited Partnership, a Florida limited partnership, Jefferson Plaza, Ltd., a Florida limited partnership,
The City of Miami Beach, Florida, a municipality in the State of Florida, and Miami Beach
Redevelopment Agency, a Florida public body corporate and politic, recorded July 1, 1998 in Official
Records Book 18170, page 1156, Public Records Miami-Dade County, Florida.

Easement in favor of Florida Power & Light Company recorded February 26, 2001 in Official Records
Book 19516, page 3948, Public Records Miami-Dade County, Florida. (as to Parcels 1 & 2)

Coastal Construction Setback/Erosion Control Line as recorded and filed from time to time in the Public Records of Miami-Dade County, Florida; and if the subject property abuts the mean highwater line of the Gulf of Mexico, Atlantic Ocean, or the Straits of Florida, the right to use such property may be affected by the provisions of sections 161.052 and 161.053, Florida Statutes.

Master Lease Agreement between RDP Royal Palm Hotel Ltd. Partnership and Six Continent Hotels, as Lessee, and First Union Commercial Corporation, as Lessor, fully executed as of February 5, 2002 and identified as Lease #24423172 (Security Camera & Radio).

Lease No. RDO504 dated June 22, 2004 between RDP Royal Palm Hotel, LP, as Lessee, and Amaro Business Credit, as Lessor (Carpet Cleaning Machine).

Lease with Collins Avenue Association, LLC for Suite Number 509 for the use as The Bath Club sales office

Space Lease fully executed March 13, 2002 with Precious Gift Shops, Inc.

Sublease fully executed as of June 22, 2000 with Quik Park of Florida, Inc.

Lease Termination Agreement dated February 15, 2005, with Quik Park of Florida, Inc.

Sales & Marketing Agreement by and between Royal Palm Hotel Property, LLC and Global Marketing Group, LLC

Purchase and Sale Agreement dated December 2, 2004, as amended

**SERVICE CONTRACTS**

**Royal Palm Crowne Plaza**
**Service Contracts**

as November 26, 2004

| NAME | | | DESCRIPTION |
|------|---|---|-------------|
| Micros-Fidelio | | | Opera Support |
| World Cinema | | | Satellite TV programming |
| Mcclosky Window Cleaning | | | Exterior window cleaning - every other month |
| Mcclosky Window Cleaning | | | Interior window cleaning |
| DMX music | | | Public area music |
| Verizon | | | Telephone system monthly maintenance contract |
| ADP | | | System support for payroll |
| Ascom Hasler | | | Postage meter rental |
| Dunbar | | | Protective service |
| Delphi | | | Delphi System Maintenance |
| Tag | | | Advertising agency - Montlhy Retainer |
| BJB Readboard | | | Monthly Service |
| Ecolo | | | Odor Control |
| Associate Electronics | | | TV Maintenance |
| Johnson Controls | | | Building Automation Service |
| Otis | | | Elevators Maintenance |
| Tropics North | | | Landscape maintenance |
| Glenns Greenery | | | Potted plants maintenance |
| Macquay | | | HVAC - Heating, Ventilation, Air Conditioning |
| Ecolab - Pool | | | Pool maintenance |
| Ecolab - Pest Control | | | pest prevention |
| Waste Management | | | Waste disposal - 3 invoices 1)132.84, 2)405.53, 3)+/- $3500 |
| Wachovia | | | Security equipment lease |
| Delta Business | | | Copiers Maintenance - Average monthly cost |
| Hi Rise Safety System | | | Elevator/Fire alarm monitoring systems |

Schedule V

## EXHIBIT A

**(Legal Description of the Land)**

Exhibit A - Page 1

NY\992308.9

## EXHIBIT A

### (Legal Description of the Land)

PARCEL 1 (ROYAL PALM HOTEL SITE)

The South 12.65 feet of Lots 7 and 14, all of Lots 6 and 15, and the North 10 feet of Lots 5 and 16, all in Block 56, FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, Page 77, of the Public Records of Dade County, Florida, together with that certain parcel of land lying East and adjacent to the above described parcel, said parcel bounded on the South by the South line of the above described parcel extended Easterly; bounded on the North by the North line of the above described parcel extended Easterly; bounded on the East by the Erosion Control Line of the Atlantic Ocean; and bounded on the West by the East line of the above mentioned Block 56.

PARCEL 2 (SHORECREST HOTEL SITE)

The South 40.00 feet of Lots 5 and 16 and the North One Half of Lots 4 and 17, all in Block 56, FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, Page 77, of the Public Records of Dade County, Florida, together with that certain parcel of land lying East of and adjacent to the above described parcel; said parcel bounded on the South by the South line of the above described parcel extended Easterly; bounded on the North by the North line of the above described parcel extended Easterly; bounded on the East by the Erosion Control Line of the Atlantic Ocean and bounded on the West by the East line of the above mentioned Block 56.

The land described above located, lying and being in Section 34, Township 53 South, Range 42 East, City of Miami Beach, Dade County, Florida.

PARCEL 3

Easement for the benefit of Parcels I and II as contained in that Garage Easement Agreement dated May 28, 1998, recorded July 1, 1998, in Official Records Book 18170, Page 1082, of the Public Records of Dade County, Florida, over and across the following described lands:

Lots 8, 9, 10, 11, 12 and 13, Block 57, FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, Page 77, of the Public Records of Dade County, Florida, together with that portion of 16th Street (Avenue "C") lying West of the West Right of way line of Collins Avenue, as shown on said Plat, LESS AND EXCEPT the following described parcel:

Beginning at the Southwest corner of Block 54 of said FISHER'S FIRST SUBDIVISION OF ALTON BEACH PLAT; thence North 88 degrees 0 minutes 53 seconds East along the South line of said Block 54, a distance of 443.08 feet, to the Southeast corner of said Block 54, thence South 07 degrees 35 minutes 04 seconds West, a distance of 96.26 feet to a point of cusp with a tangent curve concave to the Southwest, thence along the arc of said curve to the left, having a

radius of 25.00 feet and a central angle of 90 degrees 00 minutes 00 seconds an arc distance of 39.27 feet, to a point of tangency; thence North 82 degrees 24 minutes 52 seconds West a distance of 24.75 feet; thence South 88 degrees 00 minutes 53 seconds West along a line 8.00 feet North of and parallel with, as measured at right angles to the North line of Block 57 of said Plat, a distance of 382.18 feet to a point on the Easterly right of way line of Washington Avenue, thence North 01 degrees 59 minutes 11 seconds West along said Easterly right of way line, a distance of 62.00 feet to the Southwest corner of said Block 54 and the POINT OF BEGINNING. Said lands lying and being in the City of Miami Beach, Dade County, Florida.

PARCEL 4

Easement for the benefit of Parcels I and II as contained in that Reciprocal Access, Use, Development and Easement Agreement dated October 21, 1997, recorded July 1, 1998, in Official Records Book 18170, Page 1156, of the Public Records of Dade County, Florida, over and across the following described lands:

All of Lots 1, 2, 3, 18, 19, 20; and the South Half of Lots 4 and 17, all in Block 56 of FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, Page 77, of the Public Records of Dade County, Florida.

AND

A parcel of land adjacent to and immediately East of the above described lands and more particularly described as follows:

Beginning at the Southeast corner of said Lot 1, Block 56, of FISHER'S FIRST SUBDIVISION OF ALTON BEACH; thence North 7 degrees 35 minutes 20 seconds East along the Easterly line of said Block 56 for a distance of 177.47 feet to the Northeast corner of the South Half of said Lot 4, Block 56; thence North 88 degrees 00 minutes 23 seconds East along the Easterly extension of the North line of said South Half of Lot 4 for a distance of 195.26 feet to a point on a line known as the Erosion Control Line as recorded in Plat Book 105, Page 82, of the Public Records of Dade County, Florida; thence South 3 degrees 26 minutes 45 seconds West along said Erosion Control Line also known as the Bulkhead line as described in Ordinance No. 856 Section 1 of the City of Miami Beach, recorded in Plat Book 74, Page 4, of the Public Records of Dade County, Florida, for a distance of 175.78 feet; thence South 88 degrees 00 minutes 21 seconds West along the Easterly extension of the South line of said Lot 1, Block 56, for 208.14 feet to the POINT OF BEGINNING, lying and being in the City of Miami Beach, Dade County, Florida.

## EXHIBIT B

(Conversion Work Budget and Schedule)

[See Attached Document]

Exhibit B

# Conversion Budget – Royal Palm

| Description | QTY | UNIT | UNIT COST | LABOR | HARD | AREA TTL |
|---|---|---|---|---|---|---|
| | | | | SUMMARY | | |
| **SOFT COSTS:** | | | | | | |
| **Miscellaneous:** | | | | | | |
| Freight | 5.00% | | | | $287,350.00 | $287,350.00 |
| Sales Tax | 6.50% | | | | $373,555.00 | $373,555.00 |
| Installers | 1 | lot | $0.00 | $165,000.00 | | $165,000.00 |
| Architectural | 1 | lot | $0.00 | $65,000.00 | | $65,000.00 |
| Interior Design | 1 | lot | $0.00 | $250,000.00 | | $250,000.00 |
| Landscape Design | 1 | lot | $0.00 | $4,000.00 | | $4,000.00 |
| Structural Engineer | 1 | lot | $0.00 | $25,000.00 | | $25,000.00 |
| Mechanical Engineer | 1 | lot | $0.00 | $15,000.00 | | $15,000.00 |
| Energy Consultant | 1 | lot | $0.00 | $15,000.00 | | $15,000.00 |
| Phone/IT Consultant | 1 | lot | $0.00 | $15,000.00 | | $15,000.00 |
| Purchasing Agent FF&E only | 1 | lot | $0.00 | $150,000.00 | | $150,000.00 |
| Site Supervisor/Project Mgmt | 1 | lot | $0.00 | $325,000.00 | | $325,000.00 |
| Surveyor | 1 | lot | $0.00 | $50,000.00 | | $50,000.00 |
| General Contractor | 1 | lot | $0.00 | $150,000.00 | | $150,000.00 |
| Dumpsters | 1 | lot | $0.00 | $45,000.00 | | $45,000.00 |
| Permits | 1 | lot | 0.00 | $45,000.00 | | $45,000.00 |
| Condo Conversion | 1 | lot | 0.00 | $200,000.00 | | $200,000.00 |
| Total Soft Costs | | | | $1,319,000.00 | $660,905.00 | $2,179,905.00 |
| Total Hard Costs | | | | $1,189,500.00 | $5,747,000.00 | $6,936,500.00 |
| Contingency Plan | | | | | | $346,795.00 |
| **GRAND TOTAL** | | | | $2,508,500.00 | $6,407,905.00 | $9,463,200.00 |
| | | | | | | |
| **OTHER AREAS** | | | | | | |
| New Bar/Restaurant -Leased NO expense | 1 | lot | $0.00 | $0.00 | | $0.00 |
| Lobby | 1 | lot | $125,000.00 | $0.00 | $125,000.00 | $125,000.00 |
| Banquet Spaces | 1 | lot | $365,000.00 | $120,000.00 | $245,000.00 | $365,000.00 |
| Condo Sales Office | 1 | lot | $155,000.00 | $40,000.00 | $115,000.00 | $155,000.00 |
| Starbucks/Sol-Melia store Build-out | 1 | lot | $665,000.00 | $245,000.00 | $420,000.00 | $665,000.00 |
| Guest Corridors | 1 | lot | $485,000.00 | $200,000.00 | $285,000.00 | $485,000.00 |
| Fitness Center | 1 | lot | $48,000.00 | $4,000.00 | $44,000.00 | $48,000.00 |
| Mechanical/Systems | 1 | lot | $238,000.00 | $43,000.00 | $195,000.00 | $238,000.00 |
| Exterior | 1 | lot | $225,000.00 | $95,000.00 | $130,000.00 | $225,000.00 |
| | | | | | | |
| Total Other Areas | | | | $747,000.00 | $1,559,000.00 | $2,306,000.00 |
| | | | | | | |
| **PRIVATE GUEST AREAS** | | | | | | |
| Specialty Suite A - Corner units | 17 | each | $22,500.00 | $42,500.00 | $340,000.00 | $382,500.00 |
| Specialty Suite Type B - Oversize 1 bedroom units | 128 | each | $13,000.00 | $128,000.00 | $1,536,000.00 | $1,664,000.00 |
| Standard Executive Rooms | 272 | each | $9,500.00 | $272,000.00 | $2,312,000.00 | $2,584,000.00 |
| Total Guest Rooms | 417 | | | $442,500.00 | $4,188,000.00 | $4,630,500.00 |

* Numbers are subject to change until orders are placed

| Description | QTY | UNIT | UNIT COST | LABOR | HARD | AREA TTL |
|---|---|---|---|---|---|---|
| **Specialty Suite Type A** | | | | | | |
| Allowance to comply with Hard Rock stds | 1 | lot | $20,000.00 | $2,500.00 | $20,000.00 | $22,500.00 |
| | | | | | | |
| Total Specialty Suite Type A | | | | $2,500.00 | $20,000.00 | $22,500.00 |
| | | | | | | |
| **Specialty Suite Type B** | | | | | | |
| Allowance to comply with Hard Rock Stds | 1 | lot | $12,000.00 | $1,000.00 | $12,000.00 | $13,000.00 |
| | | | | | | |
| Total Specialty Suite Type B | | | | $1,000.00 | $12,000.00 | $13,000.00 |
| | | | | | | |
| **Standard Executive Rooms** | | | | | | |
| Allowance to comply with Hard Rock Stds | 1 | lot | $8,500.00 | $1,000.00 | $8,500.00 | $9,500.00 |
| | | | | | | |
| Total Standard Executive Rooms | | | | $1,000.00 | $8,500.00 | $9,500.00 |
| | | | | | | |
| **Guestroom Bathroom** | | | | | | |
| Costs included in the above allowances | 0 | lot | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | |
| Total Guestroom Bathroom | | | | $0.00 | $0.00 | $0.00 |

THE FALOR COMPANIES

Confidential

| | PLANNED QTY | UNIT | UNIT COST | LABOR TL | FF&E TL | AREA TL |
|---|---|---|---|---|---|---|
| **New Bar/Restaurant -Leased NO expense** | | | | | | |
| Build-out | 0 | lot | $0.00 | $0.00 | $0.00 | $0.00 |
| OS&E - FF&E | 1 | lot | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total New Bar/Restaurant** | | | | $0.00 | $0.00 | $0.00 |
| **Lobby** | | | | | | |
| FF&E | 1 | lot | $125,000.00 | $0.00 | $125,000.00 | $125,000.00 |
| **Total Lobby** | | | | $0.00 | $125,000.00 | $125,000.00 |
| **Banquet Spaces** | | | | | | |
| Paint/finishes | 1 | lot | $20,000.00 | $60,000.00 | $20,000.00 | $80,000.00 |
| Electrical | 1 | lot | $10,000.00 | $15,000.00 | $10,000.00 | $25,000.00 |
| FF&E | 1 | lot | $75,000.00 | $0.00 | $75,000.00 | $75,000.00 |
| OS&E | 1 | lot | $50,000.00 | $10,000.00 | $50,000.00 | $60,000.00 |
| Flooring | 1 | lot | $90,000.00 | $35,000.00 | $90,000.00 | $125,000.00 |
| **Total Banquet Space** | | | | $120,000.00 | $245,000.00 | $365,000.00 |
| **Condo Sales Office** | | | | | | |
| build-out allowance | 1 | lot | $45,000.00 | $35,000.00 | $45,000.00 | $80,000.00 |
| FF&E | 1 | lot | $40,000.00 | $0.00 | $40,000.00 | $40,000.00 |
| Technology | 1 | lot | $30,000.00 | $5,000.00 | $30,000.00 | $35,000.00 |
| **Total Condo Sales Office** | | | | $40,000.00 | $115,000.00 | $155,000.00 |
| **Starbucks/Sol-Melia store Build-out** | | | | | | |
| Soft costs | 1 | lot | $0.00 | $75,000.00 | $0.00 | $75,000.00 |
| Buildout | 1 | lot | $325,000.00 | $170,000.00 | $325,000.00 | $495,000.00 |
| FF&E | 1 | lot | $95,000.00 | $0.00 | $95,000.00 | $95,000.00 |
| **Total - Hard Rock Store & Starbucks** | | | | $245,000.00 | $420,000.00 | $665,000.00 |
| **Guest Corridors** | | | | | | |
| Paint/drywall/misc labor | 1 | lot | $75,000.00 | $145,000.00 | $75,000.00 | $220,000.00 |
| electrical | 1 | lot | $0.00 | $15,000.00 | $0.00 | $15,000.00 |
| plumbing | 1 | lot | $0.00 | $0.00 | $0.00 | $0.00 |
| flooring | 1 | lot | $90,000.00 | $40,000.00 | $90,000.00 | $130,000.00 |
| FF&E/signage | 1 | lot | $30,000.00 | $0.00 | $30,000.00 | $30,000.00 |
| Millwork | 1 | lot | $90,000.00 | $0.00 | $90,000.00 | $90,000.00 |
| **Total Guest Corridors** | | | | $200,000.00 | $285,000.00 | $485,000.00 |
| **Fitness Center** | | | | | | |
| Equipment | 1 | lot | $30,000.00 | $3,500.00 | $30,000.00 | $33,500.00 |
| Misc Technology & Accessories | 1 | lot | $14,000.00 | $500.00 | $14,000.00 | $14,500.00 |
| **Total Fitness Center** | | | | $4,000.00 | $44,000.00 | $48,000.00 |
| **Mechanicals/Systems** | | | | | | |
| Time Clock system | 1 | lot | $20,000.00 | $3,000.00 | $20,000.00 | $23,000.00 |
| PMS System | 1 | lot | $145,000.00 | $25,000.00 | $145,000.00 | $170,000.00 |
| Facade Lights | 1 | lot | $30,000.00 | $15,000.00 | $30,000.00 | $45,000.00 |
| **Total Mechanicals/Systems** | | | | $43,000.00 | $195,000.00 | $238,000.00 |
| **Exterior** | | | | | | |
| Signage | 1 | lot | $50,000.00 | $35,000.00 | $50,000.00 | $85,000.00 |
| Pool improvements | 1 | lot | $80,000.00 | $60,000.00 | $80,000.00 | $140,000.00 |
| **Total Exterior** | | | | $95,000.00 | $130,000.00 | $225,000.00 |
| **Condo Conversion** | | | | | | |
| Condo Document Legal Fees | 1 | lot | $125,000.00 | $0.00 | $125,000.00 | $125,000.00 |
| Third Party Information | 1 | lot | $25,000.00 | $0.00 | $25,000.00 | $25,000.00 |
| Start-up Marketing | 1 | lot | $50,000.00 | $0.00 | $50,000.00 | $50,000.00 |
| **Total Condo Conversion** | | | | $0.00 | $200,000.00 | $200,000.00 |

THE FALOR COMPANIES

Confidential

## Royal Palm Condo Conversion Schedule

A $9,463,200 renovation is planned that will include upgrading the lobby and pool areas to be consistent with the Lifestar brand, updating the soft goods and part of the case goods, and new electronics packages in each of the 417 guest rooms. The following schedule assumes a close date of February 16th, 2005.

**February 2005–**
- Review planning, design, and branding
- Convert the gift shop within the Shorecrest lobby space to a "Condo Sales Center"
- Issue deposits on long lead items
- Review permits and historical for the pool area.

**March 2005:**
- Complete the design/bidding process and issue orders to begin
- Build and deliver three model rooms within the Shorecrest tower
- Begin the bathroom stone work and layout within the Shorecrest tower
- Begin replacement of bath hardware within the Shorecrest tower

**April 2005:**
- Bid Pool Area for construction
- Start construction in pool area (end of April)
- Start carpet and FF&E replacement within the Shorecrest Tower

**May 2005:**
- Begin construction on Shorecrest rooms
- Continue Room conversions
- Continue Pool construction
- Complete 25 Shorecrest Condos

**June 2005:**
- Complete pool area (late June)
- Continue Room conversions within Shorecrest
- Complete 25 Shorecrest Condos

**July 2005**
- Continue room conversion within the Shorecrest
- Complete 40 Shorecrest condos

**August 2005**
- Continue room conversion within the Shorecrest
- Complete 50 Shorecrest condos
- Royal Palm Tower rooms begin
- Begin Lobby construction within Royal Palm Tower (10 days)

THE FALOR COMPANIES

Confidential

- Complete Royal Palm Tower renovation
- Complete 77 rooms

**September 2005**
- Continue room conversion within the Shorecrest tower
- Complete 20 Shorecrest condos
- Continue Royal Palm Tower rooms
- Complete 60 Rooms within Royal Palm Tower

**October 2005**
- Continue Royal Palm Tower rooms
- Complete 60 Royal Palm rooms

**November 2005**
- Continue Royal Palm Tower rooms
- Complete remaining 60 Royal Palm rooms

THE FALOR COMPANIES

Confidential

<u>EXHIBIT C</u>

(Instruction to Register Pledge)

[See Attached Document]

ROYAL PALM

Instructions to Register Pledge

February 18, 2005

To:    Royal Palm Hotel Property, LLC
       c/o The Falor Companies, Inc.
       8609 W. Bryn Mawr Ave. – Suite 209
       Chicago, IL 60631
       Attention: Mr. Robert D. Falor

In accordance with the requirements of that certain Pledge Agreement, dated as of February 18, 2005 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), between CARBON CAPITAL II, INC., a Maryland corporation, having an address c/o BlackRock Financial Management, Inc., 40 East 52nd Street, 7th Floor, New York, NY 10022 (the "Lender") and ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company, having an address of c/o The Falor Companies, Inc., 8609 W. Bryn Mawr Ave. – Suite 209, Chicago, IL 60631, Attention: Mr. Robert D. Falor (the "Pledgor"), (defined terms used herein as therein defined), you are hereby instructed to register the pledge of the following property (the "Collateral"):

All of the membership interests of the Pledgor in Royal Palm Hotel Property, LLC, a Delaware limited liability company ("Company") as listed on Schedule 1 to the Pledge Agreement, including, without limitation, all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

    (a)    all additional membership interests of, or other equity interests in, Company and options, warrants, and other rights hereafter acquired by Pledgor in respect of such membership interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Company or otherwise) (all such membership interests and other equity interests, including those described on Schedule 1 to the Pledge Agreement, and all such options, warrants and other rights, collectively, the "Pledged Company Interests");

    (b)    all certificates, instruments, or other writings representing or evidencing the Pledged Company Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Company Interests;

    (c)    any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Company Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a member of Company, whether by way of a dividend, distribution, return of capital, or otherwise, as set forth in the Pledge Agreement;

    (d)    all other claims which Pledgor now has or may in the future acquire in its capacity as a member of Company against Company and its property;

NY\995026.4

(e)    all rights of Pledgor under the Limited Liability Company Agreement of Company (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of the Pledged Company Interests), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Company Interests; and

(f)    to the extent not otherwise included, all Proceeds of any or all of the foregoing.

You are hereby further authorized and instructed to execute and deliver to Lender a Confirmation Statement and Instruction Agreement, substantially in the form of Exhibit D to the Loan Agreement and, to the extent provided more fully therein, to comply with the instructions of Lender in respect of the Collateral without further consent of, or notice to, the undersigned.

Very truly yours,

PLEDGOR:

ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company

By:_____

    Name:  Robert D. Falor
    Title:    Authorized Signatory


LENDER:

CARBON CAPITAL II, INC., a Maryland corporation

By:_____

    Name:  Robert Friedberg
    Title:    Vice President and Secretary


2

## EXHIBIT D

(Confirmation of Mortgage Borrower)

[See Attached Document]

ROYAL PALM

Confirmation Statement and Instruction Agreement

February 18, 2005

To:    Carbon Capital II, Inc.
       c/o BlackRock Financial Management, Inc.
       40 East 52nd Street, 7th Floor
       New York, New York 10022

Pursuant to the requirements of that certain Pledge Agreement dated as of February 18, 2005 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), between CARBON CAPITAL II, INC., a Maryland corporation, having an address at c/o BlackRock Financial Management, Inc., 40 East 52nd Street, 7th Floor, New York, NY 10022 (the "Lender") and ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company, having an address of c/o The Falor Companies, Inc., 8609 W. Bryn Mawr Ave. – Suite 209, Chicago, IL 60631, Attention: Mr. Robert D. Falor (the "Pledgor"), this Confirmation Statement and Instruction Agreement relates to those membership interests (the "Pledged Company Interests"), as further described on Schedule 1 hereto, issued by Royal Palm Hotel Property, LLC, a Delaware limited liability company ("Company"). Terms used herein but not defined herein shall have the meaning given to them in the Pledge Agreement.

The Pledged Company Interests are not (i) "investment company securities" (within the meaning of Section 8-103 of the Uniform Commercial Code (the "Code")) or (ii) dealt in or traded on securities exchanges or in securities markets. None of the terms of any Pledged Interest provides that it is a "security" (within the meaning of Sections 8-102(a)(15) and 8-103 of the Code).

Nevertheless, in the event that the Pledged Company Interests should be determined to be "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the Code), for purposes of perfecting the security interest of Lender therein, the Company agrees as follows:

On the date hereof, the registered owner of 100% of the membership interests of Company is Pledgor, having an address of c/o The Falor Companies, Inc., 8609 W. Bryn Mawr Ave. – Suite 209, Chicago, Illinois 60631, Attn: Mr. Robert D. Falor.

The registered pledgee of the Pledged Company Interests is:

CARBON CAPITAL II, INC.,
a Maryland corporation
c/o BlackRock Financial Management, Inc.
40 East 52nd Street, 7th Floor
New York, NY 10022

There are no liens of Company on the Pledged Company Interests or any adverse claims thereto for which Company has a duty under Section 8-403 of the Code. Company has by book-entry registered the Pledged Company Interests in the name of the registered pledgee on or before the date hereof. No other pledge is currently registered on the books and records of Company with respect to the Pledged Company Interests.

Until the Obligations are paid in full (exclusive of any indemnification or other obligations which are expressly stated in any of the Loan Documents to survive satisfaction of the Note), Company agrees to: (i) comply with the instructions of Lender, without any further consent from Pledgor or any other Person, in respect of the Pledged Company Interests; and (ii) disregard any request made by Pledgor or any other person which contravenes the instruction of Lender with respect to the Pledged Company Interests.

Dated: February __, 2005

<div style="margin-left:40%">

Very truly yours,

ROYAL PALM HOTEL PROPERTY, LLC,
a Delaware limited liability company

By: _____
Name: Robert D. Falor
Title:   Authorized Signatory

</div>

ACKNOWLEDGED AND AGREED:

CARBON CAPITAL II, INC.
a Maryland corporation

By: _____
Name: Robert Friedberg
Title:   Vice President and Secretary


ROYAL PALM SENIOR INVESTORS, LLC
a Delaware limited liability company

By: _____
Name: Robert D. Falor
Title:   Authorized Signatory

SCHEDULE I

DESCRIPTION OF PLEDGED MEMBERSHIP INTEREST

| Company | Owner | Percentage of Membership Interests |
|---|---|---|
| ROYAL PALM HOTEL PROPERTY, LLC | Pledgor | 100% |

# PLEDGE AGREEMENT

This PLEDGE AGREEMENT (the "Pledge Agreement") dated as of February 18, 2005 (the "Effective Date"), is made by ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company, having an office at c/o The Falor Companies, Inc., 8609 Bryn Mawr Ave., Suite 209, Chicago, IL 60631 ("Pledgor"), for the benefit of CARBON CAPITAL II, INC., a Maryland corporation, having an office at c/o BlackRock Financial Management, Inc., 40 East 52nd Street, New York, NY 10022 ("Lender"). This Pledge Agreement is entered into with reference to the following facts:

    A.    On the Effective Date, Lender has made a loan (the "Loan") to Pledgor in the principal amount of Twenty-Four Million, Five Hundred Forty-Five Thousand, Eight Hundred Thirteen and No/100 Dollars ($24,545,813.00).

    B.    To evidence the Loan (including interest and all other obligations accruing in connection therewith), Pledgor, on the Effective Date, has executed and delivered a Promissory Note (the "Note") to Lender, in the principal amount of the Loan and a Loan Agreement relating to the Loan (the "Loan Agreement"). Defined terms used in this Pledge Agreement shall have the meaning given to them herein or in Exhibit A hereto (which refers to Pledgor as Debtor), and if not defined herein or therein, such terms shall have the meaning given to them in the Loan Agreement.

    C.    Pledgor owns 100% of the Membership Interest of the LLC, which Membership Interest is identified and more fully described in Exhibit A. The LLC was formed pursuant to the LLC Agreement. Pledgor's Membership Interest includes all right, title and interest and other property of Pledgor as described in such Exhibit A.

    D.    As further security for the Loan, and to induce Lender to make the Loan, without which Lender would not make the Loan or be obligated to make the Loan, Pledgor desires to pledge to Lender the Membership Interest and to grant to Lender a security interest in the Membership Interest (the "Security Interest").

    **NOW, THEREFORE**, in consideration for ten dollars ($10.00), and as an inducement to, the making of the Loan, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Pledgor and Lender do hereby agree as follows:

1.    <u>PLEDGE.</u>

To further secure Pledgor's obligations and liabilities under the Loan Documents, including, without limitation, this Pledge Agreement, and including Pledgor's obligations to make all payments and render all performance required by the Loan Documents and this Pledge Agreement, Pledgor does hereby pledge, assign and hypothecate to Lender and grant to Lender a continuing security interest in, to and under the Membership Interest.

2.    REPRESENTATIONS AND WARRANTIES.

Pledgor represents and warrants to Lender as follows:

2.1    LLC Agreement.  The Limited Liability Company Agreement (the "LLC Agreement") of the LLC is in full force and effect and Pledgor is not in default thereunder.

2.2    No Violation.  The execution and delivery of, and performance by Pledgor under, this Pledge Agreement will not (i) violate any provision of any mortgage, indenture, security agreement, contract, undertaking or other agreement to which Pledgor is a party or that purports to bind Pledgor or any of its property or assets including the LLC Agreement, or (ii) conflict with any law, order, rule or regulation applicable to Pledgor of any court or any federal or state government, regulatory body or administrative agency, or any other governmental body having jurisdiction over Pledgor or any of its properties.

2.3    No Filings or Consents.  Except for the filing of financing statements (pertaining to the Security Interest), and consents that have been obtained in writing and delivered to Lender, no authorization, consent, waiver, approval, exemption, registration with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or of any other party, including any other owner of the LLC, is or will be necessary to the valid execution, delivery or performance by Pledgor of this Pledge Agreement or in connection with Lender's exercise of its rights and remedies under this Pledge Agreement.  Pledgor further represents and warrants that the LLC and the requisite number of the members of the LLC have approved and consented to the execution and delivery of this Agreement and the granting of the Security Interest.

2.4    Title.  Pledgor owns the Membership Interest, free and clear of all liens, security interests and encumbrances thereon or adverse claims of title or any other interest whatsoever therein, subject to the provisions of the LLC Agreement.  This Pledge Agreement, the Security Interest, and any exercise of Lender's rights under this Pledge Agreement fully comply with all requirements in the LLC Agreement.  No financing statement, mortgage, deed of trust, security agreement, or other security instrument or filing gives notice of any pledge of the Membership Interest or any portion thereof or any proceeds thereof, except in favor of Lender.  The Security Interest is valid and constitutes a first and prior perfected security interest in the Membership Interest.

2.5    Authority and Effect.  Pledgor has full right, power and authority to grant the Security Interest and collaterally assign the Membership Interest to Lender under this Pledge Agreement, which is a valid and binding obligation of Pledgor enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the enforcement of creditor's rights.

3.    COVENANTS.

So long as this Pledge Agreement is in effect, except as otherwise expressly permitted by this Pledge Agreement:

3.1    <u>Protection of Membership Interest</u>.  Pledgor shall defend the Membership Interest against the claims and demands of all other parties; keep the Membership Interest free and clear of all security interests or other encumbrances except for Lender's Security Interest and Permitted Encumbrances; and not sell, transfer, assign, deliver or otherwise convey, pledge, hypothecate, or grant or permit to exist any lien on or security interest in, or otherwise encumber or dispose of, or modify or amend, the Membership Interest or any interest therein except for the Security Interest and Permitted Encumbrances; or otherwise alter the ownership of the LLC by admitting new Other Members or otherwise, without the prior written consent of Lender in each instance.  Pledgor shall not do or fail to do anything that would or could reasonably be expected to permit or enable any creditor of Pledgor to obtain or assert a lien upon or be legally entitled to compel a sale of the Membership Interest in order to obtain payment of any money Pledgor might owe to any of them.

3.2    <u>Notices</u>.  Pledgor shall notify Lender promptly in writing of any change in Pledgor's address or of any default or notice given with respect to the Membership Interest.

3.3    <u>Filings and Searches</u>.  Pledgor shall execute and deliver to Lender such financing statements, assignments and other documents and take such other actions relating to the Membership Interest and the Security Interest as Lender may reasonably request.  Pledgor shall pay all costs of searches as requested by Lender.  Lender is authorized to file on Pledgor's behalf, with respect to the Membership Interest, one or more notices of lien, financing statements, continuation statements or other documents (with Lender's signature on behalf of Pledgor) and to name therein Pledgor, as debtor, and Lender, as secured party, or to correct or complete, or cause to be corrected or completed, any financing statements, continuation statements or other such documents as have been filed or may be reasonably necessary naming Pledgor, as debtor, and Lender, as secured party.

3.4    <u>Costs</u>.  Pledgor shall pay when due all taxes, assessments and other charges of every nature that may be imposed, levied, or assessed against the Membership Interest.

3.5    <u>Protection of LLC Agreement</u>.  Pledgor shall preserve all its rights under the LLC Agreement.  Pledgor shall perform all its obligations as a member of the LLC when and as the LLC Agreement requires.  Pledgor shall not modify, or consent to any modification of, the LLC Agreement without Lender's prior written consent.  Pledgor shall not waive, release, or relinquish any of Pledgor's rights under the LLC Agreement without Lender's prior written consent.  Pledgor shall promptly give Lender a copy of any notice that Pledgor gives or receives (except from Lender) under the LLC Agreement.

3.6    <u>Further Assurances</u>.  Pledgor, at Pledgor's expense, shall execute and deliver all such further financing statements, continuation statements, assurances and assignments of the Membership Interest and consents with respect to the pledge of the Membership Interest and the execution of this Pledge Agreement, and shall execute and deliver such further instruments, agreements and other documents and perform such further actions as Lender may reasonably request in order to more fully effectuate the purposes of this Pledge Agreement and the assignment of the Membership Interest so that Lender may obtain the full benefits of this Pledge Agreement and the rights and powers herein created.

4. <u>EVENTS OF DEFAULT.</u>

4.1 <u>Definition</u>. Any "Event of Default" as defined in the Loan Agreement shall be an Event of Default hereunder.

4.2 <u>Lender's Remedies</u>. If an Event of Default has occurred and is continuing, Lender shall have the following rights and remedies, which shall be cumulative and shall not limit any other rights or remedies available to Lender under this Pledge Agreement or under any other Loan Document, but which shall be subject to the terms and conditions of Section 9.4 of the Loan Agreement:

4.2.1 <u>Acceleration</u>. Lender may declare the entire unpaid balance of the Loan, together with interest and any and all other charges payable under the Loan, to be immediately due and payable in full.

4.2.2 <u>UCC Rights</u>. Lender shall have with respect to the Membership Interest, in addition to all rights and remedies herein set forth, all of the rights and remedies available to a secured party under the Uniform Commercial Code as in effect in the State of New York as if such rights and remedies were fully set forth in this Security Agreement.

4.2.3 <u>Sale of Membership Interest</u>. Lender may sell any or all of the Membership Interest (in whole or in part, at Lender's option) at one or more public or private sale(s), with or without advertisement of the time, place or terms of sale, except that if it is a private sale, it shall occur no less than ten days after written notice to Pledgor at the address set forth herein. Such notice, given by certified mail, return receipt requested, or by overnight courier, shall be deemed reasonable notice. Any such sale may be conducted by an employee or agent of Lender. Any person, including both Lender (subject to any applicable legal restrictions) and Pledgor, shall be eligible to purchase any part or all of the Membership Interest at any such sale. Pledgor acknowledges that private sales, and in particular private sales of securities made pursuant to applicable law, may be at prices and on other terms less favorable to the seller than if the Membership Interest were sold at public sales. Pledgor agrees that any private sales that Lender elects to conduct or has conducted shall not be deemed to have been made in a commercially unreasonable manner by virtue of their being private sales. In the event of any sale, Lender shall apply the proceeds of such sale in accordance with the Loan Agreement. Lender shall determine the terms of such sale in its sole discretion.

4.2.4 <u>Holding of Membership Interest</u>. Lender may continue to hold the Membership Interest if it determines that a better price can be obtained, or a sale should otherwise be held, at a later date. Lender shall not be liable to Pledgor for any such delay nor for any loss in value in the Membership Interest. During the period of any such delay, Lender shall have the sole and exclusive right (at Lender's option) to exercise any and all rights of Pledgor, if any, as a member of the LLC and shall have no liability to Pledgor with respect to any act or omission by Lender in exercising such management rights.

4.2.5 <u>Assignment Documents</u>. Lender shall have the right, in connection with a sale, to execute and deliver on Pledgor's behalf one or more assignment(s) of the Membership Interest,

4

and such related documents as Lender may deem necessary, in order to perfect the transfer of the Membership Interest.

4.2.6   <u>Right to Purchase</u>. Lender or anyone designated by Lender may purchase the Membership Interest as stated above, free of any right of Pledgor to redeem the Membership Interest, which right of redemption Pledgor hereby expressly waives to the extent permitted by law.

4.2.7   <u>Appointment of Receiver</u>. Lender may obtain the appointment of a receiver, without notice to Pledgor and without regard to the adequacy of the Membership Interest as security for the Loan.

4.2.8   <u>Other Actions</u>. Lender may, at Pledgor's sole cost and expense, take any and all additional steps as Lender may, in its sole and absolute discretion, determine to (i) protect its rights in the Membership Interest; (ii) aid in the execution of any power herein granted or (iii) enforce any and all other legal or equitable remedies.

4.2.9   <u>Costs and Expenses</u>. Pledgor shall pay on demand all costs and expenses incurred by Lender in enforcing or preparing to enforce this Pledge Agreement, the Note, or any other Loan Document, in realizing upon or protecting the Membership Interest and in enforcing and collecting the Indebtedness or any guaranty thereof, including: (i) if Lender retains counsel for advice, suit, enforcement of remedies hereunder, appeal, insolvency or other proceedings under the United States Bankruptcy Code or otherwise, or for any of the above purposes, the reasonable attorneys' fees and disbursements incurred by Lender, and (ii) all filing, registration, or recording fees with respect to, and all other expenses incident to, the execution, acknowledgment and filing, registration or recording of this Pledge Agreement, any extension or modification hereof, any security agreement or other document supplemental hereto or relating to the Membership Interest, any Uniform Commercial Code financing statements evidencing this Pledge Agreement or pertaining to Lender's rights in the Membership Interest and any instrument of further assurance, and (iii) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution, delivery, filing, registration, or recording of any of the foregoing or arising out of or in connection with, or assessed with respect to, any commercial sale or other exercise of Lender's remedies (and resulting transfer of the Membership Interest) under this Pledge Agreement.

4.2.10   <u>Other</u>. Lender may exercise any other rights and remedies available pursuant to applicable law or in equity.

4.2.11   <u>Remedies Cumulative</u>. Lender's right to exercise any of its rights or remedies hereunder shall not be exclusive of Lender's right to exercise any of its other rights and remedies hereunder or available to Lender under any of the other Loan Documents, or under applicable law. Lender's rights and remedies hereunder and under the other Loan Documents shall be cumulative.

4.2.12   <u>Partial Exercise of Remedies</u>. Without limiting any rights or remedies of Lender, Lender shall have the right and option, in its sole and absolute discretion, to exercise any rights

or remedies with respect to only a portion of the Membership Interest and/or on account of only certain but not all defaults of Pledgor with respect to the Loan. If Lender partially exercises its remedies as described in the preceding sentence, then subject to applicable law, Lender shall continue to be entitled to exercise Lender's remedies as to the remainder of the Membership Interest and any other default, present or future. For example, without limiting the general application of this paragraph, Lender may realize upon portions of the Membership Interest consisting of the right to receive economic distributions or other economic benefits without realizing upon any other element(s) of the Membership Interest. If the Membership Interest relates to multiple LLC's, then Lender may realize upon some or all of the Membership Interest relating to any one or more LLC's without realizing upon the Membership Interest that relates to other LLC's, all in Lender's sole and absolute discretion and in such order as Lender shall determine.

4.3    Application of Sale Proceeds. If, after an Event of Default, Lender sells all or any part of the Membership Interest, then the proceeds of any such sale shall be applied as follows:

    4.3.1    Expenses. First, to the expenses of collecting the Membership Interest, including reasonable attorneys' fees and disbursements, and all other costs and expenses incurred by Lender in exercising its rights and remedies hereunder;

    4.3.2    Loan. Second, to be applied against the Loan, pursuant to the priorities (if any) that would apply if such proceeds were payments under the Note, as more fully described in the Loan Agreement; and

    4.3.3    Residue. The balance, if any, to the person(s) legally entitled thereto.

4.4    Grant of Power of Attorney. Pledgor hereby grants Lender a power of attorney, which power of attorney is coupled with an interest and hence irrevocable, to: (a) if an Event of Default has occurred and is continuing, exercise such rights as Pledgor may have as a member to enforce the LLC Agreement against the Other Members, including enforcement of Pledgor's right as a member of the LLC to receive any payments from the LLC, or against the LLC itself; and (b) execute, acknowledge, and deliver any further documents necessary or appropriate to perfect Lender's security interest in the Membership Interest granted pursuant to this Pledge Agreement (including UCC-1 financing statements for the Membership Interest) or any transfer or assignment of the Membership Interest pursuant to Lender's exercise of its rights and remedies under this Pledge Agreement. Such power of attorney is intended to protect Lender's security, and benefit Lender, by giving Lender a mechanism to enforce rights to receive payments and exercise rights under the LLC Agreement and rights under this Pledge Agreement. Lender shall have no obligations as a member by virtue of such power of attorney, and (unless Lender elects otherwise in writing) such power of attorney shall not give Lender any right to manage or control the LLC's affairs. Such appointment and power of attorney shall survive the death, adjudication of incompetency or insanity, retirement, removal, bankruptcy or insolvency of Pledgor or any of its members. Pledgor further agrees to execute and deliver such further confirmation of Lender's rights to enforce the LLC Agreement as may be necessary, appropriate or required as a condition to Lender's enforcement of the LLC Agreement on behalf of Pledgor or as Lender shall request.

5.    TERMINATION.

Upon the payment in full of all amounts evidenced or secured by the Loan Documents (the "Indebtedness"), Lender shall release, reassign, and return to Pledgor all Collateral hereunder then held by Lender. Thereafter, Lender shall have no further rights with respect thereto. Upon such termination of this Pledge Agreement, Lender shall deliver to Pledgor, at Pledgor's sole cost and expense, such documents as Pledgor may reasonably request to evidence such termination. If, after receipt of any payment of all or any part of the Indebtedness or interest thereon, Lender is for any reason compelled to surrender such payment because such payment is determined to be void or voidable as a preference, an impermissible set-off, or a diversion of trust funds, or for any other reason, then this Pledge Agreement shall continue in full force and effect notwithstanding any contrary action that may have been taken by Lender in reliance upon such payment. Any such contrary action so taken shall be without prejudice to Lender's rights under this Pledge Agreement and shall be deemed to have been conditioned upon such payment's having become final and irrevocable.

6.     MISCELLANEOUS.

6.1     No Lender Liability for Expenses. Nothing in this Pledge Agreement is intended or shall be construed to cause Lender to be liable or responsible for any expenses, disbursements, liability, or other obligations of any kind or nature whatsoever, including wages, salaries, payroll taxes, withholding taxes, employee benefits, or other amounts payable by or on behalf of Pledgor or the LLC, or any sums payable by Pledgor pursuant to the LLC Agreement, including capital contributions, contributions to fund losses, loans to the LLC, or any other payments or advances required of Pledgor pursuant to the LLC Agreement.

6.2     No Subrogation. No payment by or on behalf of Pledgor on account of the Loan shall create any right of subrogation, contribution, indemnification or reimbursement against Lender or any other party. In exchange for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Pledgor waives and releases any and all such rights of subrogation, contribution, indemnification and reimbursement. Pledgor expressly waives any right to enforce any remedy that Pledgor now has or may hereafter have against the LLC regarding the Loan and further waives any benefit of and any right to participate in any security for the Loan.

6.3     Waivers. Pledgor authorizes Lender, without notice or demand and without affecting Pledgor's obligations hereunder, from time to time: (i) to take from any party and to hold collateral (in addition to the Membership Interest) for the payment of the Indebtedness or any part thereof, and to exchange, enforce or release the Membership Interest or any part thereof; (ii) to accept and hold any endorsement or guaranty of payment of the Indebtedness or any part thereof and to release or substitute, or modify any obligation of, any such endorser or guarantor, or any party who has given any security interest in any other collateral as security for the payment of the Indebtedness or any part thereof, or any other party in any way obligated to pay the Indebtedness or any part thereof; (iii) if an Event of Default has occurred and is continuing, to direct the order or manner of the disposition of the Membership Interest and any and all other collateral for the Indebtedness and the enforcement of any and all endorsements, guarantees and other obligations relating to the Indebtedness or any part thereof as Lender may determine in accordance with the Loan Documents; and (iv) to determine how, when and what application of payments and credits, if any, shall be made on the Indebtedness or any part thereof.

6.4    Set-Offs.  Without limiting any other right of Lender, and subject to the terms of Section 9.4 of the Loan Agreement, whenever Lender has the right to declare the Indebtedness to be immediately due and payable (whether or not Lender has so declared), Lender, at its sole election, may set-off against the Indebtedness any and all moneys Lender then or thereafter owes Pledgor in any capacity, whether or not the Indebtedness is then due, and Lender shall be deemed to have exercised such right of set-off immediately at the time of such election whether or not any charge therefor is made or entered on Lender's records.

6.5    Protective Advances.  If Pledgor fails to perform any obligation hereunder, then Lender may, but shall not be obligated to, perform such obligation, including payment of taxes, assessments, insurance and other charges and expenses as herein provided, and Pledgor shall pay an amount equal to the cost thereof to Lender on demand by Lender.  Pledgor's obligation to make such payment shall be secured by this Pledge Agreement and all other security for the Loan Documents.

6.6    No Waivers.  No course of dealing between Pledgor and Lender and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Lender may remedy any default by Pledgor hereunder or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Pledgor.  All rights and remedies of Lender hereunder are cumulative.

6.7    Notices.  Any notice required or permitted to be given under this Pledge Agreement shall be given and shall become effective in the same manner as provided for in the Loan Agreement

6.8    Successors and Assigns.  Lender and Pledgor, as used herein, shall include successors or assigns of those parties.  The rights and benefits of Lender hereunder shall, unless Lender directs otherwise in writing, inure to any party acquiring any interest in the Indebtedness or any part thereof.

6.9    Written Modifications.  No modification, rescission, waiver, release or amendment of any provision of this Pledge Agreement shall be made except by a written agreement subscribed by the party sought to be bound.

6.10    Jury Trial.  IN ANY ACTION BROUGHT TO ENFORCE THE PROVISIONS OF THIS PLEDGE AGREEMENT, THE PARTIES HERETO AGREE THAT THEY SHALL WAIVE, AND HEREBY DO WAIVE, TRIAL BY JURY.

6.11    New York Jurisdiction and Law.  THIS PLEDGE AGREEMENT SHALL BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK.  THE PARTIES EACH HEREBY SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE OF NEW YORK FOR ANY ACTION OR PROCEEDING ARISING OUT OF THIS PLEDGE AGREEMENT OR THE RELATIONSHIP BETWEEN THE PARTIES UNDER THIS PLEDGE AGREEMENT AND WAIVE ANY AND ALL RIGHTS UNDER THE LAW OF ANY OTHER STATE OR COUNTRY TO OBJECT TO JURISDICTION WITHIN THE

NY\993511.6

STATE OF NEW YORK FOR THE PURPOSE OF LITIGATING ANY ACTION OR PROCEEDING ARISING OUT OF THIS PLEDGE AGREEMENT.

6.12    Intercreditor Agreement Controls. In the event of any conflict between any of the terms and provisions set forth in this Agreement and those set forth in the Intercreditor Agreement by and between Column Financial, Inc. and Lender, dated of even date herewith, the terms and provisions of the Intercreditor Agreement shall supersede and control the terms and provisions of this Agreement.

6.13    Interpretation. All terms, unless otherwise defined in this Pledge Agreement, shall have the definitions set forth in the Uniform Commercial Code, as may from time to time be in effect. The word "include" and its variants shall be interpreted as if followed by the words "without limitation."

<div align="center">No Further Text On This Page.</div>

**IN WITNESS WHEREOF,** Pledgor has executed and delivered this Pledge Agreement as of the Effective Date.

**PLEDGOR**

ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company,

By: _____
    Name: Robert D. Falor
    Title:  Authorized Signatory

Pledge Agreement

# EXHIBIT A

## To UCC-1 Financing Statement and To Pledge Agreement

Debtor (Pledgor):     Royal Palm Senior Investors, LLC

Secured Party:     Carbon Capital II, Inc.

Date:     February 17, 2005

I.     <u>Description of Collateral</u>.  The collateral covered by the UCC-1 financing statement to which this Exhibit A is attached (the "<u>UCC-1</u>"), and constituting the collateral in which Debtor has granted a perfected security interest to Secured Party pursuant to the Pledge Agreement to which this Exhibit A is attached, consists of the "<u>Membership Interest</u>," as defined below.  A complete description of the Membership Interest is hereby included and incorporated by reference in Item 4 (description of collateral) of the UCC-1, as if the entirety of this description of the Membership Interest (the collateral) were set forth in full on the face of the UCC-1.

II.     <u>Definitions</u>.  For purposes of the foregoing, the following terms shall have the following meanings:

"<u>Distributions</u>" means all of Debtor's right, title, and interest in and to (including the right to receive, and all rights of Debtor against the LLC or any Other Member with respect thereto) any and all distributions, issues, profits, and shares (including rights in the nature of warrants, purchase options, or options to acquire any property or further interest in the LLC) payable or distributable by the LLC, whether in cash or otherwise, whether of capital or income or surplus or otherwise, pursuant to the LLC Agreement or otherwise from the LLC, including distributions upon liquidation, dissolution, revision, reclassification, split-up, or other change or transaction affecting the LLC, or as a result of any sale, refinancing, or other capital transaction affecting any asset(s) or property of the LLC, or any borrowing by the LLC whether or not secured.

"<u>LLC</u>" means that certain limited liability company formed pursuant to the LLC Agreement (as defined below) under the limited liability company law of the State of Delaware, which LLC is known as Royal Palm Hotel Property, LLC.  The LLC's Certificate of Formation was filed with the Secretary of State of the State of Delaware on December 17, 2004.

"<u>LLC Agreement</u>" means that certain Operating Agreement dated February 17, 2005 related to the LLC (as it may be amended, modified and supplemented from time to time with Secured Party's consent).

"<u>Membership Interest</u>" means the following, whether in existence on the Effective Date or accrued and arising thereafter:

1.     <u>Distributions</u>.  All of Debtor's right, title and interest in and to any and all Distributions;

2.     <u>Other Payments and Rights Thereto</u>.  All of Debtor's rights with respect to, including Debtor's right to receive, any Distributions or other payments from the LLC, regardless of how such payments are characterized, including management fees, disposition fees,

administrative fees, reimbursements, development fees, partners' or members' fees, guaranteed payments, fees for services or for guaranteeing indebtedness, and any and all other payments from the LLC of any kind whatsoever;

3.    Capital Account. Debtor's capital account in the LLC;

4.    Mandatory Purchase. Any right of Debtor to require the LLC or any Other Member to purchase the Membership Interest or any portion thereof, and the proceeds of any such sale of the Membership Interest by Debtor;

5.    Loans. The proceeds of any loan that the LLC may make to Debtor or for Debtor's benefit, and any right of Debtor to require the LLC to make any loan to or for the benefit of Debtor;

6.    Property. All rights and interests of Debtor with respect to any property or asset of the LLC, including, without limitation, all real property, personal property and intangibles;

7.    Third-Party Proceeds. All rights of Debtor to receive the proceeds of any insurance, bond, indemnity, warranty, or guaranty pursuant to the LLC Agreement;

8.    Return on Membership Interest. Any interest or other return (preferred or otherwise) that may be earned or accrued on account of Debtor's Membership Interest;

9.    Rights as a Creditor. All of Debtor's right, title and interest as a creditor of the LLC, including all notes and other evidences of indebtedness of the LLC to Debtor, including to be paid any payments Debtor may receive or be entitled to receive from the LLC on account of the LLC's indebtedness to Debtor (whether such payments constitute principal, interest, fees, or any other amounts);

10.   Rights Against Other Members. All of Debtor's rights and claims against any Other Members with respect to the LLC or the financing and funding of the LLC and its activities, including any claims for: (a) reimbursement of sums advanced by Debtor on account of any Other Member's failure to perform under the LLC Agreement; (b) any claims for contribution or indemnity against any Other Member or its principals; and (c) any claims of Debtor against any Other Member under the LLC Agreement;

11.   Documents. All certificates or documents representing any Distribution;

12.   Rights as Partner/Member. All of Debtor's right, title and interest as a partner or member, and all of Debtor's limited liability company interests, whether now existing or hereafter created or arising, in and with respect to the LLC and the LLC Agreement, which Membership Interest of Debtor as of the date hereof constitutes 100% of the limited liability company interests in the LLC, as such interest may be increased or otherwise adjusted from time to time;

13.   LLC Agreement. All of Debtor's rights under the LLC Agreement;

14. <u>Management and Control Rights</u>. All of Debtor's right to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the LLC Agreement, or otherwise to control, manage, or direct the affairs of the LLC;

15. <u>Related Rights</u>. All rights of Debtor to terminate, amend, supplement, modify or waive performance under the LLC Agreement, to perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder;

16. <u>Documents</u>. All certificates or documents representing Debtor's interest in and rights with respect to the LLC; and

17. <u>Other</u>. Any and all other rights, claims, property interests, or other interests of any kind that Debtor may have from time to time with respect to or against the LLC or any Other Member, and any other or greater interest that Debtor may have from time to time in, to or with respect to the LLC.

18. <u>Replacements, Proceeds, Etc</u>. All replacements, additions, modifications, accessions, substitutions, products, and Proceeds relating to or arising from any of the foregoing, and all documents, ledger sheets, files, and books and records of Debtor relating thereto.

"<u>Other Members</u>" means all members of the LLC, other than Debtor, if any.

"<u>Proceeds</u>" shall include the following, whether in cash or not in cash:

1. <u>Certain Payments</u>. Any proceeds, products, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions, and replacements of the Membership Interest;

2. <u>Dispositions</u>. Whatever is received by Debtor upon the sale, exchange, collection or other disposition of any item of Collateral, whether such proceeds constitute inventory, accounts, accounts receivable, general intangibles, instruments, securities, credits, documents, letters of credit, chattel paper, documents of title, warehouse receipts, leases, deposit accounts, money, contract rights, goods or equipment;

3. <u>Applications of Proceeds</u>. Any such items that are now or hereafter acquired by Debtor with any proceeds of any collateral hereunder; and

4. <u>Insurance</u>. Any insurance proceeds payable by reason of loss or damage to the Membership Interest, the assets of the LLC, or any proceeds thereof.

III. <u>Limitation of Liability</u>. Notwithstanding anything to the contrary in the foregoing, Secured Party shall have no obligations or liability with respect to the Membership Interest unless and until Secured Party has succeeded to ownership thereof. Even then, Secured Party's liability shall: (a) terminate if and when Secured Party has transferred or abandoned such Membership Interest; and (b) under all circumstances be limited to Secured Party's interest in the Membership Interest.

*Execution Version*

SETTLEMENT AGREEMENT

Among

CARBON CAPITAL II, INC.,
as Lender

ROYAL PALM SENIOR INVESTORS, LLC,
as Borrower

and

ROBERT D. FALOR, GUY T. MITCHELL and GEOFFREY L. HOCKMAN,
each as a Guarantor

Dated as of October 24, 2007

10-24-2007 08:51

# TABLE OF CONTENTS

1. RECITALS AND DEFINITIONS. ..................................................................2
   1.1 Recitals ........................................................................................2
   1.2 Definitions ...................................................................................2

2. ACKNOWLEDGMENT OF INDEBTEDNESS...........................................2
   2.1 Borrower's Indebtedness....................................................................2
   2.2 No Offsets or Defenses......................................................................2

3. GENERAL TERMS OF SETTLEMENT. ....................................................3
   3.1 Capital Transaction; Maturity Date ....................................................3
   3.2 Excess Proceeds Sharing ..................................................................3
   3.3 Interest Rate Going Forward .............................................................4
   3.4 Waivers by Lender and Treatment of Certain Events of Default. ...............5
   3.5 Formula Settlement Rights ...............................................................6
   3.6 Mortgage Loan Funding Commitment...................................................7
   3.7 Usury Savings Clause.......................................................................7

4. BANKRUPTCY WAIVERS AND REMEDIES...............................................7
   4.1 Waiver ..........................................................................................7
   4.2 Stay Relief .....................................................................................8
   4.3 Foreclosure of Collateral ..................................................................8

5. REPRESENTATIONS, WARRANTIES AND COVENANTS. .........................9
   5.1 General Representations....................................................................9
   5.2 No Fraudulent Conveyance................................................................9

6. CONDITIONS PRECEDENT TO LENDER'S OBLIGATIONS. ......................9
   6.1 Accuracy of Representations and Warranties.........................................9
   6.2 Delivery of Borrower Deliveries..........................................................9
   6.3 Third Party Documents......................................................................9
   6.4 Independent Director.......................................................................10
   6.5 Failure of Satisfaction of Conditions..................................................10
   6.6 Costs...........................................................................................10

7. FUTURE DELIVERIES. .......................................................................10
   7.1 Delaware Opinion...........................................................................10

8. MANAGEMENT. .................................................................................11

9. ACKNOWLEDGMENTS OF BORROWER AND GUARANTORS. ..................11
   9.1 Free and Voluntary Act....................................................................11
   9.2 No Implied Terms...........................................................................11
   9.3 Fair Consideration..........................................................................11
   9.4 No Lender Control...........................................................................11
   9.5 No Other Representation...................................................................11
   9.6 Guarantees...................................................................................12

10. MISCELLANEOUS. .............................................................................12

i

10.1    Intercreditor Agreement .................................................12
10.2    Headings....................................................................12
10.3    Survival ...................................................................12
10.4    Notices.....................................................................12
10.5    No Assignment ..........................................................12
10.6    Successors and Assigns ...............................................12
10.7    Time ........................................................................12
10.8    Attorneys' Fees..........................................................12
10.9    Severability................................................................12
10.10   Authority...................................................................13
10.11   Parties in Interest .......................................................13
10.12   Other Agreements Superseded ......................................13
10.13   Further Assurances .....................................................13
10.14   Confidentiality............................................................13
10.15   LAW GOVERNING; STIPULATION TO JURISDICTION.........13
10.16   WAIVER OF JURY TRIAL ...........................................14
10.17   Counterpart Execution..................................................14

## EXHIBITS
Exhibit A:    Defaults
Exhibit B:    Special Purpose Entity Definition

## Index of Defined Terms

A/P Cap.......................... 4
Able ............................. 6
Accounts Payable............. 4
Agreement ..................... 1
Assignment .................... 9
Borrower ....................... 1
Borrower Deliveries.......... 9
Capital Transaction.......... 3
Excess Proceeds.............. 3
Formula Settlement.......... 6
Guarantor ...................... 1
Guaranty ....................... 1
Intercreditor Agreement..... 1

Lender........................... 1
LLC Power ...................... 9
Loan.............................. 1
Loan Agreement ............... 1
Loan Documents............... 1
Membership Conveyance ..... 3
Modified Default Provision ... 5
Note ............................. 1
Power of Attorney............. 9
Revised Maturity Date........ 3
Senior Loan Advance ......... 7
Stay Relief Mortion ........... 8

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement"), is made and entered into as of the 24th day of October, 2007, by and among CARBON CAPITAL II, INC., a Maryland corporation, having an address at c/o BlackRock Financial Management, Inc., 40 East 52nd Street, 7th Floor, New York, NY 10022 (together with its successors and assigns, "Lender"), and ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company, having its principal place of business at 1545 Collins Avenue, Miami Beach, FL 33139 ("Borrower"), and Robert D. Falor, Guy T. Mitchell and Geoffrey L. Hockman, each individually (individually and collectively, as the context requires, "Guarantor").

### W I T N E S S E T H :

On February 18, 2005 Lender made a certain mezzanine loan to Borrower in the principal amount of $24,545,813 (together with all interest, fees and other amounts owing on account thereof, the "Loan"), which loan is evidenced by a Promissory Note dated February 18, 2005, from Borrower in favor of Lender (the "Note").

The Loan is further evidenced by a Loan Agreement dated as of February 18, 2005, between Borrower and Lender (the "Loan Agreement").

Each Guarantor executed and delivered to Lender a Guaranty Agreement, dated February 18, 2005 (the "Guaranty"), guaranteeing to Lender the payment of the Guaranteed Obligations (as defined therein).

The Note, Loan Agreement, Guaranty and all other instruments and documents executed in connection with the Loan sometimes are referred to collectively as the "Loan Documents."

Lender and Column Financial, Inc., as initial mortgage lender, entered into a certain Intercreditor Agreement (the "Intercreditor Agreement") dated as of February 18, 2005.

Borrower has defaulted in its obligation to timely repay the indebtedness under the Loan Agreement on the Initial Maturity Date, among other Events of Default, and Borrower has requested Lender to forbear from the exercise of certain remedies in respect of the Loan, and to make certain other modifications to the terms of the Loan, subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the premises, the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the parties hereto, intending to be legally bound hereby, do hereby covenant and agree as follows:

10-24-2007 08:51

1.     RECITALS AND DEFINITIONS.

1.1     Recitals.  Lender, Borrower and Guarantors hereby acknowledge and agree that each and all of the recitations set forth herein are true and correct and are incorporated herein by this reference and made a part hereof for all purposes.

1.2     Definitions.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to the same in the Loan Documents.

2.     ACKNOWLEDGMENT OF INDEBTEDNESS.

2.1     Borrower's Indebtedness.  Borrower hereby acknowledges that the unpaid principal balance of the Note is presently due and payable in full, that Borrower heretofore has failed to pay the same, and that the total amount owing pursuant to the Note, including all accrued but unpaid interest as of October 23, 2007 is as follows:

| | |
|---|---|
| Outstanding Principal Balance: | $24,545,813.00 |
| Current Interest: | 1,554,568.14 |
| Deferred Interest Fee: | 9,405,276.58 |
| Default Rate Interest: | 777,284.07 |
| Maturity Late Fee: | 727,290.65 |
| Late Fee: | 72,955.62 |
| Legal Fees: | 178,654.57 |
| Total: | $37,261,842.63 |

Borrower acknowledges that interest continues to accrue on the principal amount of the Debt after the date hereof, as provided in the Loan Documents, and such additional interest shall constitute a part of and be added to the total amount of the Debt.  Borrower acknowledges that the Obligations include all principal, interest and servicer advances that Lender has made on the Mortgage Loan and the Loan.

2.2     No Offsets or Defenses.  As a material inducement to Lender to enter into this Agreement, (a) Borrower and Guarantors acknowledge that the Debt and the Loan Documents are valid and binding liabilities and obligations of Borrower and Guarantors, as the case may be, and (b) Borrower and Guarantors acknowledge that there are no claims or offsets against, or defenses or counterclaims to, the Debt or the other obligations to Lender evidenced by the Loan Documents.  Borrower acknowledges and agrees that the rate of interest on the Loan, as accrued prior to the date hereof and as amended by this Agreement, is reasonable in light of the risk of the Loan.  Borrower and Guarantors acknowledge that their obligations to Lender under this Agreement and the Loan Documents are valid and absolute.  Borrower and Guarantors hereby expressly waive any set off, defenses, including usury, and counterclaims in law or equity to the validity of the Debt or other obligations to Lender under this Agreement and/or the Loan Documents.

2

3.    GENERAL TERMS OF SETTLEMENT.

3.1    Capital Transaction; Maturity Date.  Borrower shall cause Mortgage Borrower to sell the Property or refinance the Loan (any such transaction, a "Capital Transaction") on or before March 31, 2008 (such date, as it may be extended or accelerated in the event of a Termination Event in accordance with the term hereof, the "Revised Maturity Date").  Borrower shall repay the Loan on the earlier of the Revised Maturity Date or the date of the closing of any Capital Transaction.  All references in the Loan Documents to the Extension Option and the Extended Maturity Date are hereby deleted, but without limiting or releasing Guarantor from any liability on account of Borrower's failure to satisfy the terms and conditions in order to extend the Loan pursuant to Section 2.7 of the Loan Agreement and Borrower's failure to pay and satisfy the Debt and all Other Obligations on the initial Maturity Date.  From and after the Revised Maturity Date, Lender may foreclose the Loan and pursue any other remedies available to it under the terms of the Loan Documents, at law or in equity.  Notwithstanding the foregoing, if a Capital Transaction has not occurred by the Revised Maturity Date, 99.9% of Borrower's membership interest in the Mortgage Borrower shall be deemed to have been conveyed (the "Membership Conveyance") by Borrower to Lender effective as of the Revised Maturity Date.  On October 1, 2008, the remaining 0.1% membership interest in Mortgage Borrower shall be deemed to have been conveyed by Borrower to Lender.  The Membership Conveyance and the 0.1% conveyance shall be automatic and shall not require the execution of any further documentation to evidence or effectuate such conveyance; nonetheless, Borrower hereby agrees to execute any documentation reasonably requested by Lender to confirm or evidence the Membership Conveyance and the 0.1% conveyance contemplated by the previous sentence and the changes to Mortgage Borrower's operating agreement contemplated by this paragraph.  Borrower shall bear all transfer taxes, if any, that may be payable in connection with the Membership conveyance or any other conveyance to Lender contemplated hereby.

Upon the Membership Conveyance, Lender shall become the managing member of the Mortgage Borrower.  Borrower shall become a 0.1% nonvoting member of Mortgage Borrower.  The amended operating agreement of Mortgage Borrower shall include a provision that requires Borrower's consent to any sale or refinance of the Property or Lender's interest under this agreement or Lender's interest in Mortgage Borrower subsequent to the Membership Conveyance and prior to October 1, 2008, such consent not to be unreasonably withheld or delayed.  The amended operating agreement of Mortgage Borrower shall require Lender, as managing member, to enter into and approve of any sale or refinancing of the Property proposed by Borrower prior to October 1, 2008, as along as the net proceeds of such transaction are sufficient to yield not less than $1.00 of Excess Proceeds (hereinafter defined).

3.2    Excess Proceeds Sharing.  For the purposes hereof, "Excess Proceeds" means the actual net proceeds of any Capital Transaction, but only to the extent that such proceeds exceed the total amount then owing on account of the Mortgage Loan and all of the Obligations outstanding as of the date received by Lender, including any obligations that would have accrued on unpaid amounts under the Loan Agreement after the Revised Maturity Date (including, without limitation, interest, all payments made in respect of the Mortgage Loan, all protective advances and the cost of all extraordinary expenses and capital expenditures made by Mortgage Borrower after the date of the Membership Conveyance, all of which shall be retained by Lender) at the rates contemplated by the Loan Agreement and hereby, notwithstanding the Membership

3

Conveyance and the fact that the Loan became due and payable in full on the Revised Maturity Date.

The Operating Agreement of Mortgage Borrower shall be deemed amended to provide that Borrower, as member, shall receive Excess Proceeds as follows:

(i) with respect to any Capital Transaction that closes prior to June 1, 2008, other than a Capital Transaction subsequent to a Termination Event, Borrower, as member, shall be entitled to 100% of the Excess Proceeds;

(ii) with respect to any Capital Transaction that closes after June 1, 2008 but prior to October 1, 2008, other than a Capital Transaction subsequent to a Termination Event, Borrower, as member, shall be entitled to the first $20,000,000 of the Excess Proceeds, plus fifty percent (50%) of all remaining Excess Proceeds. Lender shall be entitled to all remaining Excess Proceeds; and

(iii) with respect to any Capital Transaction that closes from and after October 1, 2008 or a Capital Transaction subsequent to a Termination Event, Lender shall be entitled to all Excess Proceeds.

3.3    Interest Rate Going Forward. Notwithstanding Section 2.2.3(a) of the Loan Agreement, from and after the date hereof and until the occurrence of a Termination Event, the Applicable Interest Rate shall be 10.0%. The Deferred Interest under the Loan Agreement shall accrue in addition to the revised Applicable Interest Rate; for the avoidance of doubt, upon the earlier of the Revised Maturity Date or such earlier date as the Loan is repaid in full, payments of interest (inclusive of the Deferred Interest) shall be required so as to yield an Internal Rate of Return equal to twenty-two percent (22.0%). A "Termination Event" shall mean:

3.3.1    Borrower shall fail to perform, observe or comply with any covenant, agreement or term contained in this Agreement in any material respect.

3.3.2    Subject to the provisions of Section 3.4 hereof, any Event of Default shall occur under any of the Loan Documents.

3.3.3    Borrower shall commence a voluntary proceeding (or an involuntary proceeding shall be commenced against Borrower in which there is collusive action, participation or communication by Borrower, Mortgage Borrower or any Affiliates of Borrower or Mortgage Borrower and such involuntary filing is not unconditionally dismissed or vacated within 120 days of filing), seeking liquidation, reorganization, or other relief with respect to Borrower or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of it or a substantial part of its property.

3.3.4    The "Accounts Payable" for the Mortgage Borrower shall exceed $4,600,000 (the "A/P Cap") at any time prior to the Revised Maturity Date, which excess shall not be paid down within ten days after Lender's written demand therefor. For purposes hereof, the "Accounts Payable" shall mean trade payables of the hotel for utilities and service and materials vendors, any amounts due for construction materials or labor, payroll taxes, state and local taxes,

including sales and occupancy taxes, real estate taxes, payroll and/or pension contribution delinquencies, which amount shall be reduced by any revenues available for application for such purposes pursuant to the Cash Management Account. In addition, the A/P Cap shall be reduced by any amounts advanced by Lender at Borrower's request to pay vendors in amounts (with respect to each vendor) not greater than the Accounts Payable delinquent on the date hereof and Lender agrees to advance such funds at Borrower's request to pay such items within five days after Borrower's written request therefor, together with lien waivers, releases and other documentation reasonably acceptable to Lender evidencing such debt and the satisfaction of such debt. Any amounts made available by Lender shall be deemed protective advances that will be added to the amount of the Loan and shall accrue interest accordingly.

Prior to the date of any Termination Event, Lender agrees that it shall not raise, claim or allege an Event of Default for any purposes within the contemplation of the Loan Documents solely on account of Borrower's failure to repay to Lender amounts owing and otherwise payable in respect of the Debt, including interest on any Payment Date or on the Initial Maturity Date or on any other date prior to the Revised Maturity Date.

3.4     Waivers by Lender and Treatment of Certain Events of Default.

Lender hereby waives any Event of Default existing as of the date hereof that would not have a material adverse impact on Borrower's ability to perform under the terms of this Agreement.

3.4.1     Lender hereby waives, on a going forward basis, the covenant to pay all amounts due and payable under the Note as and when due and payable, other than the obligation to repay the Debt in its entirety on the Revised Maturity Date (provided the provisions of Section 9.4(vii) of the Loan Agreement do not apply and Borrower is not in violation of the terms of the Cash Management Agreement or Mezzanine Cash Management Agreement).

3.4.2     Lender hereby waives, on a going forward basis, as against Borrower, only, any default or Event of Default that may now or hereafter occur solely on the part of Robert D. Falor or Geoffrey L. Hockman under the terms of the Guaranty. However, such waiver shall not waive or limit any rights or remedies that Lender may have against any such Guarantor on account of such default or Event of Default. In addition, Lender hereby waives the net worth requirement contained in Section 1.12 of the Guaranty and the requirement for delivery of financial statements contained in Section 5.15 of the Guaranty.

3.4.3     Lender and Borrower acknowledge and agree that the late fee shown in Section 2.1 hereof reflects a credit that Lender has granted to Borrower in the amount of $500,000.

3.4.4     Lender agrees that it shall not be permitted to sell Loan, or any interest therein or any portion thereof at any time between October 1, 2007, and the Revised Maturity Date. In addition, Lender agrees that from the Revised Maturity Date through October 1, 2008, Lender may sell its interest in the Collateral in connection with a sale of the Mortgaged Property, only.

Lender agrees that Section 8.1 of the Loan Agreement shall be modified as set forth on the attached Exhibit A. An Event of Default shall not be deemed to have occurred under Sections 8.1(a)(x), 8.1(a)(xii), 8.1(a)(xiv) or 8.1(a)(xix) of the Loan Agreement (in each case, a "Modified Default Provision"), unless and until (a) Lender shall have delivered to Borrower

written notice of such default and (b) if the fact, circumstance or event underlying such default is susceptible of cure, then Borrower shall have failed to cure such default within 20 days after the foregoing notice. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to the 20-day cure period if the relevant default could, in Lender's reasonable judgment, foreseeably lead to an impairment or diminution in the value or utility of the Mortgaged Property and the Collateral or in the priority and/or security of any of the Loan Documents.

Following the expiration of the applicable cure period, if any, with respect to a Modified Default Provision, Lender may call a Termination Event only if (a) Borrower is Able but unwilling to cure the relevant default or (b) such default is material. For the purposes hereof, "Able" shall mean that cure may be made by the payment by Borrower or Mortgage Borrower from amounts reasonably available from operations of the Mortgaged Property (while retaining sufficient reserves for the management of accounts payable) of a liquidated sum of money without the action or assent of a third party (or with the action or assent of a third party if there is no basis to believe that such action or assent will not be granted upon Borrower's performance). In the event that Borrower disputes Lender's determination of materiality with respect to the relevant default, then Borrower shall be entitled to submit the issue to binding arbitration, provided Lender will not be prohibited or delayed from exercising its remedies on account of the resulting Termination Event as provided herein and under the Loan Agreement during the pendency of such arbitration. The arbitration shall be conducted in the City and County of New York by a single arbitrator on an expedited basis in accordance with the commercial arbitration rules then prevailing of the American Arbitration Association (or any successor organization thereto). The arbitrator chosen or appointed pursuant to this Article shall be a disinterested attorney having at least 10 years experience as an arbitrator in the City of New York. The parties shall attempt to agree in good faith on the selection of an arbitrator. If the parties cannot promptly agree, then either party, on behalf of both and on notice to the other, may request such appointment by the American Arbitration Association in accordance with its commercial arbitration rules then prevailing. The arbitrator shall conduct such hearings and investigations as he may deem appropriate and, within 20 days of its designation, render an independent decision of the matter dispute, which decision shall be conclusive and binding upon the parties. The fee of the arbitrator, plus all third party legal costs of arbitration for both parties, shall be borne by the losing party.

3.5    Formula Settlement Rights. Lender agrees that (unless Guy Mitchell has repaid and satisfied the judgment entered in favor of The Formula, Inc. in Case No. 06-24774 Ca 02, 11th Circuit in and for Miami-Dade County, Stipulated Final Judgment dated October 8, 2007 and recorded in Official Records Book 25984, Pages 4762-4764, against Mortgage Borrower and Guy Mitchell) Lender shall, as soon as practical, either satisfy such judgment or shall succeed or cause an Affiliate of Lender to succeed to the rights of The Formula, Inc. pursuant to the Stipulation for Settlement (the "Formula Settlement") among Royal Palm Hotel Property LLC, Guy Mitchell and The Formula, Inc., dated June 5, 2007, including any judgment that may now or hereafter be obtained with respect to the Formula Settlement. Borrower and Guy Mitchell, personally, acknowledge and agree that the judgment is valid and enforceable, and hereby waive any right to seek to vacate or appeal the judgment. Lender agrees not to seek enforcement of such judgment or agreement against Borrower, Mortgage Borrower or the Mortgaged Property unless and until a Termination Event (other than an involuntary bankruptcy filing) occurs. Lender further agrees to vacate the judgment as it may relate to Guy Mitchell upon the

completion of the Membership Conveyance, provided that no Bankruptcy Action (other than an involuntary bankruptcy filing) is then pending against Borrower or Mortgage Borrower. The actual amount paid to The Formula, Inc. (i.e., net of any discounts) shall accrue interest in favor of Lender at the Applicable Interest Rate, unless a Termination Event occurs, in which case Default Rate interest shall thereafter apply.

3.6    Mortgage Loan Funding Commitment. Provided all conditions precedent to Lender's obligations hereunder have been satisfied and no Termination Event has occurred, Lender agrees to cause the payment (in each case, a "Senior Loan Advance") of the monthly debt service accruing under the Mortgage Loan and payable on the respective payment date in the months of October 2007, November 2007, December 2007 and January 2008, in the event and to the extent that available funds from operations after payment of items contemplated by the Cash Management Agreement are insufficient to fully pay such monthly debt service, shall pay such monthly debt service. Each Senior Loan Advance shall be added to the principal amount of the Debt and interest in respect of the Senior Loan Advances shall accrue at the Applicable Interest Rate unless a Termination Event occurs, in which case Default Rate interest shall thereafter apply.

3.7    Usury Savings Clause. This Agreement, and the Loan Documents as amended hereby are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate that could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full, so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan.

## 4.    BANKRUPTCY WAIVERS AND REMEDIES.

4.1    Waiver. Borrower acknowledges and agrees that Borrower is financially sophisticated; that Borrower has been represented by competent counsel in connection with the negotiation and execution of this Agreement; that this Agreement is the result of arms-length negotiations and has been entered into freely and voluntarily; and that Lender has given significant consideration in exchange for the agreements contained herein. Borrower further acknowledges that it has no other creditors whose interests would be adversely affected by enforcement of a waiver of Borrower's ability to file bankruptcy or to oppose a motion for relief from the automatic stay, and that any bankruptcy filing as to Borrower would be for the sole purpose of hindering and delaying Lender's exercise of its remedies. Borrower further acknowledges that if it has been unable to cause the Mortgage Borrower to complete a Capital Transaction with respect to the

Property or otherwise repay the Loan by the Revised Maturity Date, that Borrower has no reasonable prospect of reorganization in bankruptcy.

ACCORDINGLY, BORROWER HEREBY AGREES THAT: (1) IT SHALL NOT COMMENCE OR CAUSE TO BE COMMENCED AGAINST BORROWER ANY PROCEEDING SEEKING LIQUIDATION, REORGANIZATION, OR OTHER RELIEF WITH RESPECT TO BORROWER OR ITS DEBTS UNDER ANY BANKRUPTCY, INSOLVENCY, OR OTHER SIMILAR LAW NOW OR HEREAFTER IN EFFECT OR SEEKING THE APPOINTMENT OF A TRUSTEE, RECEIVER, LIQUIDATOR, CUSTODIAN, OR OTHER SIMILAR OFFICIAL OF IT OR A SUBSTANTIAL PART OF ITS PROPERTY; AND (2) IN THE EVENT OF THE FILING OF ANY PROCEEDING UNDER TITLE 11, UNITED STATES CODE WITH RESPECT TO BORROWER, BORROWER WAIVES THE PROTECTIONS OF THE "AUTOMATIC STAY" OF 11 U.S.C. 362(a) WITH RESPECT TO ANY ACT BY LENDER TO EXERCISE ANY AND ALL RIGHTS AND REMEDIES AVAILABLE TO LENDER UNDER THE LOAN DOCUMENTS OR AT LAW, IN EQUITY, OR OTHERWISE, AND LENDER SHALL BE ENTITLED TO IMMEDIATE RELIEF FROM THE "AUTOMATIC STAY."

4.2     Stay Relief. LENDER MAY FILE A MOTION FOR RELIEF FROM THE "AUTOMATIC STAY" OF 11 U.S.C. 362(a) ("STAY RELIEF MOTION") ON AN EXPEDITED BASIS AND SUCH MOTION MAY BE HEARD BY THE COURT ON TWO BUSINESS DAYS' NOTICE. BORROWER HAS NO DEFENSES AND SHALL NOT ASSERT ANY DEFENSES TO ANY STAY RELIEF MOTION FILED BY LENDER. BORROWER CONSENTS TO THE ENTRY OF AN ORDER GRANTING RELIEF FROM THE "AUTOMATIC STAY" TO LENDER TO EXERCISE ANY AND ALL RIGHTS AND REMEDIES AVAILABLE TO LENDER AGAINST BORROWER OR BORROWER'S PROPERTY UNDER THE LOAN DOCUMENTS OR AT LAW, IN EQUITY OR OTHERWISE.

4.3     Foreclosure of Collateral. Upon the earlier of (i) the occurrence of a Termination Event or (ii) the Revised Maturity Date, Lender shall be entitled to exercise all rights and remedies available to Lender under the Loan Documents or at law, in equity or otherwise, including, without limitation, institution of foreclosure proceedings against the Collateral or institution of or proceeding with other remedies such as those provided in the Guaranty or Note, without further notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to foreclose, protest or other formalities of any kind, all of which are hereby expressly waived by Borrower. After a Termination Event, Borrower shall not interfere with, or cause interference with, (a) the foreclosure of the Collateral or the exercise of any rights of Lender under the Loan Documents, (b) utilization of the Power of Attorney (hereinafter defined) and execution of the Assignment in favor of Lender or its designee or (c) the sale of the Collateral by Lender to any person or entity whatsoever. Borrower agrees that the use of the Power of Attorney and execution of the Assignment (hereinafter defined) are commercially reasonable and would constitute an effective and valid transfer of the Collateral. Borrower waives any right to defend against a deficiency judgment on the ground that any foreclosure of the Collateral was not commercially reasonable, to the extent permitted by applicable law.

5.    REPRESENTATIONS, WARRANTIES AND COVENANTS.

5.1    General Representations.  In order to induce Lender to execute this Agreement, Borrower and Guarantors hereby remake each of the representations and warranties contained in Sections 4.1.1 (except with respect to an occupancy license required with respect to the Property, which Borrower shall cause Mortgage Borrower to use its best efforts to remedy within thirty days after the date hereof), 4.1.2, 4.1.3 (other than with respect to the Mortgage Loan, and to Borrower's knowledge, only), 4.1.6 (except with respect to Liens on account of account of Accounts Payable previously disclosed to Lender and possible liens with respect to furniture, fixtures and equipment), 4.1.7 and 4.1.18 of the Loan Agreement with reference to the state of facts existing on today's date.  Borrower and Guarantors warrant and represent that they are each duly authorized to enter into this Agreement and are authorized to act in accordance with the terms hereof.

5.2    No Fraudulent Conveyance.  In addition, Borrower hereby represents and agrees that the grants of security to Lender and Loan modifications that are contemplated by this Agreement are not fraudulent conveyances under the Bankruptcy Code, and such conveyances are being made for "reasonably equivalent value" as defined in Section 548 of Title 11 of the Bankruptcy Code.

6.    CONDITIONS PRECEDENT TO LENDER'S OBLIGATIONS.

Lender's obligations under this Agreement are conditioned on the satisfaction of each of the following conditions precedent:

6.1    Accuracy of Representations and Warranties.  The respective representations and warranties of Borrower and Guarantors contained herein must be true and correct in all material respects when made.

6.2    Delivery of Borrower Deliveries.  Borrower and Guarantors shall have executed and/or delivered, as applicable, to Lender the following documents (collectively, the "Borrower Deliveries"):

6.2.1    A Release in favor of Lender in form and substance acceptable to Lender;

6.2.2    An executed and binding power of attorney (the "Power of Attorney") in favor of the Independent Director appointed pursuant to Section 6.4, below, on terms acceptable to Lender, pursuant to which the holder thereof shall be authorized to execute an assignment (the "Assignment") of the Membership Interest and the 0.1% interest conveyance (or if a Termination Event shall occur, 100% of the Collateral) in favor of Lender or its designee, in the form of assignment annexed to such power of attorney, in pursuit of Lender's remedies after the occurrence of a Termination Event or the Revised Maturity Date.

6.2.3    An executed and binding power of attorney (the "LLC Power") in favor of Lender, on terms acceptable to Lender, pursuant to which Lender shall be authorized to execute any amendments to the organizational documents of Mortgage Borrower required to effectuate the provisions contemplated hereby subsequent to the conveyance of the Membership Interest.

9

6.2.4    A reaffirmation of the guaranty of Mr. Guy T. Mitchell, on terms acceptable to Lender.

6.3    Third Party Documents.

6.3.1    Lender shall have received from Mortgage Lender (or its designee) an acknowledgment that this Agreement and the terms hereof do not cause a violation of the provisions of the Intercreditor Agreement.

6.3.2    Mortgage Borrower and Borrower shall have entered into a replacement Cash Management Agreement with Wachovia Bank, National Association on terms acceptable to Borrower and Lender.

6.3.3    Borrower shall furnish to Lender an opinion of counsel for Borrower (such counsel qualified in the State of New York to be reasonably acceptable to Lender) to the effect that the Borrower Deliveries and all other documents executed in connection with this Agreement are valid and enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights.

6.4    Independent Director.  Borrower shall have delivered evidence that Borrower has appointed or caused to be appointed Donald Puglisi as an Independent Director of the Company, and Mr. Puglisi shall have accepted such appointment.

6.5    Failure of Satisfaction of Conditions.  If any condition precedent set forth in this Article shall not be satisfied on or before October ___, 2007, then Lender shall have the option, in its sole discretion, either to (a) waive such condition precedent and proceed to close the transaction contemplated hereby, or (b) notify Borrower and Guarantors in writing that this Agreement will not come into force and effect, in which event Lender shall have no further obligations under this Agreement and shall not be bound hereby.

6.6    Costs.  All costs imposed on the transactions contemplated under this Agreement shall be paid by Borrower and shall be added to the total Debt.  Without limiting the generality of the foregoing, Borrower shall be responsible for the costs and expenses of the preparation and negotiation of this Agreement and the Borrower Deliveries, including legal fees.  All costs and expenses of the parties' performance of their respective obligations hereunder and the consummation of the transactions contemplated herein that have not been assumed specifically by any of the parties under the terms hereof shall be borne by the party incurring such cost or expense.

7.    FUTURE DELIVERIES.

7.1    Delaware Opinion.  Within 30 days after the date hereof, Borrower shall furnish to Lender an opinion of counsel for Borrower (such counsel to be reasonably acceptable to Lender) to the effect that (a) Borrower is a duly organized and validly existing limited partnership, in good standing under the laws of Delaware; (b) Borrower and Guarantors possess the full power and authority to perform their obligations hereunder and under the Borrower Deliveries; (c) this

Agreement, the Borrower Deliveries and all other documents executed in connection with this Agreement shall have been duly authorized, executed and delivered by Borrower and Guarantors, as the case may be, and constitute the valid and binding obligations of Borrower and Guarantors.

## 8. MANAGEMENT.

Borrower shall within three days after the date hereof cause Mortgage Borrower to serve notice of its termination of the existing Management Agreement (which termination shall take effect 30 days after notice of termination) and, upon such termination, to enter into a Replacement Management Agreement provided that Lender and Mortgage Lender have identified and approved a new Qualified Manager and approved the Replacement Management Agreement, it being agreed that the management fee for such Qualified Manager shall not exceed currently prevailing market rates. If a Replacement Management Agreement is entered into and the financial performance of the new Qualified Manager falls below the pro forma projections of existing management, then such loss of revenue and all resulting defaults shall not be deemed a Termination Event under this Agreement.

## 9. ACKNOWLEDGMENTS OF BORROWER AND GUARANTORS.

9.1    Free and Voluntary Act. Borrower and Guarantors are entering into this Agreement freely and voluntarily and shall enter into each of the Borrower Deliveries after full opportunity for consultation with legal, financial and other counsel of their choosing. One or more responsible officers of each of Borrower and each Guarantor have read this Agreement and each of the Borrower Deliveries and had the opportunity to discuss them with such legal, financial and other counsel. Borrower and Guarantors understand this Agreement and each of the Borrower Deliveries and the risk inherent in, and significance of, each of them.

9.2    No Implied Terms. Any and all duties or obligations that Lender may have to Borrower or Guarantors are limited to those expressly stated in this Agreement and the Borrower Deliveries, and neither the duties and obligations of Lender nor the rights of Borrower or Guarantors shall be expanded beyond the express terms of this Agreement and the Borrower Deliveries.

9.3    Fair Consideration. Lender's agreement contained herein (including, without limitation, Lender's agreement to issue the Formula Advance and Senior Loan Advances) constitutes valuable, adequate and fair consideration for the obligations of Borrower and Guarantors hereunder.

9.4    No Lender Control. Borrower and Guarantors agree that they shall not make or raise any claim that Lender is or has ever been, a partner, joint venturer, alter ego, manager, or controlling person of Borrower or any Guarantor, nor a participant of any type in any of their affairs.

9.5    No Other Representation. Borrower and Guarantors acknowledge and agree that neither Lender nor any person or entity acting on its behalf has made any representation or promise to Borrower or Guarantors that is not expressly set forth herein or in the Borrower Deliveries.

11

9.6    Guarantees.  By executing this Agreement below, each Guarantor consents to this Agreement, acknowledges that the Guaranty remains in full force and effect and agrees that the obligations of Guarantor thereunder shall in no way be reduced or excused on account of this Agreement and the amendment of the Loan Documents effected hereby.

10.    MISCELLANEOUS.

10.1    Intercreditor Agreement.  Lender acknowledges that all rights and remedies contained herein are subject to the terms of the Intercreditor Agreement and are subordinate to the payment and other rights of Mortgage Lender, as and to the extent provided therein.

10.2    Headings.  The captions and headings used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

10.3    Survival.  Each and every provision of this Agreement shall survive the execution hereof, any investigation relating hereto and any document executed under and pursuant to the provisions hereof.

10.4    Notices.  All demands, notices, requests or other communications required or permitted hereby shall be in writing and shall be given and deemed received in the manner contemplated by the Loan Agreement.  The updated notices address for Borrower is as follows:

       If to Borrower:



       With a copy to:




10.5    No Assignment.  Borrower and Guarantors shall not assign this Agreement or any of the Borrower Deliveries or any of their rights or obligations hereunder or thereunder without the prior written consent of Lender, which consent may be withheld by Lender in its absolute discretion.  Any purported assignment in violation of this provision shall be null and void.

10.6    Successors and Assigns.  This Agreement and all Borrower Deliveries shall inure to the benefit of and be binding upon the parties hereto and their permitted legal representatives, successors and assigns.

10.7    Time.  Time is of the essence as to each provision of this Agreement.

10.8    Attorneys' Fees.  If any legal action, arbitration or other proceeding is commenced to enforce or interpret any provision of this Agreement or any of the Borrower Deliveries, the

prevailing party shall be entitled to an award of its actual fees and expenses, including, without limitation, attorneys' fees and disbursements (including fees on appeal), expert witness fees and disbursements. The term "prevailing party" shall include a party who receives substantially the relief desired whether by settlement, dismissal, summary judgment, judgment or otherwise.

10.9    Severability. If for any reason any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

10.10   Authority. Each individual executing this Agreement on behalf of any party to this Agreement represents and warrants that he is authorized to enter into this Agreement on behalf of that party and that this Agreement binds that party.

10.11   Parties in Interest. Nothing in this Agreement, express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge any obligation of any third person or any party hereto or give any third person any right to subrogation or action over or against any party to this Agreement.

10.12   Other Agreements Superseded. This Agreement and the Borrower Deliveries supersede all prior agreements or understandings, written or oral, of Lender, Borrower and Guarantors relating to the subject matter of this Agreement, and, together with the writings to be delivered pursuant to this Agreement, incorporate the entire understanding of this transaction. This Agreement may be amended or supplemented only by a written instrument signed by the party against whom the amendment or supplement is sought to be enforced.

10.13   Further Assurances. Borrower and Guarantors, at any time before, at or after the effective date hereof, at their own expense, shall execute, acknowledge and deliver any further deeds, assignments, conveyances or other assurances, documents or instruments reasonably requested by Lender and shall take any other action consistent with the terms of this Agreement or that reasonably may be requested by Lender.

10.14   Confidentiality. It is important to all parties hereto to maintain a reasonable confidentiality regarding the subject matter hereof. Accordingly, no party shall disclose the terms or conditions of this Agreement or any document executed in connection herewith, except (i) as may be required by applicable law, (ii) to provide information to any management company or leasing agent hired with respect to the Collateral, (iii) to provide information to their respective accountants, counsel or other professionals, (iv) in any litigation, threatened litigation or action involving (A) this Agreement or any other document executed in connection herewith, (B) the Collateral, (C) the foreclosure of the Loan Agreement, or (D) the exercise by Lender of any rights or remedies under the Loan Documents, (v) to provide information that is of public record, (vi) to provide information that is a prerequisite to the registering or recording, in the appropriate county, of any of the Borrower Deliveries, or (vii) pursuant to a court order or subpoena. Further, Lender, Borrower and Guarantors, or their affiliates, when required by third parties to enable Lender, Borrower or Guarantors, as the case may be, to comply with contractual requirements, to deal with inquiries in connection with prospective transactions or to deal with inquiries of tenants and vendees of the Collateral, may give such explanation of the

13

circumstances giving rise to this Agreement and/or the terms and conditions thereof as may be requested by such third parties.

10.15  LAW GOVERNING; STIPULATION TO JURISDICTION.

THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, AND GOVERNED AND ENFORCED IN ALL RESPECTS BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE. BORROWER AND GUARANTORS DO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND FURTHER IRREVOCABLY AND UNCONDITIONALLY DO STIPULATE AND AGREE THAT THE FEDERAL COURTS IN THE STATE OF NEW YORK OR THE CIRCUIT COURT IN AND FOR NEW YORK COUNTY, NEW YORK SHALL HAVE JURISDICTION TO HEAR AND FINALLY DETERMINE ANY DISPUTE, CLAIM, CONTROVERSY OR ACTION ARISING OUT OF OR CONNECTED (DIRECTLY OR INDIRECTLY) WITH THIS AGREEMENT OR THE BORROWER DELIVERIES. BORROWER AND GUARANTORS HEREBY IRREVOCABLY DO AGREE THAT FINAL JUDGMENT IN ANY ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR THE BORROWER DELIVERIES SHALL AFFECT THE RIGHT OF LENDER TO BRING AN ACTION OR PROCEEDING AGAINST BORROWER OR EITHER GUARANTOR IN THE COURTS OF ANY OTHER JURISDICTION. THE FOREGOING CONSENT, IN ADVANCE, TO THE JURISDICTION OF THE ABOVE-MENTIONED COURTS, IS A MATERIAL INDUCEMENT TO LENDER FOR ENTERING INTO THIS AGREEMENT AND THE BORROWER DELIVERIES.

10.16  WAIVER OF JURY TRIAL.

LENDER, BORROWER AND GUARANTORS HEREBY DO KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE THE RIGHT THAT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE BORROWER DELIVERIES OR ANY TRANSACTION CONTEMPLATED HEREIN. THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

10.17  Counterpart Execution. This Agreement may be executed in several counterparts, each of which shall be fully effective as an original and all of which together constitute one and the same instrument but only after all of the parties have executed counterparts of this Agreement.

14

EXECUTED, DATED and DELIVERED as of the date first above written.

LENDER:

CARBON CAPITAL II, INC.

By:_____
    Name:_____
    Title:_____

BORROWER:

ROYAL PALM SENIOR INVESTORS, LLC

By: _Guy Mitchell_____
    Name: _Guy Mitchell_____
    Title: _MGR_____

GUARANTORS:

ROBERT D. FALOR

By:_____

GUY T. MITCHELL

By: _Guy Mitchell_____

GEOFFREY L. HOCKMAN

By:_____

15

<u>EXHIBIT A</u>

Section 8.1  Event of Default

    (a)    Each of the following events shall constitute an event of default hereunder (each, an "<u>Event of Default</u>"):

        (i)    Failure to pay the Debt, as modified pursuant to the terms of this Agreement;

        (ii)    [Intentionally Omitted];

        (iii)    if any of the Taxes are not paid prior to delinquency, provided, however, that Taxes shall be deemed timely paid for the purposes hereof as along a Borrower has paid or caused to be paid the amount of the most recent installment of Taxes coming due and payable from time to time after the due date hereof, regardless of the application of such payment to past-due time periods;

        (iv)    if the Policies are not kept in full force and effect;

        (v)    if certified copies of the Policies are not delivered to Lender within five (5) business days after request therefor;

        (vi)    if any Transfer shall occur without Lender's prior consent in violation of the provisions of this Agreement or the Pledge; provided, however, that for the purposes hereof, the term "Restricted Party" shall not include any members of Royal Palm Investors, LLC or Royal Palm Manager, LLC, or any shareholder, partner, member, non-member manager, direct or indirect legal or beneficial owner or employee of any such excluded members;

        (vii)    if any representation or warranty made by Borrower in the Settlement Agreement, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender after the date hereof shall be false or misleading in any material respect as of the date the representation or warranty was made;

        (viii)    if Mortgage Borrower, Borrower, Principal or Guy Mitchell shall make an assignment for the benefit of creditors;

        (ix)    Mortgage Borrower, Principal or Guy Mitchell shall commence a voluntary proceeding (or an involuntary proceeding shall be commenced against Mortgage Borrower, Principal or Guy Mitchell in which there is collusive action, participation or communication by Borrower, Mortgage Borrower or any Affiliates of Borrower or Mortgage Borrower and such involuntary filing is not unconditionally dismissed or vacated within 120 days of filing), seeking liquidation, reorganization, or other relief with respect to Mortgage Borrower, Principal or Guy Mitchell or their respective debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of it or a substantial part of its property;

A-1

10-24-2007 08:51

(x)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents; provided that, in each case, such breach shall not become a Termination Event of Default unless and (a) Lender shall have delivered to Borrower notice of such breach and (b) if the fact, circumstance or event underlying such breach is susceptible of cure, then Borrower shall have failed to cure such default within 20 days after the foregoing notice, subject to subsection 3.3.4 of the Settlement Agreement;

(xi)    if Borrower breaches any of its respective negative covenants contained in Section 5.2 (other than those Liens against the Property under Section 5.2.2(ii) existing as of the date thereof and Liens hereinafter arising that aggregate not more than $1,200,000, or in excess of $1,200,000 in the aggregate that Borrower has bonded against or caused to be released within thirty days after receiving actual notice of their existence) or any special purpose entity covenant contained on Exhibit B attached hereto or any covenant contained in the financial reporting requirements set forth in Section 5.1.11, subsection (a)-(f) and subsection (j) items (i)-(iii), subsection (m) or if Borrower fails to provide a fiscal 2008 Budget prior to December 1, 2007;

(xii)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period, provided that, in each case, such breach shall not become a Termination Event of Default unless and (a) Lender shall have delivered to Borrower notice of such breach and (b) if the fact, circumstance or event underlying such breach is susceptible of cure, then Borrower shall have failed to cure such breach within 20 days after the foregoing notice, subject to subsection 3.3.4 of the Settlement Agreement;

(xiii)    [Intentionally Omitted];

(xiv)    if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement), which default permits the Manager to terminate or cancel the Management Agreement (or such Replacement Management Agreement), and a new Qualified Manager is not appointed pursuant to a Replacement Management Agreement in accordance with the terms of this Agreement prior to the termination or cancellation of the Management Agreement (or such Replacement Management Agreement);

(xv)    [Intentionally Omitted];

(xvi)    [Intentionally Omitted]

(xvii)    [Intentionally Omitted];

(xviii)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or with respect to any Other Obligations under any Loan Documents not specified in subsections (i) to (xvi) above (as opposed to the provisions set forth in Section 8.1.1 of the Loan Agreement), for ten (10) days after written notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money that borrower is Able to cure, or for thirty (30) days after written notice from Lender in the case

of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days;

(xix)    if there shall be a default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Mortgage Borrower, Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt, provided that, in each case, such default shall not become and Termination Event of Default unless and (a) Lender shall have delivered to Borrower notice of such default and (b) if the fact, circumstance or event underlying such breach is susceptible of cure, then Borrower shall have failed to cure such default within 20 days after the foregoing notice, subject to subsection 3.3.4 of the Settlement Agreement;

(xx)    [Intentionally Omitted];

(xxi)    [Intentionally Omitted];

(xxii)    [Intentionally Omitted];

(xxiii)    [Intentionally Omitted];

(xxiv)  if Mortgage Borrower shall enter into any amendment, restatement, modification, or supplement to the Mortgage Loan Documents without obtaining Lender's prior written consent;

(xxv)    if a "Termination Event of Default" under the Mortgage Loan Forbearance Agreement shall occur and Mortgage Lender shall have issued written notice thereof or commenced a foreclosure or other enforcement proceeding against Borrower; and

(xxvi) if the Membership Interest or the Cash Management Account is transferred, changed, or modified by Borrower (except as contemplated herein) without Lender's prior written consent or the Liens created pursuant to the Pledge and other Loan Documents shall cease to be a fully perfected, enforceable first priority security interest in favor of Lender (other than as a result of Lender's action or inaction) or if the direction instruction letter to Mortgage Lender to deposit Required Mezzanine Interest Reserve Payments and, when applicable, Excess Cash Flow into the Mezzanine Cash Management Account is revoked or modified without Lender's prior written consent.

## EXHIBIT B

"Special Purpose Entity" shall mean a corporation, limited partnership or limited liability company which at all times, on and after the date hereof:

A.     Was organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property or the Collateral, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) acting as the general partner of the limited partnership that owns the Property or as the sole member or the managing member of the limited liability company that owns the Property, or (iii) acting as the general partner of the limited partnership or as the sole member or the managing member of the limited liability company that owns the equity interests of the limited partnership or limited liability company that satisfies clause (ii) above;

B.     will not be engaged in any business unrelated to (i) the acquisition, development, ownership, leasing, management, operation or sale of the Property or the Collateral, (ii) acting as the general partner of the limited partnership that owns the Property, (iii) acting as the sole member or the managing member of the limited liability company that owns the Property, as applicable, or (iv) acting as the general partner of the limited partnership or as the sole member or the managing member of the limited liability company that owns the equity interests of the limited partnership that satisfies clause (ii) above or the limited liability company that satisfies clause (iii) above;

C.     will not have, any assets other than those related to the Property or the Collateral or its partnership interest in the limited partnership or the membership interest in the limited liability company that owns the Property or acts as the general partner or managing member thereof, as applicable;

D.     will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is the general partner in a limited partnership or the sole member or managing member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

E.     [Omitted];

F.     [Omitted];

G.     [Omitted];

H.     if such entity is a limited liability company with only one member, will be a limited liability company organized in the State of Delaware that has (i) as its only member a managing member that is a Special Purpose Entity, (ii) at least one (1) Independent Director and

has not caused or allowed, and will not cause or allow, the manager of such entity to take any Bankruptcy Action unless the Independent Director shall have participated in such vote, and (iii) at least one (1) springing member that will become the non-managing member of such entity upon the dissolution of the existing non-managing member;

I.      if such entity is a limited liability company, will have an operating agreement, that, provides that such entity will not, so long as the Debt is outstanding: (A) dissolve, merge, liquidate or consolidate; (B) sell all or substantially all of its assets or the assets of Borrower (as applicable); (C) engage in any other business activity or amend its organizational documents with respect to the matters set forth in this definition; or (D) without the affirmative vote of one (1) Independent Director and of all other directors or managers of such entity, take any Bankruptcy Action with respect to itself or any other entity in which it has a direct or indirect legal or beneficial ownership interest;

J.      [Omitted];

K.      will not fail to correct any known misunderstanding regarding the separate identity of such entity;

L.      [Omitted];

M.      will maintain its own resolutions and agreements;

N.      other than as provided in the Mezzanine Cash Management Agreement and the other Loan Documents, in the case of Borrower, and in the Cash Management Agreement and the other Mortgage Loan Documents, in the case of Mortgage Borrower, will not commingle, its funds or assets with those of any other Person and (ii) will not participate in any cash management system with any other Person;

O.      will hold its assets in its own name;

P.      will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (ee) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

Q.      [Omitted];

R.      will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets;

S.      will maintain a sufficient number of employees in light of its contemplated business operations;

T.      will observe all partnership, corporate or limited liability company formalities, as applicable;

U.   will have no Indebtedness other than (i) the obligations and indebtedness evidenced and secured by the Loan Documents, (ii) such other liabilities that are permitted pursuant to the Loan Agreement and this Agreement;

V.   will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person;

W.   will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

X.   will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

Y.   [Omitted];

Z.   will not pledge its assets for the benefit of any other Person other than pursuant to the Loan Documents;

AA.   will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (ee) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

BB.   will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

CC.   will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

DD.   will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and shall not identify itself, as a division of any other Person;

EE.   will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates, except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with a third party that is not an Affiliate, and (ii) in connection with this Agreement and the other Loan Documents;

FF.   will not indemnify its partners, officers, directors (other than Independent Directors) or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the

B-3

event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation to indemnify;

GG.   [Omitted];

HH.   will not have any of its obligations guaranteed by any Affiliate, except pursuant to the Loan Documents; and

II.   will comply with all of the terms and provisions contained in its organizational documents (other than the special purpose entity covenants) in all material respects.

NY\1333365.6

10-24-2007 08:51

<u>CERTIFICATE OF SERVICE</u>

I, Alex J. Kaplan, hereby certify that on the 18th day of July 2008, I caused the

foregoing Notice of Motion, Memorandum of Law in Support of Defendant's Motion to Dismiss

Plaintiff Royal Palm Senior Investors, LLC's Claims, and Declaration of Nicholas P. Crowell

with exhibits annexed thereto to be filed and served via the Court's ECF system upon the

following counsel:

> H. Peter Haveles, Jr.
> Jonathan Francis
> Arnold & Porter LLP
> 399 Park Avenue
> New York, New York 10022
>
> Richard R. DuVall
> McCabe & Mack LLP
> 63 Washington Street
> P.O. Box 509
> Poughkeepsie, New York 12602-0509

_____
Alex J. Kaplan