10959-0001/dmf

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

GUY T. MITCHELL,

                        Plaintiff,

       -against-

CARBON CAPITAL II, INC.,

                        Defendant.

----------------------------------------------------------------------x

**AFFIRMATION**

08 CIV 4319 (JES)

      **PHILLIP SHATZ**, an attorney duly admitted to practice before this Court, hereby

affirms that the following is true and correct:

      1.      I am an attorney admitted to practice before this Court, am Of Counsel to the

law firm of McCabe & Mack LLP, counsel for the Involuntary Plaintiff, Royal Palm Senior

Investors, LLC ("Involuntary Plaintiff").  I submit this Affirmation in Opposition to Defendant

Carbon Capital II, Inc.'s Motion to Dismiss.

      2.      On October 23, 2007, the Supreme Court of the State of New York, County of

New York (the "State Court"), in connection with the action entitled *Hotel 71 Mezz Lender,*

*L.L.C. v. Falor, et al.*, No. 601175/07 (Ramos, J.) (the "*Hotel 71 v. Mitchell* State Action"),

attached Mitchell's interests in limited liability companies that were previously levied upon by

the New York County Sheriff.  A true and correct copy of the Order of Attachment is attached

hereto as Exhibit 1.

      3.      On March 26, 2008, the State Court granted Hotel 71 Mezz Lender, L.L.C.'s

motion to appoint former New York Court of Appeals Judge Albert M. Rosenblatt as receiver

(the "Receiver" or "Receiver Rosenblatt") over all of the personal property of Mitchell (and

10959-0001/dmf

the other judgment debtors), including all of the contractual rights and membership interests that they own in certain limited liability companies and other entities. True and correct copies of orders dated April 2 and April 4, 2008 regarding the receivership are attached hereto as Exhibits 2 and 3, respectively.

4.     On June 16, 2008, the State Court held a hearing in the *Hotel 71 v. Mitchell* State Action. A true and correct copy of the transcript of the June 16, 2008 hearing is attached hereto as Exhibit 4.

5.     A recent article in *The Deal* stated that "The [Royal Palm Hotel] is on the block, although it isn't clear who owns it" and further that "exactly who owns the Royal Palm is in dispute" because an "affiliate of BlackRock Inc. [*i.e.*, Carbon], which holds a loan for the property it says is in default, wants control," but "Mitchell has resisted" and "[l]awsuits have flown." A true and correct copy of the June 3, 2008 article in *The Deal* is attached hereto as Exhibit 5.

6.     On March 25 and April 1, 2008, Carbon sent RPSI letters notifying RPSI that Carbon deemed RPSI in default of the Settlement Agreement. True and correct copies of the March 25 and April 1, 2008 letters are attached hereto as Exhibits 6 and 7, respectively.

7.     On June 10, 2008, in connection with this action, Carbon deposed Plaintiff Guy T. Mitchell. A true and correct copy of the transcript of this deposition is attached hereto as Exhibit 8.

DATED:     Poughkeepsie, New York
           August 1, 2008

                                        _____
                                        PHILLIP SHATZ

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

HOTEL 71 MEZZ LENDER, L.L.C.,

                Plaintiff,

        v.

ROBERT D. FALOR, DAVID FALOR, CHRIS M.
FALOR, JENNIFER FALOR, GEOFFREY L.
HOCKMAN, and GUY T. MITCHELL,
                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

023027

Hon. Charles E. Ramos

Index No. 601175/07

Commercial Part

[PROPOSED] ORDER OF
ATTACHMENT

TO THE SHERIFF OF ANY COUNTY OF THE STATE OF NEW YORK OR OF THE

CITY OF NEW YORK:

Whereas an application has been made to the undersigned by Plaintiff, Hotel 71 Mezz

Lender, L.L.C. ("Plaintiff"), for an Order of Attachment against the property of each of the

defendants, Robert D. Falor, David Falor, Chris M. Falor, Jennifer Falor, Geoffrey L. Hockman

and Guy T. Mitchell ("Defendants"), in an action in the Supreme Court, now pending and

filing the affidavit of Ambrose J. Fisher, duly sworn to on September 18, 2007, and the exhibits

annexed thereto; the affirmation of Robert L. Weigel, Esq., duly sworn to on September 19,

2007, and the exhibits annexed thereto; the Memorandum of Law in Support of Plaintiff's Ex

Parte Application for an Order of Attachment; and it satisfactorily appearing to the Court from

the affidavit and affirmation that one of the grounds for attachment set down in CPLR § 6201

exists in favor of Plaintiff, and against the Defendants, to recover a sum of money, that is, the

sum of $57,411,864.33 (which is the amount calculated to be due and owing, jointly and

severally, by the Defendants as of September 18, 2007) to recover damages for breach of

contract on the Defendants' personal guaranty obligations, that Plaintiff is entitled to recover that

1

sum over and above all counterclaims known to them, and that each of the Defendants is a

nondomiciliary residing outside of the State of New York – defendants Robert Falor, David

Falor, and Chris Falor are all nondomiciliaries who reside in Florida; defendant Jennifer Falor is

a nondomiciliary who resides in Illinois; defendant Geoffrey Hockman is a nondomiciliary who

resides in Michigan; and defendant Guy Mitchell is a nondomiciliary who resides in Florida, and

the Plaintiff having given an undertaking with corporate surety in the amount of $ *10,000,000*

it is, therefore,

On motion of Gibson, Dunn & Crutcher LLP and Akin Gump Strauss Hauer & Feld LLP,

attorneys for the Plaintiff,

ORDERED that an Order of Attachment be and the same hereby is granted, and it is

further

ORDERED, that the amount to be secured by this order of attachment, including any

interest, costs, and sheriff's fees and expenses shall be $~~57,411,864.33~~ *$65,149,926.00* (the amount calculated to

be due and owing, jointly and severally, by the Defendants as of September 18, 2007).

Now, you are commanded to levy within your jurisdiction at any time before final

judgment, upon such property in which any of the Defendants has an interest and such debts

owing to Defendants, including, but not limited to, any interest any of the Defendants may have

in any of the companies or entities listed on the attached **Rider A**, and for the purpose of

securing and satisfying the sum of $57,411,864.33, and that you proceed hereon in the manner

and make your return within the time prescribed by law.

It is further ORDERED that the garanishee's statement required by CPLR § 6219 be

served within five days after levy, that a copy of the garanishee's statement be served upon the

plaintiff, and that the plaintiff shall move within 10 days after levy for an order confirming this

order of attachment

*and it is ORDERED that the plaintiff's undertaking be and the same is hereby fixed in the sum of $ 10,000,000 conditioned that the plaintiff shall pay to the defendant an amount not exceeding $ 10,000,000 for legal costs and damages which may be sustained by reason of the attachment, and up to and not exceeding $ 50,000.00 to the Sheriff for allowable fees, if the defendant recovers judgment or if it is decided that the plaintiff is not entitled to an attachment of the property of the defendants, and it is*

ENTERED:

9/25/07

_____
J.S.C.
Charles E. Ramos

*Attorneys for Plaintiff:*

John W. Berry
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000

Robert L. Weigel
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
(212) 351-4000

☑ DO NOT POST
JSC

3

## RIDER A

Royal Palm Manager, LLC
Royal Palm Hotel Property LLC
Royal Palm Hotel Senior Investors LLC
Royal Palm Senior Investors, LLC
Royal Palm Hotel Junior Investors LLC
Royal Palm Junior Investors, LLC
Royal Palm Hotel Investors LLC
Royal Palm Investors, LLC
Royal Palm Hotel Employers, LLC
MSD Investment Co., LLC
Mitchell Hotel Group LLC
Molinar Buildings LLC
Grove One Realty LLC
Grove One Management LLC
Airport North Business Center LLC
Pointe South Shopping Center LLC
Tri-County Shopping Center LLC
Virginia Station Shopping Center LLC
Red Oak Shopping Center LLC
Salem Crossing Shopping Center LLC
Salem Crossing (Phase 2) Shopping Center LLC
Mountain Valley Holdings of Georgia LLC
MHG Casa Madrona Hotel LLC
Readhouse Investors LP
Read House Investors, LP d/b/a The Read House Hotel
Pinecrest Properties Inc.
The Falor Companies, Inc.
The Falor Companies, LLC
Allied Hospitality Group, Inc.
Cypress Creek Associates, LLC
Printers Row, LLC
Printers Row Investors, LLC
Printers Row Manager, LLC
Printers Row Employer, LLC
South Beach Breakwater, LLC
South Beach Hotel Investors, LLC
South Beach Investors, LLC
South Beach Manager, LLC
Breakwater Condominium Association, Inc.
BRFLMF, LLC
BRFLMF JET, LLC
Any entity known as or d/b/a "Casa Madrona Hotel & Spa"
Cheeca Holdings, LLC
Cheeca Lodge Investors, LLC

4

Cheeca Lodge Manager, LLC
CD General Partnership
CD Cheeca General Partnership
Cheeca Hotel, LLC
Collinsville Holiday Inn
Empire Realty Investors, L.P.
Empire Realty Investors Express, L.P.
EWD Solutions, LLC
Grand Companies
Grand Hotel Supply, LLC
Grand Hotel and Restaurant Supply, LLC
Grand Rapids AFG Comfort, LLC
Melbourne Beach Hotel Investors, LLC
Melbourne Hotel Investors, LLC
Melbourne Hotel Manager, LLC
Melbourne Management Group, LLC
JBD Allied, LLC
Johnson Resort Properties d/b/a Key West Courtyard
Lansing AFG Hampton, LLC
Mayfair Hotel Group, LLC
Mayfair House Hotel, LLC
Mayfair Hotel Property Investors, LLC
Mayfair Hotel Investors, LLC
Mayfair Hotel Manager, LLC
National DF Investments, LLC
Nationwide Discount Hotel Supply, Inc.
Nationwide Hotel Management, Inc.
Nationwide Restaurant Industries, Inc.
PFI Holdings, LLC
PFI Holdings 1, LLC
Robert Falor Investments, LLC
Chicago H&S Hotel Property, LLC
Chicago H&S Investors, LLC
Chicago H&S Senior Investors, LLC
Chicago H&S Junior Investors, LLC
Chicago H&S Hotel Manager, LLC
Chicago H&S Manager, LLC
H & S Manager, LLC
Hotel 71 Management Group, LLC
Chicago H&S Hotel Employer, LLC
Hotel 71 Mezz Lender, LLC
Chattanooga Hotel Group, LLC
Chattanooga Hotel Investors, LLC
Chattanooga Hotel Manager, LLC
Chattanooga Hotel Management, LLC
CH Management Group, LLC

5

CD Chattanooga General Partnership
Springfield Inn Limited Partnership d/b/a The Springfield Inn
Tech Motel Ltd d/b/a Read House Hotel
The Tides, LLC
Tides Hotel Property, LLC
Tides Investors, LLC
Tides Hotel Investors, LLC
Tides Manager, LLC
Tides Hotel Employer, LLC
Trident-Allied Associates, LLC
State Street Hotel, LLC
202 S. State, LLC
State Street Hotel Investors, LLC
State Street Hotel Manager, LLC
U.S.A. Hotel Supply, Inc. d/b/a Grand Companies

Index No. 601175/07
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HOTEL 71 MEZZ LENDER, L.L.C.,

Plaintiff,

v.

ROBERT D. FALOR, DAVID FALOR, CHRIS M.
FALOR, JENNIFER FALOR, GEOFFREY L.
HOCKMAN, and GUY T. MITCHELL,

Defendants.

ORDER OF ATTACHMENT

Attorneys for Plaintiff

GIBSON, DUNN & CRUTCHER LLP

200 PARK AVENUE
NEW YORK, NY 10166-0193
(212) 351-4000

To

Attorney for

, Esq.,

Due and proper service of a copy
of the within is hereby admitted

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT:  *Ramos*                                    PART  S3m
                        *Justice*

Hotel 71 Mezz Lender            INDEX NO.  601178/07

                                MOTION DATE _____

        - v -                   MOTION SEQ. NO.  026

Robert D. Falor et al           MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

PAPERS NUMBERED

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... _____

Answering Affidavits — Exhibits _____ _____

Replying Affidavits _____ _____

*FILED*

*APR 07 2008*
*COUNTY CLERK'S OFFICE*
*NEW YORK*

Cross-Motion:  ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

        Conditioned upon the entry of judgment, which this Court is informed is imminent, the motion for the appointment of a receiver is granted.  The Defendants' refusal to produce documents related to their finances and their refusal to appear at depositions as ordered by this Court warrant the requested relief.
        Accordingly, this Court hereby appoints Albert M. Rosenblatt, of 63 Washington Street, Poughkeepsie, NY 12602 (tel. 845-486-6800) to serve as the receiver in this matter and to take such actions as are appropriate to satisfy the outstanding Order of Attachment and the Judgment (or Judgments) to be entered herein against the defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffery Hockman and David Falor.  To the extent the interests of these defendants are the controlling interests in entities owning real estate outside of this jurisdiction, the Receiver is hereby authorized, if he is so advised, to seek the aid of the Courts of those States in which the real estate is located in executing the duties of this receivership.
        This shall constitute the decision and order of this Court.

Dated:  4/2/08

                                        J.S.C.
                                HON. CHARLES E. RAMOS

Check one:  ☐ FINAL DISPOSITION  ☐ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST          ☐ REFERENCE



**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

HOTEL 71 MEZZ LENDER, L.L.C., )
)
     Plaintiff, ) Hon. Charles E. Ramos
)
  - against - ) Index No. 601175/07
)
ROBERT D. FALOR, DAVID FALOR, CHRIS ) Commercial Part
M. FALOR, JENNIFER FALOR, GEOFFREY )
L. HOCKMAN, GUY T. MITCHELL and AMY )
MITCHELL, )
)
     Defendants. )
)
---------------------------------------------

Supplemental [~~PROPOSED~~] ORDER

   Plaintiff Hotel 71 Mezz Lender, LLC, by its attorneys Akin Gump Strauss Hauer

& Feld LLP and Gibson, Dunn & Crutcher LLP, having commenced an action against the above-

named Defendants and having moved this Court for an Order against Defendants Guy Mitchell,

Robert Falor, Chris Falor, Geoffrey Hockman and David Falor (the "Defendants") under CPLR

§§ 3126 and 5228 to appoint a receiver authorized (i) to take any appropriate actions designed to

satisfy the Order of Attachment entered by this Court on September 25, 2007 and each and every

judgment entered or to be entered in this action, including, but not limited to, gaining access to

the relevant books and records relating to these Defendants' various entities and causing

compliance with the Court-ordered discovery, and (ii) to administer, collect, improve, lease,

repair or sell any ownership or management interests that Defendants Guy Mitchell, Robert

Falor, Chris Falor, Geoffrey Hockman and/or David Falor have in the personal property specified

below, and the motion having regularly come on to be heard,

1

NOW, upon reading and filing the order to show cause dated March 19, 2008, the affidavit of Robert L. Weigel, in support of the motion, sworn to on the 18th day of March, 2008, all the papers and proceedings heretofore had herein, and upon the affidavit of Stephen P. Younger, in opposition to the motion, sworn to on the 25th day of March, 2008, and upon the affidavit of Gerald Padian, in opposition to the motion, sworn to on the 25th day of March, 2008, and after hearing Robert L. Weigel, Esq., of counsel for Plaintiff Hotel 71 Mezz Lender, LLC, in support of the motion, and Stephen P. Younger, Esq., of counsel for Defendant Guy Mitchell, and Gerald Padian, of counsel for Defendants Robert Falor, Chris Falor, Geoffrey Hockman and David Falor in opposition thereto, and Nicholas P. Crowell, Esq., of counsel for judgment creditor Carbon Capital II, Inc., and after due deliberation having been held thereon,

NOW, upon motion of Gibson, Dunn & Crutcher LLP, attorney for Plaintiff Hotel 71 Mezz Lender, LLC, it is

ORDERED, that upon the entry of Judgment in favor of Plaintiff against Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor, the motion be and the same is hereby ~~in all respects~~ granted, and that the Honorable Albert M. Rosenblatt, 63 Washington Street, Poughkeepsie NY, 12602, be and is hereby appointed Receiver of all of the personal property of Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor, and each of them, identified in paragraphs (a) through (e), inclusive, of this Order, and authorized (i) to take any appropriate actions designed to implement, satisfy and enforce the Order of Attachment entered by this Court on September 25, 2007 and any judgment entered or to be entered in this action pursuant to this Court's Order granting summary judgment against Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor dated February 6, 2008 (hereinafter the "Judgment"), including, but

2

not limited to, obtaining possession of and otherwise exercising dominion and control of all books and records of any type or nature relating to or evidencing the Defendants' interests in the "Receivership Property" (as defined below), causing compliance by Defendants with all Court-ordered discovery, and (ii) to administer, collect, improve, lease, manage, repair or sell any and all personal property in which Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor have or claim any right, title, interest, claim and/or estate and any and all personal property in which Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor have or claim any rights to manage or direct the conduct of, whether as an owner, member, managing member, partner, president, shareholder, manager or otherwise, including:

(a)     the ownership and/or management interests of Defendant Guy Mitchell in Mitchell Hotel Group, LLC, Royal Palm Junior Investors, LLC, Royal Palm Investors, LLC, Royal Palm Senior Investors, LLC, Royal Palm Hotel Property, LLC, Royal Palm Manager, LLC, The Mitchell Companies, LLC, Mitchell Hospitality Investments, LLC, Molinar Buildings, LLC, GAM Holdings, LLC, GAM Investments, Ltd., Grove One Realty, LLC, Grove One Realty, Inc., Grove One Management, LLC, PBH Lake Worth Resort, LLC, Airport North Business Center, LLC, Virginia Station Shopping Center, LLC, Red Oak Shopping Center, LLC, Salem Crossing Shopping Center, LLC, Salem Crossing (Phase II) Shopping Center, LLC, Mountain Valley Holdings of Georgia, LLC, MHG Casa Madrona Hotel, LLC, Pointe South Shopping Center, LLC, and Tri-County Station Shopping Center, LLC (collectively the "Guy Mitchell Entities");

(b)     the ownership and/or management interests of Defendant Robert Falor in Royal Palm Investors, LLC, Royal Palm Manager, LLC, Chattanooga Hotel Investors,

3

LLC, Chattanooga Hotel Manager, LLC, Cheeca Lodge Investors, LLC, Cheeca Lodge Manager, LLC, Chicago H&S Investors, LLC, Chicago H&S Manager, LLC, Mayfair Hotel Manager, LLC, Mayfair Hotel Property Investors, LLC, Mayfair House Hotel, LLC, Melbourne Hotel Investors, LLC, Melbourne Hotel Manager, LLC, Printers Row Investors, LLC, Printers Row Manager, LLC, Printers Row, LLC, Readhouse Investors, LP, Robert Falor Investments, LLC, South Beach Hotel Investors, LLC, South Beach Investors, LLC, South Beach Manager, LLC, State Street Hotel Property, LLC, Tides Hotel Investors, LLC, Tides Manager, LLC, Tides Hotel Property, LLC and in any of the Guy Mitchell Entities (collectively the "Robert Falor Entities");

(c)     the ownership and/or management interests of Defendant Chris Falor in Royal Palm Investors, LLC, Royal Palm Manager, LLC, any of the Guy Mitchell Entities, and any of the Robert Falor Entities;

(d)     the ownership and/or management interests of Geoffrey Hockman in Royal Palm Investors, LLC, Royal Palm Manager, LLC, any of the Guy Mitchell Entities, and any of the Robert Falor Entities; and

(e)     the ownership and/or management interests of Defendant David Falor in Royal Palm Investors, LLC, Royal Palm Manager, LLC, any of the Guy Mitchell Entities, and any of the Robert Falor Entities; and it is further

ORDERED, that the Receiver (i) Shall take possession of all personal property described in paragraphs (a)-(e) above (hereinafter the "Receivership Property"); (ii) May employ agents, employees, clerks, and accountants incidental to his services, provided however that the Receiver may employ counsel and file suit only with permission of the Court; (iii) May incur the risks and obligations ordinarily incurred by receivers; (iv) May assume any management role,

4

including, but not limited to, whether as an owner, member, managing member, partner, president, shareholder, manager or otherwise, currently held by Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and/or David Falor, whether directly or indirectly, in or in respect of any of the Receivership Property, and may perform any and all acts and exercise all authority that Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and/or David Falor are authorized, empowered, obligated or otherwise permitted to do under the respective operating agreements, articles of incorporation, bylaws, or statutes governing management of the Receivership Property; and (v) May assert any legal rights that the Defendants may have to challenge any purported third party rights in the Receivership Property, notwithstanding any of the other provisions of this Order, and it is further

ORDERED, that any and all persons claiming any interest in any of the Receivership Property be and hereby are and shall be enjoined (i) from commencing any action against the Receiver, (ii) from interfering or impeding in any manner or to any extent with the Receiver's possession, dominion and control of the Receivership Property, (iii) from interfering or impeding in any manner or to any extent with the discharge of the duties of the Receiver herein, except with the express permission of this Court obtained after filing a motion on notice to the Receiver and all parties to this action, and it is further

ORDERED, that nothing herein shall be deemed to enlarge any rights or privileges of the Receivership Property as against any third party, and it is further

ORDERED, that the Receiver and Plaintiff Hotel 71 Mezz Lender, LLC, may at any time apply to this Court for further instructions and orders related to this Order and for additional powers necessary to enable the Receiver to perform the Receiver's duties properly at any time on noticed motion, and it is further

5

ORDERED, that the Receiver shall take possession of and be fully authorized to exercise dominion and control of any and all property described in the Order of Attachment as the equivalent of the Sheriff of the County of New York's agent, that the Receiver shall serve papers on the Sheriff indicating as much, and that this shall constitute attornment to the Sheriff under the Order of Attachment, and it is further

ORDERED, that pursuant to Section 202.52 of the Uniform Civil Rules for the Supreme Court and the County Court, (i) the Receiver shall keep separate written accounts for each of the Defendants, (ii) the Receiver shall promptly deposit any funds received in an interest-bearing account, in ~~the following bank or trust company designated by the Court:~~

any New York State commercial Bank,

(iii) the account shall be in the Receiver's name as receiver or assignee and shall show the name of the above-referenced matter, (iv) the depository shall furnish monthly statements to the receiver or assignee and to the attorney for the receiver or the assignee, (v) no funds shall be withdrawn from a receiver's or assignee's account, and no check thereon shall be honored, unless directed by court order or the check is countersigned by the receiver's or assignee's surety, and it is further

ORDERED, that at such intervals as the Receiver deems appropriate, the Receiver shall apply, upon notice to all parties to this action, to the Court for permission to (i) pay all the Receiver's expenses, including any fees owed to the Sheriff of the County of New York, but not including general office expenses, from the proceeds of the aforesaid sale or other disposition of the Receivership Property, (ii) a receive compensation pursuant to CPLR 8004 ~~pay from the proceeds of the sale or other disposition of the Receivership Property an amount equal to five percent of the net proceeds as his fee~~ and (iii) expeditiously transfer to Plaintiff Hotel 71 Mezz Lender, LLC, in partial satisfaction of Plaintiff's

Judgment, any remaining funds or other property of any type or nature obtained from or in respect of any sale or other disposition of the Receivership Property, and it is further

ORDERED, that the Receiver, before entering upon his duties, shall give an undertaking to faithfully discharge his duties, with sufficient surety or sureties to be approved by the court in the penal sum of $250,000 ($_____) Dollars, and file that bond in the Office of the Clerk of the County of New York, and serve copies thereof upon the Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor, and that upon the filing of this order and the final approval and filing of the bond as required by law, the Receiver shall be invested with all the rights and powers of a receiver as such according to law and practice, and it is further

ORDERED, that the Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor are restrained from doing the following: (i) Disposing of the Receivership Property and any and all funds or property now or hereafter subject to this Order, except to transfer the Receivership Property to the Receiver; (ii) Diverting, concealing, encumbering, or transferring any of the Receivership Property; (iii) Interfering in any manner with the discharge of the Receiver's duties under this Order, (iv) Doing any act that will impair the preservation of Plaintiff Hotel 71 Mezz Lender, LLC's interest in the Receivership Property, and it is further

ORDERED, that the Defendants Guy Mitchell, Robert Falor, Chris Falor, Geoffrey Hockman and David Falor and their agents, accountants, servants, and attorneys are directed to do the following: (i) To execute and deliver to the Receiver all documents necessary for the Receiver to take possession of the Receivership Property; (ii) To expeditiously relinquish possession of and turn over possession to the Receiver of any and all documents, books, and

records relating to and/or evidencing the Receivership Property, including, but not limited to,

accounting records, bank statements, financial statements, operating statements, and loan

agreements, including any information stored on computer, and to promptly, fully and truthfully

answer any reasonable questions asked by the Receiver concerning such documents, books, and

records, and it is further

ORDERED, that to the extent there is any conflict between this ~~Supplemental~~ Order, ~~and~~ the

transcript of the hearing held in this action on March 26, 2008, the terms of ~~this Order shall~~ the 4/2/08 ~~and the terms of the 4/2/08 Order,~~

~~J.S.C. Order shall~~ supersede the transcript and ~~Supplemental Order~~ constitute a final and controlling Order on this Motion.

Dated: April 4, 2008

_____
Hon. Charles Edward Ramos, J.S.C.

【 FILED 】
APR 0 7 2008
COUNTY CLERK'S OFFICE
NEW YORK

8

1

1

2          SUPREME COURT OF THE STATE OF NEW YORK.
           COUNTY OF NEW YORK - CIVIL TERM - PART 53
3          -----------------------------------------------X

4          HOTEL 71 MEZZ LENDER, LLC

5                                      Plaintiff,

6                              -against-

7          ROBERT D. FALOR, DAVID FALOR, CHRIS M. FALOR,
           JENNIFER FALOR, GEOFFREY L. HOCKMAN, GUY T. MITCHELL,
8          and AMY MITCHELL,
                                      Defendants.

9

10         -----------------------------------------------X
           Index # 601175/07                    Proceedings
11
                                          60 Centre Street
12                                        New York, New York
                                          June 16, 2008
13

14
           B E F O R E:
15
                                 HONORABLE CHARLES E. RAMOS,
16                                        Supreme Court Justice.

17
           A P P E A R A N C E S:
18

19              AKIN GUMP STAUSS HAUER & FELD, LLP
                590 Madison Avenue
20              New York, New York 10022-2524
                     BY:   ROBERT HOTZ, ESQ.
21                         and RICHARD NASSEL, ESQ.
                           Attorneys for Plaintiff
22
                GIBSON, DUNN & CRUTCHER, LLP
23              200 Park Avenue
                New York, New York 10166-0193
24                   BY:   ROBERT L. WEIGEL, ESQ.
                     Attorneys for the Plaintiff - Hotel 71
25

26                            DEBORAH A. ROTHROCK, RPR
                              OFFICIAL COURT REPORTER

```
 1                    -Proceedings-

 2          McCABE & MACK, LLP
            63 Washington Street
 3          Poughkeepsie, New York 12602-0509
                 BY:  PHILLIP SHATZ, ESQ.
 4               Attorneys for Receiver Rosenblatt

 5          SIDLEY AUSTIN, LLP
            787 Seventh Avenue
 6          New York, New York 10019
                 BY:  ISAAC S. GREANEY, ESQ.
 7                   and Andrew Ross
                     Attorneys for Carbon Capital
 8
            TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
 9          425 Park Avenue
            New York, New York 10022
10                    By:  MATHEW E. HOFFMAN, ESQ.
                      Attorneys for Defendant-Amy Mitchell
11

12          BERGER & WEBB, LLP
            1633 Broadway
13          New York, New York 10019
                 BY:  STEVEN BERGER, ESQ.
14                   Attorneys for Defendant-Guy Mitchell

15
        ALSO PRESENT:  RECEIVER ALBERT M. ROSENBLATT
16

17

18

19

20

21

22

23

24

25

26
```

1                          -Proceedings-

2                 (Whereupon, the following is heard

3         before the Court.)

4                 THE COURT:  All right.

5                 MR. HOLTZ:  Robert Hotz from Akin Gump

6         for the Plaintiff Mezz Lender.  And this is

7         Richard Nassel from my firm as well, he's not

8         going to be speaking.

9                 MR. SHATZ:  Phillip Shatz from the firm

10        of McCabe & Mack representing the Receiver

11        Rosenblatt.

12                JUDGE ROSENBLATT:  I am the Receiver

13        Albert Rosenblatt.

14                MR. WEIGEL:  Robert Weigel from Gibson,

15        Dunn & Crutcher for Hotel 71.

16                MR. ROSS:  Andrew Ross Sidley Austin

17        representing Carbon Capital.

18                MR. GREANEY:  Isaac Greaney form Sidley

19        Austin representing Carbon Capital.

20                MR. HOFFMAN:  Mathew Hoffman from

21        Todtman, Nachamie, Pizz & Johns representing Amy

22        Mitchell on motion to dismiss.

23                MR. BERGER:  Steven A. Berger from

24        Berger & Webb for Guy Mitchell.

25                THE COURT:  I think I have three motions

26        at least.

```
1                        -Proceedings-
2               Which one will we start with?
3               MR. HOFFMAN:  Your Honor, our motion
4      with regard to Amy Mitchell is fairly simple.
5               Of course you will have to hear them all
6      one way or the other.
7               THE COURT:  This is not-- this is
8      against Falor?
9               MR. HOFFMAN:  No.
10              THE COURT:  You would happen to know the
11     sequence number?
12              Apparently this is motion Sequence 029.
13     Motion sequence 29.
14              This is Amy Mitchell's motion, right?
15              MR. HOFFMAN:  Yes, your Honor.
16              THE COURT:  Proceed.
17              MR. HOFFMAN:  Your Honor, my name is Mat
18     Hoffman and I represent Amy Mitchell.
19              I'm here to argue on her behalf that she
20     should be dismissed from the case because the
21     Court does not have jurisdiction over her.
22              There's no contention here that there is
23     long-arm jurisdiction.
24              There is only a contention here that Amy
25     Mitchell -- that there's jurisdiction over Amy
26     Mitchell based on a side letter.
```

```
1                          -Proceedings-

2                 I would like, with the Court's

3       permission, to hand up the language of the side

4       letter that I will be discussing.  It is not the

5       entire side letter, your Honor.  I've chosen to

6       take certain language from it that I will be

7       discussing and thought it might be more

8       convenient for the Court if the Court had it.

9                 THE COURT:  Hold on.  I want to find it

10      in the record.

11                As usual, it is wonderful motions that

12      are electronically filed.  I don't have a

13      complete set of paper.

14                MR. HOTZ:  Your Honor, I could hand up

15      the entire side letter and the guarantee of

16      payment.

17                THE COURT:  I would like to see papers

18      in opposition to motion to dismiss.

19                Is there an Affidavit submitted or memo

20      of law?

21                MR. HOTZ:  Just a memo of law.

22                THE COURT:  Does it annexed have the

23      exhibits?

24                MR. HOTZ:  No, I believe that the papers

25      were --the relevant signed agreement and

26      guarantee of payment were attached and in the
```

```
1                    -Proceedings-

2        motion.

3                MR. HOFFMAN:  As Exhibit A to the moving

4        papers, your Honor.

5                THE COURT:  Yes.

6                MR. Hoffman:  May I hand up the excerpt?

7                THE COURT:  No.

8                What is the date?

9                MR. HOFFMAN:  Exhibit A is dated

10       March 29, 2005.

11               THE COURT:  What paragraph?

12               MR. HOFFMAN:  All the way down to the

13       bottom where it says:  "It is agreed."

14               THE COURT:  Right.

15               (Pausing.)

16               Okay.

17               What you are saying is that it does

18       incorporate guarantee --

19               MR. HOFFMAN:  Well, what I am saying,

20       your Honor, it does incorporate the guarantee,

21       which has consent to jurisdiction.

22               My point is two-folds, your Honor.

23               First, assuming that the guarantee is

24       incorporated in whole and that the guarantee has

25       consent of jurisdiction.  The jurisdiction over

26       Amy is not merely as broad picture as the claims
```

```
1                        -Proceedings-
2       in the complaint.
3               They are entitled to, if you read
4       language here, in the side letter, to only -- and
5       I am reading from the last piece:
6               "Only to the extent of the value of such
7       assets as transferred to or owned by Amy
8       Mitchell."
9               Therefore, there is jurisdiction,
10      basically, which is only really based on this
11      letter, the incorporation of the guarantee, is
12      only to that extent.
13              THE COURT:  I am a little confused.
14              MR. HOFFMAN:  Yes.
15              THE COURT:  The relief they're seeking
16      is Amy pursuant to this side letter?
17              MR. HOFFMAN:  Well, yes and no.
18              They are seeking for broader relief than
19      the side letter, your Honor.
20              They are seeking to hold her responsible
21      for the entire debt.
22              THE COURT:  There's language limitation
23      in this side letter?
24              MR. HOFFMAN:  Correct.
25              THE COURT:  Where you say in that
26      language, that it trumps under some broader
```

```
1                          -Proceedings-

2          language in the guarantee?

3                     MR. HOFFMAN:  No.

4                     What I am saying,  your Honor, is that

5          -- yes, that is in fact correct.

6                     I'm saying that it trumps the broader

7          language of the guarantee.  It is specific.  It

8          says it is only incorporated to that extent.

9                     And, therefore, jurisdiction --assuming

10         that you incorporate the guarantee and assuming

11         that the jurisdictional language of the guarantee

12         is incorporated, and assume that for the moment,

13         it is only there for the extent of that, it is

14         limited by only the value of such assets so

15         transferred.

16                    THE COURT:  What do you say Plaintiff is

17         seeking in excess of the language of limitation?

18                    MR. HOFFMAN:  Because what they are

19         seeking -- if you look at the complaint, they're

20         not just seeking to hold her liable under the

21         side agreement.  They're seeking to hold

22         liability under the entire debt.

23                    And under the -- and according to their

24         complaint.  And according to this language here

25         they're not entitled to do it.  So their broad

26         causes of action are inappropriate.
```

1                        -Proceedings-

2            THE COURT:  Let me read.

3            (Pausing.)

4            THE COURT:  Who wants to speak in

5    opposition?

6            MR. HOLTZ:  I will, Robert Holtz.

7            THE COURT:  Yes.

8            MR. HOLTZ:  Your Honor, we are seeking

9    to revoke jurisdiction under a side letter which

10   incorporates by a reference the terms of the

11   guarantee of payment.

12           The terms of guarantee of payment are

13   clear, they are incorporated.  In fact, they were

14   attached to the actual side letter.

15           And in fact, it is interesting that

16   counsel did not read from the first paragraph of

17   the side letter, which expressly incorporates the

18   guarantee of payment and also by reference makes

19   it a part of this agreement.  It attaches a copy

20   to it of it.

21           Under Section 5.3 (B) of the guarantee

22   of payment, Ms. Mitchell has consented to

23   personal jurisdiction by this Court for any legal

24   suit or action or proceeding against her arising

25   out of or relating to this guarantee.

26           THE COURT:  Okay.

```
 1                    -Proceedings-
 2            MR. HOTZ:  We have limited thereto.
 3            And our causes of action are breach of a
 4      guarantee.
 5            We also have three causes of action for
 6      fraud --one related to actual fraud in connection
 7      with the fraudulent transfer of assets between
 8      Mr. Mitchell and Mrs. Mitchell.
 9            And for constructive fraud also arising
10      out of the same transfer of those assets.
11            THE COURT:  The claims-- do you accept
12      the limitation that is contained in the last
13      sentence, which would limit her liability to a
14      certain extent.  I think we're talking probably
15      about a dollar amount.
16            MR. HOFFMAN:  Only to the extent of
17      these actions.
18            MR. HOTZ:  Your Honor, that is what the
19      agreement so provides.
20            The only issue is the extent of the
21      assets transferred by Mr. Mitchell to his wife.
22            THE COURT:  I don't understand what your
23      objection is.
24            MR. HOFFMAN:  My objection is two-folds.
25            They're only allowing not whatever
26      transfers are, your Honor.  If you look at the
```

```
1                          -Proceedings-
2       language, it is only to the extent of such assets
3       go back that are on a certain financial
4       statement.  If you go back into that paragraph.
5       They have gone well beyond that your Honor, in
6       terms of their complaint.  They have pled far
7       more liability than the assets in that financial
8       statement.
9                  So, assuming they have jurisdiction --
10      let's assume.
11                 THE COURT:  You are saying there were
12      transfers to Amy Mitchell outside of the
13      financial statements that described certain
14      documents?
15                 MR. HOFFMAN:  If they were, they were
16      not entitled to reach those because there's only
17      jurisdiction -- I'm not saying there were, your
18      Honor, I don't know.
19                 THE COURT:  That is what they are
20      alleging.
21                 MR. HOFFMAN:  Yes, they are alleging.
22                 And what we're saying, your Honor, they
23      are only entitled to jurisdiction to the extent
24      they seek those assets.  There's no -- to the
25      extent there's fraud and he transferred something
26      else, they are not entitled to sue her for that
```

1                           -Proceedings-

2        in this court because the jurisdiction granted

3        only to the value of the assets that is in the

4        fine term so transferred.

5                   THE COURT:  We're really talking --

6        we're really talking about a cap on a dollar

7        amount.  They may be able to sue every asset she

8        has but limited to the value of those assets, the

9        scheduled assets that were turned over.

10                  Let's say there were five million

11       dollars of assets but 25 million dollars of

12       assets were turned over to her.

13                  In fact, now the assets all combined are

14       worth over $3 million.  These Plaintiffs would be

15       entitled to go after all assets.

16                  MR. HOFFMAN:  Well, first, your Honor,

17       the only case that says-- which says you can

18       incorporate jurisdictional consent in a way such

19       as this, in a Supreme Court Nassau case in terms

20       of New York law.

21                  THE COURT:  There's no language here

22       that says she cannot be sued or she can't be

23       compelled to pay money out of other assets.

24                  It just says the amount is tapped.

25                  MR. HOFFMAN:  The question is, they

26       cannot sue her for more than that amount and they

```
1                        -Proceedings-

2       don't have jurisdiction over any claims over that

3       limit.  And the complaint is not so limited.

4               In the first instance, to the extent

5       they're seeking, general jurisdiction over her

6       for more than that amount, they are not entitled

7       to it.

8               Therefore, there's no jurisdiction --

9               THE COURT:  Only a limitation on the

10      liability.

11              MR. HOFFMAN:  No.

12              THE COURT:  That is what it says.

13              "Would be liable under each of the

14      guarantees but only to the extent of the value of

15      the assets so transferred."

16              MR. HOFFMAN:  The guarantee is the only

17      thing that is arguably gives them jurisdiction.

18              So they only have jurisdiction to the

19      maximum -- assuming that that gives them --

20              THE COURT:  You got-- we know we have

21      jurisdiction over the person.

22              Let's say there were 20 transactions

23      that were entered into between Guy and Amy

24      Mitchell, ten are scheduled and ten are not

25      scheduled.  Out of the guarantees she owes

26      $5 million.  The Plaintiff goes and tries to
```

```
1                      -Proceedings-

2     satisfy the judgement --they've got a judgement

3     for $5 million.  And they satisfy out of the 20

4     scheduled -- they satisfied partially out of the

5     20 scheduled transactions -- the ten scheduled

6     transactions.  Now they want to go after the

7     other ten, they can.

8            MR. HOFFMAN:  We are saying they don't

9     have broad personal jurisdiction.  They only have

10    jurisdiction to a certain amount in a certain way

11    assuming that the jurisdiction --

12           THE COURT:  You are partially correct.

13           They do have -- there's a cap.  There's

14    a limitation on how much Amy is going to be

15    responsible for.  Her liability is capped at the

16    net asset value of those assets scheduled.

17           I agree if those assets were only worth

18    $200,000 and she otherwise had five million

19    dollars, it is capped.  The guarantee caps.

20           MR. HOFFMAN:  That is not what they

21    pled, your Honor, and they don't have

22    jurisdiction over that amount.

23           Assuming that we accept that this

24    incorporates the jurisdictional rights.

25           THE COURT:  First of all, do we know

26    what the assets are worth, the scheduled assets
```

```
 1                    -Proceedings-

 2     are worth?

 3          MR. WEIGEL:  It is a substantial amount

 4     and likely enough to sink the boat.

 5          I think that the value.

 6          MR. HOFFMAN:  Mr. Mitchell listed all of

 7     his financial assets on that schedule that he

 8     owned at that point in time.

 9          THE COURT:  Let me just go back to the

10     movant for second.

11          I don't understand your motion.  At this

12     point it is premature.

13          First of all, we don't know if they are

14     actually going to try to recover money in access.

15          We can cap --and I can do it if it is

16     meaningful to you now, I will grant the motion

17     capping whatever the ultimate recovery will be.

18     But that is the only restriction.

19          She's going to be interrogated on

20     anything they consider to be relevant.  They're

21     going to ask her about other transactions, quite

22     possibly.  And she may have to ultimately --

23     ultimately there may be a judgement for X number

24     of dollars.  They are going to collect that

25     against all of her assets, no exception, all of

26     her assets.  There is only a cap on the dollar
```

```
1                          -Proceedings-
2         amount, that's all.
3                   MR. BERGER:  If I may speak.
4                   THE COURT:  Yes.
5                   MR. BERGER:  Steven Berger.  I do
6         represent the husband here.
7                   I think what we're missing, your Honor,
8         is that the financial statement that limits the
9         guarantee is regarding transfers of assets
10        predating that date or that may take place after
11        that date with regard to those assets.
12                  THE COURT:  I'm not following the
13        significance.
14                  MR. BERGER:  It was a scheduled list of
15        assets.
16                  THE COURT:  Right.
17                  MR. BERGER:  What they're looking to do
18        is to deal with fraudulent conveyances that took
19        place in January of 2006, unrelated to the assets
20        that were listed there.
21                  You may be right that if they get a
22        judgement regarding the assets that are covered
23        by the guarantee, they go against any of her
24        assets.  But they cannot conduct discovery, for
25        example, of fraudulent conveyances regarding
26        assets.
```

```
 1                    -Proceedings-

 2              THE COURT:  I see.

 3              MR. BERGER:  That is the issue.

 4              THE COURT:  As if they were doing

 5     sub-pro prematurely.

 6              MR. BERGER:  Yes.

 7              MR. WEIGEL:  Your Honor, if I may.

 8     There really are two separate causes of action.

 9              One cause of action under the guarantee

10     says however she gets this property.

11              Mr. Mitchell said at the time of the

12     loan, she has nothing, no interest in any of my

13     properties.

14              So she signs a guarantee saying if she

15     does -- now, that is limited by the amount of the

16     financial statement.

17              THE COURT:  Language of limitation.

18              MR. WEIGEL:  Yes.

19              Subsequent to that in 2006 --

20              THE COURT:  Now, she does something else

21     wrong.

22              MR. WEIGEL:  She does something else

23     wrong.

24              Mr. Mitchell purports to convey to her,

25     while he's insolvent, it is a transaction without

26     consideration, to his spouse --he's not the first
```

```
1                    -Proceedings-
2      guy to think about giving my assets to my wife to
3      avoid a judgement.
4              THE COURT:  The question now is whether
5      or not the consent to liability bleeds over to
6      the other causes of action.
7              MR. WEIGEL:  In addition to the consent
8      of jurisdiction that she has given to be here to
9      litigate the guarantee, whether that allows us to
10     also litigation the fraudulent conveyance claim.
11             THE COURT:  If you are in for a penny
12     you are in for a pound.
13             MR. HOFFMAN:  She only adopted the
14     guarantee to the extent.  And the guarantee-- so
15     that what we are saying here is that they pled
16     that she adopted the guarantee, gave them the
17     limited adoption of the guarantee.  And,
18     therefore, your Honor, she's only in
19     jurisdictionally.
20             THE COURT:  No.  But that is just it.
21             It doesn't say I'm consenting to
22     jurisdiction on these transactions.
23             She says I'm accepting a cap on
24     liability.
25             MR. HOFFMAN:  Your Honor --
26             THE COURT:  She's consenting to
```

```
1                        -Proceedings-

2        jurisdiction.

3               MR. HOFFMAN:   I'll assume for sake of

4        argument that the Court's reading is one

5        legitimate reading.

6               In order to accept jurisdiction it has

7        to be clear and convincing that there's an

8        jurisdiction acceptance.   And that is not clear

9        and convincing.

10              One could read it that it is limited

11       only to the extent there are transfers of assets.

12              Let's look back at the language.

13              It is only if we look -- go back to the

14       language.

15              She is not a party to and has not

16       liability under any of the guarantee--

17       --skipping now -- with the exception of except to

18       the extent of any of the assets described.   Okay,

19       which are owned or become transfer to Amy

20       Mitchell.

21              It is to that extent that she has

22       conceded arguably to the jurisdiction of the

23       court, assuming you accept their incorporation by

24       reference language.

25              But she has not given a blanket consent.

26              THE COURT:   Once she becomes guarantor
```

```
1                        -Proceedings-
2        she's the guarantor.
3               MR. HOFFMAN:  She is guarantor to
4        limited extent not on everything to the world.
5               THE COURT:  Motion denied.  I disagree.
6               MR. BERGER:  Judge, If I could just one
7        final word.
8               THE COURT:  Sure.
9               MR. BERGER:  One asset everybody agrees
10       was not on that financial statement is the Royal
11       Palm.  You know, about the Royal Palm.  It is the
12       jewel in the crown.
13              The Royal Palm, not being asset on that
14       statement, indeed I believe it was acquired by
15       Mr. Mitchell after the statement was given and
16       after he signed the guarantee.  Assume for
17       purposes of discussions that there was a transfer
18       to Amy of his interest in the Royal Palm in
19       January '06, if that is not sub-pro, I don't know
20       what it is.
21              You can't try in this Court, I believe,
22       under that jurisdictional limitation, the issue
23       of the fraudulent transfer relating to the Royal
24       Palm.  It has got to go to Florida.
25              THE COURT:  Because it is outside of
26       the--
```

```
 1                      -Proceedings-

 2               MR. WEIGEL:  Your Honor, I read the

 3      guarantee--

 4               THE COURT:  But wait a minute.  Wait a

 5      minute.

 6               I keep getting back to the fact that

 7      this is not a limitation of jurisdiction.  It is

 8      a jurisdictional of liability in an amount, in an

 9      amount, in an amount.

10               MR. BERGER:  No.

11               THE COURT:  Once you are a guarantor,

12      you're guarantor.

13               Once you consented to jurisdiction,

14      you're consented yourself to jurisdiction.

15               If there's a limitation as to the

16      amount, it is fine.

17               MR. BERGER:  It is not just a cap on

18      liability.

19               I am consenting to my jurisdiction.

20               I argued this with you in an earlier

21      point in time, Judge, whether or not the

22      corporation was really subjected to her for

23      jurisdiction, because she actually never signed a

24      piece of paper saying I submit to the

25      jurisdiction in the State of New York.

26               Even assuming the arguendo, as Mr.
```

-Proceedings-

1

2      Hoffman does, that she does get into this

3      courthouse, it is only with regard to

4      jurisdictional with her relating to that

5      limitation.

6              It is not in for a penny in for a pound

7      jurisdiction,  Judge.  That's sub-pro on the

8      Royal Palm.  And for that they got to go to

9      Florida.

10             MR. WEIGEL:  Your Honor, these LLC's

11     were attached to this courtroom.

12             278 of the debtor credit law allows us--

13     you may remember this.  This was their

14     certificate that Mr. Mitchell said convey the

15     interest to himself and his wife.

16             Your Honor was going to hold hearing.

17     Mr. Mitchell would not come up to testify about

18     the certificates.

19             Mr. Mitchell who has now testified.

20     What happened, his testimony was stricken.

21             There is jurisdiction.

22             This is already in the hands of the

23     Receiver.  The Receiver already has the property.

24     They argued this up in the Appellate Division

25     last week.

26             THE COURT:  This is not slam dunk.  It

```
1                        -Proceedings-

2          is an interesting argument you're making.

3                   The limitation is only as to amount

4          there is no other limitation.

5                   Motion is denied.

6                   MR. HOFFMAN:  Thank you, your Honor.

7                   MR. SHATZ:  Your Honor, before we get to

8          the main motion, may I approach?

9                   MR. HOTZ:  Your Honor, in terms of last

10         motion, just in setting a time for Ms. Mitchell

11         to respond, she has to answer now.  I believe

12         under 3211 (F) she would have ten days from the

13         notice of entry of this order.  So, your Honor,

14         we can provide you with the order by the close of

15         business today so that it could be entered.

16                  THE COURT:  No problem.

17                  MR. HOFFMAN:  May I be excused?

18                  THE COURT:  Have a nice say.

19                  MR. SHATZ:  Your Honor, I represent

20         Steven Rosenblatt.

21                  We went to Chicago, Illinois to attempt

22         to take control of the Hotel Blake there.  We

23         served the order on the senior officer present

24         and we were rebuffed.  The only way that we know

25         that he had domesticated the order in Illinois

26         and we had consulted with counsel.
```

```
 1                      -Proceedings-
 2               Under the terms of your order, we must
 3       have your consent to bring action-- to bring
 4       suit.  So I'm here.  If I may, I want to pass up
 5       a letters.  And I have two orders, your Honor.
 6               One, limiting it to the hotel in
 7       Illinois, but we also now have discovered a hotel
 8       in Melville, Florida.  And we also found five
 9       shopping centers in Georgia.
10               So, the second order, which is the
11       bottom one, gives leave to bring suit in whatever
12       jurisdiction as is required to enable the
13       Receiver to perform his duties.
14               THE COURT:  Have you distributed copies?
15               MR. SHATZ:  I have distributed copies.
16               MR. WEIGEL:  Your Honor, Mr. Padian's
17       client is impacted by this and he's not here,
18       Gerald Padian.
19               I think we need to serve that.
20               MR. SHATZ:  I was not aware, your Honor,
21       of his being involved.  I have a list which did
22       not include him.  None of the papers we have
23       served have been served on him.
24               THE COURT:  Once you serve him, then you
25       get it to my chambers by mail or messenger or
26       whatever.
```

|    |    |
|----|----|
| 1  | -Proceedings- |
| 2  | MR. WEIGEL:  We can deliver it, yes. |
| 3  | MR. SHATZ:  Sure. |
| 4  | THE COURT:  Coordinate with counsel. |
| 5  | MR. SHATZ:  You prefer this to |
| 6  | hand-delivery before we send this to you, your |
| 7  | Honor. |
| 8  | THE COURT:  Yes. |
| 9  | MR. SHATZ:  Very well, your Honor, thank |
| 10 | you. |
| 11 | THE COURT:  All right. |
| 12 | What are we going to T-up next? |
| 13 | MR. SHATZ:  Your Honor, we received |
| 14 | --submitted a letter to you on the June 12th by |
| 15 | fax.  I have the originals here, if it please the |
| 16 | Court. |
| 17 | May I approach. |
| 18 | THE COURT:  Please. |
| 19 | (Handing.) |
| 20 | MR. SHATZ:  We are caught in a situation |
| 21 | where there appears to be a dispute as to which |
| 22 | court should be governing what in connection |
| 23 | between the Federal Court and State Court. |
| 24 | THE COURT:  Judge Sprizzo and I have |
| 25 | been missing each other.  Unfortunately, Judge |
| 26 | Sprizzo is about to go back into the hospital. |

1                          -Proceedings-

2        We keep missing one another.  I am going to try

3        to hook up with him tomorrow and see if we can

4        discuss this.  But we have been in touch with his

5        chambers and just have been missing each other.

6               I am sorry.

7               What else did you want to say?

8               MR. SHATZ:  Receiver Rosenblatt seeks

9        direction from you because he is an arm of your

10       court and because there is a jurisdictional

11       dispute.

12              And we received a letter from Mr.

13       Greaney demanding that we withdraw the order to

14       show cause or he would quote "seek appropriate

15       action in another forum."

16              We, representing the Receiver, who is an

17       officer of your court seek guidance from you as

18       to what we should do.  Because as an arm of your

19       court, for us to not follow what we understand

20       protection of the res, which is under your

21       possession, is a problem.

22              And, your Honor, there is kind of a

23       distinction in the transcript at the hearing

24       before Judge Sprizzo, he acknowledges that the

25       res was under possession of the state court,

26       which would presumptively give you jurisdiction.

```
 1                        -Proceedings-
 2        But he makes a distinction somehow between the
 3        res and the corporation itself.
 4               That is why we are caught in a quandary.
 5        We believe they are one of the same and we need
 6        guidance.  We don't want to be contemptuous of
 7        your court nor be contemptuous of his court.
 8               THE COURT:  You are entitled to have my
 9        direction, obviously.
10               MR. SHATZ:  Thank you.
11               THE COURT:  Let's hear your thoughts.
12               MR. GREANEY:  Sure.
13               Isaac Greaney from the Offices of Sidley
14        Austin for Carbon Capital.
15               I think the current situation with what
16        is going on in the federal action and what is
17        going on in here, is not in need of any
18        intervention by you right now.
19               We had a deposition notice, which was
20        one of the things that precipitated Judge
21        Rosenblatt coming to you.  That deposition is
22        going to take place at 1:30.  It is not going to
23        be --Receiver Rosenblatt is not what we every
24        intended nor expected.
25               It is going to be one of the employees
26        of the Royal Palm Hotel who has the knowledge of
```

```
1                        -Proceedings-
2          the day-to-day goings on there.
3                 Mr. Shatz and his colleague went before
4          Judge Sprizzo and Judge Sprizzo took the
5          position, as set forth in the transcript that we
6          sent to you.  He has jurisdiction of the LLC in
7          that case.
8                 The goal of which is to determine the
9          rights and obligations of the parties with regard
10         to particular contracts.
11                He is not asserting jurisdiction over
12         the ultimate res, whichever one we're talking
13         about, or over Receiver Rosenblatt's action.
14                And Carbon Capital has absolutely no
15         intentions of interfering with what Receiver
16         Rosenblatt has been doing.  In fact, I think we
17         have been facilitating in that effort as much as
18         we can.
19                All we are seeking from Judge Sprizzo is
20         a declaratory judgement as to the rights and
21         obligations of the parties under the agreements
22         that existed long before Judge Rosenblatt was
23         appointed by you as Receiver.
24                MR. WEIGEL:  Your Honor, this ties into
25         the second action that we filled against Carbon
26         on behalf of Hotel 71.
```

```
1                      -Proceedings-

2              If I may, I would like to address this

3      at this same time.

4              We were not invited to federal court

5      because we're not diverse.  If anybody were to

6      bring my client into Federal Court we would be

7      all back in front of you and in front of you for

8      the Court.

9              So, we have been forced to protect our

10     rights to bring an action against Carbon here.

11             I would like to explain what Carbon is

12     trying to do, your Honor.

13             The hotel, the Royal Palm, was in

14     contract to be sold for approximately

15     $200 million to the Hyatt, it was some months

16     ago.  And I don't know if 200 is the right

17     number, your Honor, or is 190 or 210, or even if

18     the swing is bigger than that.

19             But there's a first mortgage on this of

20     about 112 million dollars, based not upon our in

21     investigate, but what people are representing.

22     And Carbon's loan is approximately, I think, 37

23     million dollars.  So there's about 150 million

24     ahead.  Maybe there's some more.  Maybe the hotel

25     is worth a little less, maybe the hotel is worth

26     a little more.  But there's substantial equity
```

```
1                        -Proceedings-

2      whether it is 50 million or 40 million.  There's

3      substantial equity here.

4            Now, Carbon is claiming that they

5      figured out a way to avoid -- the limitations on

6      straight foreclosures in the UCC and they have

7      gotten around it somehow.

8            And now how do they do that?

9            Well, the day after Mr. Mitchell was

10     attached here by the Sheriff, he signs an

11     agreement.  And in that agreement he says six

12     months from now if I don't get the hotel sold,

13     things will happen, you can have title to it.

14           Now, in that agreement Carbon waives all

15     prior defaults.  So the loan is not in default.

16     At that time Mr. Mitchell is a defendant in the

17     lawsuit.  Mr. Mitchell knows this is not going to

18     go well.  He knows that ultimately he will end up

19     owing my client a substantial amount of money.

20           Mr. Mitchell argues for six months time

21     in which he-- and he signs the conveyance by the

22     way.  Mr. Mitchell personally signs both as the

23     guarantor and the manager of Royal Palm Senior

24     Investors.

25           Mr. Mitchell, at the time he does this,

26     has a bad intent.  We know this because Mr.
```

-Proceedings-

1

2 Mitchell has stolen $3.8 million from the hotel,

3 according to the books and records that were

4 uncovered by Receiver Rosenblatt.

5   Mr. Mitchell then purports to have sent

6 that money -- he testified to this-- to a trust

7 in the Cook Islands where supposedly US

8 judgements are not recognized, using a law firm

9 which I -- may I approach, your Honor?

10   Using a law firm that specializing in

11 asset protection trust planning.  They advertise

12 on the internet.

13   And I attached the latest article that

14 this gentleman wrote, which he posts on the

15 internet, which is entitled "Contempt of the

16 Court.  Will Not Go To Jail If I Establish An

17 Offshore Trust."

18   Mr. Mitchell took the six months he got

19 from Carbon and used it to steal, to send the

20 money to the Cook Islands.  He testified to this.

21 It is astounding.

22   Now, Carbon didn't actually get title at

23 that point in time.  They waived defaults.  And

24 now they claim that the day-- once our notice for

25 Receiver was appointed, they claim that they sent

26 a letter, that that meant that Mitchell was now

1           -Proceedings-

2       in default under this agreement and they can now

3       take 100 percent of the equity of the hotel.

4               Now, the UCC, you know, strict

5       forecloses are frowned upon.

6               The UCC has a specific provision 9620,

7       which says:

8               "When a lender can take collateral in

9       full or in partial satisfaction of the debt,

10      there are notice requirements and there are --"

11              THE COURT:  I'm having difficulty

12      following the logical here.

13              Your position in this particular case

14      has a judgement granted, correct?

15              MR. WEIGEL:  Yes, your Honor.

16              THE COURT:  And your client's rights

17      were perfected at the time of the order?

18              MR. WEIGEL:  Yes.  On anything that Mr.

19      Mitchell and the other defendants had in any of

20      these LLC's.

21              THE COURT:  How can what Mr. Mitchell

22      does with Carbon, if retroactively, affect your

23      client's perfected interest?

24              I don't follow.

25              The perfection of Mezz's interest was as

26      of what date?

```
 1                        -Proceedings-
 2              MR. WEIGEL:  Well, Mezz was perfected
 3      before we attached.  In the sense that they had
 4      lent the money that forms of the basis of their
 5      claim.
 6              THE COURT:  Let's think in terms of
 7      this.  This was not a mortgage on this particular
 8      asset, correct?
 9              MR. WEIGEL:  This was a Mezzanine
10      Financing borrowed by Royal Palm Senior
11      Investors, secured by shares of the entity that
12      actually owns the hotel.  So, they had a lien on
13      those shares.
14              THE COURT:  Yes.
15              The collateral we're talking about here
16      is the shares of stock?
17              MR. WEIGEL:  Shares of LLC, yes, your
18      Honor, membership.
19              THE COURT:  You're saying that the stock
20      was pledged as collateral to your client?
21              MR. WEIGEL:  No.
22              THE COURT:  What?
23              MR. WEIGEL:  I'm sorry, there's are two
24      Mezz Lenders.
25              My client is Mess Lender in Illinois and
26      Chicago.
```

1                    -Proceedings-

2              THE COURT:  Right.

3              MR. WEIGEL:  But I have a judgement

4    against Mitchell.  They were Mezz Lenders in this

5    hotel --

6              THE COURT:  Carbon --

7              MR. WEIGEL:  Yes, Carbon.

8         Carbon had a lien on the stock or the

9    LLC interest of the company that actually owns

10   the hotel.

11             THE COURT:  And that lien had been

12   perfected long before we came around on this?

13             MR. WEIGEL:  Yes.

14             THE COURT:  Was that on 100 percent

15   share of the stock?

16             MR. WEIGEL:  It was, your Honor.  But it

17   only secured the debt.  I think the debt was

18   originally 24 million and then it became

19   something like 37 million.

20             So, if they had not screwed it up,

21   there's no doubt there comes at some point in

22   time they could have held a UCC sale.  And it

23   turns out these shares may be worth $70 million.

24   They secure a loan for 24 million or 30 million,

25   whatever it was.

26             THE COURT:  As a judgement creditor,

```
1                        -Proceedings-

2         your rights could be defeated by a prior lien or

3         in this case, 100 percent of the stock stood as

4         collateral for the outstanding balance owed to

5         Carbon?

6                   MR. WEIGEL:  Yes, your Honor.

7                   THE COURT:  What was the value of the

8         stock at the time that Carbon declared default?

9                   MR. WEIGEL:  At the time that Carbon

10        claimed to take it for themselves, the value of

11        the stock was somewhere between -- let's say,

12        roughly, 50 million dollars more than their loan.

13                  THE COURT:  There's still a surplus?

14                  MR. WEIGEL:  There's still a surplus.

15                  They're claiming that they have somehow

16        they have eliminated that surplus.

17                  THE COURT:  They can't.

18                  MR. WEIGEL:  Exactly, your Honor.

19                  THE COURT:  It has to be -- everything

20        has to be in good faith.  You cannot defeat the

21        judgement.

22                  MR. WEIGEL:  Exactly.

23                  All we're asking, your Honor, is that

24        Receiver Rosenblatt --there was a broker in place

25        to sell the hotel.  Carbon had signed off on

26        that, Mitchell had signed off on that.  It is a
```

```
1                        -Proceedings-
2        company Eastville, It is apparently a very
3        reputable outfit, they have a very fancy
4        brochure, and they are out there trying to market
5        the hotel to all sorts of people who buy
6        $200 million hotels.
7                The problem is that Carbon, when they
8        claim they suddenly own 100 percent of it and
9        they purport now to both own 100 percent of it
10       and have a website up talking about how they are
11       going to hold a UCC sale, have created chaos in
12       the marketplace.
13               The Receiver will sell this property
14       quickly and promptly in a commercially reasonably
15       manner.  He will pay off the first, he will pay
16       off Carbon.
17               THE COURT:  Either the Receiver or
18       Carbon could sell off the property.
19               MR. WEIGEL:  Yes.
20               THE COURT:  And in that sale there has
21       to be an accounting that will demonstrate to what
22       extent the sale proceeds are necessary to satisfy
23       Carbon's loans.
24               The sale has to be conducted in an a
25       honest transaction.
26               MR. WEIGEL:  Exactly.
```

```
 1                    -Proceedings-

 2              The problem is that Carbon has taken

 3      conflicting positions.  They are saying we own

 4      100 percent of it already, we don't have to have

 5      a sale.  Then they claim they are having a sale.

 6      They have created a situation where bidders don't

 7      know where they go.  Should they go to Eastville

 8      or should they go to Carbon.

 9              THE COURT:  I think what you are

10      accusing Carbon of is bad-faith.

11              MR. WEIGEL:  I am accusing Carbon of

12      violating 9620 of the UCC and 9625 gives your

13      Honor the right to enjoin somebody --

14              THE COURT:  This has to be commercially

15      reasonably sale.

16              MR. WEIGEL:  Yes, exactly.

17              And they are not following UCC.  They

18      admit they're not following UCC.  And they are

19      somehow saying the UCC does not apply to them.

20              And this is what is truly interesting.

21      They say 9620 only applies --

22              THE COURT:  I can't do anything unless

23      we hold a hearing.  I have to come to a

24      conclusion that this is what Carbon is doing.

25      This is the accusation.

26              MR. WEIGEL:  Well, I'm happy to have
```

```
1                         -Proceedings-
2        hearing, your Honor.  And I think we can
3        establish these facts clearly.
4                    Carbon claims that they took
5        100 percent.  And the fact that they have a
6        website of trying to sell is also in the record.
7                    THE COURT:  Is there anything in the
8        agreement that Carbon has with Mitchell that
9        grants Carbon the right to own all of Mitchell's
10       stock regardless of its value?
11                   MR. WEIGEL:  They claim it does, your
12       Honor.  But that violates 9620 of the UCC.
13                   It is a disguised mortgage or a
14       disguised security interest.
15                   You can't have this sort of automatic I
16       take the collateral when there is default.
17                   The UCC sets forth rules with how to do
18       it and they did not follow.
19                   All we are asking--
20                   THE COURT:  That is being done in
21       Florida, correct?
22                   MR. WEIGEL:  Eastville is marketing it
23       and Eastville is nationwide.  So I believe
24       there's somebody in Florida --
25                   THE COURT:  Carbon is represented here.
26                   Is Carbon taking position there's no
```

1                  -Proceedings-

2          need to have a sale?

3                  MR. GREANEY:  No.

4                  Your Honor, if you would indulge me I

5          could try to go through the background and try to

6          be quick.  But this kind of shadow shot approach

7          to the facts makes a lot of things misleading.

8                  February 2005, Carbon Capital enters

9          into Mezzanine loan with Royal Palm Senior.  At

10         the same time, the first --there's a first

11         mortgage lender who loans money to Royal Palm

12         property.  The Mezzanine loan is secured by the

13         100 percent membership interest in the Royal Palm

14         property.  The first loan is secured by the real

15         property.  The maturity date for both of those

16         loans is March 2007.  March 2007 rolls around and

17         there's a default on both of those.  There's a

18         period of  negotiation.

19                 Carbon Capital has scheduled a UCC

20         disposition of collateral notice, moved it back a

21         couple of times, had one scheduled for the day

22         after they entered into a forbearance agreement,

23         which is the agreement Mr. Weigel refers to.

24                 THE COURT:  That is between Falor and

25         Mitchell?

26                 MR. GREANEY:  Between Carbon Capital and

-Proceedings-

1

2  Royal Palm Senior LLC.

3          Mitchell signed on that reaffirming

4  prior guarantee.

5          This agreement is between Royal Palm

6  Senior and Carbon Capital, the same two parties

7  who entered into the Mezzanine loan agreement in

8  2005.

9          Now, I want to make it clear and

10 undisputed that at the time they entered into

11 that forbearance agreement, the loan was in

12 default that Royal Palm Senior, LLC, had no

13 defenses, had no ability to stop the disposition

14 of the collateral sale the next day.

15         Carbon Capital agreed to forbear on

16 excising undisputed rights to exercise the

17 parameters, in exchange for eight months time,

18 during which Royal Palm Senior would have the

19 ability to sell the hotel.

20         THE COURT:  Now, what happened to

21 ownership during that period of time?

22         MR. GREANEY:   The ownership remains

23 --nothing changes from the original loan

24 agreement.

25         There's 100 percent of ownership and

26 interest.  There needs to be the collateral pled

```
 1                    -Proceedings-
 2      under the agreement.  The guarantee --
 3                THE COURT:  There had been no transfer
 4      then from Mitchell to Capital of Mitchell's
 5      interest?
 6                MR. GREANEY:  No.
 7                THE COURT:  Just collateral.
 8                MR. GREANEY:  It is collateral.
 9                What the parties did in the settlement
10      agreement, and this is why what we have here is a
11      bit of a strong arm about 9620.  That is not what
12      happened.  And the reason that it would be so
13      defective under the UCC, if that is what the
14      parties were trying to deal with.  They were not
15      trying to do that.  So none of the things you
16      need to do to accept collateral in partial or
17      full satisfaction of the loan exists.
18                THE COURT:  When does Carbon contend
19      that the collateral was turned over in full
20      satisfaction of the loan, prior to perfection of
21      the judgement?
22                MR. GREANEY:  It never was turned over
23      in full satisfaction.  That is my point.
24                THE COURT:  Then clearly Mezz has an
25      interest in the disposition of the property.
26                MR. GREANEY:  Let me explain what
```

```
 1                        -Proceedings-
 2        happened in the forbearance agreement.
 3                MR. WEIGEL:  Your Honor, they contend
 4        that there was --
 5                MR. GREANEY:  Let me finish.
 6                MR. WEIGEL:  -- a conveyance to them,
 7        but that did not satisfy any of the debts.  That
 8        is where your Honor --
 9                MR. GREANEY:  I am about to explain if I
10        can finish.
11                MR. WEIGEL:  Please.
12                MR. GREANEY:  What the parties did,
13        which is completely proper under the UCC and set
14        forth in our papers is, in exchange of Carbon's
15        forbearance in exercising these remedies at that
16        time in October of 2007, they agreed for a manner
17        in which, contractually, Carbon would take
18        possession of the collateral at a given time in
19        the future.
20                The way they did that was by March 31,
21        2008, the lone had to be repaid.  It was a
22        revived maturity date.  There was no forgiveness
23        or satisfaction of the debt.  But, what we can do
24        as a lender is not to just take the collateral of
25        satisfaction but take possession of it.  This is
26        not a car we can go and grab off the street.
```

```
1                   -Proceedings-

2               THE COURT:  You didn't.

3               MR. GREANEY:  We did.

4               THE COURT:  When?

5               MR. GREANEY:  Contractually in October

6     of 2007, at such time that they did not pay off

7     the loan in March 31, 2008, the membership

8     interests were automatically conveyed to our

9     possession.

10              THE COURT:  You think it relates back to

11    that point in time?

12              MR. GREANEY:  Certainly.

13              THE COURT:  And intervening judgement

14    creditor has no rights?

15              MR. GREANEY:  I did not say they have

16    not rights.

17              They step into the shoes, as you said

18    when my colleague was here for when the receiver

19    order ends, they step into the shoes wherever Mr.

20    Mitchell was.

21              They are not even a creditor of Royal

22    Palm Senior.  They have never lent him a penny.

23    They lent some other LLC in Chicago money.  We

24    lent Royal Palm Senior $24 million which is now a

25    much higher amount.

26              THE COURT:  I'm only interested in Guy
```

```
 1                    -Proceedings-
 2       Mitchell's interest in this case.
 3                 MR. GREANEY:  Exactly.
 4                 THE COURT:  That's what we are
 5       interested in.
 6                 MR. GREANEY:  The only interest that Guy
 7       Mitchell has is as somewhere way up the LLC
 8       chain, it does go way up.  He has some indirect
 9       interest in the membership interest of Royal Palm
10       Senior.  That is his interest.
11                 THE COURT:  I thought we were talking
12       about ownership interest.
13                 MR. GREANEY:  We are a secured creditor
14       in Royal Palm Senior.
15                 THE COURT:  Tell me about Mitchell's
16       ownership interest.
17                 MR. WEIGEL:  Mr. Mitchell owns, through
18       a series of LLC's, approximately 84 percent of
19       the Royal Palm Senior endeavor.  And, yes, he has
20       put LLC's between there, but he owes 84 percent.
21       That is what they are seeking to extinguish
22       without the benefit of the UCC sale.  They are
23       saying they took that.  They didn't even give
24       anything for it because they did not wipe out any
25       of the debt.
26                 MR. GREANEY:  That is incorrect, your
```

```
1                        -Proceedings-
2       Honor.
3               THE COURT:  If they did it properly they
4       could do, but certainly do it before your
5       judgement lien was perfected.
6               MR. GREANEY:  Of course, and we did.
7               THE COURT:  How?  When?
8               MR. GREANEY:  We entered into the
9       October 2007 --
10              THE COURT:  That is perspective.
11              Collateral is a thing.  It exists.  You
12      let someone walk around with title to that
13      collateral, it's vulnerable.  It is not
14      protected.  That is why you file mortgages to
15      protect your interest.
16              MR. GREANEY:  Hotel 71 does not have any
17      interest in Royal Palm Senior Investigators, LLC.
18      That is the entity that pledged to Carbon Capital
19      100 percent of the membership interest in Royal
20      Palm Hotel property.  It is a pledged agreement
21      perfected, filed security interest and it existed
22      long before Hotel 71 ever came around.
23              The only issue--
24              THE COURT:  Someone has to give you a
25      diagram.
26              Are you disagreeing with Mr. Mitchell's
```

```
 1                    -Proceedings-
 2    ownership through the various LLC's?
 3              MR. GREANEY:  I'm not sure what they
 4    are.  But he certainly had some level up top to
 5    controls it, to have built for quite a bit of
 6    money from it.
 7              MR. WEIGEL:  Mr. Mitchell --
 8              MR. GREANEY:  The notion that somehow
 9    Carbon Capital is in cahoots with Mr. Mitchell to
10    rip-off Hotel 71 is really outrageous and unfair.
11              I mean the reason that we know--
12              THE COURT:  I don't think anyone has
13    alleged it.
14              MR. GREANEY:  Well, the briefs reads,
15    that under the cover of darkness, Mitchell and
16    Carbon, sneaked around and took the money out of
17    Hotel 71.
18              We don't even know in October of 2007
19    who the heck Hotel 71 is.
20              We entered into a forbearance agreement,
21    hoping that the hotel will sell.
22              THE COURT:  You entered into an
23    agreement that in the future will result in your
24    client becoming the owner of something that the
25    client is not the owner of.
26              The only dispute, as I understand, is
```

```
 1                      -Proceedings-
 2         whether or not the intervening judgement
 3         creditors get some rights to that asset.
 4                 That asset is not in your client's
 5         possession and there is no mortgage recorded that
 6         covers it.
 7                 MR. GREANEY:  It is in our client's
 8         possession, as it was since February of 2005,
 9         that is the point here.
10                 We already had a perfected security
11         interest in that collateral.  Nothing changed in
12         that forbearance agreement.   And the 9620 is
13         completely mispled.
14                 THE COURT:  If he is right he is going
15         to prevail.
16                 MR. WEIGEL:  Your Honor, here is the
17         thing, it is very simple.
18                 Your Honor, nobody is saying that they
19         don't --they're not entitled to get their loan
20         repaid.
21                 The question is, they claim that they
22         took the equity of redemption and that Mitchell
23         extinguished it in this document they admittedly
24         said was secret.
25                 THE COURT:  He says UCC filing, I'm not
26         sure.
```

```
 1                        -Proceedings-
 2              MR. GREANEY:  I keep trying to finish
 3      what the forbearance agreement did, the right to
 4      redemption.
 5              MR. WEIGEL:  The forbearance agreement
 6      was not filed, your Honor.
 7              THE COURT:  There's no UCC filing?
 8              MR. WEIGEL:  There is a UCC filing on
 9      their interest.  But the forbearance agreement,
10      which they claim gave them the right to take
11      100 percent was not filed.
12              THE COURT:  I see.
13              MR. WEIGEL:  And they are trying to take
14      collateral that is worth considerably more than
15      their debt, without the benefit of the UCC.
16              THE COURT:  You have got your prior UCC
17      filing.  Clearly you have a presumptive
18      preference to these assets to satisfy the 30, 40
19      million dollars that your client is owed?
20              MR. WEIGEL:  Forty.
21              MR. GREANEY:  Forty.
22              THE COURT:  At some point the allegation
23      is that your client and Mitchell agree to a new
24      deal.  And the new deal is that you're not going
25      to recover your money and give him whatever
26      equity redemption there is, you get everything.
```

```
 1                     -Proceedings-

 2              MR. WEIGEL:  No.

 3              MR. GREANEY:  No.

 4         THE COURT:  No.

 5              MR. GREANEY:  It is very improperly

 6    set --

 7              Could I explain the contract?

 8         THE COURT:  Yes,  sure.

 9              MR. GREANEY:  The first part was the

10    forbearance, which sets forth, as I described,

11    sets forth a manner in which Carbon Capital will

12    be able to take possession of the collateral in

13    order to sell it.

14         THE COURT:  That is not filed?

15              MR. GREANEY:  I am just setting the

16    table for the next part, which is --

17         THE COURT:  But what I need to know is

18    what is effective as against intervening

19    judgement creditors.  You cannot have a secret

20    agreement with Mr. Mitchell.

21              MR. GREANEY:  It's not a secret

22    agreement.  It does not change the nature of the

23    collateral which we have security interest long

24    before these folks came around.

25              I am trying to explain.  All I need is

26    two minutes to explain.  That is all I need.
```

```
 1                        -Proceedings-

 2              THE COURT:  Yes.

 3              MR. GREANEY:  In addition to forbearing

 4      and setting up a mechanism for taking possession

 5      for sale under the UCC, which we are trying to do

 6      now, the parties also agree in consideration for

 7      the forbearance to a partial waiver of the right

 8      of redemption of the equity.  Which is also

 9      perfectly legitimate under the UCC.

10              It is after default of the Mezzanine

11      loan, way after.  And a debtor is allowed to

12      waive the right of redemption after authenticated

13      document.  And that is what they did in the

14      settlement agreement.  That is what the senior

15      LLC did.

16              The reason it is partial is because if

17      we were to sell the property when we first

18      noticed it in May, the LLC would have gotten

19      100 percent of the excess.

20              If we sold it today, they would get

21      50 percent of the excess.

22              It set up a diminishing schedule of

23      excess proceeds, which was partly in

24      consideration of our forbearing on exercising our

25      remedy in October of 2007.

26              Now, we also had an agreement with Mr.
```

1                      -Proceedings-

2       -- with the LLC, that if they defaulted under

3       forbearance agreement, meaning defaulted again.

4       It already defaulted under the Mezzanine loan

5       agreement.  They want 100 percent of the interest

6       conveyed to us to --for possession of the

7       property for sale.  That is what we were trying

8       to do.  We are trying to sell the property.  We

9       are in a position, Carbon Capital, of some peril

10      here.

11             We have a first mortgage which is owed,

12      I don't know where the numbers come from.  My

13      understanding of it is 540 million, making

14      outstanding debt on this property 180 million.

15             Wachovia is the servicer of that loan.

16      They have nothing stopping them right now, as I

17      understand, from coming in and taking us out

18      completely.

19             We're being held up by the judgement

20      creditor of another hotel in another place from

21      going ahead trying to sell the property and get

22      back our collateral.

23             Now, the other issue that I think is

24      important to raise, we are seeing the numbers of

25      200 million.  I don't know, you know, we're in

26      open courtroom here.  I will tell you exactly the

```
 1                    -Proceedings-

 2      --completely inconsistent with what I have been

 3      informed that was told to Mr. Weigel and the

 4      Receiver about what the current indications of

 5      that property are.

 6            I would invite you to ask them or we

 7      could come up to the bench.  It is not this happy

 8      situation where everybody is just sitting around

 9      waiting to carve up the money here.

10            We are in peril here on the Messanine

11      loan and there's no reason we should be.

12            MR. WEIGEL:  Your Honor, it is very

13      simple.

14            The peril that they have created is that

15      they are creating chaos.  They're trying to have

16      competing sale with what the Receiver is trying

17      to do.  And we have heard numbers as high as 180.

18      We don't know --bids have not come in yet, we

19      don't know.

20            I don't know.  I have never seen that

21      number that they have and there's nothing in the

22      record that supports the idea that the first is

23      140.

24            The situation is that this is akin to

25      either a strict foreclose or them buying in at a

26      private sale.  You can't do that.  You can't give
```

-Proceedings-

1

2    up the equity of redemption.

3            A lender can't have a private sale and

4    take it for himself.  He can't make a deal with

5    borrower and say I will take the collateral.  The

6    UCC does not allow that.

7            They could have, if they had not done it

8    so crazily, conducted a perfectly fine UCC sale.

9            There is a sale process going on.  It is

10    reasonable.  And they are trying --at one hand

11    they say they own 100 percent and on the other

12    hand they are trying to sell it.

13            They have created chaos that buyers

14    don't know where to go.

15            MR. GREANEY:  May I explain the

16    difference of the 100 percent and what would have

17    happened under the agreement had March 31st come

18    and pass?  I think it is very important.

19            THE COURT:  Yes, go ahead.

20            MR. GREANEY:  All of these issues have

21    to do with possession of the collateral.

22            This is not -- this is not a car that we

23    can go get.

24            This is a hotel that's being operated,

25    that we need to do have the ability to go in

26    there and take control and sell the property.

1                    -Proceedings-

2              All right.

3              The notion that somehow we're taking all

4       this to ourselves is wrong.

5              THE COURT:  What is Wachovia's position?

6       They are willing to let you step in?

7              MR. GREANEY:  We had --as this was

8       approaching, there have been some communications

9       with Wachovia to the affect that we have issues

10      with Wachovia because the highest piece of the

11      first mortgage is secured.  But the answer is

12      yes.

13             Wachovia was comfortable with us coming

14      in.  We had a management company set up.

15             Now, when the Receiver was appointed, we

16      didn't run to you and try to throw the Receiver

17      out or anything.  We worked with the Receiver.

18      We sent insurance information, bank account

19      information, everything we had that we had got

20      with Mitchell in our Federal action we sent it.

21      And we said let's sell the property and let's get

22      it done.

23             We have been in active negotiations, all

24      of us.  But we can't sit here and wait into

25      perpetuity while a judgement creditor on a

26      different hotel waits to maximize the value of

-Proceedings-

1

2      the hotel while market conditions improves.

3              The papers say 200 million now.  These

4      were filed a week ago.  And now it is 180.  What

5      is it really?

6              THE COURT:  You will not know until the

7      market tells you.

8              MR. SHATZ:  Representing the Receiver,

9      while the motion here between Hotel 71 and Carbon

10     is not our motion, Receiver is taking possession

11     of the hotel has discovered a sum, a substantial

12     sum, $3.8 million as adequately met with the

13     broker.

14              We have agreed to have weekly conference

15     calls.

16              We have been informed over 27 firms

17     taking tours of the hotel.

18              It would appear to me that the more

19     logical way for the Court to handle this is to

20     allow the Receiver to seek to sell the hotel,

21     where there's no question there is one seller who

22     is without question has the integrity and the

23     support of the court.  And as the Receiver

24     advised your Honor, he understands that after the

25     first mortgagee, Carbon comes in subject to

26     rights of minor creditors of the corporation.

1          -Proceedings-

2              But if the chaos goes on and makes it

3      very difficult for the receiver to perform its

4      functions.  And as Mr. Greaney said, we have been

5      working together, we kept them fully informed of

6      exactly what happened, what our marketing efforts

7      are, the efforts we made to make sure the hotel

8      is run well.

9              It would appear that allowing the

10     Receiver to do his job cannot work Carbon Capital

11     but will allow this court to monitor and see that

12     the manner is done in an orderly manner.

13             I would hope that on the Receiver's part

14     that you would enjoin Carbon Capital going

15     forward with a UCC sale which, in our view, would

16     destroy the value of the property.  Because the

17     UCC sale will give them defacto in a private

18     setting to take the entire collateral, which

19     would really damage the res which is under your

20     control, your Honor.

21             MR. GREANEY:  Your Honor, you understand

22     what is being said.  For a judgement creditor

23     again on a different hotel wants to hold on and

24     go through bidding process.  They will not agree

25     to sell it at any price.  They will not agree

26     when he comes back the end of July and says

```
1                        -Proceedings-

2         here's the best we can get that they will take

3         it.  If we want to sell right away so that we can

4         get money out before the market continues to go

5         down --

6                    THE COURT:  Let's try to be practical

7         for a while.

8                    We have legal issues that have to be

9         decided, obviously, between Capital, Mitchell,

10        and 71 Mezz Hotel.  You are right, there's an

11        asset, it is a hotel.  Its got to be sold.  We

12        want to sell it for the greatest amount.  If it

13        all goes to Carbon, fine, to Carbon's benefit.

14        If it gets spread around, it gets spread around.

15                   It does not serve anyone's purpose if we

16        somehow damage the value of the asset in the fire

17        sale.  This is going to look like a fire sale

18        anyway.  It could look like a little less than

19        fire sale.

20                   MR. GREANEY:  There's no way to avoid

21        this.

22                   Mr. Weigel argues in the papers which

23        is, by the way, in support of irreputable harm.

24                   Carbon Capital is not out there telling

25        the world that there's a problem with the

26        property.
```

```
1                    -Proceedings-

2              Mr. Mitchell is the one who caused this

3      upon everybody.  And that is what we are doing

4      with and there's no way to stop that.  The world

5      knows about it.  There's an appeal in the

6      Appellate Division, there's a case next-door,

7      there is a case here-- there is three cases here.

8              How were are we going to stop it?  What

9      is being asked of us is to sit back again.  It

10     has been 15 months now since the loan was due.

11     To sit back again and say we'll not exercise our

12     remedies, we'll wait.

13             Meanwhile, we have got our first lender

14     Philip Hathaway and would wipe us out.

15             MR. WEIGEL:  I think the first lender

16     and we have been communicating too.

17             I think everybody has got to be

18     comfortable now that instead of Mr. Mitchell

19     being in control of the cash, Receiver Rosenblatt

20     is in control of the cash.  And every dollar will

21     be accounted for.  He will sell it, we think it

22     will yield money to my client.  If it does, so be

23     it.  I don't control what Receiver Rosenblatt,

24     your Honor does.  Receiver Rosenblatt will hear

25     it and try to get the best price.

26             THE COURT:  What harm is there to Carbon
```

```
1                      -Proceedings-
2        if the Receiver sells the property, all the money
3        goes to escrows.  If we have to fight it out we
4        have to fight it out.
5               I don't what to have fighting going on
6        while something is being done to the maximize
7        value of the property.
8               MR. GREANEY:  Here is the question for
9        Mr. Weigel.  He says this over and over again:
10              We want to sell the property.
11              We think, we're hopeful, we're going to
12       get a little out of it.
13              Ask him when.
14              Is it going to happen when the bids come
15       in at the end of the month or is it going to
16       happen in 2009?
17              THE COURT:  Why don't we ask Judge
18       Rosenblatt.
19              MR. GREANEY:  Even better.
20              MR. SHATZ:  I would like to speak to
21       that.
22              The inference that Mr. Greaney says if
23       the Receiver Rosenblatt will not use his honest
24       and best judgement --
25              MR. GREANEY:  No.
26              MR. SHATZ:  --to get a prompt sale at
```

DEBORAH A. ROTHROCK, RPR

-Proceedings-

1

2      best price.    That is exactly what he said.

3              MR. GREANEY:  No.

4              MR. SHATZ:  He said how do I know it

5      will be sold this month or next month?

6              What it is is a question of have you

7      chosen a Receiver with the ability and the

8      integrity to do right thing to maximum money

9      coming out of this property.

10              I argue that is self-evident.

11              For that reason, I would hope that the

12      Court would enjoin Carbon from going forward.

13              THE COURT:  I am trying to maximize

14      this.  Trust me, if I can get $300 million for

15      the hotel, I would be thrilled.

16              MR. GREANEY:  So would everybody.

17              THE COURT:  Exactly.

18              I would like to maximize it.  I would

19      think that in the process of selling it, if we

20      can calm the collateral issue and get it sold

21      effectively, with everybody on board, as far as

22      to how it's to be sold and what is to be done in

23      terms of the proceeds, and then fight about it

24      later, then it is just money.

25              MR. GREANEY:  But everybody wants-- Mr.

26      Mitchell, through the LLC, has been trying to

-Proceedings-

1

2      sell the property for over 18 months --

3              THE COURT:  Please, Mr. Mitchell's not

4      the one in charge here.

5              MR. GREANEY:  Yes, I know.  Please this

6      is important.

7              He has been using recognized brokers,

8      the best around, supposedly, and I don't

9      disagree.

10             He had --he was going to sell it.  He

11     had an appraisal done at some point in time of

12     '06 or '07 for 250 million dollars.

13             Then he had the Hyatt deal at the end of

14     '07 for 200 million in Mr. Weigel's papers, that

15     fell through.

16             Now, all of a sudden we're talking about

17     well, maybe we can get 180.

18             The point is, we're the ones on the hook

19     while everybody waits around saying let's find a

20     good time to sell it.  If not for Mr. Mitchell--

21             THE COURT:  When we agree today what to

22     do and how to sell the thing and get it done.

23             MR. GREANEY:  Take the best bid that

24     Eastville comes up with at the end of the month.

25             MR. WEIGEL:  Your Honor, we have no

26     objection to doing it quickly.  We want it done

```
1                           -Proceedings-
2        quickly --
3                THE COURT:  We have to be able to tell
4        Judge Rosenblatt what he's supposed to do.  I
5        think we're all confident that if we give him his
6        marching orders he will do it.
7                MR. GREANEY:  Absolutely.
8                MR. WEIGEL:  I think Judge Rosenblatt,
9        as I understand after talking to him, is going to
10       market this --the way this comes up, there will
11       be a buyer selected by Eastville as the best
12       buyer, then they will a 30-day window to look at
13       the property.
14               THE COURT:  Are these properties --is
15       this sold by prospectus?
16               MR. WEIGEL:  There's a fancy brochure
17       and so forth.
18               THE COURT:  It is not an auction?
19               MR. WEIGEL:  It is not auction.
20               They have gone -- they have talked to
21       people, they are going to collect --
22               THE COURT:  Pension funds?
23               MR. GREANEY:  It's not an auction.
24               He's talking about the hotel.  He's not
25       talking about our collateral.  He's talking about
26       real property.
```

```
1                    -Proceedings-
2              MR. WEIGEL:  When Receiver Rosenblatt is
3        doing which is that Eastville is out marketing
4        the property to pension funds, investment funds.
5              MR. GREANEY:  They're working on selling
6        the real property, your Honor.
7              MR. SHATZ:  Let there be an
8        understanding.  Through the brokers we're
9        informed something like 125 firms expressed
10       interest.  Some 27 firms, as we are told, have
11       taken tours of the property.  A date was set to
12       submit bids, originally -- forgive me, your
13       Honor, I believe the 12th of June and because
14       people wanted more time then it was extended, to
15       my memory, the 25th of June when bids will come
16       in.  After those bids are in Eastville says they
17       will screen to pick the most probable financially
18       capable buyer.  And they are typically given
19       30-day window to due diligence that would be more
20       detailed than going through and looking at
21       finances.
22              The Receiver has moved forward with the
23       utmost diligence.
24              We have had cooperation, without
25       question, from Carbon.  We have corporation from
26       Hotel 71.  But right now the Receiver is,
```

```
 1                          -Proceedings-

 2          frankly, distracted by the litigation.  All he

 3          wants to do is do his job.

 4                    THE COURT:  Yes, I understand.

 5                    MR. SHATZ:  The only way I understand

 6          that to be done would be for your Honor to

 7          inhibit Carbon from going forward in their fight

 8          with Hotel 71 so that the Receiver can --

 9                    THE COURT:  I don't want to prejudice

10          Carbon's rights vis-a-vis Hotel 71 or the other

11          way around.  But I don't want that fight to

12          interfere with the most effective selling of the

13          asset.

14                    Now you've raised another issue, your

15          collateral is the stuff --

16                    MR. GREANEY:  Membership interest.

17                    THE COURT:  Membership interest, yes.

18          But the assets that we're seeking to sell is the

19          hotel itself.

20                    MR. GREANEY:  Yes.

21                    MR. WEIGEL:  Look your Honor, this is

22          very --

23                    THE COURT:  Wait a minute.

24                    You want the hotel sold as well,

25          correct?

26                    MR. GREANEY:  Of course.
```

```
 1                    -Proceedings-
 2          THE COURT:  How does that prejudice or
 3     does it prejudice your interest vis-a-vis your
 4     percentage interest in the LLC?
 5          MR. GREANEY:  Them selling the hotel, it
 6     doesn't.
 7          THE COURT:  Why don't we move forward
 8     with selling the hotel and let's do whatever we
 9     have to do to adjudicate the bids, this has to be
10     adjudicated here as opposed to Federal Court.
11          MR. WEIGEL:  Yes, your Honor.
12          THE COURT:  I think it is Carbon's
13     rights, if any --
14          MR. WEIGEL:  I may be wrong, I think I
15     heard my colleague say here, they're not trying
16     to get 100 percent.
17          The way this will work is Judge
18     Rosenblatt will sell the hotel, he will pay off
19     the first mortgage which comes before them, he
20     will pay there may be guy delivering the laundry,
21     creditors of the hotel, then whatever is left
22     over he'll pay to Carbon.  Anything left over it
23     will come to me.  That is the way it works.
24          MR. GREANEY:  The 100 percent is not
25     --Mr. Weigel is using the terms loosely.
26          I want the hundred percent.  I want it
```

```
1                        -Proceedings-

2          so that I can sell it under the UCC.  That is

3          what the forbearance agreement was all about.

4                  If there was some type of default we got

5          it all, we can sell it.

6                  If it was just a passage of time, we

7          only got almost all of it and the LLC and Mr.

8          Mitchell had a right to veto or approve of sale.

9                  This is exactly what we bargained

10         against.

11                 THE COURT:  You didn't want hundred

12         percent to sell, you want 100, period.

13                 MR. GREANEY:  No, we want 100 percent in

14         our possession to sell it, to get our money out

15         as quickly as possible.  That is what I have been

16         saying for the last hour.  That is what we want.

17                 THE COURT:  Let's assume there's a

18         surplus after your obligation to satisfy the two

19         million dollar surplus, what happens?

20                 MR. GREANEY:  Well, we can fight about

21         that under the settlement agreement.

22                 That money could be put somewhere and we

23         can come back before you, my guess is that it

24         probably will be worked out, but that goes to all

25         of Mr. Weigel questions.

26                 THE COURT:  What we have to decide today
```

```
 1                        -Proceedings-

 2        is how will we sell the property.

 3              The question is let Judge Rosenblatt

 4        continue to sell.

 5              MR. GREANEY:  I am perfectly comfortable

 6        with Judge Rosenblatt selling property, provided

 7        that we are going forward on an tight schedule to

 8        get it sold.

 9              THE COURT:  I like it.

10              MR. GREANEY:  It is not fair for us to

11        have any type of discretion on Eastville or Hotel

12        71 or Receiver to pick and choose what market

13        condition they want to sell it.

14              THE COURT:  Yes, I agree.  I agree.

15              MR. WEIGEL:  The only thing I object --

16              THE COURT:  Could you give me your

17        client's word, that you agree for having Judge

18        Rosenblatt move forward as quickly as possible.

19              MR. GREANEY:  Well, as I understand it,

20        I would actually -- Judge Rosenblatt, he's

21        dealing with the Eastville broker.  My indication

22        it is not that there's an auction, but as I

23        understand it, there's a window of time bids will

24        be received.  My understanding is that would be

25        sometime in June.  There was talk about

26        postponing it, one of the things I would be
```

```
1                        -Proceedings-
2         against.  Once the bids come in Eastville, the
3         recognized broker would say Judge Rosenblatt here
4         is the best one, the most financially secured,
5         best price, whatever, they do diligence 30 days,
6         sign papers.
7              JUDGE ROSENBLATT:  I appreciate what
8         Isaac Greaney is saying here.  I'll tell him and
9         I will say it for the record.  Wachovia is first
10        in line, then he comes second.  I appreciate why
11        he is concerned.  He has a valid legitimate
12        stayed of credit.
13             THE COURT:  And he's in a second
14        position.
15             JUDGE ROSENBLATT:  I say now, it is hard
16        for me to imagine how he can drop to third.  I
17        can't see any scenario.  Mr. Weigel's client is
18        third.  My program was, and I understood this
19        throughout, was that I sell it at the maximum
20        price, Wachovia in comes in first 100, 125, he
21        comes in second, they loan 24, they are going to
22        get some more, then the surplus goes to Mr.
23        Weigel.
24             If it sells for 200 everybody is going
25        to be more or less happy.
26             If it sells 150, then Carbon might be
```

-Proceedings-

1

2    happy, but Mr. Weigel will not be happy.

3         My concern is this.  I was a little

4    confused, Isaacs, when you said you are not

5    trying to get 100 percent.  The Judge ask the

6    same question.

7         I was under the impression, that if you

8    were to sell it, you would keep all of it because

9    you own it, which would extinguish completely the

10   third creditor here.

11        I understood you today to say that is

12   not quite so.  If it is not your position that by

13   selling it you would distinguish, I would want to

14   know that.

15        That is another question.

16        THE COURT:  It is not irrelevant but

17   that is the second issue we have to deal with.

18        MR. GREANEY:  That is just money, your

19   Honor.

20        JUDGE ROSENBLATT:  I would be willing to

21   do this.

22        We have moved very very quickly.  As

23   soon as we got this, the first thing we did was

24   go down to Florida-- Judge, I wish you had given

25   me the Receivership in February to go down to

26   Aspen.

1              -Proceedings-

2                   This was the Receivership to go to

3       Florida in June.  It was no holiday.  I say that

4       with some levity.

5                   We went down there and what did we find?

6                   Not bad looking hotel, it is going to

7       sell for some amount.

8                   We find what appears to be a defaultion

9       of 3.8 million or at least 1.2 million and we

10      share that.  We are in open communication because

11      they are very valid, bona fide, second creditors

12      here.  And I have nothing to hide from them, we

13      want complete transparency.

14                  I am happy willing and able to continue

15      under the Court's discretion to move as speedily

16      as I can, with help from Carbon, that we expedite

17      this.  If I am not moving speedily enough, to

18      come back to court and let them explain why they

19      feel we're not moving speedily.

20                  I don't know I could do it any faster.

21      If anybody has any idea of how I could do it

22      faster, I would be happy to cooperate with Isaac.

23      He is a legitimate bonafied creditor here and I

24      want to see he gets paid.  I have an obligation

25      to see that he gets paid.

26                  THE COURT:  Yes.

```
1                        -Proceedings-

2                 JUDGE ROSENBLATT:  Where I baulk is that

3        if he gets paid to the point where he sweeps the

4        table, based on contract, and then the Mezz

5        Lender 17 get's nothing, based on the

6        interpretation of the contract, at that point I

7        may say well, they maybe in violation of the

8        UCC --

9                 THE COURT:  I can deal with that but

10       that is money.

11                JUDGE ROSENBLATT:  That is another

12       matter.

13                So I am happy to work with Mr. Greaney.

14       We have open lines of communication.  If he has

15       any suggestion as to how we do it more quickly,

16       fine.  But I am under the Court's supervision.

17                I am happy to cooperate and it is in

18       everyone's interest that I sell it as soon as

19       possible.

20                THE COURT:  I think everyone agrees, at

21       least I do.

22                MR. GREANEY:  I just need to --we need

23       to see it come into realty and some protection --

24                THE COURT:  Is there something you need

25       from Judge Rosenblatt by way of updates or

26       correspondence?
```

```
1                        -Proceedings-

2              MR. GREANEY:  There's nothing --I don't

3         think there's anything needed by virtue of order,

4         we have been in communication.

5              The issue I have and I will come back to

6         is when?

7              When?

8              When is this going to be sold?  And are

9         we going to start delaying things because of the

10        market things or the bids don't come in the way

11        we like them.  I am the one on the hook while

12        everyone looks for the best prices.

13             JUDGE ROSENBLATT:  You've come in first

14        right after Wachovia.  So you are okay.

15             I can really appreciate your concern it

16        not go on indefinitely.

17             THE COURT:  Is there consciences that

18        the market in Florida is still deteriorating or

19        we don't know?

20             MR. GREANEY:  Nobody yet has told you

21        what they heard from Eastville.  But what I heard

22        is that, yes, the answer is yes.  It is still an

23        issue.

24             JUDGE ROSENBLATT:  I have no reason to

25        not share with you what we learned from

26        Eastville.  That is --I want complete on complete
```

```
1                      -Proceedings-

2      transparency.

3              THE COURT:  I think to give Carbon some

4      comfort, I think that is the first thing.

5              JUDGE ROSENBLATT:  Yes, Judge, how do we

6      do that?  I would like to do that too.

7              MR. SHATZ:  I want to throw one thing

8      in.  In talking about Eastville, they said thank

9      goodness the  Receiver is here.

10             The problem with Mitchell was he always

11     had an unrealistic number the thought 220 million

12     was a good number.  And it was impossible for

13     them to engage in valid exercise of selling the

14     property.

15             They would be pleased to have somebody

16     with sense, who the Court set down, to take it

17     this over and to get it done.

18             THE COURT:  And the sharks would be

19     pleased too.  They know it would be sold.

20     Unfortunately that does intend to depress the

21     price.

22             MR. GREANEY:  Nobody is saying --I hope

23     I made this clear at least.

24             There's no complaint about Judge

25     Rosenblatt.

26             The alternative before he came along is
```

1                         -Proceedings-

2      somebody stealing at a clip of four million

3      dollars a quarter.

4              What we have now is some control of the

5      property.

6              Again, let's go through whatever the

7      process is.  I would like to find out what it is

8      to make sure it does not get moved.

9              THE COURT:  I think we have to have you

10     ongoing communication with Judge Rosenblatt's

11     office and with the Court.  If you feel something

12     is not moving along quickly enough or if Judge

13     Rosenblatt needs special instruction from me,

14     there's some problem coming.

15             Look, I think it is working in the right

16     direction.  It is just a question of the

17     progress.

18             JUDGE ROSENBLATT:  I you would like I

19     could supply the Court and Mr. Greaney with

20     periodic reports weekly even.

21             I want to do this as quickly as anybody.

22     And I recognize his rights, which are not only

23     considerable, but also paramount.  So no ne wants

24     to cut him out on the contrary.

25             And if the Court wants to make some

26     program by which I alert the Court and Carbon to

-Proceedings-

1

2    the progress, then the Court will be able acquire

3    as to whether or not there is any unreasonable

4    delay.  You can make that determination.  I am

5    happy to work.

6            MR. GREANEY:  I am sure we can work

7    together on the details.

8            What would be helpful to us, with

9    respect to our own security, and dealing with

10   certain other parties, Wachovia.  It would be

11   helpful to have some time when we know we will be

12   back before your Honor to say why has this not

13   been sold.  And if that is July 10th or --

14           THE COURT:  Why don't we have 4:00

15   conference calls periodically once a week.

16           MR. GREANEY:  Yes, once before the

17   fourth of July would be great to see where we

18   are.

19           MR. WEIGEL:  The only concern that I

20   have your Honor, I would prefer not to do that in

21   open court because obviously --

22           THE COURT:  We'll do it conference

23   calls.

24           MR. WEIGEL:  That would be great.

25           THE COURT:  If we get to disclosing

26   prices, it does not get published.

```
1                    -Proceedings-
2            So, let's set up conference 4:00 for a
3       week from today.
4                    MR. SHATZ:  Your Honor, could it be a
5       week from Thursday.  I have the good fortune --
6                    THE COURT:  I can accommodate everyone.
7                    MR. SHATZ:  I am going to Denver,
8       Colorado a week from Thursday.  It would be
9       greatly appreciated.
10                   THE COURT:  All right.
11                   MR. WEIGEL:  May I suggest we talk to
12      Carbon in the interim.
13                   THE COURT:  Of course.
14                   MR. WEIGEL:  It may be that we don't
15      need it and we are up to speed.  We can just
16      alert your office.
17                   THE COURT:  Sure.
18            Two issues, the paramount issue for me
19      right now is that, I think I have a feeling of
20      what is going on to get the thing sold.
21            The secondary issue is to dissolve the
22      dispute.
23                   MR. GREANEY:  If there is anything to
24      fight about.
25                   THE COURT:  All right.
26            So, are we clear?  We're going to
```

                          -Proceedings-

1

2        proceed with Judge Rosenblatt full speed ahead.

3                     We'll speak on Thursday.

4                     Thursday we'll speak.

5                     MR. SHATZ:  That would be the 26th, your

6        Honor at 4:00 p.m.

7                     THE COURT:  Call chambers to set up the

8        conference call.  If they don't want to

9        participate, fine.

10                    MR. WEIGEL:  I want to make sure that

11       there's not going to be a UCC sale notice now

12       that Judge Rosenblatt is doing this.

13                    MR. GREANEY:  We could not even if we

14       wanted to.

15                    Judge Sprizzo has enjoined us from doing

16       just that.  We would not do that without coming

17       to your Honor first anyway.

18                    THE COURT:  Let's get this sold.

19                    MR. WEIGEL:  Thank you, your Honor.

20                    THE COURT:  Good seeing everyone.

21                    MR. GREANEY:  Thank You.

22                    MR. WEIGEL:  Thank you.

23                  *       *       *       *

                    It is hereby certified that the

24       foregoing is a true and accurate transcript of
         the proceedings.

25       _____

                    DEBORAH A. ROTHROCK, RPR

26                  Official Court Reporter



▶ RETURN TO ARTICLE    ▶ E-MAIL THIS ARTICLE

## South reach

**by Matt Miller** Posted 02:09 EST, 3, Jun 2008

The Royal Palm Resort, we are reliably informed by unbiased marketers, is perched majestically on Miami's South Beach, basking in sunshine and kissed by ocean breezes. Here's what the promotions don't mention: The Royal Palm has a history of unpaid bills, overdue loans, lawsuits. One partner has been forced out. The property is on the block, although it isn't clear who owns it.

The Royal Palm is part of one of the current real estate crash's many pileups: hotel to condo-hotel conversion. This concept is a variation on the straight hotel-to-condo play. While rooms are sold to retail investors, the property still operates as a hotel. Room owners can stay as long as they want. When not around, their rooms can be rented out.

Florida led the U.S. in these instruments, which means the Sunshine State is sitting on a lot of disasters.

Why fashion these conversions? A traditional hotel can be carved up and sold to individual owners. The developer gets money up front and the project becomes a real estate play as opposed to a long-term investment. The problem is equally straightforward, says Gregory Rumpel, executive vice president of Jones Lang LaSalle Hotels: greed.

A hotel room may be valued at, say, $100,000. You could argue that an investor might pay $200,000 for the room, a diminished return offset by the ability to use it as a destination. "You don't buy a condo-hotel for only an investment," Rumpel says, adding that some condo-hotels, well managed and marketed, have prospered even in Miami's market dive.

But in the crazy years of the boom, some developers tried to inflate prices far beyond reasonable values. They marketed to "uneducated and unsuspecting buyers who anticipated a return," Rumpel says. After the crash, investors discovered they were sitting on assets that are not only worth a lot less, but return little relative to the outstanding mortgages.

A Chicago developer, Robert Falor, personifies this mess. He has left busted hotel to condo-hotel deals that include the Royal Palm and four other Florida properties, plus three in Chicago. Multiple bankruptcies, lawsuits and forced sales mark his trail. Attempts to reach Falor weren't successful. His Robert Falor Investments LLC isn't listed in Chicago.

Typical of Falor's approach was a much-ballyhooed — and stillborn — plan to convert hotels into condo-hotels and brand them "Nicky O," after Paris Hilton's lesser-known sister, Nicky. A lawsuit marked the end of that partnership, although why Ms. Hilton would be an inducement to investors is beyond us. It was beyond potential acquirers too. The three properties initially tagged for Nicky's imprint failed to sell any condos. Two — Miami's Breakwater and Edison hotels — went bankrupt (a sale is pending). The third is Chicago's boutique Hotel Blake. Despite many lawsuits, Falor has held onto the property, which remains for sale.

He wasn't as fortunate with the bigger Hotel 71. This 437-room Chicago property filed for Chapter 11 twice last year. Falor defaulted on more than $100 million in loans and took the hotel into bankruptcy court before creditors could auction off the property. Mezzanine lender **Oaktree Capital Management LLC** assumed the equity. The bankruptcy was dismissed, but Oaktree took the hotel back into Chapter 11 to cut losses. Another distressed real estate fund bought the $100 million senior debt. No one else wanted to acquire the property, so the fund and its partner will own the hotel.

In Miami, Falor found backing from financier Guy Mitchell to buy the 414-room Royal Palm in 2005 for $128 million. Last year, R. Donahue Peebles, the previous owner who retained a minority stake, sued Mitchell for

breach of contract. In turn, Mitchell ousted Falor. In the time he was involved, Falor couldn't sell a single room as a condo conversion — a stunning failure in a Miami condo market that was so hot in 2005 and 2006 that a closet might get multiple bids.

That incompetence may be a blessing for current owners, now peddling the hotel for an unrealistic $220 million. Condo owners seem to only diminish the value of a hotel property these days. However, exactly who owns the Royal Palm is in dispute. An affiliate of **BlackRock Inc.**, which holds a loan for the property it says is in default, wants control. Mitchell has resisted. Lawsuits have flown. It's no day at the beach.

*Matt Miller writes about distressed investing for The Deal.*

---

**MOVERS & SHAKERS**
See who is moving into the corner office at investment banks and law firms.

---

▶ **RETURN TO ARTICLE**    ▶ **E-MAIL THIS ARTICLE**    ▶ **REPRINT THIS ARTICLE**

| **D** HOME | SITEMAP | ABOUT US | CONTACT US | ADVERTISE | PRIVACY POLICY | TERMS AND CONDITIONS |

©Copyright 2008, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.

March 25, 2008

<u>**VIA HAND DELIVERY, FEDERAL EXPRESS & U.S. MAIL**</u>

Royal Palm Senior Investors Inc.
c/o Guy T. Mitchell
14 Tahiti Beach Island Road
Miami, Florida 33143

Re: **Royal Palm Settlement Agreement**

Dear Mr. Mitchell:

This letter shall serve as formal notice to you that Royal Palm has failed to satisfy certain obligations required by the Settlement Agreement dated October 24, 2007 among Carbon Capital II, Inc.("Carbon II"), Royal Palm Senior Investors, LLC ("Royal Palm"), Robert D. Falor, Guy Mitchell and Geoffrey L. Hockman ("Settlement Agreement").

Royal Palm has defaulted on its obligation under Section 6.3.2 of the Settlement Agreement to enter into a replacement Cash Management Agreement with Wachovia Bank, National Association on terms acceptable to Carbon II. Royal Palm has also defaulted on its obligation under Section 8 of the Settlement Agreement to enter into a Replacement Management Agreement for a Qualified Manager approved by Carbon II. In addition to these defaults, Royal Palm is in default under Sections 6.3.3 and 7.1 of the Settlement Agreement.

Royal Palm's failure to comply with the terms and conditions of the Settlement Agreement is a Termination Event pursuant to Section 3.3.1. You are hereby advised that as a result of the occurrence of a Termination Event, Royal Palm is no longer entitled to the Applicable Rate or Excess Proceeds Sharing, as fully described in the Settlement Agreement. You are further advised that Carbon II has the right to foreclose its Collateral pursuant to Section 4.3 of the Settlement Agreement and Carbon II is no longer obligated to release the Formula Judgment as to Guy Mitchell, individually. Carbon II will immediately take steps to enforce its rights as a Judgment Creditor against Mr. Mitchell.

Nothing contained herein is intended, and shall not be construed, as a waiver of, or an election of, any remedy with respect to Royal Palm's obligations under the

Guy T. Mitchell
March 25, 2008
Page 2

Settlement Agreement and/or Loan Documents including, but not limited to, its right to initiate foreclosure proceedings against Royal Palm.

    If you have any questions regarding the above, please feel free to contact me.

          Sincerely,

          Detra Shaw-Wilder

DPS/es

cc:    Frank Pomar
       Brian Rich, Esq. (via electronic mail)

3517/101/286392.1



KOZYAK · TROPIN
THROCKMORTON
ATTORNEYS AT LAW

Detra P. Shaw-Wilder, Esq.
dps@kttlaw.com | 305.377.0668

April 1, 2008

<u>VIA ELECTRONIC MAIL AND FEDERAL EXPRESS</u>
Royal Palm Senior Investors, LLC
c/o Guy T. Mitchell
14 Tahiti Beach Island Road
Miami, Florida 33143

Re:  Royal Palm Senior Investors, LLC ("Royal Palm")

Dear Mr. Mitchell:

Reference is hereby made to (i) the Settlement Agreement, dated October 24, 2007 ("Settlement Agreement"), by and among Carbon Capital II ("Carbon II"), Royal Palm, Robert D. Falor, Guy T. Mitchell and Geoffrey L. Hockman; and (ii) the letter, dated March 28, 2008 (the "Default Letter"), delivered by the undersigned to Royal Palm. Capitalized terms used herein without definition shall have the meanings given thereto in the Settlement Agreement.

In the Default Letter, I notified you that Termination Events had occurred under the terms and conditions of the Settlement Agreement. I am now writing to inform you that, in addition to the Termination Events, the time for a Capital Transaction to occur under the Settlement Agreement expired by its terms on March 31, 2008, the Revised Maturity Date.

Pursuant to Section 3.1 of the Settlement Agreement, because a Capital Transaction did not occur on or before the Revised Maturity Date, 99.9% of Royal Palm's membership interest was automatically conveyed to Carbon II and Carbon II is now the managing member of Royal Palm Hotel Property, LLC. While the transfer of membership interest and management does not require any further documentation, as a condition precedent to the Settlement Agreement, Royal Palm was required to deliver an "executed and *binding*" Power of Attorney to Donald Puglisi to execute an assignment of the membership interest in Carbon II's favor. Notwithstanding your obligation under the Settlement Agreement, Mr. Rich has asserted to Mr. Puglisi that the Power of Attorney that you delivered to Carbon II is not "binding." We find Mr. Rich's argument to be without merit. Nonetheless, pursuant to Section 3.1 of the Settlement Agreement, your cooperation is requested to document and confirm the transfer of the membership interest and management of Royal Palm Hotel Property, LLC. Carbon II hereby requests that Royal Palm execute the enclosed Assignment and Transfer of Membership Interest and cooperate in the execution of any other documents that Carbon II may request in the future to confirm or evidence

Page 2

the transfer of membership interest and management.   Please immediately confirm by the close of business on April 2, 2008 that you will comply with these requests and with your obligations under the Settlement Agreement.

Carbon II has negotiated with Davidson Hotel Company, LLC ("Davidson") to manage the Royal Palm Hotel.  In addition to execution of the documents referenced above, Carbon II also requests that you instruct Naveen Ahuja, the current property manager, to assist in implementing a smooth and orderly transfer of hotel management.   A representative from Davidson will contact Mr. Ahuja shortly to discuss and implement a plan to transfer management.

Nothing contained herein is intended to, and shall not be deemed, as a waiver of any of Carbon II's rights and/or remedies under the Settlement Agreement or applicable law including, but not limited to, its right to foreclose or otherwise seek a transfer of the remaining 0.1% membership interest in Royal Palm Hotel Property, LLC that Carbon II is entitled to receive under the Settlement Agreement.

If you have any questions regarding the above, please feel free to contact me.

Sincerely,

Detra Shaw-Wilder

DPS/es

cc:    Frank Pomar
       Brian Rich, Esq.
       John Buehner, Esq.

3517/101/286674.1

ASSIGNMENT AND TRANSFER OF MEMBERSHIP INTEREST

THIS ASSIGNMENT AND TRANSFER OF MEMBERSHIP INTEREST (this "Assignment") is made and executed this 26th day of March 2008, by ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company ("Assignor") in favor of CARBON CAPITAL II, INC., a Maryland Corporation ("Assignee").

R E C I T A L S:

In consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration in hand paid by Assignee to Assignor, the receipt and sufficiency of which is hereby acknowledged and confessed, Assignor and Assignee hereby agree as follows:

1.     Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's right, title and interest in and to 99.9% membership interest (the Membership Interest") in Royal Palm Hotel Property, LLC (the "Company"), together with all accounts, funds and assets of any nature of the Company, whether real or personal.

2.     TO HAVE AND TO HOLD the Membership Interest unto Assignee and Assignee's successors, legal representatives and assigns, forever, free from any encumbrances.

3.     The intent of this Assignment is to assign to Assignee any and all rights of Assignor as stated herein and the full power to exercise any and all rights so assigned.

4.     Assignor (for itself and on behalf of Assignor's legal representatives, successors and assigns) hereby warrants, represents, covenants and agrees with Assignee as follows:

    i.   That this Assignment and the conveyances being made hereby (a) are absolute conveyances to Assignee of all of Assignor's interest in the Membership Interest and all properties, rights and interests located on, affixed to, and/or arising from or used in connection with the property owned by the Company, Assignor having transferred and assigned such property to Assignee for a fair and adequate consideration, and (b) are not intended as a pledge, trust conveyance or security of any kind or nature whatsoever; and

    ii.   That Assignor has not sold, transferred or granted to any other person or entity any right, title or interest (legal, beneficial or otherwise) in the Membership Interest or the Company, and Assignor has not pledged or otherwise encumbered the Membership Interest or the Company.

5.     Assignor does hereby agree to perform, execute and/or deliver or to cause to be performed, executed and/or delivered any and all such further acts and assurances as Assignee reasonably may require to perfect and convey Assignee's interest in the Membership Interest.

This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed on the day and year first above written.

ASSIGNOR:

ROYAL PALM SENIOR INVESTORS, LLC, a Delaware limited liability company

By: _____
      Name:
      Title:

2

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4

5  GUY T. MITCHELL,     )

             )

6      Plaintiff,  ) 08 Civ. 4319 (JES)

             )

7      vs.      )

             )

8  CARBON CAPITAL II, INC.,  )

             )

9      Defendant.  )

  -----------------------------)

10

11

12

13

14       VOLUME II

15

16   CONTINUED VIDEOTAPED DEPOSITION OF

17      GUY T. MITCHELL

18     New York, New York

19    Tuesday, June 10, 2008

20

21

22

23 Reported by:

24 KRISTIN KOCH, RPR, RMR, CRR, CLR

25 JOB NO. 17198

Page 236

```
 1
 2
 3
 4
 5              June 10, 2008
 6              10:07 a.m.
 7
 8
 9        Continued Videotaped Deposition of
10    GUY T. MITCHELL, held at the offices of
11    Sidley Austin LLP, 787 Seventh Avenue,
12    New York, New York, before Kristin Koch, a
13    Registered Professional Reporter,
14    Registered Merit Reporter, Certified
15    Realtime Reporter, Certified Livenote
16    Reporter and Notary Public of the State of
17    New York.
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 237

```
 1
 2    A P P E A R A N C E S :
 3
 4
 5        ARNOLD & PORTER LLP
 6        Attorneys for Plaintiff
 7            399 Park Avenue
 8            New York, New York 10022-4690
 9        BY:  H. PETER HAVELES, JR., ESQ.
10
11
12        SIDLEY AUSTIN LLP
13        Attorneys for Defendant
14            787 Seventh Avenue
15            New York, New York 10019
16        BY:  ISAAC S. GREANEY, ESQ.
17
18
19
20    ALSO PRESENT:
21
22        MICHAEL PINEIRO, Legal Video Specialist
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 238

```
 1
 2        THE VIDEOGRAPHER:  This is the start
 3    of the tape labeled number 1 of the
 4    continuing videotaped deposition of Guy
 5    Mitchell in the matter of Mitchell versus
 6    Carbon Capital, Inc.
 7        This deposition is being held at 787
 8    Seventh Avenue, New York, New York on June
 9    10th, 2008 at approximately 10:07 a.m.
10        My name is Michael Pineiro from TSG
11    Reporting, Inc. and I am the legal video
12    specialist.  The court reporter is Kristin
13    Koch in association with TSG Reporting.
14        Will counsel please introduce
15    yourselves.
16        MR. HAVELES:  Peter Haveles of
17    Arnold & Porter LLP on behalf of the
18    plaintiff and the witness.
19        MR. GREANEY:  Isaac Greaney from
20    Sidley Austin LLP on behalf of defendant
21    Carbon Capital II.
22        THE VIDEOGRAPHER:  Will the court
23    reporter please swear in the witness.
24            *   *   *
25
```

TSG Reporting - Worldwide    877-702-9580

Page 239

```
 1
 2    G U Y  T.  M I T C H E L L ,
 3        resumed as a witness, having been duly sworn
 4        by a Notary Public, was examined and
 5        testified as follows:
 6    EXAMINATION BY
 7    MR. GREANEY:
 8        Q.  Good morning, Mr. Mitchell.
 9        A.  Good morning.
10        Q.  Welcome back.  I'll just briefly go
11    over the rules, since we already went over them
12    before.
13        If you need a break at any time,
14    please take one, let us know and we will take
15    one.
16        If you don't understand any question
17    I ask, please let me know.  Can you do that?
18        A.  Yes.
19        Q.  And if you don't, I will assume that
20    you understand it.  Is that okay?
21        A.  Yes.
22        Q.  Did you think of anything in the
23    past week that you'd like to clarify or change
24    about your prior testimony?
25        A.  No.
```

TSG Reporting - Worldwide    877-702-9580

Page 240

Mitchell

1
2    Q.    Did you remember anything that you
3    couldn't remember the last time we were
4    together that you would like to include in your
5    testimony?
6    A.    No.
7    Q.    Is there any reason that you are
8    aware of why you can't testify fully and
9    accurately today?
10    A.    No.
11    Q.    Have you talked to anyone since the
12    last time we were together about your
13    deposition?
14    A.    No.
15    Q.    Even your lawyer?
16    MR. HAVELES:  Well, I direct him not
17    to answer.  We have had numerous
18    conversations about various topics over the
19    last week and a half.
20    Q.    Anyone else besides your attorneys?
21    A.    No.
22    Q.    Have you reviewed the transcript of
23    your prior deposition?
24    A.    Yes.
25    Q.    When did you review that?

TSG Reporting - Worldwide    877-702-9580

Page 241

Mitchell

1
2    A.    I reviewed them last night.
3    Q.    When was the last time that you
4    personally invested money into the Royal Palm
5    Hotel?
6    A.    I don't recall the date.
7    Q.    Was it less than six months ago?
8    A.    No.
9    Q.    Was it less than a year ago?
10    A.    It may have been a year ago.
11    Q.    Do you remember the circumstances of
12    your investing money into the Royal Palm Hotel?
13    A.    It could have been -- be a mortgage,
14    pay mortgage, or it could have been to
15    shortfalls of the hotel.
16    Q.    And did you pay that personally or
17    through an LLC?
18    A.    Through an LLC.
19    Q.    Which one?
20    A.    Mitchell Hotel Group.
21    Q.    Do you remember how much money that
22    was, roughly?
23    MR. HAVELES:  Don't guess.
24    A.    No.
25    MR. HAVELES:  Just from your

TSG Reporting - Worldwide    877-702-9580

Page 242

Mitchell

1
2    recollection.
3    A.    No.
4    Q.    Do you have an understanding of what
5    your total investment into the hotel has been
6    over the course of time?
7    MR. HAVELES:  Both equity and debt?
8    MR. GREANEY:  Yes.
9    A.    Probably in excess of 14 to 15
10    million in debt.
11    MR. HAVELES:  He wants both equity
12    and debt.
13    A.    Oh.  North of 25.
14    Q.    What's the outstanding amounts owed
15    on the mortgage loan?
16    A.    I don't know the exact number.
17    Q.    Do you know generally what the
18    number is?
19    A.    123 to -24 million.
20    Q.    Do you have an understanding of how
21    much is outstanding on the mezzanine loan?
22    A.    Roughly 37 million.
23    Q.    What's your understanding of the
24    total amount of debt on the Royal Palm Hotel
25    right now?

TSG Reporting - Worldwide    877-702-9580

Page 243

Mitchell

1
2    MR. HAVELES:  All debt?
3    MR. GREANEY:  All debt.
4    A.    I don't have that number with me.
5    Q.    Is it more or less than
6    $180 million?
7    A.    I don't have that figure.
8    Q.    But do you know whether it's more or
9    less than 180?
10    MR. HAVELES:  You can answer the
11    question to the best of your knowledge, if
12    you know.
13    A.    The best of my knowledge, it's less.
14    Q.    Did you promise to do certain
15    renovation work on the hotel at any time?
16    MR. HAVELES:  Did Mr. Mitchell
17    personally promise?
18    MR. GREANEY:  Yes.
19    A.    Yes.
20    Q.    Okay.  What did you promise to do
21    with the hotel?
22    A.    To complete renovation of certain
23    rooms.
24    Q.    Do you recall which rooms?
25    A.    No.

TSG Reporting - Worldwide    877-702-9580

Page 244

1          Mitchell
2      Q.   Did you promise to renovate rooms in
3  the Shorecrest Tower?
4      A.   Yes.
5      Q.   And also in the Lanai?  Excuse me,
6  the Lanai Suites.
7      A.   Yes.
8      Q.   Who did you make that promise to?
9      A.   That was basically a global
10 understanding if the funding was there to
11 complete, you know, renovation.  It wasn't a
12 sequence of which rooms or whatever the case
13 was, but...
14     MR. HAVELES:  He asked to whom did
15     you make the promise.
16     A.   I maybe retract my words.  The word
17 "promise" is fairly strong.  You know, we were
18 going to obviously continue renovation on
19 certain rooms, but it did not make sense.  We
20 actually put the rooms back together that were
21 in renovation mode to effactually generate the
22 income, which was greater than taking the rooms
23 down, so the choice was not to do any further
24 renovation.  We instead enhanced a lot of the
25 corridors of the hotel and that was the basic

TSG Reporting - Worldwide    877-702-9580

Page 245

1          Mitchell
2  recommendation versus the amount of money that
3  we had in the reserve.
4      Q.   I know you are uncomfortable now
5  with the word "promise," so you can feel free
6  to change that in your answer, but who did you
7  promise to make those renovations to?
8      A.   Well, with the word "promise," you
9  know, I don't like the word "promise," but
10 we -- it was mentioned to if -- we spoke to
11 Frank or -- Pomar, Mr. Pomar, or it could have
12 been Wachovia, but, again, the choice was not
13 to do anything else and not to do any further
14 renovation and to put the rooms that were off
15 line back on line, which occurred, because the
16 revenue was better for the hotel.
17     Q.   Were the renovations contemplated in
18 the agreement that you entered into?
19     A.   That was prior to me getting in.
20 There was an agreement, I guess, with -- I
21 don't know that there was a specific agreement.
22 I don't -- I don't recall that.
23     Q.   Do you remember the circumstances of
24 your telling Mr. Pomar that you intended to do
25 those renovations?

TSG Reporting - Worldwide    877-702-9580

Page 246

1          Mitchell
2      A.   We were going to do renovations with
3  what funds we had and the choice was not to
4  continue the reservations because it would have
5  been a huge loss in revenue, and there was not
6  enough funds to complete or do the renovation
7  of those rooms and the choice was to keep those
8  rooms on line and that's what we did.
9      Q.   Who made that choice?
10     A.   I did.
11     Q.   Did you consult with anyone about
12 that, making that choice?
13     A.   We spoke to management, that was
14 Naveen Ahuja, to keep the revenues going and
15 that was the decision we came up with.
16     Q.   Did you represent to Mr. Pomar that
17 you will do these renovations on numerous
18 occasions or just once?
19     A.   He may have brought them up numerous
20 times, but it wasn't -- it wasn't me.
21     Q.   Did Mr. Pomar discuss with you the
22 fact that you weren't going to do the
23 renovations once you had made that decision?
24     A.   I don't know, but he was fully
25 informed that the reasons why we did not do any

TSG Reporting - Worldwide    877-702-9580

Page 247

1          Mitchell
2  further renovations, because there was -- there
3  wasn't enough money and that it was better --
4  the hotel was much better served putting those
5  rooms back on line and doing the cosmetic stuff
6  that was needed to do, which was done.
7      Q.   You mean to do it to sell it in the
8  short term?
9      A.   To sell it in the short term and
10 also keep the revenues up without creating a
11 deficit.
12     Q.   Do you remember when that decision
13 was made that it would be better to do the more
14 minor renovations for the short-term sale
15 process?
16     A.   No.  It was -- no.
17     Q.   Was it in 2006?
18     A.   I don't recall.
19     Q.   Was it before the maturity date of
20 the loans?
21     A.   I don't recall.
22     Q.   Do you remember having discussions
23 with Wachovia about renovations to the hotel?
24     A.   Not specifically.
25     Q.   What do you generally recall?

TSG Reporting - Worldwide    877-702-9580

Page 248

Mitchell

1
2    A.   I remember everybody -- we informed
3    what we were doing and kept everybody apprised
4    at all times of what the choices were and what
5    the options were.
6    Q.   And did Wachovia have any reaction
7    to that?
8    A.   No.
9    Q.   Why did you make the decision to
10   sell the hotel in the short term?
11   A.   It was better served and the market
12   was stronger and it was the opportune time to
13   sell the hotel.
14   Q.   What time was that?
15   A.   In the last two years.
16   Q.   I think the last time we spoke you
17   mentioned that the lending market had
18   deteriorated at some point in time.  Was this
19   prior to that time?
20   A.   Yes.
21   Q.   I can show you the testimony if you
22   don't recall it, but last time we spoke you
23   said that sometime around March '07, roughly
24   thereabouts, you had thought the lending market
25   had turned and had gotten significantly worse

TSG Reporting - Worldwide    877-702-9580

Page 249

Mitchell

1
2    and had remained basically unchanged up until
3    today.  Does that square with your
4    recollection?
5    A.   Yes.
6    Q.   At the time that you made the
7    decision not to do the more significant
8    renovations on the Shorecrest and the Lanai
9    Suites, is that prior to the market turning in
10   March '07?
11   A.   Yes.
12   Q.   Do you know how much prior to that
13   it was?
14   A.   No.
15   Q.   When did you first start trying to
16   sell the property?
17   A.   I don't recall the date.
18   Q.   Do you recall how many years ago it
19   was?
20   A.   Greater than a year.
21   Q.   Have you been trying to sell the
22   property since the mortgage transaction in
23   2005?
24   A.   Yes.
25   Q.   Last time we were together we spoke

TSG Reporting - Worldwide    877-702-9580

Page 250

Mitchell

1
2    a little bit about your communications with
3    Easdil about the property.
4         Have you had any communications with
5    Easdil since our last deposition?
6    A.   No.
7    Q.   Has Easdil provided you with any
8    information about the sales process for the
9    property in the last two weeks?
10   A.   Yes.  There was an update.
11   Q.   What did they say in the update?
12   A.   They were continuing to market the
13   property and so forth.
14   Q.   Did they tell you anything about the
15   progress on their efforts to market the
16   property?
17   A.   They are still entertaining
18   purchasers.
19   Q.   Have they had any offers?
20   A.   Not yet.
21   Q.   Any indications?
22   A.   We won't know until the offerings
23   come out.
24   Q.   Have they given you an opinion on
25   what they think a possible sales price would

TSG Reporting - Worldwide    877-702-9580

Page 251

Mitchell

1
2    be?
3         MR. HAVELES:  Answer the question to
4    the best of your knowledge.
5    A.   Yes.
6    Q.   What was the possible sales price
7    they mentioned?
8    A.   I retract that.  It's not a -- they
9    have not gone to market, so there is not a
10   specific -- there is not a specific number, you
11   know, for that.  They couldn't do it.  They
12   don't have bids yet.
13   Q.   In the last two weeks can you tell
14   me everything you remember about your
15   communications with Easdil?
16   A.   I haven't spoken to them.
17   Q.   You said you received an update;
18   correct?
19   A.   Just received an update, yes.
20   Q.   From -- is that via e-mail?
21   A.   Yes.
22   Q.   What did Easdil write in the e-mail?
23   A.   Easdil wrote that they were
24   continuing to market the property and that they
25   may want to defer the bidding process until we

TSG Reporting - Worldwide    877-702-9580

Page 252

```
 1           Mitchell
 2  resolve some of these issues.
 3     Q.   Did they say why?
 4     A.   Well, I think the reason why is
 5  because there is litigation going on and I
 6  think it's much easier for them to do what they
 7  need to do without having a litigation.
 8     Q.   Is that what they said?
 9     A.   That's what I am assume -- well --
10          MR. HAVELES:  Tell him what they
11     said.  He is not asking what you assume
12     they said.
13     A.   I don't recall exactly what it read.
14  I don't recall.
15     Q.   Did they say what -- what else do
16  you recall from the e-mail?
17     A.   Basically that they would like to go
18  out a little further on the timing.
19     Q.   Do you recall anything else from the
20  e-mail?
21     A.   No.
22     Q.   Nothing else?
23     A.   I don't -- I didn't really -- I
24  didn't have time to go through the e-mail
25  because I was coming up here.
```

TSG Reporting - Worldwide    877-702-9580

Page 253

```
 1           Mitchell
 2     Q.   They didn't say anything about the
 3  price or the indications of the market?
 4     A.   I didn't get to that point.  I
 5  don't --
 6     Q.   Was it in the e-mail?
 7     A.   It may have been.  I don't know.
 8     Q.   How long was the update?
 9     A.   I don't know when it came in,
10  because I was out of town.
11          MR. HAVELES:  How long was the
12     update, how many pages, or how long was the
13     text?
14     A.   They sent an update previously and
15  it looked similar to what they had sent before
16  that just -- that they were doing more tours,
17  so I didn't read a lot of the detail.
18     Q.   How long was it?
19     A.   I don't know.  I didn't go down that
20  far.
21     Q.   Was it just an e-mail or was there
22  an attachment?
23     A.   It may have been an attachment.
24     Q.   But you don't recall?
25     A.   It may have been an attachment.  I
```

TSG Reporting - Worldwide    877-702-9580

Page 254

```
 1           Mitchell
 2  guess it showed a list of their clients.
 3     Q.   When you say a list of clients, do
 4  you mean a list of people they have spoken with
 5  about the property?
 6     A.   Prospective purchasers or who they
 7  sent their packages out to.
 8     Q.   Did they provide a report on what
 9  the indications were from those individuals or
10  those entities?
11     A.   I just said to you I didn't read --
12  I didn't have a chance to read the entire
13  e-mail.
14     Q.   And you have had no discussions
15  orally or by any other means communicated with
16  Easdil in the last two weeks?
17     A.   No.
18     Q.   Other than that single e-mail?
19     A.   Right.
20     Q.   Where was that e-mail sent?
21     A.   It was sent to FirstChoice01 at
22  AOL.com.
23     Q.   So other than the statement by
24  Easdil that they were recommending deferring
25  the bidding process, you don't recall anything
```

TSG Reporting - Worldwide    877-702-9580

Page 255

```
 1           Mitchell
 2  else about that e-mail update; is that correct?
 3     A.   I don't recall a lot of the
 4  specifics, no, because I didn't read it in its
 5  entirety.
 6     Q.   What do you recall beyond --
 7     A.   Just what I told you.
 8     Q.   Nothing more?
 9     A.   No.
10     Q.   The last time we were here you
11  mentioned -- you testified that Miles Spencer
12  had e-mailed you at your personal e-mail
13  address, which I think was different than the
14  one you just gave us.
15          Do you have another personal e-mail
16  address you use?
17     A.   No.
18     Q.   You don't have a G Mitchell e-mail
19  address?
20     A.   Yes.
21     Q.   What e-mail address is that?
22     A.   It's the BlackBerry.
23     Q.   What is the address?
24     A.   G.Mitchell at EarthLink.net.
25     Q.   You mention that in that e-mail
```

TSG Reporting - Worldwide    877-702-9580

Page 256

                    Mitchell
1
2    Miles Spencer told you that the value of the
3    property could be north of 220 million.  Do you
4    recall that?
5        A.    That wasn't that specific e-mail.
6        Q.    Which e-mail was that?
7        A.    That was previous, a few -- I think
8    I told you about two months prior.
9        Q.    Has Mr. Spencer given you any
10   indication of whether the value of the property
11   in his opinion has changed since that
12   $220 million quote?
13       A.    I haven't spoken to him in detail,
14   no.
15           MR. HAVELES:  Isaac, for the record,
16       since the receiver interjected himself in
17       the sales process, Easdil has not had any
18       voice communications of any sort with
19       Mr. Mitchell.
20           MR. GREANEY:  Okay.
21       Q.    Is that -- can I -- is that true?
22       A.    Yes.
23   RQ        MR. GREANEY:  Peter, we do not -- I
24       don't believe that we have a copy of the
25       e-mail from Miles Spencer, so I would like
          TSG Reporting - Worldwide    877-702-9580

Page 257

                    Mitchell
1
2    to request that that be produced if it still
3    exists.
4            MR. HAVELES:  I will check.  We
5        attempted -- because it's a personal
6        address where he did not -- it doesn't have
7        a server where they get done.  It's like
8        any other --
9            MR. GREANEY:  I understand.
10           MR. HAVELES:  So I will -- if he has
11       them, we will check to see.  We didn't see
12       them in the productions when we collected
13       all e-mails back at the end of April.  We
14       will try to see if they are still around
15       and get copies of them.
16           MR. GREANEY:  Just to be clear, we
17       request production of any responsive
18       documents in the EarthLink account as well
19       as the AOL account.
20           MR. HAVELES:  No, I understand.  We
21       searched both accounts back -- we searched
22       both accounts back in April.  To the extent
23       the EarthLink he uses for his BlackBerry,
24       he went into the server to see if he had
25       saved any -- or went into his BlackBerry
          TSG Reporting - Worldwide    877-702-9580

Page 258

                    Mitchell
1
2    and computer to see if he saved any and
3    same -- we did the same with the AOL e-mail
4    address as well, but we will go back and
5    conduct a further search to determine
6    whether those e-mails were saved or not.
7            MR. GREANEY:  Thank you.
8            MR. HAVELES:  But, you know, you can
9        also serve a subpoena on Easdil, because it
10       will have a server.
11           MR. GREANEY:  Okay.
12           MR. HAVELES:  And I will not
13       interpose the discovery cut-off date as an
14       obstruction -- an objection to your doing
15       so.
16           MR. GREANEY:  Okay.
17       Q.    Do you have a current belief as to
18   what the property will sell for?
19       A.    I don't know.
20       Q.    You don't have a belief as to what
21   the Royal Palm Hotel will sell for?
22       A.    I would hope north of 200.
23       Q.    And in what time frame do you hope
24   to achieve that price?
25       A.    I mentioned the other day at least a
          TSG Reporting - Worldwide    877-702-9580

Page 259

                    Mitchell
1
2    March date.
3        Q.    March 2009?
4        A.    Yes.
5        Q.    So is it fair to say that you are
6    hopeful that by March 2009 you could get a
7    price north of 200 million?
8        A.    Yes.
9        Q.    Will you -- is it your intention to
10   accept the highest offer that Easdil obtains?
11           MR. HAVELES:  Well, he doesn't have
12       any authority to accept any offer at the
13       moment, so I object to that question, to
14       the extent that there is a receiver in
15       place at the moment.
16       Q.    Well, to the extent that the
17   receiver is ousted from his responsibilities by
18   the court or otherwise, would you -- is it your
19   intention to accept the highest offer received
20   by Easdil?
21           MR. HAVELES:  Objection.  Vague.
22       You may answer the question.
23       A.    I would have to see what that offer
24   would be.
25       Q.    So the answer is no?
          TSG Reporting - Worldwide    877-702-9580

Page 260

```
1        Mitchell
2    A.  No. I can't answer that question,
3 because I don't know what the offer would be.
4    Q.  Is there a minimum amount of money
5 that you would be willing to approve if you had
6 approval authority over the sales process?
7    A.  Again, I can't answer that question
8 now.
9    Q.  Why not?
10   A.  Because the sales process hasn't
11 gone through.
12   Q.  The sales process is going to take
13 place soon; is that correct?
14   A.  Well, we will see.
15        MR. HAVELES:  The sales process has
16 been under way.
17        THE WITNESS:  Right.
18        MR. HAVELES:  Mr. Mitchell --
19        When I am speaking, you do not
20 speak.
21        The sales process is under way.
22 Mr. Mitchell has no control over the sales
23 process at the moment.  He is entitled to
24 receive reports from Easdil, but other than
25 getting occasional reports from Easdil he
```
TSG Reporting - Worldwide    877-702-9580

Page 261

```
1        Mitchell
2 is not allowed to have any involvement in
3 the process pursuant to directions that the
4 receiver gave to Easdil, so Mr. Mitchell at
5 this particular moment in time is somewhat
6 handicapped to say what the sales process
7 is beyond what he sees in the reports or
8 what it will reasonably be able to
9 accomplish if he assumed control later this
10 summer, because what may or may not have
11 happened up to this date has not been under
12 his direction and control.
13        Notwithstanding that, I mean, he
14 is -- you can ask him whatever questions
15 you have about his views of what he is
16 aware of in terms of the market or anything
17 else.  I am just saying in terms of --
18        MR. GREANEY:  I understand.
19        MR. HAVELES:  -- institutionally, he
20 can't speak about what the process is going
21 to produce when he is not -- has no
22 responsibility or involvement in the
23 process.
24   Q.  Do you have an understanding of what
25 the process is going to be over the near term?
```
TSG Reporting - Worldwide    877-702-9580

Page 262

```
1        Mitchell
2    A.  Not the details.
3        MR. HAVELES:  To the best you can,
4 answer the question.
5    A.  The process might be delayed and we
6 need to -- you know, that's what Easdil does
7 and they do competitive marketing and sales
8 process.
9        MR. HAVELES:  The question is what
10 do you understand Easdil is trying to do
11 right now.
12   A.  Market and sell the property.
13   Q.  Do you have an understanding of
14 whether there is currently in place a date for
15 accepting offers on the hotel?
16   A.  I don't recall the date.  I know
17 that they wanted to extend the date.
18   Q.  Do you recall whether the current
19 date is in the next two weeks?
20        MR. HAVELES:  I believe there is a
21 date, Mr. Greaney, for the receipt of
22 offers sometime in the near future.  I
23 don't believe any date has been set, at
24 least not to our -- what we have been
25 advised by Easdil as to when offers would
```
TSG Reporting - Worldwide    877-702-9580

Page 263

```
1        Mitchell
2 be accepted.  At this juncture the receiver
3 is under an order from the appellate
4 division that he cannot go forward to
5 accept any sale or transfer without the
6 approval of the court, so due to the stay
7 that -- the order that the appellate
8 division had issued back in late April or
9 early May, so I'm not sure that any date
10 has been set for acceptance of offers.  I
11 believe there has been some discussion
12 about the date as to when offers would
13 begin to be received and that's the
14 postponement date to which Mr. Mitchell has
15 alluded.
16   Q.  Do you have an understanding of when
17 the date for receiving offers is currently?
18   A.  I don't know the time sequences.  I
19 know it was probably in the -- within a few
20 weeks they were going to start receiving
21 offers, but I think they would like to postpone
22 that.
23   Q.  Do you know whether there has been a
24 decision to postpone it yet?
25   A.  Not yet.
```
TSG Reporting - Worldwide    877-702-9580

Page 264

1           Mitchell
2      Q.   Do you know -- do you have an
3  understanding of who will make that decision?
4      A.   Not yet.
5      Q.   Under the current circumstances, if
6  the decision was made today, who would make it?
7      A.   The receiver.
8      Q.   Did you agree to that arrangement?
9      A.   No.
10     Q.   You mentioned earlier that Easdil --
11 you recall Easdil proposing or recommending
12 deferring the bidding process; correct?
13     A.   Correct.
14     Q.   And you said that you thought the
15 reason why was because of the litigation
16 issues?
17     A.   Yeah, that would --
18     Q.   Is that correct?
19     A.   Right.
20     Q.   Okay.  And why would the litigation
21 issues, as you understand it, why would the
22 litigation issues warrant deferring the bidding
23 process?
24     A.   You would have to ask Easdil that.
25     Q.   Do you have an opinion yourself?

Page 265

1           Mitchell
2      A.   It's probably confusing to the
3  marketplace.
4      Q.   Do you think the bidding process
5  should be deferred?
6      A.   Yes.
7      Q.   And that's because it's confusing to
8  the marketplace?
9      A.   Yes.
10     Q.   In what sense is it confusing to the
11 marketplace?
12     A.   You see all litigation.  I think you
13 are confused too.
14          MR. HAVELES:  No, answer the
15     question as to why you think it's confused.
16     That's not an appropriate answer.
17     A.   I just think it's -- that's just
18 what they felt.
19     Q.   No, I am asking you why you think
20 that the litigation that's going on is causing
21 confusion in the marketplace.
22          MR. HAVELES:  He is asking for your
23     personal opinion now, not Easdil's opinion.
24     A.   I feel that people see that it would
25 be a much greater opportunity to buy an asset

Page 266

1           Mitchell
2  for a lot less than the value.
3      Q.   So does that mean you think the
4  bids -- the offers will be lower than they
5  otherwise would be in the absence of
6  litigation?
7      A.   Yes.
8      Q.   Do you think it impacts the speed of
9  whether a sale takes place?
10          MR. HAVELES:  Objection to form.
11     Vague.
12          You may answer the question.
13     A.   No.
14     Q.   Do you believe that you would be
15 harmed by a sale price while this confusion is
16 present in the marketplace?
17     A.   Yes.
18     Q.   And how would that be?
19     A.   Well, if people are trying to buy as
20 an opportunity in lower -- as low as possible,
21 that affects the sales price.
22     Q.   And that would harm you how?
23     A.   Harm me because I wouldn't be -- I
24 would be getting less equity.
25     Q.   Does it harm anyone else to get a

Page 267

1           Mitchell
2  lower sales price?
3      A.   Yes.
4      Q.   Who else does it harm?
5      A.   Other investors.
6      Q.   Who are those other investors?
7      A.   The Falor group, the Hockman group,
8  and whoever their other investors may be.
9      Q.   Anyone else?
10     A.   I guess Don Peebles.  I don't know
11 all the investors' names.
12     Q.   Does it harm anyone who is
13 interested in maximizing the value of the sales
14 process?
15          MR. HAVELES:  Objection to form.
16     A.   Repeat that question.
17     Q.   Does it harm anyone whose interest
18 is in maximizing the sale value of the hotel?
19     A.   Say that again.  It doesn't make
20 sense to me, what you are asking.
21     Q.   Does it harm anyone whose interest
22 is in maximizing the sale price of the hotel?
23          MR. HAVELES:  Objection to form.
24     Vague.
25     A.   I really don't get what you are

Page 268

Mitchell

1    saying. It -- yes, it does hamper the
2    saying. It -- yes, it does hamper the
3    investment of the hotel to sell for a lower
4    price.
5        Q.    Well, it harms you because it would
6    sell for a lower price and you would recover
7    less on your equity; correct?
8        A.    Correct.
9        Q.    And it would harm other investors
10   for the same reason; correct?
11       A.    Correct.
12       Q.    And would it harm Black Rock or
13   Carbon Capital?
14       A.    I can't answer that question.
15       Q.    You don't know whether it would harm
16   Carbon Capital to have a lower sales price for
17   the property?
18       A.    I -- it possibly could.
19       Q.    And how could it possibly?
20       A.    If it sold for less money.
21       Q.    Less than what?
22       A.    Less than what the bids would be. I
23   don't know. You keep going on and it's getting
24   aggravating because, you know, you are trying
25   to get me to make presumptions on stuff that I

TSG Reporting - Worldwide    877-702-9580

Page 269

Mitchell

1    can't predict, so -- I don't know.
2        Q.    All you have to do is answer the
3    question, which is do you have an understanding
4    of whether the confusion in the marketplace
5    leading to a lower sales price would harm
6    Carbon Capital?
7        A.    I said to you it could.
8        Q.    And I asked you how.
9        A.    It could lower the sales price.
10       Q.    And how would that harm Carbon
11   Capital?
12       A.    There is sufficient equity in the
13   hotel and the hotel is worth a lot of money and
14   having -- anything affecting the value trying
15   to create a lower sales price harms anyone.
16   The hotel obviously is worth north of
17   $200 million and if someone is thinking it's a
18   feeding frenzy or having issues, possibly it
19   could affect anybody. So I can't answer that
20   question. My feel and my belief is that the
21   property has a greater value in excess of
22   $200 million.
23       Q.    Is it fair to say it has the -- it
24   could harm anyone who has an equity interest in

TSG Reporting - Worldwide    877-702-9580

Page 270

Mitchell

1    the property?
2        A.    Yes.
3        Q.    We spoke last time about the lending
4    market deteriorating or taking a turn for the
5    worse in March 2007. Do you remember that?
6        A.    Yes.
7        Q.    How has that impacted your ability
8    to sell the property?
9        A.    I don't know yet.
10       Q.    You don't have an opinion of whether
11   in the last year and change the condition of
12   the lending market had an effect on your
13   ability to sell the property?
14       A.    I can't answer that question.
15       Q.    Do you have no opinion in that
16   regard?
17       A.    It depends on who the buyer would
18   be.
19       Q.    Well, does the condition of the
20   lending market have an impact on potential
21   purchasers?
22       A.    Some it may, yes.
23       Q.    In which cases would it have an
24   impact?

TSG Reporting - Worldwide    877-702-9580

Page 271

Mitchell

1        A.    Some seeking to borrow, some
2    institutions have their own funds. So, again,
3    I say it depends on who the borrower would be.
4        Q.    And for those seeking to borrow,
5    what is the impact, as you understand it?
6        A.    Like I said the other day, it's a
7    tighter lending market.
8        Q.    I understand that, but how would
9    that impact a potential purchaser who would
10   need to borrow funds in order to purchase the
11   hotel?
12       A.    I don't know. I'm not that person.
13   I don't know what their wherewithal would be
14   and what their credentials might be.
15       Q.    Well, you said you believed it would
16   have an impact; correct?
17       A.    It's not as -- how about this: It's
18   not as easy as it was a year ago.
19       Q.    Does that affect the price available
20   for the hotel?
21           MR. HAVELES:    Objection to form.
22   Foundation.
23       A.    You are asking the same question.
24   It depends on who the buyer would be. I can't

TSG Reporting - Worldwide    877-702-9580

Page 272

```
1              Mitchell
2    answer that question now.
3        Q.   Would it reduce the pool of
4    potential purchasers?
5        A.   It may.
6        Q.   And would reducing the pool of
7    potential purchasers have an impact on the
8    price?
9        A.   Again, it depends on who that buyer
10   would be.
11       Q.   Have you been -- from March 2008
12   until you entered into or until the receiver
13   took control of the sales process, were you
14   continuously marketing the property through
15   Easdil?
16       MR. HAVELES:  Could you read the
17   question back, please.
18       (Record read.)
19       MR. HAVELES:  You may answer that
20   question.
21       A.   We have been marketing the property
22   through Easdil.
23       Q.   Continuously?
24       A.   Through what date?
25       MR. HAVELES:  Since March 2008 until
```
TSG Reporting - Worldwide    877-702-9580

Page 273

```
1              Mitchell
2    the receiver took over control.
3        A.   Yes.
4        Q.   Okay.  And is it your understanding
5    that the receiver is continuing to market the
6    property through Easdil?
7        MR. HAVELES:  Objection to form.
8    Foundation.
9        A.   Yes.
10       Q.   Has Carbon Capital interfered with
11   that marketing process?
12       A.   Yes.
13       Q.   In which ways?
14       A.   They interfered with the sale of
15   Hyatt.
16       Q.   Other than in the sale of Hyatt,
17   have they interfered with the marketing of the
18   property since March 2008?
19       A.   I have no personal knowledge.
20       Q.   Have you heard from anyone that
21   Carbon Capital has interfered with the
22   marketing of the property since March 2008?
23       A.   No.
24       Q.   Is it your understanding that the
25   first mortgage loan, the senior loan, matured
```
TSG Reporting - Worldwide    877-702-9580

Page 274

```
1              Mitchell
2    on March 9th, 2007?
3        A.   Yes.
4        Q.   Was that the same time as the
5    mezzanine loan matured?
6        A.   Yes.
7        Q.   Is it your understanding that the
8    pledge under the pledge agreement we looked at
9    is for a hundred percent of the Royal Palm
10   Hotel property membership interest?
11       A.   Yes.
12       Q.   Do you have an understanding as to
13   the practical effect of the transfer of a
14   hundred percent of the membership interest in
15   the Royal Palm Hotel Property LLC?
16       A.   Explain the question again.
17       Q.   Do you have an understanding of what
18   the effect would be of transferring a hundred
19   percent of the membership interest to another
20   party?
21       A.   Yes.
22       Q.   What would that effect be?
23       A.   Transferring a hundred percent.
24       Q.   Is there any other effect of that
25   transfer?
```
TSG Reporting - Worldwide    877-702-9580

Page 275

```
1              Mitchell
2        MR. HAVELES:  You can answer the
3    question to the best of your ability.
4        A.   No, I don't know.
5        Q.   Does the person or entity that
6    controls a hundred percent of the membership
7    interest control the operation, management and
8    sales process of the hotel?
9        A.   Not currently.
10       MR. HAVELES:  No, he is asking
11   generally now, not currently.  If there is
12   a transfer of a hundred percent of the
13   hotel company, does that party who received
14   the transfer have control over the
15   operation and the marketing -- of the hotel
16   and the sales and marketing of the hotel.
17       MR. GREANEY:  Why don't I reask it.
18       MR. HAVELES:  Yes, why don't you ask
19   it, because I butchered it a bit,
20   Mr. Greaney.
21       Q.   Does the person or entity that
22   controls a hundred percent of the membership
23   interest control the operation, management and
24   sales process of the hotel?
25       A.   Yes.
```
TSG Reporting - Worldwide    877-702-9580

Page 276

```
1              Mitchell
2         MR. GREANEY:  Can I mark this as
3    Mitchell Exhibit 20.
4         (Mitchell Exhibit 20, Loan Agreement
5    Dated as of February 18, 2005 between Royal
6    Palm Senior Investors, LLC as borrower and
7    Carbon Capital II, Inc. as lender, marked
8    for identification.)
9    Q.   Mitchell Exhibit 20 is entitled Loan
10   Agreement Dated as of February 18, 2005 between
11   Royal Palm Senior Investors LLC as borrower and
12   Carbon Capital II, Inc. as lender.
13        Are you familiar with this document?
14   A.   Yes.
15   Q.   Is this the mezzanine loan
16   agreement?
17   A.   Yes.
18   Q.   If you could turn towards the back,
19   the signature pages.  If you find page 100,
20   it's the following page.  Are you there?  Do
21   you see a signature there?
22   A.   Yes.
23   Q.   Whose signature is that?
24   A.   Robert Falor.
25   Q.   Was he authorized to sign on behalf
```
TSG Reporting - Worldwide    877-702-9580

Page 277

```
1              Mitchell
2    of Royal Palm Senior Investors LLC?
3    A.   Yes.
4    Q.   And to bind them to this agreement?
5    A.   Yes.
6    Q.   Is it your understanding that the
7    failure to pay -- to make payments under the
8    first loan was also a default under the
9    mezzanine loan?
10        MR. HAVELES:  Objection to form.
11   Seeks a legal conclusion.
12        You can answer to the best of your
13   understanding.
14   A.   That the fail -- say -- repeat your
15   question.
16   Q.   Do you have an understanding that a
17   failure to pay under the first mortgage loan
18   was a default under the mezzanine loan?
19   A.   Yes.
20   Q.   Do you recall last time we looked at
21   the Settlement Agreement which was titled the
22   Settlement Agreement?
23        MR. GREANEY:  Do you have a copy,
24   Peter?
25        MR. HAVELES:  Yes, I do.  I am just
```
TSG Reporting - Worldwide    877-702-9580

Page 278

```
1              Mitchell
2    scrolling down to it here.
3         MR. GREANEY:  It was Exhibit 9, I
4    believe.
5         MR. HAVELES:  It is, indeed, 9.
6         MR. GREANEY:  Do you mind showing
7    that to Mr. Mitchell for a second.
8         MR. HAVELES:  (Handing.)
9    Q.   Do you recall that agreement?
10   A.   Yes.
11   Q.   Do you know whether Wachovia had any
12   role in the negotiations of that Settlement
13   Agreement, Exhibit 9?
14   A.   No.
15        MR. HAVELES:  No, you don't know?
16   A.   This is a settlement agreement with
17   Black Rock.
18        MR. HAVELES:  He asked did it have
19   any role.  The question is do you know.
20   A.   I don't know.
21        MR. HAVELES:  Okay.  I just wanted
22   to make sure when you said no, you don't
23   know.
24        THE WITNESS:  Right.
25   Q.   Did you understand whether Wachovia
```
TSG Reporting - Worldwide    877-702-9580

Page 279

```
1              Mitchell
2    had any input on the terms of the Settlement
3    Agreement?
4    A.   No.
5    Q.   Did you have any communications with
6    Wachovia about the Settlement Agreement?
7    A.   Yes.
8    Q.   Prior to signing it?
9    A.   Not detail.  They just knew that we
10   were working on a Settlement Agreement.
11   Q.   Do you recall anything you had
12   talked with them about the Settlement
13   Agreement?
14   A.   No.
15   Q.   At the time you entered into the
16   Settlement Agreement on behalf of LLC, did --
17   was the Royal Palm Hotel Property LLC in
18   default under the first mortgage loan?
19   A.   Yes.
20   Q.   Did you have an understanding of
21   whether Wachovia was going to agree to forbear
22   from exercising its remedies under the first
23   mortgage?
24   A.   No.
25   Q.   Did you have an understanding of --
```
TSG Reporting - Worldwide    877-702-9580

Page 280

Mitchell

1     Mitchell
2 that that wouldn't happen?
3     A.   Yes.
4     Q.   What was your understanding?
5     A.   Mr. Pomar said that he would take
6 care of Wachovia.
7     Q.   Did he say anything else?
8     A.   No.
9     Q.   Did you have an understanding of
10 what he meant when he said that?
11    A.   No.
12    Q.   Did you have any concern that there
13 would be remedies -- that Wachovia would seek
14 to exercise its remedies on behalf of the first
15 mortgage lender?
16    A.   I relied on Mr. Pomar.
17    Q.   And to this date has Wachovia, to
18 your knowledge, has Wachovia exercised any
19 remedies on behalf of the first mortgage
20 lender?
21    A.   No.
22    Q.   At time you entered into that
23 Settlement Agreement, did you have -- did the
24 LLC have the ability to satisfy the obligations
25 under the first mortgage loan?

Page 281

Mitchell

1     Mitchell
2     MR. HAVELES:  Objection to form.
3     A.   Ask the question again.
4     Q.   At the time you entered into the
5 settlement agreement with Carbon Capital, did
6 the Royal Palm Hotel Property LLC have the
7 ability to satisfy the outstanding obligations
8 on the first mortgage?
9     A.   No.
10    MR. GREANEY:  I am going to use
11 number 10.  I think I have copies,
12 actually.
13    MR. HAVELES:  I have it.
14    MR. GREANEY:  I think I have one for
15 Mr. Mitchell.
16    MR. HAVELES:  I'll show it to him.
17 It's okay (handing).
18 I have put Exhibit 10 in front of
19 Mr. Mitchell at the request of Mr. Greaney.
20    Q.   Mr. Mitchell, this is Exhibit 10
21 from your prior deposition entitled Limited
22 Power of Attorney.  Do you remember this
23 document?
24    A.   Yes.
25    Q.   You signed this document; correct?

Page 282

Mitchell

1     Mitchell
2     A.   Yes.
3     Q.   Did you have any intent when you
4 signed this document?
5     MR. HAVELES:  Objection to form.
6 Vague.
7     A.   You have to ask your question again.
8     Q.   What was your intention when you
9 signed this Limited Power of Attorney?
10    MR. HAVELES:  Objection.  Vague.
11    A.   I guess the document explains
12 itself.
13    Q.   You didn't have any independent
14 intent from what's written on the document?
15    A.   To comply with the agreement.
16    Q.   What did you think that this
17 document provided for?
18    MR. HAVELES:  Objection.  Calls for
19 a legal conclusion.
20    You may answer the question to the
21 best of your ability.
22    A.   You would have to refer back to the
23 Settlement Agreement.
24    Q.   You didn't have any independent
25 understanding at the time you signed it of what

Page 283

Mitchell

1     Mitchell
2 it is you were signing and what it was intended
3 to do?
4     A.   It was a Limited Power of Attorney
5 on a certain date that would transfer
6 membership interest on April 1 and any disputes
7 were -- they were changing the independent
8 director to the person of their choice.  He
9 would be a mediator as well.
10    Q.   Do you have any understanding right
11 now that this Power of Attorney is invalid for
12 some reason?
13    A.   Yes.
14    Q.   What's your understanding?
15    A.   I was told by the attorney that it
16 was invalid.
17    Q.   Did you have knowledge at the time
18 you signed it that it was invalid?
19    A.   That's a legal conclusion.  No.
20    Q.   Did you have knowledge at the time
21 you signed it that it was invalid?
22    A.   No.
23    Q.   Did you believe it to be invalid at
24 the time you signed it?
25    A.   I'm not an attorney, so I can't

Page 284

```
1              Mitchell
2  answer that question.
3       MR. HAVELES:  He is asking what your
4  state of mind was --
5       A.   No.
6       MR. HAVELES:  -- at the time you
7  signed it.
8       Q.   Did you believe it to be valid at
9  the time you signed it?
10      A.   Yes.
11      Q.   Under the Settlement Agreement,
12 Exhibit 9, is it your understanding that you
13 had to enter -- or the LLC had to enter into a
14 listing agreement?
15      A.   Yes.
16      Q.   Did you at any time enter into a
17 listing agreement on behalf of the LLC?
18      A.   Yes.
19      Q.   When did you enter into that listing
20 agreement?
21      A.   I don't recall the dates and it was
22 with Easdil.
23      Q.   This is Exhibit 17 from your last
24 deposition (handing).
25           Is that the listing agreement that
```
TSG Reporting - Worldwide    877-702-9580

Page 285

```
1              Mitchell
2  you were just referring to?
3       A.   Yes.
4       Q.   Did you enter into any prior listing
5  agreements with Easdil?
6       A.   No.
7       Q.   Did you enter into any other listing
8  agreements with any other party other than
9  Easdil?
10      A.   There was a Hodges, Ward & Elliot,
11 there was an agreement that the Falors had with
12 them a while back.  I don't know -- recall the
13 details.
14      Q.   Was that prior to the date of the
15 Settlement Agreement?
16      A.   Yes.
17      Q.   Thank you.
18      MR. GREANEY:  I think it would be
19 easier if I give him one of his own.  Okay?
20      MR. HAVELES:  Sure.
21      Q.   Mitchell Exhibit 9, the Settlement
22 Agreement.  Did you have an obligation or --
23 excuse me.  Did the LLC have an obligation
24 under this agreement to enter into a cash
25 management agreement with Wachovia?
```
TSG Reporting - Worldwide    877-702-9580

Page 286

```
1              Mitchell
2       A.   Yes.
3       Q.   I think we established last time
4  that that did not, in fact, happen; right?
5       A.   No, it did happen.
6       Q.   It did?  When did that happen?
7       A.   No, not with Wachovia, no.
8       Q.   Did you enter into a cash management
9  agreement with someone else?
10      A.   No.
11      MR. HAVELES:  It's page 10 if you
12 are looking for the cash management
13 agreement.
14      MR. GREANEY:  Thanks.
15      Q.   Can you look at page 10, please,
16 section 6.3.2 of the agreement.
17      A.   Okay.
18      Q.   Is that the provision, as you
19 understand it, that required the LLC to enter
20 into a replacement cash management agreement?
21      A.   Yes.
22      Q.   Was there a lockbox set up with
23 Wachovia?
24      A.   The contemplation was there to --
25 no. No.
```
TSG Reporting - Worldwide    877-702-9580

Page 287

```
1              Mitchell
2       Q.   Was there a Wachovia lockbox set up
3  at any time?
4       A.   I don't recall.
5       Q.   Who would -- who was in charge of
6  the financial accounts of the hotel?
7       A.   Bill Cygnor.
8       Q.   Would he have knowledge of the --
9  would you expect him to have knowledge of
10 these -- whether there was a lockbox account
11 set up with Wachovia?
12      A.   No.
13      Q.   You wouldn't expect him to?
14      A.   No, I -- say your question again.
15      Q.   Would you expect Mr. Cygnor to have
16 knowledge of whether there was a lockbox
17 account set up with Wachovia?
18      MR. HAVELES:  At any time.
19      A.   Yes.
20      MR. GREANEY:  Can I mark this,
21 please, as Mitchell Exhibit 21.
22           (Mitchell Exhibit 21, e-mail dated
23 November 2, 2007, Bates stamped RP 11975
24 and RP 11976, marked for identification.)
25      Q.   Exhibit 21 is a series of e-mails.
```
TSG Reporting - Worldwide    877-702-9580

Page 288

```
 1          Mitchell
 2 It's Bates stamped RP 011975 to RP 011976.
 3      Have you seen any of these e-mails
 4 before?
 5   A.  Yes.
 6   Q.  What do you recognize them to be?
 7   A.  Correspondence with Wachovia.
 8   Q.  If you flip to the second page,
 9 please, RP 011976, who is Lea Land?
10   A.  She is a servicer with Wachovia.
11   Q.  Is the individual at Wachovia
12 responsible for the Royal Palm Hotel loan?
13   A.  Yes.
14   Q.  Do you see in the first sentence she
15 writes to Mr. Cygnor: "It is my understanding
16 that Royal Palm will be resuming remitting all
17 income to the Wachovia lockbox"?
18   A.  Yes.
19   Q.  Does that refresh your recollection
20 as to whether there was a lockbox set up with
21 Wachovia?
22   A.  Yes.
23   Q.  Okay. What do you recall now?
24   A.  Basically the same thing, that it
25 was -- it was contemplated and I -- we don't
        TSG Reporting - Worldwide   877-702-9580
```

Page 289

```
 1          Mitchell
 2 know exactly if it was actually opened or not,
 3 because the agreement was being reviewed by
 4 Black Rock on the lockbox agreement and they
 5 wanted us to proceed as we were doing and it
 6 never happened.
 7      MR. HAVELES:  His question, though,
 8   was what you recall about the earlier
 9   lockbox or does it refresh your
10   recollection about the earlier lockbox.
11   A.  You will have to ask the question
12 again.
13   Q.  I had asked you whether that
14 refreshed your recollection about the Wachovia
15 lockbox and you said yes and I was just trying
16 to ask what had been refreshed and I thought
17 you were explaining it.
18   A.  Well, I did. I went through the
19 whole gyration of what I thought it was, an
20 attempt to happen, but it never occurred. It
21 never -- because Frank wanted -- Mr. Pomar
22 wanted us to continue as it was going on and he
23 never made or came back on the comments on the
24 agreement that was -- he asked for comments on
25 what we thought the lockbox agreement would be
        TSG Reporting - Worldwide   877-702-9580
```

Page 290

```
 1          Mitchell
 2 and we submitted it to him and he wanted to
 3 hold onto it.
 4   Q.  Okay. So, to your knowledge, there
 5 was never a Wachovia lockbox set up?
 6   A.  I didn't say that. I said it was --
 7 I don't know that it actually -- it was being
 8 contemplated being done, but it was not -- it
 9 didn't go forward because we didn't have an
10 agreement in place.
11   Q.  But do you understand whether or not
12 there was a lockbox account set up with
13 Wachovia?
14   A.  No.
15      MR. GREANEY:  Can you mark that as
16   Mitchell Exhibit 22, please.
17      (Mitchell Exhibit 22, e-mail dated
18   November 19, 2007, Bates stamped RP 9426,
19   marked for identification.)
20   Q.  Mitchell Exhibit 22 is a redacted
21 document with an e-mail. It's Bates stamped
22 RP 009426.
23      MR. HAVELES:  For the record, as we
24   stated in our privilege log, the redacted
25   text is merely the transmission with
        TSG Reporting - Worldwide   877-702-9580
```

Page 291

```
 1          Mitchell
 2 comments by Mr. Mitchell to us from this
 3 e-mail mailbox.
 4   Q.  Have you seen this e-mail before?
 5   A.  Yes.
 6   Q.  Okay. As of November 19th had you
 7 made a proposal to Mr. Pomar about the Wachovia
 8 cash management agreement?
 9   A.  Don't know the dates, but I believe
10 so, yes.
11   Q.  Do you know what he is seeking from
12 you in this e-mail?
13   A.  Wanted us to know how we wanted to
14 make payments, how this would work, how bills
15 would be paid as they were directing him
16 previously.
17   Q.  And did you get back to him on this?
18   A.  Yes.
19   Q.  Did you send him a draft agreement?
20   A.  Yes.
21   Q.  When did you first meet Bill Cygnor?
22   A.  I don't recall the dates.
23   Q.  How long ago was it, approximately?
24   A.  I'm sure it's over two years.
25   Q.  That's the first time you met him
        TSG Reporting - Worldwide   877-702-9580
```

Page 292

```
 1              Mitchell
 2  was two years ago?
 3        MR. HAVELES: Objection. He said
 4  over two years.
 5     A.   I believe it -- I believe it's been
 6  in excess of two years.
 7     Q.   Okay. How -- what was the
 8  circumstances the first time you met him?
 9     A.   Introduced himself to me.
10     Q.   Where was that?
11     A.   I believe at the hotel.
12     Q.   Was he applying for a job?
13     A.   No.
14     Q.   Had he already been hired?
15     A.   Yes.
16     Q.   And you didn't know him before that
17  date?
18     A.   No.
19     Q.   Did you have any involvement in
20  hiring him?
21     A.   No.
22     Q.   Do you know who made the decision to
23  hire him?
24        MR. HAVELES: Objection to form.
25  Foundation.
```

Page 293

```
 1              Mitchell
 2     A.   No.
 3     Q.   Do you have any business interests
 4  right now with Mr. Cygnor?
 5     A.   No.
 6     Q.   Do you have an understanding of
 7  where operating income from the hotel was
 8  deposited?
 9     A.   Yes.
10     Q.   What's your understanding?
11        MR. HAVELES:  At any time or at a
12  particular moment in time?
13     Q.   After the Settlement Agreement.
14     A.   The same bank, I believe.  I -- same
15  bank it's been in.
16     Q.   Do you know which bank that is?
17     A.   Regions.
18     Q.   Were there any other accounts that
19  money went into from the hotel?
20        MR. HAVELES:  Any accounts or banks?
21        MR. GREANEY:  Any banks, other than
22  Regions.
23     A.   You will have to explain your
24  question.
25        MR. HAVELES:  Were there any other
```

Page 294

```
 1              Mitchell
 2  banks other than Regions into which money
 3  was deposited from the hotel.
 4     A.   Not that I'm aware of.
 5     Q.   Earlier you mentioned that Frank
 6  Pomar, I believe, told you that he would stop
 7  Wachovia from exercising its remedies under the
 8  first mortgage; is that correct?
 9        MR. HAVELES: Objection to form.
10  Mischaracterizes his testimony.
11     A.   Yeah, you are rephrasing what I
12  said.
13     Q.   Okay. What did you say?
14     A.   He said he would take care of
15  Wachovia.
16     Q.   All right. And do you know what he
17  did in that regard?
18     A.   No.
19     Q.   Is it your understanding that Carbon
20  Capital II has taken some action to induce
21  Wachovia to forbear from exercising its
22  remedies on the first mortgage?
23     A.   No.
24     Q.   Do you have any opinion as to why
25  Wachovia has not exercised remedies under the
```

Page 295

```
 1              Mitchell
 2  first mortgage?
 3     A.   No.
 4     Q.   Is that a source of concern for you?
 5        MR. HAVELES: Objection to form.
 6  Vague.
 7     A.   Yes.
 8        MR. HAVELES: It's the antecedent.
 9     Q.   Yes? Why does it concern you?
10     A.   Create foreclosure.
11     Q.   What would be the impact if Wachovia
12  foreclosed?
13     A.   They would -- the hotel would end up
14  in bankruptcy.
15     Q.   In bankruptcy? Is that -- why do
16  you say that?
17     A.   If they foreclosed on the hotel.
18     Q.   Would that harm you?
19     A.   Yes.
20     Q.   In the same ways as when we
21  discussed earlier if Carbon Capital foreclosed
22  on the membership interest?
23     A.   Yes.
24     Q.   Do you have an understanding of
25  whether a Wachovia foreclosure would harm
```

Page 296

Mitchell

1    **Mitchell**
2    **Carbon Capital?**
3        A.   No.
4        **Q.   You recall last time we were here**
5    **that you spoke about Hyatt issuing a soft**
6    **termination of your purchase and sale**
7    **agreement?**
8        A.   Yes.
9        **Q.   Do you recall when that was?**
10       A.   Not the date, no.
11           MR. GREANEY:  Mark this, please, as
12   Mitchell Exhibit 22.
13           MR. HAVELES:  23.
14           MR. GREANEY:  23.
15           (Mitchell Exhibit 23, Facsimile
16   Transmission dated January 28, 2008 Bates
17   stamped RP 9232, with letter dated January
18   28, 2008, Bates stamped RP 9233 and
19   RP 9234, marked for identification.)
20       **Q.   Mitchell number 23 is Bates stamped**
21   **RP 009232 through RP 009234.**
22       A.   Okay.
23       **Q.   Mr. Mitchell, the second page -- on**
24   **the second page there is a letter here.  Is**
25   **this the soft termination?**

TSG Reporting - Worldwide    877-702-9580

Page 297

Mitchell

1    **Mitchell**
2        A.   Yes.
3        **Q.   After the soft termination do you**
4    **have an understanding of why no deal was**
5    **accomplished with Hyatt?**
6           MR. HAVELES:  Objection to form.
7    Foundation.
8           You can answer the question the best
9    you can.
10       A.   No.
11       **Q.   Do you know who David Tarr is?**
12       A.   Yes.
13       **Q.   Who is David Tarr?**
14       A.   He is one of the directors.
15       **Q.   Of?**
16       A.   Hyatt.
17       **Q.   Did he have a role in your**
18   **negotiations over the purchase and sale**
19   **agreement?**
20       A.   Yes.
21       **Q.   What was his role?**
22       A.   He negotiated the agreement.
23       **Q.   Was he the principal negotiator in**
24   **the agreement?**
25       A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 298

1           Mitchell
2           MR. GREANEY:  Mark this, please, as
3    Mitchell Exhibit 24.
4           (Mitchell Exhibit 24, Affidavit of
5    David Tarr, marked for identification.)
6        **Q.   Have you seen this affidavit before,**
7    **Mr. Mitchell?**
8           (Document review.)
9        A.   No.
10       **Q.   Take a look at page 2, paragraph 5.**
11       **Are you aware of the e-mail**
12   **communication and voicemail message that**
13   **Mr. Tarr is referring to in this paragraph of**
14   **his affidavit?**
15       A.   Yes.
16       **Q.   Do you see paragraph 6?**
17       A.   Yes.
18       **Q.   Where Mr. Tarr writes:  "At the time**
19   **I made the Mitchell communications I had no**
20   **knowledge of any Settlement Agreement between**
21   **Carbon Capital and Royal Palm."**
22       A.   Yes.
23       **Q.   Do you have any reason to believe**
24   **that Mr. Tarr is not being truthful in that**
25   **paragraph?**

TSG Reporting - Worldwide    877-702-9580

Page 299

Mitchell

1    **Mitchell**
2        A.   I can't answer that question.
3        **Q.   The question is whether you have any**
4    **reason to believe.**
5        A.   I don't know through him, but we
6    feel very strongly that there is a lot of smoke
7    that's been circulating and I can't evaluate
8    that right now.
9        **Q.   The question is do you have any**
10   **reason to believe that Mr. Tarr is not being**
11   **truthful in this statement?**
12       A.   I can't answer that question.  I
13   don't know.
14       **Q.   So you have no reason to believe he**
15   **is being untruthful?**
16           MR. HAVELES:  He said "I don't
17   know."
18       A.   I don't know.
19           MR. HAVELES:  That was his answer,
20   Mr. Greaney.
21       **Q.   How can you not know whether you**
22   **have a reason to believe something?**
23           MR. HAVELES:  Objection to form.
24   Argumentative.
25           You may answer the question to the

TSG Reporting - Worldwide    877-702-9580

Page 300

```
 1            Mitchell
 2     extent you can.
 3     Q.   Take a look at paragraph 7.
 4     Mr. Tarr writes: "At the time that I made the
 5     Mitchell communications I had no knowledge that
 6     March 31, 2008 was a significant date to Royal
 7     Palm or Carbon Capital."
 8            Do you have any reason to believe
 9     Mr. Tarr is being untruthful in that statement?
10     A.   I can't answer the question. I
11     don't know.
12     Q.   In paragraph 8 Mr. Tarr writes: "On
13     or before the time I made the Mitchell
14     communications no one at Carbon Capital or any
15     party related to Carbon Capital communicated
16     with me regarding the Royal Palm."
17            Do you have any reason to believe
18     Mr. Tarr is being untruthful in that paragraph?
19     A.   I can't answer that question. I
20     don't know.
21     Q.   In paragraph number 9 Mr. Tarr
22     writes: "I requested the extension of time
23     from Mr. Mitchell because Hyatt needed more
24     time to evaluate the purchase of the hotel from
25     Royal Palm."
          TSG Reporting - Worldwide    877-702-9580
```

Page 301

```
 1            Mitchell
 2            Do you have any reason to believe
 3     that's an untruthful statement?
 4     A.   Again, it's the same thing. I can't
 5     answer that question.
 6     Q.   In paragraph 10 he writes: "To my
 7     knowledge I have never had any conversation
 8     with anyone at Carbon Capital regarding any
 9     prospective purchase by Hyatt."
10            Do you see that?
11     A.   Yes.
12     Q.   Do you have any reason to believe
13     that that's an untruthful statement?
14     A.   Not sure. I don't know.
15     Q.   In paragraph 11 he writes: "No one
16     at Hyatt ever indicated to me that the reason
17     for delaying the closing date to April 1, 2008
18     was because of anything having to do with
19     Carbon Capital or its Settlement Agreement with
20     Royal Palm."
21            Do you see that?
22     A.   Yes.
23     Q.   Do you have any reason to believe
24     that's an untruthful statement?
25     A.   I don't know.
          TSG Reporting - Worldwide    877-702-9580
```

Page 302

```
 1            Mitchell
 2     Q.   With respect to paragraphs 6 through
 3     11 of this affidavit, do you have any reason to
 4     believe Mr. Tarr is mistaken about some fact?
 5     A.   Again, I can't --
 6            MR. HAVELES: Objection to form.
 7     Vague.
 8     A.   I can't answer that question.
 9     Q.   Do you have any reason to believe
10     that he is under some type of misapprehension
11     with respect to any of these statements he has
12     made?
13     A.   I can't answer that question either.
14     Q.   How long have you dealt with
15     Mr. Tarr?
16     A.   Only through the contract, from
17     point of working on the contract of the
18     purchase.
19            MR. HAVELES: Is this a good time to
20     take a break?
21            MR. GREANEY: Sure.
22            THE VIDEOGRAPHER: The time is
23     11:21. This is the end of the tape labeled
24     number 1. We are going off the record.
25            (Recess was taken from 11:21 to
          TSG Reporting - Worldwide    877-702-9580
```

Page 303

```
 1            Mitchell
 2     11:32.)
 3            THE VIDEOGRAPHER: This is the start
 4     of the tape labeled number 2. The time is
 5     11:32. We are back on the record.
 6     BY MR. GREANEY:
 7     Q.   Mr. Mitchell, is there anything from
 8     our earlier session that you want to clarify or
 9     change?
10     A.   Not right yet, no.
11     Q.   I'm sorry, I didn't hear you.
12     A.   I said no.
13     Q.   Is there anything that you recall
14     now that you couldn't remember before?
15     A.   No.
16     Q.   If you could take a look at
17     Exhibit 9, which is the Settlement Agreement.
18     A.   Okay.
19     Q.   If you take a look at page 7,
20     paragraph 3.6, do you see that provision?
21            (Document review.)
22     A.   Yes.
23     Q.   Is this the provision under which
24     you believe Carbon Capital was required to pay
25     certain interest payments under the first
          TSG Reporting - Worldwide    877-702-9580
```

Page 304

1          Mitchell
2  mortgage loan?
3      A.  Yes.
4      Q.   Do you see in the middle of the
5  paragraph the clause that reads:  "In the event
6  and to the extent that available funds from
7  operations after payment of items contemplated
8  by the cash management agreement are
9  insufficient to fully pay such monthly debt
10 service," do you see that clause?
11     A.  Yes.
12     Q.   I think you testified earlier that
13 there was no cash management agreement in
14 place?
15     A.  Yes.
16     Q.   And do you know whether Royal Palm
17 Hotel made any payments to Wachovia for the
18 first mortgage loan in the months of October
19 2007, November 2007, December 2007 and January
20 2008?
21     A.  No.
22     Q.   You don't know?
23     A.  They did not.
24     Q.   They did not make the payments?
25     A.  No.

Page 305

1          Mitchell
2      Q.   If you read the next sentence down
3  that begins "each senior loan advance," do you
4  see that?
5      A.  Yes.
6      Q.   Was it your understanding that any
7  amounts paid by Carbon Capital would be added
8  to the principal amount of debt that you owed
9  Carbon Capital?
10     A.  Yes.
11     Q.   Do you have an understanding of
12 whether the interest rate for the debt owed to
13 Carbon Capital was higher or lower than the
14 interest rate owed to Wachovia under the first
15 mortgage?
16     A.  Higher.
17         MR. GREANEY:  Can I enter this as
18 Mitchell Exhibit 24, please.
19         MR. HAVELES:  25.
20         MR. GREANEY:  25.
21         (Mitchell Exhibit 25, e-mail dated
22 March 17, 2008, Bates stamped Carbon 7499
23 and Carbon 7500, marked for
24 identification.)
25     Q.   Mitchell 25 is Bates stamped Carbon

Page 306

1          Mitchell
2  0007499 to 0007500.
3          Have you ever seen this e-mail?
4          (Document review.)
5      Q.   You are not listed as a recipient,
6  so if you don't otherwise recall it --
7      A.  Yeah, I don't recall.  Yeah, no, I
8  don't recall it.  I'm just -- no.
9      Q.   Take a look at chart, the attached
10 chart to the e-mail.  Have you ever seen this
11 document before?
12         (Document review.)
13     A.  Not specifically, I don't think.
14     Q.   Have you seen documents that set
15 forth the amounts owed under the first
16 mortgage?
17         MR. HAVELES:  Generally or for --
18         MR. GREANEY:  Just generally.  Well,
19 he said --
20     A.  Generally I have seen them.  Yeah, I
21 have seen them.
22     Q.   This indicates, as far as I can
23 tell, that $1.47 million, approximately, had
24 been received by Wachovia between September 7th
25 and March 8th.  Does that comport with your

Page 307

1          Mitchell
2  understanding of how much was paid?
3          MR. HAVELES:  Objection to form.
4  Foundation.
5      A.  Yeah, I don't know the exact
6  amounts.
7      Q.   Do you have an idea of how much was
8  paid --
9      A.  No.
10     Q.   -- by the Royal Palm Hotel Property
11 LLC to Wachovia?
12     A.  It would have been whatever the
13 statement would have been for that month.
14     Q.   So it's your understanding that you
15 paid the outstanding amount each month?
16         MR. HAVELES:  Objection to form.
17 Foundation.
18     A.  The amount that was listed on the
19 statement was forwarded to Wachovia.
20     Q.   Okay.  And that was in each month
21 from between the Settlement Agreement through
22 March 2008?
23     A.  That was through, I believe, March.
24 I'm not sure of the dates, but...
25     Q.   Who was responsible for actually

Page 308

```
 1            Mitchell
 2  making the payment?
 3      A.   Bill Cygnor.
 4      Q.   I show you Exhibit 1 from the last
 5  time, which is the First Amended Complaint.
 6      (Document review.)
 7      Q.   Can you take a look at paragraph 1,
 8  please.
 9      A.   Okay.
10      MR. GREANEY:  Do you have it, Peter?
11      MR. HAVELES:  I know what it is.  Go
12  ahead.
13      MR. GREANEY:  I have another copy if
14  you --
15      MR. HAVELES:  No, it's all right.
16  They just didn't put it in what they sent
17  me.  Thank you.
18      Q.   The first paragraph of the Complaint
19  reads:  "This is an action for declaratory
20  judgement and injunctive relief to prevent
21  Carbon Capital from interfering with
22  plaintiff's right and ability to manage and
23  market for sale the Royal Palm Hotel," and it
24  continues, but do you see that?
25      A.   Yes.
     TSG Reporting - Worldwide   877-702-9580
```

Page 309

```
 1            Mitchell
 2      Q.   At the current time are you aware of
 3  Carbon Capital interfering with the plaintiff's
 4  right to manage the hotel?
 5      MR. HAVELES:  As we sit here today
 6  in the deposition?
 7      MR. GREANEY:  Yes.
 8      MR. HAVELES:  You may answer the
 9  question.
10      A.   Yes.
11      Q.   In which way?
12      A.   They interfered with our capital
13  event.
14      MR. HAVELES:  No, he is asking is
15  there anything going on presently.
16      A.   Presently, no.
17      Q.   Is there -- are you aware at the
18  present time of whether Carbon Capital is
19  taking any action to interfere with the
20  plaintiff's ability to market for sale the
21  Royal Palm Hotel?
22      A.   I don't know.
23      Q.   What is your -- do you have an
24  understanding of who currently manages and
25  controls the Royal Palm Hotel?
     TSG Reporting - Worldwide   877-702-9580
```

Page 310

```
 1            Mitchell
 2      A.   Yes.
 3      Q.   Who is currently managing and
 4  operating the Royal Palm Hotel?
 5      A.   The receiver, which is -- has
 6  created the issues.
 7      Q.   What issues?
 8      A.   The receiver.
 9      Q.   Okay.  Is that Judge Albert
10  Rosenblatt?
11      A.   Yes.
12      Q.   Did you enter into an agreement with
13  the receiver regarding the operation and
14  management of the hotel?
15      A.   Yes.
16      MR. GREANEY:  Can I enter this,
17  please, as Mitchell Exhibit 26.
18      (Mitchell Exhibit 26, Stipulation,
19  marked for identification.)
20      Q.   Mitchell Exhibit 26 is a Stipulation
21  of the date and time stamp at the top of
22  5-19-08, 3:45 p.m.
23      Do you recognize this document,
24  Mr. Mitchell?
25      A.   Yes.
     TSG Reporting - Worldwide   877-702-9580
```

Page 311

```
 1            Mitchell
 2      Q.   What do you recognize it to be?
 3      A.   It appoints the receiver to manage
 4  assets.
 5      Q.   Are you aware of any -- have you
 6  made or anyone on your behalf made any
 7  agreements with the receiver that's not
 8  reflected in this stipulation?
 9      A.   No.
10      Q.   Have you made any promises to the
11  receiver that aren't set forth in this
12  stipulation?
13      A.   No.
14      Q.   Has the receiver or any of his
15  representatives made any promises to you that
16  aren't set forth in this stipulation?
17      A.   No.
18      Q.   As you sit here today, do you --
19  have you performed all of the things you agreed
20  to do under this stipulation?
21      A.   Yes.
22      Q.   To your knowledge, has the receiver
23  performed all of the obligations and things he
24  agreed to do under this stipulation?
25      A.   I don't know that question.
     TSG Reporting - Worldwide   877-702-9580
```

Page 312

1           Mitchell
2       Q.   To your knowledge.
3       A.   I -- that I can't answer the
4   question.
5       Q.   Are you aware of him breaching this
6   agreement in any way?
7       A.   That's a legal question, so I
8   can't -- that's difficult to answer.
9       Q.   Well, do you have an opinion as to
10  whether he has not done anything he promised to
11  do in this agreement?
12      A.   I can't answer that question.  I
13  don't know.
14          MR. GREANEY:  Can we go off the
15  record for a second.
16          MR. HAVELES:  Sure.
17          THE VIDEOGRAPHER:  The time is
18  11:45.  We are going off the record.
19          (Recess was taken from 11:45 to
20  11:47.)
21          THE VIDEOGRAPHER:  The time is
22  11:47.  We are back on the record.
23  BY MR. GREANEY:
24      Q.   Are you familiar with the financial
25  condition of the Royal Palm Hotel currently?

Page 313

1           Mitchell
2          MR. HAVELES:  I will stipulate he
3   has not seen any financial statements since
4   the receiver has taken -- asserted control
5   over the hotel.
6       Q.   Okay.  And was that on March -- or
7   May 19th, the date of the Stipulation, that the
8   receiver took control?
9       A.   I don't know if I saw anything
10  between that date, but -- or not.
11      Q.   Prior to the --
12      A.   Recently.
13      Q.   I'm sorry, I cut you off.
14      A.   Not recently.  Not within the last
15  several weeks.
16      Q.   Okay.  Prior to entering into this
17  agreement with the receiver, were you familiar
18  with the financial condition of the Royal Palm
19  Hotel?
20      A.   Yes.
21      Q.   Do you have a general understanding
22  of the hotel's assets and liabilities?
23          For each of these questions will be
24  as of the time that you ceded control of the
25  hotel to the receiver.

Page 314

1           Mitchell
2       A.   Yes.
3       Q.   Do the liabilities of the hotel
4   include the loan, outstanding loan on the first
5   mortgage?
6       A.   Yes.
7       Q.   Do the liabilities of the hotel
8   include the outstanding debt on the mezz loan
9   to Carbon Capital?
10      A.   Yes.
11          MR. GREANEY:  Mark this as Mitchell
12  Exhibit 227, please.
13          (Mitchell Exhibit 227, Royal Palm
14  Hotel Balance Sheet as at January-07, Bates
15  stamped RP 11250 through RP 11252; Royal
16  Palm Hotel Balance Sheet as at February-07,
17  Bates stamped RP 11247 through RP 11249;
18  Royal Palm Hotel Balance Sheet as at
19  March-07, Bates stamped RP 11258 through RP
20  11260; Royal Palm Hotel Balance Sheet as at
21  April-07, Bates stamped RP 11241 through RP
22  11243; Royal Palm Hotel Balance Sheet as at
23  May-07, Bates stamped RP 11261 through RP
24  11263; Royal Palm Hotel Balance Sheet as at
25  June-07, Bates stamped RP 11255 through RP

Page 315

1           Mitchell
2   11257; Royal Palm Hotel Balance Sheet as at
3   July-07, Bates stamped RP 11253 through RP
4   11254; Royal Palm Hotel Balance Sheet as at
5   August-07, Bates stamped RP 11244 through
6   RP 11246; Royal Palm Hotel Balance Sheet as
7   at September-07, Bates stamped RP 7533 and
8   RP 7534; Royal Palm Hotel Balance Sheet as
9   at October-07, Bates stamped RP 11264 and
10  RP 11265; Royal Palm Hotel Balance Sheet as
11  at November-07, Bates stamped RP 5180 and
12  RP 5181; Royal Palm Hotel Balance Sheet as
13  at December-07, Bates stamped RP 5136 and
14  RP 5137; Royal Palm Hotel Balance Sheet as
15  at February-08, Bates stamped RP 1462 and
16  RP 1463, and Royal Palm Hotel Balance Sheet
17  as at March-08, Bates stamped RP 1419 and
18  RP 1420, marked for identification.)
19      Q.   Mitchell 27 is a collection of
20  documents entitled Royal Palm Hotel Balance
21  Sheet, each month from January '07 to March
22  '08, with the exception of January '08.
23          Do you recognize these documents,
24  Mr. Mitchell?
25      A.   Yes.

Page 316

```
1              Mitchell
2     Q.   What do you recognize them to be?
3     A.   Balance sheets for the hotel.
4     Q.   Did you prepare these documents?
5     A.   No.
6     Q.   Who prepared them?
7     A.   The hotel accounting.
8     Q.   And are these corporate records of
9  the Royal Palm Hotel?
10    A.   Yes.
11    Q.   Did you review these documents on a
12 monthly basis?
13    A.   Informally.
14    Q.   Were they sent to you each month?
15    A.   No.
16    Q.   Were they made available for your
17 review each month?
18    A.   Yes.
19    Q.   If you look at the first page of the
20 January '07 balance sheet, Bates stamped
21 RP 011250, do you see there is a line item for
22 Wachovia lockbox?
23         MR. HAVELES:  Do you see that,
24 Mr. Mitchell?
25    A.   Yes.
       TSG Reporting - Worldwide    877-702-9580
```

Page 317

```
1              Mitchell
2     Q.   I will represent to you, you can
3  verify if you would like, but that in each one
4  of these balance sheets there is a line for
5  Wachovia lockbox.
6     A.   Yes.
7     Q.   Does this refresh your recollection
8  as to whether the Royal Palm Hotel had set up
9  an existing Wachovia lockbox at the time of the
10 Settlement Agreement?
11    A.   No.
12         MR. HAVELES:  Objection to form.
13    Q.   If you look down, please, at Other
14 Receivables, do you see a listing there for
15 Breakwater A/R and Hotel 71 A/R?
16    A.   Yes.
17    Q.   Do you know what those represent?
18    A.   They represent what they say.
19    Q.   Do you know what the account
20 receivable to Hotel 71 was?
21         MR. HAVELES:  From 71, not to.
22         THE COURT REPORTER:  I'm sorry?
23         MR. HAVELES:  From, not to, because
24 it's a receivable.
25    A.   No.
       TSG Reporting - Worldwide    877-702-9580
```

Page 318

```
1              Mitchell
2     Q.   Do you know what the Breakwater
3  account receivable was for?
4     A.   No.
5     Q.   Who would know that?
6     A.   Bill Cygnor.
7     Q.   Take a look at the second page of
8  the January balance sheet, which is RP 011251.
9          Under Liabilities do you see the
10 line item for Guy Mitchell A/P?
11    A.   Yes.
12    Q.   And it's in the amount of
13 $9,899,909.50?
14    A.   Yes.
15    Q.   What does that relate to?
16    A.   I'm not sure how that line item is
17 broken out.
18    Q.   Did the Royal Palm Hotel owe you
19 money in January of 2007?
20    A.   Yes.
21    Q.   What did they owe you money -- what
22 did it owe you money for?
23    A.   I said previously, I funded the
24 hotel since -- you know, for a long time.
25    Q.   And I believe before you couldn't
       TSG Reporting - Worldwide    877-702-9580
```

Page 319

```
1              Mitchell
2  recall whether you funded it personally or
3  through an LLC; is that correct?
4          MR. HAVELES:  Objection.  I think he
5  did say he recalled.
6          THE COURT REPORTER:  I'm sorry, I
7  didn't hear you.
8          MR. HAVELES:  Objection.  I said I
9  did -- I think he did say he recalled.
10    Q.   So what do you recall, that you
11 funded it personally?
12    A.   I funded through Mitchell Hotel
13 Group.
14    Q.   Do you know why it's not listed as
15 Mitchell Hotel Group here?
16    A.   Again, I don't recall what these --
17 you know, what that amount is.
18    Q.   If you look on the third page,
19 RP 011252, do you see the section on long-term
20 liabilities?
21    A.   Right.
22    Q.   Does that list the principal amount
23 of the mortgage loan and the mezzanine loan?
24    A.   Yes.
25    Q.   Does that listing include the
       TSG Reporting - Worldwide    877-702-9580
```

Page 320

Mitchell

1 interest owed on those two loans?
2 A. No.
3 Q. Why not?
4 MR. HAVELES: Objection to form.
5 Foundation.
6 A. I don't know.
7 Q. Do you believe that the interest
8 amounts owed under those two loans are
9 liabilities of the Royal Palm Hotel?
10 A. Again, I don't know how the
11 accounting procedure with that particular --
12 how that is done.
13 Q. Do you consider the interest owed on
14 those two loans to be liabilities of the hotel?
15 A. I'm not an accountant. I don't know
16 how that -- again, that's not what I do.
17 Q. Take a look at the March '07 balance
18 sheet. On the second page, which is RP 011259,
19 do you see the current liability again for Guy
20 Mitchell A/P?
21 MR. HAVELES: Do you see it?
22 THE WITNESS: No.
23 MR. HAVELES: It's line 2009 of the
24 current liabilities.

TSG Reporting - Worldwide    877-702-9580

Page 321

Mitchell

1 THE WITNESS: It's in the back?
2 MR. HAVELES: Second page.
3 A. Yes.
4 Q. And that amount is approximately
5 $2.72 million. Do you see that?
6 A. Yes. Yes.
7 Q. Do you recall being paid back by the
8 hotel between January and March of 2007
9 approximately $7 million?
10 A. Say that again.
11 Q. Do you recall the hotel paying you
12 back approximately $7 million between January
13 '07 and March '07?
14 A. No.
15 Q. If you flip one page forward from
16 that --
17 A. Forward?
18 MR. HAVELES: To the last page of
19 the first page of this -- the financial
20 statement.
21 Q. The first page of March '07. It's
22 probably best we use the Bates numbers. It's
23 RP 011258. They are not in order, but just to
24 confirm we are on the same page.

TSG Reporting - Worldwide    877-702-9580

Page 322

Mitchell

1 Do you see the Hotel 71 account
2 receivable entry there?
3 MR. HAVELES: On the first page of
4 the March '07 balance sheet.
5 A. Yes.
6 Q. And that indicates $3,500,
7 approximately?
8 A. Yes.
9 Q. Do you recall between January '07
10 and March '07 over $200,000 being paid to
11 Hotel 71?
12 A. Yes, that's what it shows.
13 Q. Do you recall that?
14 A. I don't know what that -- you would
15 have to ask the accounting department how that
16 works.
17 Q. Did you -- I'm sorry.
18 A. You would have to ask accounting.
19 You would have to ask Bill Cygnor.
20 Q. Do you recall any services provided
21 by Royal Palm Hotel to Hotel 71?
22 A. I know that they did payroll or
23 they -- it was managed by West Paces and I know
24 that they had a certain way that certain things

TSG Reporting - Worldwide    877-702-9580

Page 323

Mitchell

1 were done and charged back one another through
2 West Paces, so -- but I don't know the details.
3 I was never involved in that part of it.
4 Q. Okay. If you flip to the May '07
5 balance sheet --
6 A. Right.
7 Q. The second page of that sheet is
8 Bates stamped RP 011262. Do you see the
9 current liability in line 2009 for Mitchell
10 Hotel Group?
11 A. Which one is this?
12 MR. HAVELES: The May. Why don't
13 you undo the clip so it's easier.
14 A. Okay.
15 Q. Do you see that line item for
16 Mitchell Hotel Group LLC?
17 (Document review.)
18 A. Yes.
19 Q. Do you understand that to be the
20 same liability as the one previously listed as
21 Guy Mitchell accounts payable?
22 A. That's all -- that was all handled
23 through accounting. I don't know how that -- I
24 don't know the details.

TSG Reporting - Worldwide    877-702-9580

Page 324

1          Mitchell
2     Q.   Who handled accounting for Mitchell
3   Hotel Group LLC?
4     A.   Peter Jonas.
5     Q.   Who is Peter Jonas?
6     A.   He is the accountant.
7     Q.   What firm is he with?
8          MR. HAVELES:  You could answer.
9     A.   He is -- Peter Jonas is his
10  accounting firm.  I don't know the name.
11    Q.   If you could turn to the October '07
12  balance sheet, please.
13         MR. HAVELES:  What page do you want
14    to look at?
15    Q.   The second page, which is Bates
16  stamped RP 011265.  Do you see on line 2012
17  under Current Liabilities --
18    A.   Yes.
19    Q.   -- the Falor MSD Group, liability of
20  almost -- just shy of $14,000?
21    A.   Yes.
22    Q.   Do you know what that liability
23  represents?
24    A.   No idea.
25    Q.   Was the Breakwater also managed by
        TSG Reporting - Worldwide    877-702-9580

Page 325

1          Mitchell
2   West Paces?
3     A.   Not to my knowledge.  I don't know.
4     Q.   Could you take a look at the
5   February '08 balance sheet, which is Bates
6   stamped RP 001462.
7     A.   Okay.
8     Q.   Do you see under Other
9   Receivables --
10         MR. HAVELES:  The first page.
11    Q.   It's the first page.  It says
12  Breakwater A/R?
13    A.   Yes.
14    Q.   Approximately $122,000?
15    A.   Yes.
16    Q.   Do you know what that account
17  receivable involves?
18    A.   No.
19         MR. GREANEY:  Can I enter this,
20    please, as exhibit -- Mitchell Exhibit 28.
21         (Mitchell Exhibit 28, Royal Palm
22    Hotel spread sheet, marked for
23    identification.)
24    Q.   Have you seen this document before,
25  Mr. Mitchell?
        TSG Reporting - Worldwide    877-702-9580

Page 326

1          Mitchell
2     A.   Yes.
3     Q.   When did you see it?
4     A.   Today.
5     Q.   What is your understanding of what
6   this document is?
7     A.   It's a repayment of loans to
8   Mitchell Hotel Group.
9     Q.   Do you know who prepared this
10  document?
11    A.   The receiver.
12    Q.   Were you involved in the preparation
13  of this document?
14    A.   No.
15         MR. HAVELES:  I will represent to
16    you that none of us saw it until it was
17    submitted in connection with papers filed
18    with the court Sunday afternoon.
19    Q.   Do you have any reason to believe
20  that there was not a transfer of a total of 3
21  point -- approximately $3.8 million from the
22  Royal Palm Hotel to Mitchell Hotel Group
23  between February 29th, 2008 and May 15th, 2008?
24    A.   No.
25    Q.   Do you know why that money was
        TSG Reporting - Worldwide    877-702-9580

Page 327

1          Mitchell
2   transferred?
3     A.   Repayment of loan.
4     Q.   And was that the same loan that we
5   looked at as a current liability for the hotel
6   on some of the balance sheets?
7     A.   That was included on the balance
8   sheets.
9     Q.   Are there any written agreements
10  between Mitchell Hotel Group and Royal Palm
11  Hotel Property LLC?
12    A.   No.
13    Q.   Are there any written agreements
14  between you as an individual and Royal Palm
15  Hotel Property LLC?
16    A.   No.
17    Q.   Did you instruct anyone to transfer
18  the moneys as indicated on this chart?
19    A.   Yes.
20    Q.   Who did you instruct?
21    A.   Accounting department.
22    Q.   Who in the accounting department?
23    A.   Bill Cygnor.
24    Q.   Do you recall any discussions with
25  him about this?
        TSG Reporting - Worldwide    877-702-9580

Page 328

Mitchell

1
2     A.   No.
3     Q.   Do you recall what you said when you
4   spoke to him?
5         MR. HAVELES:  You can answer the
6   question.
7     A.   No.
8     Q.   Did you have any e-mails with him
9   about these transfers?
10    A.   No.
11    Q.   Did you instruct him separately with
12  respect to each transfer?
13    A.   Possibly.
14    Q.   Do you recall how many times you
15  spoke to him in the last three or four months
16  regarding transfer of money from the Royal Palm
17  Hotel to Mitchell Hotel Group?
18    A.   No.
19    Q.   Is it more than five?
20    A.   I don't recall.
21    Q.   Did Mr. Cygnor ask you any questions
22  during those conversations about the transfers?
23    A.   No.
24    Q.   Did you explain to him why the
25  transfers should be made?

Page 329

Mitchell

1
2     A.   Just the fact that they are
3   repayments of loan.
4     Q.   Do you recall when the loan was
5   made?
6     A.   They were made throughout the
7   inception of the loan.
8     Q.   And I think we went over this
9   before, but do you recall any of the reasons
10  why loans were made from Mitchell Hotel Group
11  to Royal Palm Hotel Property LLC?
12    A.   I don't recall the exact.  When the
13  hotel needed money, I funded it.
14    Q.   Is Mitchell Hotel Group LLC subject
15  to the receiver order?
16    A.   I believe it is.
17    Q.   Is the receiver in control of
18  Mitchell Hotel Group LLC?
19    A.   I don't know.  That's a legal
20  question.  I don't -- I don't know.
21    Q.   Do you still manage and operate
22  Mitchell Hotel Group LLC?
23    A.   Again, that's a legal question that
24  I don't -- I don't understand the --
25    Q.   Are you in control of the bank

Page 330

Mitchell

1
2   accounts of Mitchell Hotel Group LLC?
3         MR. HAVELES:  Presently?
4         MR. GREANEY:  Presently.
5     A.   Again, I don't -- you know, I don't
6   know how to answer that question.
7     Q.   Well, who are the members of
8   Mitchell Hotel Group LLC?
9     A.   I don't actually have the details of
10  that, the corporate --
11    Q.   Are you a member?
12    A.   Yes.
13    Q.   Are you a member with your wife?
14    A.   I don't know.
15    Q.   Has Mitchell Hotel Group LLC paid
16  any money from it to its investors since
17  February 29th, 2008?
18    A.   Mitchell Hotel Group received
19  reimbursements, but I don't know -- that's it.
20        MR. HAVELES:  He is asking you has
21  Mitchell Hotel Group paid money out to any
22  of its investors since --
23        THE COURT REPORTER:  I can't hear
24  you.
25        MR. HAVELES:  He is asking whether

Page 331

Mitchell

1
2   Mitchell Hotel Group paid money out to any
3   of its investors since February 2008.
4     A.   I still don't understand the
5   question.
6     Q.   Has Mitchell Hotel Group LLC paid
7   any money to anyone since February 29th, 2008?
8     A.   It received money, right.
9     Q.   That wasn't my question.  Has it
10  paid any money to anyone since February 29th,
11  2008?
12    A.   I really don't know how to answer
13  that question.
14        MR. HAVELES:  Let's take a break,
15  please.
16        THE VIDEOGRAPHER:  The time is
17  12:14.  We are going off the record.
18        (Recess was taken from 12:14 to
19  12:16.)
20        THE VIDEOGRAPHER:  The time is
21  12:16.  We are back on the record.
22        MR. HAVELES:  I believe the pending
23  question which Mr. Mitchell answered is
24  whether Mitchell Hotel Group has paid any
25  money out to anyone since February 28,

Page 332

```
1               Mitchell
2    2008.  Is that correct?
3         MR. GREANEY:  February 29th, 2008.
4         MR. HAVELES:  February 29th, 2008.
5         You may answer the question,
6    Mr. Mitchell.
7    A.   Yes.
8    Q.   To whom?
9    A.   To me.
10   Q.   In what amount?
11   A.   In the amount that would probably be
12   on the repayment sheet.
13   Q.   What was the purpose of that payment
14   from Mitchell Hotel Group to yourself?
15   A.   It's a repayment of loans.
16   Q.   Did you make loans to Mitchell Hotel
17   Group?
18   A.   Yes.
19   Q.   What was the purpose of those loans?
20   A.   To fund the Royal Palm deficits and
21   shortfalls.
22   Q.   Do you have anyone providing
23   accounting services to you personally?
24   A.   Yes.
25   Q.   Who is that?
```
TSG Reporting - Worldwide    877-702-9580

Page 333

```
1               Mitchell
2    A.   Peter Jonas.
3    Q.   Do you have anyone providing you
4    with financial advisory services?
5    A.   No.
6    Q.   Do you have an understanding of your
7    current net worth?
8    A.   No.
9    Q.   Do you have a positive net worth?
10   A.   I don't -- I don't know.
11   Q.   You don't know whether you have a
12   positive net worth or not?
13        MR. HAVELES:  He just said that.
14   Q.   Do you know the amount of your
15   assets?
16   A.   No.
17   Q.   Do you know the amount of your
18   outstanding liabilities?
19   A.   No.
20   Q.   Have you or any of the LLCs in which
21   you hold a membership interest filed for
22   bankruptcy?
23   A.   Yes.
24   Q.   Which ones?
25   A.   The Atlanta shopping centers.
```
TSG Reporting - Worldwide    877-702-9580

Page 334

```
1               Mitchell
2    Q.   Any others?
3    A.   Hotel 71.
4    Q.   Any others?
5    A.   No.
6    Q.   Have you filed for bankruptcy?
7    A.   No.
8    Q.   How much is the outstanding
9    judgement owed by you to Hotel 71?
10        MR. HAVELES:  You mean to the mezz
11   lender of Hotel 71?
12        MR. GREANEY:  Yes.
13   A.   50 million.
14   Q.   Have you disputed the judgement
15   pursuant to which that amount was awarded?
16        MR. HAVELES:  Objection to form.
17   A.   Yeah, I don't -- the attorneys
18   handled that stipulation.
19   Q.   Do you dispute that you owe that
20   money?
21   A.   I dispute I owe the money.
22        MR. HAVELES:  I believe that there
23   is a stipulation -- there was a stipulation
24   entered only as to the amount of the
25   judgement, but there is a notice of appeal
```
TSG Reporting - Worldwide    877-702-9580

Page 335

```
1               Mitchell
2    that has been filed as to the judgement by
3    counsel representing Mr. Mitchell and
4    others in that case.
5         MR. GREANEY:  With respect to
6    liability?
7         MR. HAVELES:  I believe so.
8    Q.   If you could go back to Mitchell 28,
9    please.  Did you -- did Royal Palm Hotel
10   transfer money to Mitchell Hotel Group prior to
11   February 29th, 2008?
12   A.   Yes.
13   Q.   Do you know how much?
14   A.   Prior to February 29th?  No.
15   Q.   Are you aware of any documents
16   evidencing loans made by Mitchell Hotel Group
17   to the Royal Palm Hotel other than the balance
18   sheet we looked at?
19   A.   I'm not aware.
20   Q.   Are you aware of any documents
21   evidencing loans from you personally to the
22   Royal Palm Hotel other than the balance sheets
23   we looked at today?
24   A.   It would be by wire transfer or the
25   way it was loaned to the hotel.
```
TSG Reporting - Worldwide    877-702-9580

Page 336

Mitchell

1
2      Q.   Are you aware of any promissory
3  notes executed --
4      A.   No.
5      Q.   -- in connection with those loans?
6  No?
7      A.   No.
8      Q.   Are you aware of any loan
9  agreements?
10     A.   No.
11     Q.   Are you aware of any documents
12 evidencing loans from you personally to
13 Mitchell Hotel Group LLC?
14     A.   They were booked through accounting.
15     Q.   Through the accounting records of
16 Mitchell Hotel Group LLC?
17     A.   Through my accountant and the hotel
18 accountant.
19     Q.   I think you mentioned earlier that
20 the payments from Mitchell Hotel Group to
21 yourself in the period February 29, 2008 to May
22 15, 2008 were in repayment of debts that
23 Mitchell Hotel Group LLC owed to you; is that
24 correct?
25     A.   Yes.

Page 337

Mitchell

1
2      Q.   Are there any documents evidencing
3  those debts?
4      A.   It would be through wire transfers
5  and loans to the hotel.
6      Q.   Do you know where those documents
7  are?
8      A.   In the accountant's office.
9      Q.   That's Peter Jonas?
10     A.   Yes.
11        MR. GREANEY: Can I take a
12 couple-minute break and see --
13        MR. HAVELES: Absolutely.
14        MR. GREANEY: -- whether I have
15 anything further.
16        Go off the record, please.
17        THE VIDEOGRAPHER: The time is
18 12:23. We are going off the record.
19        (Recess was taken from 12:23 to
20 12:28.)
21        THE VIDEOGRAPHER: The time is
22 12:28. We are back on the record.
23 BY MR. GREANEY:
24     Q.   Mr. Mitchell, what did you do with
25 the money that Mitchell Hotel Group paid to

Page 338

Mitchell

1
2  you?
3      A.   I put it in a bank account.
4      Q.   Do you still hold that money now?
5      A.   No.
6      Q.   Who holds it now?
7      A.   It's in a trust.
8      Q.   A trust for whose benefit?
9      A.   It's a family trust.
10     Q.   And where is that trust located?
11     A.   In the Cook Islands.
12     Q.   And when was that money deposited
13 into the trust?
14     A.   I don't know the dates or times that
15 it was done.
16     Q.   And did you handle that yourself or
17 was that handled for you by someone?
18     A.   That was done a while back.
19        MR. HAVELES: He asked by whom.
20        THE WITNESS: Oh.
21        MR. HAVELES: Did you do it or did
22 someone else do it for you?
23     A.   Rephrase the question so I
24 understand it.
25     Q.   Did you make the deposits from your

Page 339

Mitchell

1
2  accounts into the trust or did someone do that
3  for you?
4      A.   I did.
5      Q.   And how did you accomplish that?
6      A.   By wire.
7      Q.   You said it was some time ago. My
8  understanding is that we were talking right now
9  about the specific payments indicated on
10 Exhibit 28.
11     A.   Right.
12     Q.   Is that what you are talking about?
13     A.   That's correct, yes.
14     Q.   So when you say "some time ago,"
15 what do you mean?
16     A.   Payments were made to the trust
17 previously and now.
18     Q.   So prior to February 29th and then
19 also since February 29th?
20     A.   Yes.
21     Q.   In roughly the amounts indicated on
22 this sheet, $3.8 million?
23        MR. HAVELES: In total or just
24 recently?
25        MR. GREANEY: Just recently.

## Page 340

1              Mitchell
2     A.   Less than that.
3     Q.   What did you do with the remainder
4  of the money?
5     A.   Spent.
6     Q.   Did you pay your legal bills with
7  that money?
8     A.   I'm sure.
9     Q.   How much did you retain that wasn't
10 paid to the trust?
11    A.   I don't -- I don't recall.
12    Q.   Do you have a lawyer advising you
13 with respect to the trust?
14         MR. HAVELES:  You may answer that
15    yes or no.
16    A.   Yes.
17    Q.   Who is that lawyer?
18         MR. HAVELES:  You may answer that
19    question.
20    A.   Howard Rosen.
21    Q.   What firm is Howard Rosen with?
22    A.   Rosen & Rosen.
23    Q.   Where is that located?
24    A.   Coral Gables, Florida.
25    Q.   Do you have an accountant that helps

TSG Reporting - Worldwide   877-702-9580

## Page 341

1              Mitchell
2  you with the administration of the trust?
3     A.   I don't know that answer.
4     Q.   Does Peter Jonas assist you with the
5  trust?
6     A.   I don't know the answer to that
7  question.  The attorney, you know, has filed
8  the papers and I'm sure Peter Jonas will be --
9  you know, handles the --
10    Q.   Who is the executor of the trust?
11         MR. HAVELES:  You mean the trustee?
12    Q.   I mean the trustee.
13    A.   I don't know the details.
14    Q.   Who set up the trust for you?
15    A.   Howard Rosen.
16    Q.   Do you know which members of your
17 family are beneficiaries of the trust?
18    A.   Not the details, no.
19    Q.   Do you know any of the individuals
20 who are beneficiaries?
21    A.   No, I don't know the details of how
22 the trust is structured and set up.  It's a
23 family trust for estate planning.
24    Q.   Did you direct that the trust be set
25 up?

TSG Reporting - Worldwide   877-702-9580

## Page 342

1              Mitchell
2     A.   Yes.
3     Q.   And at the time you did that, who
4  did you have in mind as beneficiary of the
5  trust?
6     A.   My family.
7     Q.   Which is who?
8     A.   My wife.
9     Q.   Any else?
10    A.   I don't know.  See, you are asking
11 things that I don't understand the corporate
12 structure.  When you say "beneficiary," I don't
13 know --
14         MR. HAVELES:  Right now he is asking
15    is there anyone else besides your wife who
16    is a member of your family.
17    A.   I can't recall on how it was set up,
18 the will and so forth, so -- the trust.
19    Q.   Mr. Mitchell, do you have anything
20 that you feel you need to add to your testimony
21 from today to make it complete and accurate?
22    A.   No.
23    Q.   Okay.  Do you recall anything now
24 that you couldn't remember earlier in the day?
25    A.   No.

TSG Reporting - Worldwide   877-702-9580

## Page 343

1              Mitchell
2     Q.   And do you have anything you want to
3  clarify or change from your prior testimony?
4     A.   No.
5         MR. GREANEY:  I don't have any
6    further questions for you.
7         MR. HAVELES:  I have one question on
8    cross.
9  EXAMINATION BY
10 MR. HAVELES:
11    Q.   Mr. Mitchell, earlier today
12 Mr. Greaney asked you some questions about the
13 sale of the marketing of the property by
14 Easdil.  Do you recall that?
15    A.   Yes.
16    Q.   And you recall you advised him in
17 one of your answers that you were concerned
18 about confusion due to litigation with respect
19 to the impact on the marketing of the property?
20    A.   That's correct.  That's correct.
21    Q.   Okay.  Could you explain what you
22 meant by confusion due to the litigation having
23 an effect on the marketing of property?
24    A.   Basically it has to do with the
25 receivership of who actually has control of the

TSG Reporting - Worldwide   877-702-9580

Page 344

```
1              Mitchell
2  property, whether it's the receiver or myself,
3  and that's what's -- you know, that's created
4  confusion as well.
5          MR. HAVELES:  I have no other
6  questions of the witness.
7          MR. GREANEY:  I don't have any
8  further.
9          THE VIDEOGRAPHER:  The time is
10 12:33.  This is the end of today's
11 deposition.  We are going off the record.
12        (Time noted:  12:31 p.m.)
13
14
15      ---------------------
16        GUY T. MITCHELL
17
18 Subscribed and sworn to before me
19 this      day of        2008.
20
21 ---------------------------------------
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 345

```
1
2          C E R T I F I C A T E
3
4  STATE OF NEW YORK   )
5                      ) ss.:
6  COUNTY OF NASSAU    )
7
8          I, KRISTIN KOCH, a Notary Public within
9  and for the State of New York, do hereby
10 certify:
11        That GUY T. MITCHELL, the witness
12 whose deposition is hereinbefore set forth,
13 was duly sworn by me and that such
14 deposition is a true record of the
15 testimony given by such witness.
16        I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage; and that I am
19 in no way interested in the outcome of this
20 matter.
21        IN WITNESS WHEREOF, I have hereunto
22 set my hand this 11th day of June, 2008.
23        ------------------------
24        KRISTIN KOCH, RPR, RMR, CRR, CLR
25
```

TSG Reporting - Worldwide    877-702-9580

Page 346

```
1
2  -------------------I N D E X-----------------
3
   WITNESS       EXAMINATION BY      PAGE
4
5  GUY T. MITCHELL   MR. GREANEY      239
6          MR. HAVELES       343
7
   -----------------EXHIBITS-----------------
8
9  MITCHELL          PAGE LINE
10
   Exhibit 20           276  4
11 Loan Agreement dated as of February
   18, 2005, between Royal Palm Senior
12 Investors, LLC as borrower and
   Carbon Capital II, Inc. as lender....
13                       287 22
   Exhibit 21
14 E-mail dated November 2, 2007,
   Bates stamped RP 11975 and RP 11976..
15                       290 17
   Exhibit 22
16 E-mail dated November 19, 2007,
   Bates stamped RP 9426...............
17                       296 15
   Exhibit 23
18 Facsimile Transmission dated
   January 28, 2008 Bates stamped RP
19 9232 with letter dated January 28,
   2008 Bates stamped RP 9233 and RP
20 9234.............................
                         298  4
21 Exhibit 24
   Affidavit of David Tarr.............
22                       305 21
   Exhibit 25
23 E-mail dated March 17, 2008, Bates
   stamped Carbon 7499 and Carbon 7500..
24                       310 18
   Exhibit 26
25 Stipulation........................
```

TSG Reporting - Worldwide    877-702-9580

Page 347

```
1
2  -----------------EXHIBITS-----------------
3
   MITCHELL          PAGE LINE
4
                        314 13
   Exhibit 227
5  Royal Palm Hotel Balance Sheet as
   at January-07, Bates stamped RP
6  11250 through RP 11252; Royal Palm
   Hotel Balance Sheet as at
7  February-07, Bates stamped RP 11247
   through RP 11249; Royal Palm Hotel
8  Balance Sheet as at March-07, Bates
   stamped RP 11258 through RP 11260;
9  Royal Palm Hotel Balance Sheet as
   at April-07, Bates stamped RP 11241
10 through RP 11243; Royal Palm Hotel
   Balance Sheet as at May-07, Bates
11 stamped RP 11261 through RP 11263;
   Royal Palm Hotel Balance Sheet as
12 at June-07, Bates stamped RP 11255
   through RP 11257; Royal Palm Hotel
13 Balance Sheet as at July-07, Bates
   stamped RP 11253 through RP 11254;
14 Royal Palm Hotel Balance Sheet as
   at August-07, Bates stamped RP
15 11244 through RP 11246; Royal Palm
   Hotel Balance Sheet as at
16 September-07, Bates stamped RP 7533
   and RP 7534; Royal Palm Hotel
17 Balance Sheet as at October-07,
   Bates stamped RP 11264 and RP
18 11265; Royal Palm Hotel ...........
19                       325 21
   Exhibit 28
20 Royal Palm Hotel spread sheet........
21
   ----------------DOCUMENT REQUESTS-------------
22
23 PAGE 256  E-mail from Miles Spencer
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 348

```
 1
 2        ERRATA SHEET FOR THE TRANSCRIPT OF:
 3  Case Name:    Mitchell v. Carbon Capital
    Dep. Date:    June 10, 2008
 4  Deponent:     Guy T. Mitchell
 5        CORRECTIONS:
 6  Pg. Ln. Now Reads    Should Read    Reason
 7  ___ ___ _____  _____  _____
 8  ___ ___ _____  _____  _____
 9  ___ ___ _____  _____  _____
10  ___ ___ _____  _____  _____
11  ___ ___ _____  _____  _____
12  ___ ___ _____  _____  _____
13  ___ ___ _____  _____  _____
14  ___ ___ _____  _____  _____
15  ___ ___ _____  _____  _____
16  ___ ___ _____  _____  _____
17  ___ ___ _____  _____  _____
18
19        _____
20        Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS____DAY OF_____, 2008.
23
24  _____
25  (Notary Public) MY COMMISSION EXPIRES:_____
       TSG Reporting - Worldwide   877-702-9580
```

**A**

ability (8)
270:8,14 275:3
280:24 281:7
282:21 308:22
309:20
able (1)
261:8
absence (1)
266:5
Absolutely (1)
337:13
accept (4)
259:10,12,19 263:5
acceptance (1)
263:10
accepted (1)
263:2
accepting (1)
262:15
accomplish (2)
261:9 339:5
accomplished (1)
297:5
account (10)
257:18,19 287:10,17
290:12 317:19
318:3 322:2 325:16
338:3
accountant (5)
320:16 324:6 336:17
336:18 340:25
accountant's (1)
337:8
accounting (12)
316:7 320:12 322:16
322:19 323:24
324:2,10 327:21,22
332:23 336:14,15
accounts (8)
257:21,22 287:6
293:18,20 323:22
330:2 339:2
accurate (1)
342:21
accurately (1)
240:9
achieve (1)
258:24
action (4)
294:20 308:19 309:19
345:18
add (1)
342:20
added (1)
305:7
address (7)
255:13,16,19,21,23

257:6 258:4
administration (1)
341:2
advance (1)
305:3
advised (2)
262:25 343:16
advising (1)
340:12
advisory (1)
333:4
affect (2)
269:20 271:20
affidavit (5)
298:4,6,14 302:3
346:21
afternoon (1)
326:18
aggravating (1)
268:24
ago (9)
241:7,9,10 249:18
271:19 291:23
292:2 339:7,14
agree (2)
264:8 279:21
agreed (2)
311:19,24
agreement (60)
245:18,20,21 274:8
276:4,10,16 277:4
277:21,22 278:9,13
278:16 279:3,6,10
279:13,16 280:23
281:5 282:15,23
284:11,14,17,20,25
285:11,15,22,24,25
286:9,13,16,20
289:3,4,24,25
290:10 291:8,19
293:13 296:7
297:19,22,24
298:20 301:19
303:17 304:8,13
307:21 310:12
312:6,11 313:17
317:10 346:11
agreements (6)
285:5,8 311:7 327:9
327:13 336:9
ahead (1)
308:12
Ahuja (1)
246:14
Albert (1)
310:9
allowed (1)
261:2
alluded (1)

263:15
Amended (1)
308:5
amount (16)
242:24 245:2 260:4
305:8 307:15,18
318:12 319:17,22
321:5 332:10,11
333:14,17 334:15
334:24
amounts (6)
242:14 305:7 306:15
307:6 320:9 339:21
answer (45)
240:17 243:10 245:6
251:3 259:22,25
260:2,7 262:4
265:14,16 266:12
268:14 269:3,20
270:15 272:2,19
275:2 277:12
282:20 284:2 297:8
299:2,12,19,25
300:10,19 301:5
302:8,13 309:8
312:3,8,12 324:8
328:5 330:6 331:12
332:5 340:14,18
341:3,6
answered (1)
331:23
answers (1)
343:17
antecedent (1)
295:8
anybody (1)
269:20
AOL (2)
257:19 258:3
AOL.com (1)
254:22
appeal (1)
334:25
appellate (2)
263:3,7
applying (1)
292:12
appoints (1)
311:3
apprised (1)
248:3
appropriate (1)
265:16
approval (2)
260:6 263:6
approve (1)
260:5
approximately (9)
238:9 291:23 306:23

321:5,10,13 322:8
325:14 326:21
April (5)
257:13,22 263:8
283:6 301:17
April-07 (2)
314:21 347:9
Argumentative (1)
299:24
Arnold (2)
237:5 238:17
arrangement (1)
264:8
asked (7)
244:14 269:9 278:18
289:13,24 338:19
343:12
asking (12)
252:11 265:19,22
267:20 271:24
275:10 284:3
309:14 330:20,25
342:10,14
asserted (1)
313:4
asset (1)
265:25
assets (3)
311:4 313:22 333:15
assist (1)
341:4
association (1)
238:13
assume (3)
239:19 252:9,11
assumed (1)
261:9
Atlanta (1)
333:25
attached (1)
306:9
attachment (3)
253:22,23,25
attempt (1)
289:20
attempted (1)
257:5
attorney (7)
281:22 282:9 283:4
283:11,15,25 341:7
attorneys (4)
237:6,13 240:20
334:17
August-07 (2)
315:5 347:14
Austin (3)
236:11 237:12 238:20
authority (2)

259:12 260:6
authorized (1)
276:25
available (3)
271:20 304:6 316:16
Avenue (4)
236:11 237:7,14
238:8
awarded (1)
334:15
aware (14)
240:8 261:16 294:4
298:11 309:2,17
311:5 312:5 335:15
335:19,20 336:2,8
336:11
a.m (2)
236:6 238:9
A/P (2)
318:10 320:21
A/R (3)
317:15,15 325:12

**B**

back (25)
239:10 244:20 245:15
247:5 257:13,21,22
258:4 263:8 272:17
276:18 282:22
285:12 289:23
291:17 303:5
312:22 321:2,8,13
323:2 331:21 335:8
337:22 338:18
balance (38)
314:14,16,18,20,22
314:24 315:2,4,6,8
315:10,12,14,16,20
316:3,20 317:4
318:8 320:18 322:5
323:6 324:12 325:5
327:6,7 335:17,22
347:5,6,8,9,10,11
347:13,14,15,17
bank (5)
293:14,15,16 329:25
338:3
bankruptcy (4)
295:14,15 333:22
334:6
banks (3)
293:20,21 294:2
basic (1)
244:25
basically (5)
244:9 249:2 252:17
288:24 343:24
basis (1)
316:12

**Bates (43)**
287:23 288:2 290:18
290:21 296:16,18
296:20 305:22,25
314:14,17,19,21,23
314:25 315:3,5,7,9
315:11,13,15,17
316:20 321:23
323:9 324:15 325:5
346:14,16,18,19,23
347:5,7,8,9,10,12
347:13,14,16,17
**begins (1)**
305:3
**behalf (8)**
238:17,20 276:25
279:16 280:14,19
284:17 311:6
**belief (3)**
258:17,20 269:21
**believe (35)**
256:24 262:20,23
263:11 266:14
278:4 283:23 284:8
291:9 292:5,5,11
293:14 294:6
298:23 299:4,10,14
299:22 300:8,17
301:2,12,23 302:4,9
303:24 307:23
318:25 320:8
326:19 329:16
331:22 334:22
335:7
**believed (1)**
271:16
**beneficiaries (2)**
341:17,20
**beneficiary (2)**
342:4,12
**benefit (1)**
338:8
**best (9)**
243:11,13 251:4
262:3 275:3 277:12
282:21 297:8
321:23
**better (5)**
245:16 247:3,4,13
248:11
**beyond (2)**
255:6 261:7
**bidding (5)**
251:25 254:25 264:12
264:22 265:4
**bids (3)**
251:12 266:4 268:22
**Bill (6)**
287:7 291:21 308:3

318:6 322:20
327:23
**bills (2)**
291:14 340:6
**bind (1)**
277:4
**bit (2)**
250:2 275:19
**Black (3)**
268:12 278:17 289:4
**BlackBerry (3)**
255:22 257:23,25
**blood (1)**
345:18
**booked (1)**
336:14
**borrow (3)**
271:2,5,11
**borrower (4)**
271:4 276:6,11
346:12
**breaching (1)**
312:5
**break (4)**
239:13 302:20 331:14
337:12
**Breakwater (4)**
317:15 318:2 324:25
325:12
**briefly (1)**
239:10
**broken (1)**
318:17
**brought (1)**
246:19
**business (1)**
293:3
**butchered (1)**
275:19
**buy (2)**
265:25 266:19
**buyer (3)**
270:18 271:25 272:9

---

**C**

**C (4)**
237:2 239:2 345:2,2
**Calls (1)**
282:18
**capital (32)**
235:8 238:6,21
268:13,16 269:7,12
273:10,21 276:7,12
281:5 294:20
295:21 296:2
298:21 300:7,14,15
301:8,19 303:24
305:7,9,13 308:21

309:3,12,18 314:9
346:12 348:3
**Carbon (36)**
235:8 238:6,21
268:13,16 269:7,11
273:10,21 276:7,12
281:5 294:19
295:21 296:2
298:21 300:7,14,15
301:8,19 303:24
305:7,9,13,22,23,25
308:21 309:3,18
314:9 346:12,23,23
348:3
**care (2)**
280:6 294:14
**case (3)**
244:12 335:4 348:3
**cases (1)**
270:24
**cash (7)**
285:24 286:8,12,20
291:8 304:8,13
**causing (1)**
265:20
**ceded (1)**
313:24
**centers (1)**
333:25
**certain (7)**
243:14,22 244:19
283:5 303:25
322:25,25
**Certified (2)**
236:14,15
**certify (2)**
345:10,16
**chance (1)**
254:12
**change (5)**
239:23 245:6 270:12
303:9 343:3
**changed (1)**
256:11
**changing (1)**
283:7
**charge (1)**
287:5
**charged (1)**
323:2
**chart (3)**
306:9,10 327:18
**check (2)**
257:4,11
**choice (7)**
244:23 245:12 246:3
246:7,9,12 283:8
**choices (1)**
248:4

**circulating (1)**
299:7
**circumstances (4)**
241:11 245:23 264:5
292:8
**Civ (1)**
235:6
**clarify (3)**
239:23 303:8 343:3
**clause (2)**
304:5,10
**clear (1)**
257:16
**clients (2)**
254:2,3
**clip (1)**
323:14
**closing (1)**
301:17
**CLR (2)**
235:24 345:24
**collected (1)**
257:12
**collection (1)**
315:19
**come (1)**
250:23
**coming (1)**
252:25
**comments (3)**
289:23,24 291:2
**COMMISSION (1)**
348:25
**communicated (2)**
254:15 300:15
**communication (1)**
298:12
**communications (8)**
250:2,4 251:15
256:18 279:5
298:19 300:5,14
**company (1)**
275:13
**competitive (1)**
262:7
**Complaint (2)**
308:5,18
**complete (4)**
243:22 244:11 246:6
342:21
**comply (1)**
282:15
**comport (1)**
306:25
**computer (1)**
258:2
**concern (3)**
280:12 295:4,9

**concerned (1)**
343:17
**conclusion (3)**
277:11 282:19 283:19
**condition (4)**
270:12,20 312:25
313:18
**conduct (1)**
258:5
**confirm (1)**
321:25
**confused (2)**
265:13,15
**confusing (3)**
265:2,7,10
**confusion (6)**
265:21 266:15 269:5
343:18,22 344:4
**connection (2)**
326:17 336:5
**consider (1)**
320:14
**consult (1)**
246:11
**contemplated (4)**
245:17 288:25 290:8
304:7
**contemplation (1)**
286:24
**continue (3)**
244:18 246:4 289:22
**Continued (2)**
235:16 236:9
**continues (1)**
308:24
**continuing (4)**
238:4 250:12 251:24
273:5
**continuously (2)**
272:14,23
**contract (2)**
302:16,17
**control (14)**
260:22 261:9,12
272:13 273:2 275:7
275:14,23 313:4,8
313:24 329:17,25
343:25
**controls (3)**
275:6,22 309:25
**conversation (1)**
301:7
**conversations (2)**
240:18 328:22
**Cook (1)**
338:11
**copies (2)**
257:15 281:11

copy (3)
256:24 277:23 308:13
Coral (1)
340:24
corporate (3)
316:8 330:10 342:11
correct (19)
251:18 255:2 260:13
264:12,13,18 268:7
268:8,10,11 271:17
281:25 294:8 319:3
332:2 336:24
339:13 343:20,20
CORRECTIONS (1)
348:5
Correspondence (1)
288:7
corridors (1)
244:25
cosmetic (1)
247:5
counsel (2)
238:14 335:3
COUNTY (1)
345:6
couple-minute (1)
337:12
course (1)
242:6
court (9)
235:2 238:12,22
259:18 263:6
317:22 319:6
326:18 330:23
create (2)
269:16 295:10
created (2)
310:6 344:3
creating (1)
247:10
credentials (1)
271:15
cross (1)
343:8
CRR (2)
235:24 345:24
current (10)
258:17 262:18 264:5
309:2 320:20,25
323:10 324:17
327:5 333:7
currently (7)
262:14 263:17 275:9
275:11 309:24
310:3 312:25
cut (1)
313:13
cut-off (1)

258:13
Cygnor (10)
287:7,15 288:15
291:21 293:4 308:3
318:6 322:20
327:23 328:21

—————————— D ——————————

D (1)
346:2
date (28)
241:6 247:19 249:17
258:13 259:2
261:11 262:14,16
262:17,19,21,23
263:9,12,14,17
272:24 280:17
283:5 285:14
292:17 296:10
300:6 301:17
310:21 313:7,10
348:3
dated (13)
276:5,10 287:22
290:17 296:16,17
305:21 346:11,14
346:16,18,19,23
dates (5)
284:21 291:9,22
307:24 338:14
David (4)
297:11,13 298:5
346:21
day (6)
258:25 271:7 342:24
344:19 345:22
348:22
deal (1)
297:4
dealt (1)
302:14
debt (10)
242:7,10,12,24 243:2
243:3 304:9 305:8
305:12 314:8
debts (2)
336:22 337:3
December (1)
304:19
December-07 (1)
315:13
decision (9)
246:15,23 247:12
248:9 249:7 263:24
264:3,6 292:22
declaratory (1)
308:19
default (3)
277:8,18 279:18

defendant (3)
235:9 237:13 238:20
defer (1)
251:25
deferred (1)
265:5
deferring (3)
254:24 264:12,22
deficit (1)
247:11
deficits (1)
332:20
delayed (1)
262:5
delaying (1)
301:17
Dep (1)
348:3
department (3)
322:16 327:21,22
depends (4)
270:18 271:4,25
272:9
Deponent (2)
348:4,20
deposited (3)
293:8 294:3 338:12
deposition (13)
235:16 236:9 238:4,7
240:13,23 250:5
281:21 284:24
309:6 344:11
345:12,14
deposits (1)
338:25
detail (3)
253:17 256:13 279:9
details (8)
262:2 285:13 323:3
323:25 330:9
341:13,18,21
deteriorated (1)
248:18
deteriorating (1)
270:5
determine (1)
258:5
different (1)
255:13
difficult (1)
312:8
direct (2)
240:16 341:24
directing (1)
291:15
direction (1)
261:12
directions (1)

261:3
director (1)
283:8
directors (1)
297:14
discovery (1)
258:13
discuss (1)
246:21
discussed (1)
295:21
discussion (1)
263:11
discussions (3)
247:22 254:14 327:24
dispute (2)
334:19,21
disputed (1)
334:14
disputes (1)
283:6
DISTRICT (2)
235:2,3
division (2)
263:4,8
document (21)
276:13 281:23,25
282:4,11,14,17
290:21 298:8
303:21 306:4,11,12
308:6 310:23
323:18 325:24
326:6,10,13 347:21
documents (11)
257:18 306:14 315:20
315:23 316:4,11
335:15,20 336:11
337:2,6
doing (5)
247:5 248:3 253:16
258:14 289:5
Don (1)
267:10
draft (1)
291:19
due (3)
263:6 343:18,22
duly (2)
239:3 345:13

—————————— E ——————————

E (6)
237:2,2 239:2 345:2,2
346:2
earlier (10)
264:10 289:8,10
294:5 295:21 303:8
304:12 336:19

342:24 343:11
early (1)
263:9
EarthLink (2)
257:18,23
EarthLink.net (1)
255:24
Easdil (28)
250:3,5,7 251:15,22
251:23 254:16,24
256:17 258:9
259:10,20 260:24
260:25 261:4 262:6
262:10,25 264:10
264:11,24 272:15
272:22 273:6
284:22 285:5,9
343:14
Easdil's (1)
265:23
easier (3)
252:6 285:19 323:14
easy (1)
271:19
effect (6)
270:13 274:13,18,22
274:24 343:23
effectually (1)
244:21
efforts (1)
250:15
either (1)
302:13
Elliot (1)
285:10
enhanced (1)
244:24
enter (13)
284:13,13,16,19
285:4,7,24 286:8,19
305:17 310:12,16
325:19
entered (6)
245:18 272:12 279:15
280:22 281:4
334:24
entering (1)
313:16
entertaining (1)
250:17
entire (1)
254:12
entirety (1)
255:5
entities (1)
254:10
entitled (4)
260:23 276:9 281:21
315:20

entity (2)
275:5,21
entry (1)
322:3
equity (6)
242:7,11 266:24
268:7 269:13,25
ERRATA (1)
348:2
ESQ (2)
237:9,16
established (1)
286:3
estate (1)
341:23
evaluate (2)
299:7 300:24
event (2)
304:5 309:13
everybody (2)
248:2,3
evidencing (4)
335:16,21 336:12
337:2
exact (3)
242:16 307:5 329:12
exactly (2)
252:13 289:2
EXAMINATION (3)
239:6 343:9 346:3
examined (1)
239:4
exception (1)
315:22
excess (3)
242:9 269:22 292:6
excuse (2)
244:5 285:23
executed (1)
336:3
executor (1)
341:10
exercise (1)
280:14
exercised (2)
280:18 294:25
exercising (3)
279:22 294:7,21
exhibit (42)
276:3,4,9 278:3,13
281:18,20 284:12
284:23 285:21
287:21,22,25
290:16,17,20
296:12,15 298:3,4
303:17 305:18,21
308:4 310:17,18,20
314:12,13 325:20

325:20,21 339:10
346:10,13,15,17,21
346:22,24 347:4,19
EXHIBITS (2)
346:7 347:2
existing (1)
317:9
exists (1)
257:3
expect (3)
287:9,13,15
EXPIRES (1)
348:25
explain (4)
274:16 293:23 328:24
343:21
explaining (1)
289:17
explains (1)
282:11
extend (1)
262:17
extension (1)
300:22
extent (5)
257:22 259:14,16
300:2 304:6
e-mail (34)
251:20,22 252:16,20
252:24 253:6,21
254:13,18,20 255:2
255:12,15,18,21,25
256:5,6,25 258:3
287:22 290:17,21
291:3,4,12 298:11
305:21 306:3,10
346:14,16,23
347:23
e-mailed (1)
255:12
e-mails (5)
257:13 258:6 287:25
288:3 328:8

_____
F
F (1)
345:2
Facsimile (2)
296:15 346:18
fact (4)
246:22 286:4 302:4
329:2
fail (1)
277:14
failure (2)
277:7,17
fair (2)
259:5 269:24

fairly (1)
244:17
Falor (3)
267:7 276:24 324:19
Falors (1)
285:11
familiar (3)
276:13 312:24 313:17
family (5)
338:9 341:17,23
342:6,16
far (2)
253:20 306:22
February (17)
276:5,10 325:5
326:23 330:17
331:3,7,10,25 332:3
332:4 335:11,14
336:21 339:18,19
346:11
February-07 (2)
314:16 347:7
February-08 (1)
315:15
feeding (1)
269:19
feel (5)
245:5 265:24 269:21
299:6 342:20
felt (1)
265:18
figure (1)
243:7
filed (5)
326:17 333:21 334:6
335:2 341:7
financial (6)
287:6 312:24 313:3
313:18 321:20
333:4
find (1)
276:19
firm (3)
324:7,10 340:21
first (30)
249:15 273:25 277:8
277:17 279:18,22
280:14,19,25 281:8
288:14 291:21,25
292:8 294:8,22
295:2 303:25
304:18 305:14
306:15 308:5,18
314:4 316:19
321:20,22 322:4
325:10,11
FirstChoice01 (1)
254:21
five (1)

328:19
flip (3)
288:8 321:16 323:5
Florida (1)
340:24
following (1)
276:20
follows (1)
239:5
forbear (2)
279:21 294:21
foreclosed (3)
295:12,17,21
foreclosure (2)
295:10,25
form (19)
266:10 267:15,23
271:22 273:7
277:10 281:2 282:5
292:24 294:9 295:5
297:6 299:23 302:6
307:3,16 317:12
320:5 334:16
forth (6)
250:13 306:15 311:11
311:16 342:18
345:12
forward (4)
263:4 290:9 321:16
321:18
forwarded (1)
307:19
Foundation (7)
271:23 273:8 292:25
297:7 307:4,17
320:6
four (1)
328:15
frame (1)
258:23
Frank (3)
245:11 289:21 294:5
free (1)
245:5
frenzy (1)
269:19
front (1)
281:18
fully (3)
240:8 246:24 304:9
fund (1)
332:20
funded (5)
318:23 319:2,11,12
329:13
funding (1)
244:10
funds (5)

246:3,6 271:3,11
304:6
further (9)
244:23 245:13 247:2
252:18 258:5
337:15 343:6 344:8
345:16
future (1)
262:22

_____
G
G (2)
239:2 255:18
Gables (1)
340:24
general (1)
313:21
generally (6)
242:17 247:25 275:11
306:17,18,20
generate (1)
244:21
getting (4)
245:19 260:25 266:24
268:23
give (1)
285:19
given (3)
250:24 256:9 345:15
global (1)
244:9
go (11)
239:10 252:17,24
253:19 258:4 263:4
290:9 308:11
312:14 335:8
337:16
going (20)
244:18 246:2,14,22
252:5 260:12
261:20,25 263:20
265:20 268:23
279:21 281:10
289:22 302:24
309:15 312:18
331:17 337:18
344:11
good (3)
239:8,9 302:19
gotten (1)
248:25
Greaney (59)
237:16 238:19,19
239:7 242:8 243:3
243:18 256:20,23
257:9,16 258:7,11
258:16 261:18
262:21 275:17,20
276:2 277:23 278:3

278:6 281:10,14,19
285:18 286:14
287:20 290:15
293:21 296:11,14
298:2 299:20
302:21 303:6
305:17,20 306:18
308:10,13 309:7
310:16 312:14,23
314:11 325:19
330:4 332:3 334:12
335:5 337:11,14,23
339:25 343:5,12
344:7 346:5
**greater (4)**
244:22 249:20 265:25
269:22
**group (34)**
241:20 267:7,7
319:13,15 323:11
323:17 324:3,19
326:8,22 327:10
328:17 329:10,14
329:18,22 330:2,8
330:15,18,21 331:2
331:6,24 332:14,17
335:10,16 336:13
336:16,20,23
337:25
**guess (5)**
241:23 245:20 254:2
267:10 282:11
**Guy (11)**
235:5,17 236:10
238:4 318:10
320:20 323:22
344:16 345:11
346:5 348:4
**gyration (1)**
289:19
**G.Mitchell (1)**
255:24

---
**H**
---

**H (2)**
237:9 239:2
**half (1)**
240:19
**hamper (1)**
268:2
**hand (1)**
345:22
**handicapped (1)**
261:6
**handing (3)**
278:8 281:17 284:24
**handle (1)**
338:16
**handled (4)**

323:23 324:2 334:18
338:17
**handles (1)**
341:9
**happen (5)**
280:2 286:4,5,6
289:20
**happened (2)**
261:11 289:6
**harm (15)**
266:22,23,25 267:4
267:12,17,21 268:9
268:12,15 269:6,11
269:25 295:18,25
**harmed (1)**
266:15
**harms (2)**
268:5 269:16
**Haveles (129)**
237:9 238:16,16
240:16 241:23,25
242:7,11 243:2,10
243:16 244:14
251:3 252:10
253:11 256:15
257:4,10,20 258:8
258:12 259:11,21
260:15,18 261:19
262:3,9,20 265:14
265:22 266:10
267:15,23 271:22
272:16,19,25 273:7
275:2,10,18 277:10
277:25 278:5,8,15
278:18,21 281:2,13
281:16 282:5,10,18
284:3,6 285:20
286:11 287:18
289:7 290:23 292:3
292:24 293:11,20
293:25 294:9 295:5
295:8 296:13 297:6
299:16,19,23 302:6
302:19 305:19
306:17 307:3,16
308:11,15 309:5,8
309:14 312:16
313:2 316:23
317:12,21,23 319:4
319:8 320:5,22,24
321:3,19 322:4
323:13 324:8,13
325:10 326:15
328:5 330:3,20,25
331:14,22 332:4
333:13 334:10,16
334:22 335:7
337:13 338:19,21
339:23 340:14,18

341:11 342:14
343:7,10 344:5
346:6
**hear (3)**
303:11 319:7 330:23
**heard (1)**
273:20
**held (2)**
236:10 238:7
**helps (1)**
340:25
**hereinbefore (1)**
345:12
**hereunto (1)**
345:21
**higher (2)**
305:13,16
**highest (2)**
259:10,19
**hire (1)**
292:23
**hired (1)**
292:14
**hiring (1)**
292:20
**Hockman (1)**
267:7
**Hodges (1)**
285:10
**hold (3)**
290:3 333:21 338:4
**holds (1)**
338:6
**hope (2)**
252:23,23
**hopeful (1)**
259:6
**hotel (146)**
241:5,12,15,20 242:5
242:24 243:15,21
244:25 245:16
247:4,23 248:10,13
258:21 262:15
267:18,22 268:3
269:14,14,17
271:12,21 274:10
274:15 275:8,13,15
275:16,24 279:17
281:6 287:6 288:12
292:11 293:7,19
294:3 295:13,17
300:24 304:17
307:10 308:23
309:4,21,25 310:4
310:14 312:25
313:5,19,25 314:3,7
314:14,16,18,20,22
314:24 315:2,4,6,8
315:10,12,14,16,20

316:3,7,9 317:8,15
317:20 318:18,24
319:12,15 320:10
320:15 321:9,12
322:2,12,22,22
323:11,17 324:3
325:22 326:8,22,22
327:5,10,11,15
328:17,17 329:10
329:11,13,14,18,22
330:2,8,15,18,21
331:2,6,24 332:14
332:16 334:3,9,11
335:9,10,16,17,22
335:25 336:13,16
336:17,20,23 337:5
337:25 347:5,6,7,9
347:10,11,12,14,15
347:16,18,20
**hotel's (1)**
313:22
**Howard (3)**
340:20,21 341:15
**huge (1)**
246:5
**hundred (7)**
274:9,14,18,23 275:6
275:12,22
**Hyatt (8)**
273:15,16 296:5
297:5,16 300:23
301:9,16

---
**I**
---

**idea (2)**
307:7 324:24
**identification (9)**
276:8 287:24 290:19
296:19 298:5
305:24 310:19
315:18 325:23
**II (7)**
235:8,14 238:21
276:7,12 294:20
346:12
**impact (8)**
270:21,25 271:6,10
271:17 272:7
295:11 343:19
**impacted (1)**
270:8
**impacts (1)**
266:8
**inception (1)**
329:7
**include (4)**
240:4 314:4,8 319:25
**included (1)**
327:7

**income (3)**
244:22 288:17 293:7
**independent (3)**
282:13,24 283:7
**indicated (4)**
301:16 327:18 339:9
339:21
**indicates (2)**
306:22 322:7
**indication (1)**
256:10
**indications (3)**
250:21 253:3 254:9
**individual (2)**
288:11 327:14
**individuals (2)**
254:9 341:19
**induce (1)**
294:20
**Informally (1)**
316:13
**information (1)**
250:8
**informed (2)**
246:25 248:2
**injunctive (1)**
308:20
**input (1)**
279:2
**institutionally (1)**
261:19
**institutions (1)**
271:3
**instruct (3)**
327:17,20 328:11
**insufficient (1)**
304:9
**intended (2)**
245:24 283:2
**intent (2)**
282:3,14
**intention (3)**
259:9,19 282:8
**interest (17)**
267:17,21 269:25
274:10,14,19 275:7
275:23 283:6
295:22 303:25
305:12,14 320:2,8
320:14 333:21
**interested (2)**
267:13 345:19
**interests (1)**
293:3
**interfere (1)**
309:19
**interfered (5)**
273:10,14,17,21

309:12
**interfering (2)**
308:21 309:3
**interjected (1)**
256:16
**interpose (1)**
258:13
**introduce (1)**
238:14
**Introduced (1)**
292:9
**invalid (5)**
283:11,16,18,21,23
**invested (1)**
241:4
**investing (1)**
241:12
**investment (2)**
242:5 268:3
**investors (12)**
267:5,6,8,11 268:9
276:6,11 277:2
330:16,22 331:3
346:12
**involved (2)**
323:4 326:12
**involvement (3)**
261:2,22 292:19
**involves (1)**
325:17
**Isaac (3)**
237:16 238:19 256:15
**Islands (1)**
338:11
**issued (1)**
263:8
**issues (7)**
252:2 264:16,21,22
269:19 310:6,7
**issuing (1)**
296:5
**item (4)**
316:21 318:10,16
323:16
**items (1)**
304:7

_____
**J**
**January (13)**
296:16,17 304:19
315:21,22 316:20
318:8,19 321:9,13
322:10 346:18,19
**January-07 (2)**
314:14 347:5
**JES (1)**
235:6
**job (2)**

235:25 292:12
**Jonas (7)**
324:4,5,9 333:2 337:9
341:4,8
**JR (1)**
237:9
**Judge (1)**
310:9
**judgement (5)**
308:20 334:9,14,25
335:2
**July-07 (2)**
315:3 347:13
**juncture (1)**
263:2
**June (5)**
235:19 236:5 238:8
345:22 348:3
**June-07 (2)**
314:25 347:12

_____
**K**
**keep (4)**
246:7,14 247:10
268:23
**kept (1)**
248:3
**knew (1)**
279:9
**know (116)**
239:14,17 242:16,17
243:8,12 244:11,17
245:4,9,21 246:24
249:12 250:22
251:11 253:7,9,19
258:8,19 260:3
262:6,16 263:18,19
263:23 264:2
267:10 268:15,23
268:24 269:2
270:10 271:13,14
275:4 278:11,15,19
278:20,23 285:12
289:2 290:7 291:9
291:11,13 292:16
292:22 293:16
294:16 297:11
299:5,13,17,18,21
300:11,20 301:14
301:25 304:16,22
307:5 308:11
309:22 311:25
312:13 313:9
317:17,19 318:2,5
318:24 319:14,17
320:7,11,16 322:15
322:23,24 323:3,24
323:25 324:10,22
325:3,16 326:9,25

329:19,20 330:5,6
330:14,19 331:12
333:10,11,14,17
335:13 337:6
338:14 341:3,6,7,9
341:13,16,19,21
342:10,13 344:3
**knowledge (17)**
243:11,13 251:4
273:19 280:18
283:17,20 287:8,9
287:16 290:4
298:20 300:5 301:7
311:22 312:2 325:3
**Koch (5)**
235:24 236:12 238:13
345:8,24
**Kristin (5)**
235:24 236:12 238:12
345:8,24

_____
**L**
**L (2)**
239:2,2
**labeled (3)**
238:3 302:23 303:4
**Lanai (1)**
244:5,6 249:8
**Land (1)**
288:9
**late (1)**
263:8
**lawyer (3)**
240:15 340:12,17
**Lea (1)**
288:9
**leading (1)**
269:6
**legal (9)**
237:22 238:11 277:11
282:19 283:19
312:7 329:19,23
340:6
**lender (6)**
276:7,12 280:15,20
334:11 346:12
**lending (6)**
248:17,24 270:4,13
270:21 271:8
**letter (3)**
296:17,24 346:19
**Let's (1)**
331:14
**liabilities (10)**
313:22 314:3,7 318:9
319:20 320:10,15
320:25 324:17
333:18
**liability (7)**

320:20 323:10,21
324:19,22 327:5
335:6
**Limited (3)**
281:21 282:9 283:4
**line (14)**
245:15,15 246:8
247:5 316:21 317:4
318:10,16 320:24
323:10,16 324:16
346:9 347:3
**list (4)**
254:2,3,4 319:22
**listed (4)**
306:5 307:18 319:14
323:21
**listing (8)**
284:14,17,19,25
285:4,7 317:14
319:25
**litigation (10)**
252:5,7 264:15,20,22
265:12,20 266:6
343:18,22
**little (2)**
250:2 252:18
**Livenote (1)**
236:15
**LLC (32)**
241:17,18 274:15
276:6,11 277:2
279:16,17 280:24
281:6 284:13,17
285:23 286:19
307:11 319:3
323:17 324:3
327:11,15 329:11
329:14,18,22 330:2
330:8,15 331:6
336:13,16,23
346:12
**LLCs (1)**
333:20
**LLP (5)**
236:11 237:5,12
238:17,20
**Ln (1)**
348:6
**loan (30)**
242:15,21 273:25,25
274:5 276:4,9,15
277:8,9,17,18
279:18 280:25
288:12 304:2,18
305:3 314:4,4,8
319:23,23 327:3,4
329:3,4,7 336:8
346:11
**loaned (1)**

335:25
**loans (14)**
247:20 320:2,9,15
326:7 329:10
332:15,16,19
335:16,21 336:5,12
337:5
**located (2)**
338:10 340:23
**lockbox (16)**
286:22 287:2,10,16
288:17,20 289:4,9
289:10,15,25 290:5
290:12 316:22
317:5,9
**log (1)**
290:24
**long (7)**
253:8,11,12,18
291:23 302:14
318:24
**long-term (1)**
319:19
**look (14)**
286:15 298:10 300:3
303:16,19 306:9
308:7 316:19
317:13 318:7
319:18 320:18
324:14 325:4
**looked (6)**
253:15 274:8 277:20
327:5 335:18,23
**looking (1)**
286:12
**loss (1)**
246:5
**lot (6)**
244:24 253:17 255:3
266:2 269:14 299:6
**low (1)**
266:20
**lower (10)**
266:4,20 267:2 268:3
268:6,16 269:6,10
269:16 305:13

_____
**M**
**M (1)**
239:2
**mailbox (1)**
291:3
**making (2)**
246:12 308:2
**manage (4)**
308:22 309:4 311:3
329:21
**managed (2)**
322:24 324:25

**management (11)**
246:13 275:7,23
  285:25 286:8,12,20
  291:8 304:8,13
  310:14
**manages (1)**
309:24
**managing (1)**
310:3
**March (25)**
248:23 249:10 259:2
  259:3,6 270:6
  272:11,25 273:18
  273:22 274:2 300:6
  305:22 306:25
  307:22,23 313:6
  315:21 320:18
  321:9,14,22 322:5
  322:11 346:23
**March-07 (2)**
314:19 347:8
**March-08 (1)**
315:17
**mark (6)**
276:2 287:20 290:15
  296:11 298:2
  314:11
**marked (9)**
276:7 287:24 290:19
  296:19 298:5
  305:23 310:19
  315:18 325:22
**market (18)**
248:11,17,24 249:9
  250:12,15 251:9,24
  253:3 261:16
  262:12 270:5,13,21
  271:8 273:5 308:23
  309:20
**marketing (11)**
262:7 272:14,21
  273:11,17,22
  275:15,16 343:13
  343:19,23
**marketplace (6)**
265:3,8,11,21 266:16
  269:5
**marriage (1)**
345:18
**matter (2)**
238:5 345:20
**matured (2)**
273:25 274:5
**maturity (1)**
247:19
**maximizing (3)**
267:13,18,22
**May-07 (2)**
314:23 347:10

**mean (8)**
247:7 254:4 261:13
  266:3 334:10
  339:15 341:11,12
**means (1)**
254:15
**meant (2)**
280:10 343:22
**mediator (1)**
283:9
**meet (1)**
291:21
**member (3)**
330:11,13 342:16
**members (2)**
330:7 341:16
**membership (8)**
274:10,14,19 275:6
  275:22 283:6
  295:22 333:21
**mention (1)**
255:25
**mentioned (8)**
245:10 248:17 251:7
  255:11 258:25
  264:10 294:5
  336:19
**merely (1)**
290:25
**Merit (1)**
236:14
**message (1)**
298:12
**met (2)**
291:25 292:8
**mezz (2)**
314:8 334:10
**mezzanine (6)**
242:21 274:5 276:15
  277:9,18 319:23
**Michael (2)**
237:22 238:10
**middle (1)**
304:4
**Miles (4)**
255:11 256:2,25
  347:23
**million (16)**
242:10,19,22 243:6
  256:3,12 259:7
  269:18,23 306:23
  321:6,10,13 326:21
  334:13 339:22
**mind (1)**
278:6 284:4 342:4
**minimum (1)**
260:4
**minor (1)**

247:14
**misapprehension (1)**
302:10
**Mischaracterizes (1)**
294:10
**mistaken (1)**
302:4
**Mitchell (207)**
235:5,17 236:10
  238:5,5 239:8 240:1
  241:1,20 242:1
  243:1,16 244:1
  245:1 246:1 247:1
  248:1 249:1 250:1
  251:1 252:1 253:1
  254:1 255:1,18
  256:1,19 257:1
  258:1 259:1 260:1
  260:18,22 261:1,4
  262:1 263:1,14
  264:1 265:1 266:1
  267:1 268:1 269:1
  270:1 271:1 272:1
  273:1 274:1 275:1
  276:1,3,4,9 277:1
  278:1,7 279:1 280:1
  281:1,15,19,20
  282:1 283:1 284:1
  285:1,21 286:1
  287:1,21,22 288:1
  289:1 290:1,16,17
  290:20 291:1,2
  292:1 293:1 294:1
  295:1 296:1,12,15
  296:20,23 297:1
  298:1,3,4,7,19
  299:1 300:1,5,13,23
  301:1 302:1 303:1,7
  304:1 305:1,18,21
  305:25 306:1 307:1
  308:1 309:1 310:1
  310:17,18,20,24
  311:1 312:1 313:1
  314:1,11,13 315:1
  315:19,24 316:1,24
  317:1 318:1,10
  319:1,12,15 320:1
  320:21 321:1 322:1
  323:1,10,17,22
  324:1,2 325:1,20,21
  325:25 326:1,8,22
  327:1,10 328:1,17
  329:1,10,14,18,22
  330:1,2,8,15,18,21
  331:1,2,6,23,24
  332:1,6,14,16 333:1
  334:1 335:1,3,8,10
  335:16 336:1,13,16
  336:20,23 337:1,24

337:25 338:1 339:1
  340:1 341:1 342:1
  342:19 343:1,11
  344:1,16 345:11
  346:5,9 347:3 348:3
  348:4
**mode (1)**
244:21
**moment (5)**
259:13,15 260:23
  261:5 293:12
**money (31)**
241:4,12,21 245:2
  247:3 260:4 268:20
  269:14 293:19
  294:2 318:19,21,22
  326:25 328:16
  329:13 330:16,21
  331:2,7,8,10,25
  334:20,21 335:10
  337:25 338:4,12
  340:4,7
**moneys (1)**
327:18
**month (6)**
307:13,15,20 315:21
  316:14,17
**monthly (2)**
304:9 316:12
**months (4)**
241:7 256:8 304:18
  328:15
**morning (2)**
239:8,9
**mortgage (21)**
241:13,14 242:15
  249:22 273:25
  277:17 279:18,23
  280:15,19,25 281:8
  294:8,22 295:2
  304:2,18 305:15
  306:16 314:5
  319:23
**MSD (1)**
324:19

——————————
**N**
——————————

**N (2)**
237:2 346:2
**name (3)**
238:10 324:10 348:3
**names (1)**
267:11
**NASSAU (1)**
345:6
**Naveen (1)**
246:14
**near (2)**
261:25 262:22

**need (5)**
239:13 252:7 262:6
  271:11 342:20
**needed (3)**
247:6 300:23 329:13
**negotiated (1)**
297:22
**negotiations (2)**
278:12 297:18
**negotiator (1)**
297:23
**net (3)**
333:7,9,12
**never (7)**
289:6,20,21,23 290:5
  301:7 323:4
**New (14)**
235:3,18,18 236:12
  236:12,17 237:8,8
  237:15,15 238:8,8
  345:4,9
**night (1)**
241:2
**north (5)**
242:13 256:3 258:22
  259:7 269:17
**Notary (4)**
236:16 239:4 345:8
  348:25
**noted (1)**
344:12
**notes (1)**
336:3
**notice (1)**
334:25
**Notwithstanding (1)**
261:13
**November (6)**
287:23 290:18 291:6
  304:19 346:14,16
**November-07 (1)**
315:11
**number (10)**
238:3 242:16,18
  243:4 251:10
  281:11 296:20
  300:21 302:24
  303:4
**numbers (1)**
321:23
**numerous (3)**
240:17 246:17,19

——————————
**O**
——————————

**object (1)**
259:13
**objection (26)**
258:14 259:21 266:10

267:15,23 271:22
273:7 277:10 281:2
282:5,10,18 292:3
292:24 294:9 295:5
297:6 299:23 302:6
307:3,16 317:12
319:4,8 320:5
334:16
**obligation (2)**
285:22,23
**obligations (3)**
280:24 281:7 311:23
**obstruction (1)**
258:14
**obtains (1)**
259:10
**obviously (2)**
244:18 269:17
**occasional (1)**
260:25
**occasions (1)**
246:18
**occurred (2)**
245:15 289:20
**October (2)**
304:18 324:11
**October-07 (1)**
315:9 347:17
**offer (5)**
259:10,12,19,23
260:3
**offerings (1)**
250:22
**offers (9)**
250:19 262:15,22,25
263:10,12,17,21
266:4
**office (1)**
337:8
**offices (1)**
236:10
**Oh (2)**
242:13 338:20
**okay (28)**
239:20 243:20 256:20
258:11,16 264:20
273:4 278:21
281:17 285:19
286:17 288:23
290:4 291:6 292:7
294:13 296:22
303:18 307:20
308:9 310:9 313:6
313:16 323:5,15
325:7 342:23
343:21
**once (2)**
246:18,23
**ones (1)**

333:24
**opened (1)**
289:2
**operate (1)**
329:21
**operating (2)**
293:7 310:4
**operation (4)**
275:7,15,23 310:13
**operations (1)**
304:7
**opinion (9)**
250:24 256:11 264:25
265:23,23 270:11
270:16 294:24
312:9
**opportune (1)**
248:12
**opportunity (2)**
265:25 266:20
**options (1)**
248:5
**orally (1)**
254:15
**order (5)**
263:3,7 271:11
321:24 329:15
**ousted (1)**
259:17
**outcome (1)**
345:19
**outstanding (8)**
242:14,21 281:7
307:15 314:4,8
333:18 334:8
**owe (5)**
318:18,21,22 334:19
334:21
**owed (10)**
242:14 305:8,12,14
306:15 320:2,9,14
334:9 336:23

─────────────
P
─────────────
**P (2)**
237:2,2
**Paces (3)**
322:24 323:3 325:2
**packages (1)**
254:7
**page (29)**
276:19,20 286:11,15
288:8 296:23,24
298:10 303:19
316:19 318:7
319:18 320:19
321:3,16,19,20,22
321:25 322:4 323:8

324:13,15 325:10
325:11 346:3,9
347:3,23
**pages (2)**
253:12 276:19
**paid (15)**
291:15 305:7 307:2,8
307:15 321:8
322:11 330:15,21
331:2,6,10,24
337:25 340:10
**Palm (69)**
241:4,12 242:24
258:21 274:9,15
276:6,11 277:2
279:17 281:6
288:12,16 298:21
300:7,16,25 301:20
304:16 307:10
308:23 309:21,25
310:4 312:25
313:18 314:13,16
314:18,20,22,24
315:2,4,6,8,10,12
315:14,16,20 316:9
317:8 318:18
320:10 322:22
325:21 326:22
327:10,14 328:16
329:11 332:20
335:9,17,22 346:11
347:5,6,7,9,10,11
347:12,14,15,16,18
347:20
**papers (2)**
326:17 341:8
**paragraph (14)**
298:10,13,16,25
300:3,12,18,21
301:6,15 303:20
304:5 308:7,18
**paragraphs (1)**
302:2
**Park (1)**
237:7
**part (1)**
323:4
**particular (3)**
261:5 293:12 320:12
**parties (1)**
345:17
**party (4)**
274:20 275:13 285:8
300:15
**pay (7)**
241:14,16 277:7,17
303:24 304:9 340:6
**payable (1)**
323:22

**paying (1)**
321:12
**payment (3)**
304:7 308:2 332:13
**payments (8)**
277:7 291:14 303:25
304:17,24 336:20
339:9,16
**payroll (1)**
322:23
**Peebles (1)**
267:10
**pending (1)**
331:22
**people (3)**
254:4 265:24 266:19
**percent (7)**
274:9,14,19,23 275:6
275:12,22
**performed (2)**
311:19,23
**period (1)**
336:21
**person (4)**
271:13 275:5,21
283:8
**personal (5)**
255:12,15 257:5
265:23 273:19
**personally (8)**
241:4,16 243:17
319:2,11 332:23
335:21 336:12
**Peter (12)**
237:9 238:16 256:23
277:24 308:10
324:4,5,9 333:2
337:9 341:4,8
**Pg (1)**
348:6
**Pineiro (2)**
237:22 238:10
**place (6)**
259:15 260:13 262:14
266:9 290:10
304:14
**plaintiff (3)**
235:6 237:6 238:18
**plaintiff's (3)**
308:22 309:3,20
**planning (1)**
341:23
**please (21)**
238:14,23 239:14,17
272:17 286:15
287:21 288:9
290:16 296:11
298:2 305:18 308:8
310:17 314:12

**paying (1)**
317:13 324:12
325:20 331:15
335:9 337:16
**pledge (3)**
274:8,8
**point (4)**
248:18 253:4 302:17
326:21
**Pomar (10)**
245:11,11,24 246:16
246:21 280:5,16
289:21 291:7 294:6
**pool (2)**
272:3,6
**Porter (2)**
237:5 238:17
**positive (2)**
333:9,12
**possible (3)**
250:25 251:6 266:20
**possibly (4)**
268:18,19 269:19
328:13
**postpone (2)**
263:21,24
**postponement (1)**
263:14
**potential (4)**
270:21 271:10 272:4
272:7
**Power (4)**
281:22 282:9 283:4
283:11
**practical (1)**
274:13
**predict (1)**
269:2
**preparation (1)**
326:12
**prepare (1)**
316:4
**prepared (2)**
316:6 326:9
**present (3)**
237:20 266:16 309:18
**presently (4)**
309:15,16 330:3,4
**presumptions (1)**
268:25
**prevent (1)**
308:20
**previous (1)**
256:7
**previously (5)**
253:14 291:16 318:23
323:21 339:17
**price (17)**
250:25 251:6 253:3

258:24 259:7
266:15,21 267:2,22
268:4,6,16 269:6,10
269:16 271:20
272:8
**principal (3)**
297:23 305:8 319:22
**prior (17)**
239:24 240:23 245:19
248:19 249:9,12
256:8 279:8 281:21
285:4,14 313:11,16
335:10,14 339:18
343:3
**privilege (1)**
290:24
**probably (5)**
242:9 263:19 265:2
321:23 332:11
**procedure (1)**
320:12
**proceed (1)**
289:5
**process (26)**
247:15 250:8 251:25
254:25 256:17
260:6,10,12,15,21
260:23 261:3,6,20
261:23,25 262:5,8
264:12,23 265:4
267:14 272:13
273:11 275:8,24
**produce (1)**
261:21
**produced (1)**
257:2
**production (1)**
257:17
**productions (1)**
257:12
**Professional (1)**
236:13
**progress (1)**
250:15
**promise (11)**
243:14,17,20 244:2,8
244:15,17 245:5,7,8
245:9
**promised (1)**
312:10
**promises (2)**
311:10,15
**promissory (1)**
336:2
**property (34)**
249:16,22 250:3,9,13
250:16 251:24
254:5 256:3,10
258:18 262:12

268:17 269:22
270:2,9,14 272:14
272:21 273:6,18,22
274:10,15 279:17
281:6 307:10
327:11,15 329:11
343:13,19,23 344:2
**proposal (1)**
291:7
**proposing (1)**
264:11
**prospective (2)**
254:6 301:9
**provide (1)**
254:8
**provided (3)**
250:7 282:17 322:21
**providing (1)**
332:22 333:3
**provision (1)**
286:18 303:20,23
**Public (4)**
236:16 239:4 345:8
348:25
**purchase (6)**
271:11 296:6 297:18
300:24 301:9
302:18
**purchaser (1)**
271:10
**purchasers (5)**
250:18 254:6 270:22
272:4,7
**purpose (2)**
332:13,19
**pursuant (2)**
261:3 334:15
**put (5)**
244:20 245:14 281:18
308:16 338:3
**putting (1)**
247:4
**p.m (2)**
310:22 344:12

_____
**Q**
**question (61)**
239:16 243:11 251:3
259:13,22 260:2,7
262:4,9 265:15
266:12 267:16
268:14 269:4,21
270:15 271:24
272:2,17,20 274:16
275:3 277:15
278:19 281:3 282:7
282:20 284:2
287:14 289:7,11
293:24 297:8 299:2

299:3,9,12,25
300:10,19 301:5
302:8,13 309:9
311:25 312:4,7,12
328:6 329:20,23
330:6 331:5,9,13,23
332:5 338:23
340:19 341:7 343:7
**questions (6)**
261:14 313:23 328:21
343:6,12 344:6
**quote (1)**
256:12

_____
**R**
**R (2)**
237:2 345:2
**rate (2)**
305:12,14
**reaction (1)**
248:6
**read (9)**
252:13 253:17 254:11
254:12 255:4
272:16,18 305:2
348:6
**reads (3)**
304:5 308:19 348:6
**really (3)**
252:23 267:25 331:12
**Realtime (1)**
236:15
**reask (1)**
275:17
**reason (20)**
240:7 252:4 264:15
268:10 283:12
298:23 299:4,10,14
299:22 300:8,17
301:2,12,16,23
302:3,9 326:19
348:6
**reasonably (1)**
261:8
**reasons (2)**
246:25 329:9
**recall (56)**
241:6 243:24 245:22
247:18,21,25
248:22 249:17,18
252:13,14,16,19
253:24 254:25
255:3,6 256:4
262:16,18 264:11
277:20 278:9
279:11 284:21
285:12 287:4
288:23 289:8
291:22 296:4,9

303:13 306:6,7,8
319:2,10,16 321:8
321:12 322:10,14
322:21 327:24
328:3,14,20 329:4,9
329:12 340:11
342:17,23 343:14
343:16
**recalled (2)**
319:5,9
**receipt (1)**
262:21
**receivable (5)**
317:20,24 318:3
322:3 325:17
**Receivables (2)**
317:14 325:9
**receive (1)**
260:24
**received (8)**
251:17,19 259:19
263:13 275:13
306:24 330:18
331:8
**receiver (25)**
256:16 259:14,17
261:4 263:2 264:7
272:12 273:2,5
310:5,8,13 311:3,7
311:11,14,22 313:4
313:8,17,25 326:11
329:15,17 344:2
**receivership (1)**
343:25
**receiving (2)**
263:17,20
**Recess (4)**
302:25 312:19 331:18
337:19
**recipient (1)**
306:5
**recognize (5)**
288:6 310:23 311:2
315:23 316:2
**recollection (6)**
242:2 249:4 288:19
289:10,14 317:7
**recommendation (1)**
245:2
**recommending (2)**
254:24 264:11
**record (15)**
256:15 272:18 290:23
302:24 303:5
312:15,18,22
331:17,21 337:16
337:18,22 344:11
345:14
**records (2)**

316:8 336:15
**recover (1)**
268:6
**redacted (2)**
290:20,24
**reduce (1)**
272:3
**reducing (1)**
272:6
**refer (1)**
282:22
**referring (2)**
285:2 298:13
**reflected (1)**
311:8
**refresh (3)**
288:19 289:9 317:7
**refreshed (2)**
289:14,16
**regard (2)**
270:17 294:17
**regarding (4)**
300:16 301:8 310:13
328:16
**Regions (3)**
293:17,22 294:2
**Registered (2)**
236:13,14
**reimbursements (1)**
330:19
**relate (1)**
318:15
**related (2)**
300:15 345:17
**relied (1)**
280:16
**relief (1)**
308:20
**remainder (1)**
340:3
**remained (1)**
249:2
**remedies (7)**
279:22 280:13,14,19
294:7,22,25
**remember (13)**
240:2,3 241:11,21
245:23 247:12,22
248:2 251:14 270:6
281:22 303:14
342:24
**remitting (1)**
288:16
**renovate (1)**
244:2
**renovation (8)**
243:15,22 244:11,18
244:21,24 245:14

246:6
renovations (10)
245:7,17,25 246:2,17
246:23 247:2,14,23
249:8
repayment (5)
326:7 327:3 332:12
332:15 336:22
repayments (1)
329:3
repeat (2)
267:16 277:14
Rephrase (1)
338:23
rephrasing (1)
294:11
replacement (1)
286:20
report (1)
254:8
Reported (1)
235:23
reporter (9)
236:13,14,15,16
238:12,23 317:22
319:6 330:23
Reporting (2)
238:11,13
reports (3)
260:24,25 261:7
represent (5)
246:16 317:2,17,18
326:15
representatives (1)
311:15
representing (1)
335:3
represents (1)
324:23
request (3)
257:2,17 281:19
requested (1)
300:22
REQUESTS (1)
347:21
required (2)
286:19 303:24
reservations (1)
246:4
reserve (1)
245:3
resolve (1)
252:2
respect (6)
302:2,11 328:12
335:5 340:13
343:18
responsibilities (1)

259:17
responsibility (1)
261:22
responsible (2)
288:12 307:25
responsive (1)
257:17
resumed (1)
239:3
resuming (1)
288:16
retain (1)
340:9
retract (2)
244:16 251:8
revenue (2)
245:16 246:5
revenues (2)
246:14 247:10
review (9)
240:25 298:8 303:21
306:4,12 308:6
316:11,17 323:18
reviewed (3)
240:22 241:2 289:3
right (21)
242:25 254:19 260:17
262:11 264:19
278:24 283:10
286:4 293:4 294:16
299:8 303:10
308:15,22 309:4
319:21 323:7 331:8
339:8,11 342:14
RMR (2)
235:24 345:24
Robert (1)
276:24
Rock (3)
268:12 278:17 289:4
role (4)
278:12,19 297:17,21
rooms (11)
243:23,24 244:2,12
244:19,20,22
245:14 246:7,8
247:5
Rosen (5)
340:20,21,22,22
341:15
Rosenblatt (1)
310:10
roughly (4)
241:22 242:22 248:23
339:21
Royal (69)
241:4,12 242:24
258:21 274:9,15
276:5,11 277:2

279:17 281:6
288:12,16 298:21
300:6,16,25 301:20
304:16 307:10
308:23 309:21,25
310:4 312:25
313:18 314:13,15
314:18,20,22,24
315:2,4,6,8,10,12
315:14,16,20 316:9
317:8 318:18
320:10 322:22
325:21 326:22
327:10,14 328:16
329:11 332:20
335:9,17,22 346:11
347:5,6,7,9,10,11
347:12,14,15,16,18
347:20
RP (74)
287:23,24 288:2,2,9
290:18,22 296:17
296:18,19,21,21
314:15,15,17,17,19
314:19,21,21,23,23
314:25,25 315:3,3,5
315:6,7,8,9,10,11
315:12,13,14,15,16
315:17,18 316:21
318:8 319:19
320:19 321:24
323:9 324:16 325:6
346:14,14,16,18,19
346:19 347:5,6,7,7
347:8,8,9,10,11,11
347:12,12,13,13,14
347:15,16,16,17,17
RPR (2)
235:24 345:24
RQ (1)
256:23
rules (1)
239:11

_____
S
_____

S (2)
237:2,16
sale (13)
247:14 263:5 266:9
266:15 267:18,22
273:14,16 296:6
297:18 308:23
309:20 343:13
sales (23)
250:8,25 251:6
256:17 260:6,10,12
260:15,21,22 261:6
262:7 266:21 267:2
267:13 268:16

269:6,10,16 272:13
275:8,16,24
satisfy (2)
280:24 281:7
saved (3)
257:25 258:2,6
saw (2)
313:9 326:16
saying (2)
261:17 268:2
says (1)
325:11
scrolling (1)
278:2
search (1)
258:5
searched (2)
257:21,21
second (10)
278:7 288:8 296:23
296:24 312:15
318:7 320:19 321:3
323:8 324:15
section (2)
286:16 319:19
see (35)
257:11,11,14,24
258:2 259:23
260:14 265:12,24
276:21 288:14
298:16 301:10,21
303:20 304:4,10
305:4 308:24
316:21,23 317:14
318:9 319:19
320:20,22 321:6
322:2 323:9,16
324:16 325:8 326:3
337:12 342:10
seek (1)
280:13
seeking (3)
271:2,5 291:11
Seeks (1)
277:11
seen (10)
288:3 291:4 298:6
306:3,10,14,20,21
313:3 325:24
sees (1)
261:7
sell (13)
247:7,9 248:10,13
249:16,21 258:18
258:21 262:12
268:3,6 270:9,14
send (1)
291:19
senior (6)

273:25 276:6,11
277:2 305:3 346:11
sense (3)
244:19 265:10 267:20
sent (7)
253:14,15 254:7,20
254:21 308:16
316:14
sentence (2)
288:14 305:2
separately (1)
328:11
September (1)
306:24
September-07 (2)
315:7 347:16
sequence (1)
244:12
sequences (1)
263:18
series (1)
287:25
serve (1)
258:9
served (2)
247:4 248:11
server (3)
257:7,24 258:10
service (1)
304:10
servicer (1)
288:10
services (3)
322:21 332:23 333:4
session (1)
303:8
set (19)
262:23 263:10 286:22
287:2,11,17 288:20
290:5,12 306:14
311:11,16 317:8
341:14,22,24
342:17 345:12,22
settlement (21)
277:21,22 278:12,16
279:2,6,10,12,16
280:23 281:5
282:23 284:11
285:15,21 293:13
298:20 301:19
303:17 307:21
317:10
Seventh (3)
236:11 237:14 238:8
sheet (39)
314:14,16,18,20,22
314:24 315:2,4,6,8
315:10,12,14,16,21
316:20 318:8

Page 11

320:19 322:5 323:6
323:8 324:12 325:5
325:22 332:12
335:18 339:22
347:5,6,8,9,10,11
347:13,14,15,17,20
348:2
**sheets (5)**
316:3 317:4 327:6,8
335:22
**shopping (1)**
333:25
**Shorecrest (2)**
244:3 249:8
**short (3)**
247:8,9 248:10
**shortfalls (2)**
241:15 332:21
**short-term (1)**
247:14
**show (3)**
248:21 281:16 308:4
**showed (1)**
254:2
**showing (1)**
278:6
**shows (1)**
322:13
**shy (1)**
324:20
**Sidley (3)**
236:11 237:12 238:20
**sign (1)**
276:25
**signature (4)**
276:19,21,23 348:20
**signed (9)**
281:25 282:4,9,25
283:18,21,24 284:7
284:9
**significant (2)**
249:7 300:6
**significantly (1)**
248:25
**signing (2)**
279:8 283:2
**similar (1)**
253:15
**single (1)**
254:18
**sit (2)**
309:5 311:18
**six (1)**
241:7
**smoke (1)**
299:6
**soft (3)**
296:5,25 297:3

**sold (1)**
268:20
**somewhat (1)**
261:5
**soon (1)**
260:13
**sorry (5)**
303:11 313:13 317:22
319:6 322:18
**sort (1)**
256:18
**source (1)**
295:4
**SOUTHERN (1)**
235:3
**speak (2)**
260:20 261:20
**speaking (1)**
260:19
**specialist (2)**
237:22 238:12
**specific (5)**
245:21 251:10,10
256:5 339:9
**specifically (2)**
247:24 306:13
**specifics (1)**
255:4
**speed (1)**
266:8
**Spencer (5)**
255:11 256:2,9,25
347:23
**Spent (1)**
340:5
**spoke (9)**
245:10 246:13 248:16
248:22 249:25
270:4 296:5 328:4
328:15
**spoken (3)**
251:16 254:4 256:13
**spread (2)**
325:22 347:20
**square (1)**
249:3
**ss (1)**
345:5
**stamp (1)**
310:21
**stamped (42)**
287:23 288:2 290:18
290:21 296:17,18
296:20 305:22,25
314:15,17,19,21,23
314:25 315:3,5,7,9
315:11,13,15,17
316:20 323:9

**324:16 325:6**
346:14,16,18,19,23
347:5,7,8,9,11,12
347:13,14,16,17
**start (4)**
238:2 249:15 263:20
303:3
**state (4)**
236:16 284:4 345:4,9
**stated (1)**
290:24
**statement (9)**
254:23 299:11 300:9
301:3,13,24 307:13
307:19 321:21
**statements (2)**
302:11 313:3
**STATES (1)**
235:2
**stay (1)**
263:6
**stipulate (1)**
313:2
**stipulation (12)**
310:18,20 311:8,12
311:16,20,24 313:7
334:18,23,23
346:25
**stop (1)**
294:6
**strong (1)**
244:17
**stronger (1)**
248:12
**strongly (1)**
299:6
**structure (1)**
342:12
**structured (1)**
341:22
**stuff (2)**
247:5 268:25
**subject (1)**
329:14
**submitted (2)**
290:2 326:17
**subpoena (1)**
258:9
**Subscribed (2)**
344:18 348:21
**sufficient (1)**
269:13
**Suites (2)**
244:6 249:9
**summer (1)**
261:10
**Sunday (1)**
326:18

**sure (11)**
263:9 278:22 285:20
291:24 301:14
302:21 307:24
312:16 318:16
340:8 341:8
**swear (1)**
238:23
**sworn (4)**
239:3 344:18 345:13
348:21

**T**

**T (11)**
235:5,17 236:10
239:2,2 344:16
345:2,2,11 346:5
348:4
**take (17)**
239:14,14 260:12
280:5 294:14
298:10 300:3
302:20 303:16,19
306:9 308:7 318:7
320:18 325:4
331:14 337:11
**taken (6)**
294:20 302:25 312:19
313:4 331:18
337:19
**takes (1)**
266:9
**talked (2)**
240:11 279:12
**talking (2)**
339:8,12
**tape (3)**
238:3 302:23 303:4
**Tarr (15)**
297:11,13 298:5,13
298:18,24 299:10
300:4,9,12,18,21
302:4,15 346:21
**tell (4)**
250:14 251:13 252:10
306:23
**telling (1)**
245:24
**term (4)**
247:8,9 248:10
261:25
**termination (3)**
296:6,25 297:3
**terms (3)**
261:16,17 279:2
**testified (3)**
239:5 255:11 304:12
**testify (1)**
240:8

**testimony (7)**
239:24 240:5 248:21
294:10 342:20
343:3 345:15
**text (2)**
253:13 290:25
**Thank (3)**
258:7 285:17 308:17
**Thanks (1)**
286:14
**thereabouts (1)**
248:24
**thing (2)**
288:24 301:4
**things (4)**
311:19,23 322:25
342:11
**think (26)**
239:22 248:16 250:25
252:4,6 255:13
256:7 263:21 265:4
265:12,15,17,19
266:3,8 281:11,14
282:16 285:18
286:3 304:12
306:13 319:4,9
329:8 336:19
**thinking (1)**
269:18
**third (1)**
319:18
**thought (5)**
248:24 264:14 289:16
289:19,25
**three (1)**
328:15
**tighter (1)**
271:8
**time (66)**
239:13 240:3,12
241:3 242:6 243:15
248:12,14,16,18,19
248:22 249:6,25
252:24 255:10
258:23 261:5
263:18 270:4 274:4
277:20 279:15
280:22 281:4
282:25 283:17,20
283:24 284:6,9,16
286:3 287:3,18
291:25 292:8
293:11,12 296:4
298:18 300:4,13,22
300:24 302:19,22
303:4 308:5 309:2
309:18 310:21
312:17,21 313:24
317:9 318:24

TSG Reporting - Worldwide    877-702-9580

331:16,20 337:17
337:21 339:7,14
342:3 344:9,12
times (4)
246:20 248:4 328:14
338:14
timing (1)
252:18
titled (1)
277:21
today (9)
240:9 249:3 264:6
309:5 311:18 326:4
335:23 342:21
343:11
today's (1)
344:10
told (5)
255:7 256:2,8 283:15
294:6
top (1)
310:21
topics (1)
240:18
total (4)
242:5,24 326:20
339:23
tours (1)
253:16
Tower (1)
244:3
town (1)
253:10
transaction (1)
249:22
transcript (2)
240:22 348:2
transfer (12)
263:5 274:13,25
275:12,14 283:5
326:20 327:17
328:12,16 335:10
335:24
transferred (1)
327:2
transferring (2)
274:18,23
transfers (4)
328:9,22,25 337:4
transmission (3)
290:25 296:16 346:18
true (2)
256:21 345:14
trust (19)
338:7,8,9,10,13 339:2
339:16 340:10,13
341:2,5,10,14,17,22
341:23,24 342:5,18

trustee (2)
341:11,12
truthful (2)
298:24 299:11
try (1)
257:14
trying (7)
249:15,21 262:10
266:19 268:24
269:15 289:15
TSG (2)
238:10,13
Tuesday (1)
235:19
turn (3)
270:5 276:18 324:11
turned (1)
248:25
turning (1)
249:9
two (13)
248:15 250:9 251:13
254:16 256:8
262:19 291:24
292:2,4,6 320:2,9
320:15
type (1)
302:10

_____
U
U (1)
239:2
unchanged (1)
249:2
uncomfortable (1)
245:4
understand (17)
239:16,20 257:9,20
261:18 262:10
264:21 271:6,9
278:25 286:19
290:11 323:20
329:24 331:4
338:24 342:11
understanding (40)
242:4,20,23 244:10
261:24 262:13
263:16 264:3 269:4
273:4,24 274:7,12
274:17 277:6,13,16
279:20,25 280:4,9
282:25 283:10,14
284:12 288:15
293:6,10 294:19
295:24 297:4 305:6
305:11 307:2,14
309:24 313:21
326:5 333:6 339:8
undo (1)

323:14
UNITED (1)
235:2
untruthful (6)
299:15 300:9,18
301:3,13,24
update (8)
250:10,11 251:17,19
253:8,12,14 255:2
use (3)
255:16 281:10 321:23
uses (1)
257:23

_____
V
v (1)
348:3
Vague (7)
259:21 266:11 267:24
282:6,10 295:6
302:7
valid (1)
284:8
value (7)
256:2,10 266:2
267:13,18 269:15
269:22
various (1)
240:18
verify (1)
317:3
versus (2)
238:5 245:2
video (2)
237:22 238:11
VIDEOGRAPHER...
238:2,22 302:22
303:3 312:17,21
331:16,20 337:17
337:21 344:9
videotaped (3)
235:16 236:9 238:4
views (1)
261:15
voice (1)
256:18
voicemail (1)
298:12
VOLUME (1)
235:14
vs (1)
235:7

_____
W
Wachovia (40)
245:12 247:23 248:6
278:11,25 279:6,21
280:6,13,17,18

285:25 286:7,23
287:2,11,17 288:7
288:10,11,17,21
289:14 290:5,13
291:7 294:7,15,21
294:25 295:11,25
304:17 305:14
306:24 307:11,19
316:22 317:5,9
want (4)
251:25 303:8 324:13
343:2
wanted (8)
262:17 278:21 289:5
289:21,22 290:2
291:13,13
wants (1)
242:11
Ward (1)
285:10
warrant (1)
264:22
wasn't (7)
244:11 246:20,20
247:3 256:5 331:9
340:9
way (7)
260:16,21 309:11
312:6 322:25
335:25 345:19
ways (2)
273:13 295:20
week (2)
239:23 240:19
weeks (6)
250:9 251:13 254:16
262:19 263:20
313:15
Welcome (1)
239:10
went (6)
239:11 257:24,25
289:18 293:19
329:8
weren't (1)
246:22
West (3)
322:24 323:3 325:2
WHEREOF (1)
345:21
wherewithal (1)
271:14
wife (3)
330:13 342:8,15
willing (1)
260:5
wire (3)
335:24 337:4 339:6
witness (13)

238:18,23 239:3
260:17 278:24
320:23 321:2
338:20 344:6
345:11,15,21 346:3
word (4)
244:16 245:5,8,9
words (1)
244:16
work (2)
243:15 291:14
working (2)
279:10 302:17
works (1)
322:17
worse (2)
248:25 270:6
worth (5)
269:14,17 333:7,9,12
wouldn't (3)
266:23 280:2 287:13
write (1)
251:22
writes (7)
288:15 298:18 300:4
300:12,22 301:6,15
written (3)
282:14 327:9,13
wrote (1)
251:23

_____
X
X (1)
346:2

_____
Y
Y (1)
239:2
Yeah (7)
264:11 294:11 306:7
306:7,20 307:5
334:17
year (5)
241:9,10 249:20
270:12 271:19
years (6)
248:15 249:18 291:24
292:2,4,6
York (14)
235:3,18,18 236:12
236:12,17 237:8,8
237:15,15 238:8,8
345:4,9

_____
$
$1.47 (1)
306:23
$122,000 (1)

Page  13

325:14
$14,000 (1)
324:20
$180 (1)
243:6
$2.72 (1)
321:6
$200 (2)
269:18,23
$200,000 (1)
322:11
$220 (1)
256:12
$3,500 (1)
322:7
$3.8 (2)
326:21 339:22
$7 (2)
321:10,13
$9,899,909.50 (1)
318:13

_____ 0 _____
0007499 (1)
306:2
0007500 (1)
306:2
001462 (1)
325:6
009232 (1)
296:21
009234 (1)
296:21
009426 (1)
290:22
011250 (1)
316:21
011251 (1)
318:8
011252 (1)
319:19
011258 (1)
321:24
011259 (1)
320:19
011262 (1)
323:9
011265 (1)
324:16
011975 (1)
288:2
011976 (2)
288:2,9
07 (13)
248:23 249:10 315:21
316:20 320:18
321:14,14,22 322:5
322:10,11 323:5

324:11
08 (4)
235:6 315:22,22
325:5

_____ 1 _____
1 (6)
238:3 283:6 301:17
302:24 308:4,7
10 (9)
235:19 236:5 281:11
281:18,20 286:11
286:15 301:6 348:3
10th (1)
238:9
10:07 (2)
236:6 238:9
100 (1)
276:19
10019 (1)
237:15
10022-4690 (1)
237:8
11 (2)
301:15 302:3
11th (1)
345:22
11:21 (2)
302:23,25
11:32 (2)
303:2,5
11:45 (2)
312:18,19
11:47 (2)
312:20,22
11241 (2)
314:21 347:9
11243 (2)
314:22 347:10
11244 (2)
315:5 347:15
11246 (2)
315:6 347:15
11247 (2)
314:17 347:7
11249 (2)
314:17 347:7
11250 (2)
314:15 347:6
11252 (2)
314:15 347:6
11253 (2)
315:3 347:13
11254 (2)
315:4 347:13
11255 (2)
314:25 347:12
11257 (2)

315:2 347:12
11258 (2)
314:19 347:8
11260 (2)
314:20 347:8
11261 (2)
314:23 347:11
11263 (2)
314:24 347:11
11264 (2)
315:9 347:17
11265 (2)
315:10 347:18
11975 (2)
287:23 346:14
11976 (2)
287:24 346:14
12:14 (2)
331:17,18
12:16 (2)
331:19,21
12:23 (2)
337:18,19
12:28 (2)
337:20,22
12:31 (1)
344:12
12:33 (1)
344:10
123 (1)
242:19
13 (1)
347:4
14 (1)
242:9
1419 (1)
315:17
1420 (1)
315:18
1462 (1)
315:15
1463 (1)
315:16
15 (3)
242:9 336:22 346:17
15th (1)
326:23
17 (4)
284:23 305:22 346:15
346:23
17198 (1)
235:25
18 (4)
276:5,10 346:11,24
180 (1)
243:9
19 (2)
290:18 346:16

19th (2)
291:6 313:7

_____ 2 _____
2 (4)
287:23 298:10 303:4
346:14
20 (4)
276:3,4,9 346:10
200 (2)
258:22 259:7
2005 (4)
249:23 276:5,10
346:11
2006 (1)
247:17
2007 (11)
270:6 274:2 287:23
290:18 304:19,19
304:19 318:19
321:9 346:14,16
2008 (33)
235:19 236:5 238:9
272:11,25 273:18
273:22 296:16,18
300:6 301:17
304:20 305:22
307:22 326:23,23
330:17 331:3,7,11
332:2,3,4 335:11
336:21,22 344:19
345:22 346:18,19
346:23 348:3,22
2009 (4)
259:3,6 320:24
323:10
2012 (1)
324:16
21 (6)
287:21,22,25 346:13
346:22 347:19
22 (6)
290:16,17,20 296:12
346:13,15
220 (1)
256:3
227 (3)
314:12,13 347:4
23 (5)
296:13,14,15,20
346:17
239 (1)
346:5
24 (5)
242:19 298:3,4
305:18 346:21
25 (6)
242:13 305:19,20,21
305:25 346:22

256 (1)
347:23
26 (4)
310:17,18,20 346:24
27 (1)
315:19
276 (1)
346:10
28 (10)
296:16,18 325:20,21
331:25 335:8
339:10 346:18,19
347:19
287 (1)
346:13
29 (1)
336:21
29th (10)
326:23 330:17 331:7
331:10 332:3,4
335:11,14 339:18
339:19
290 (1)
346:15
296 (1)
346:17
298 (1)
346:20

_____ 3 _____
3 (1)
326:20
3.6 (1)
303:20
3:45 (1)
310:22
305 (1)
346:22
31 (1)
300:6
310 (1)
346:24
314 (1)
347:4
325 (1)
347:19
343 (1)
346:6
37 (1)
242:22
399 (1)
237:7

_____ 4 _____
4 (2)
346:10,20
4319 (1)
235:6

| | |
|---|---|
| **5** | 296:18 346:19 |
| **5 (1)** | **9234 (2)** |
| 298:10 | 296:19 346:20 |
| **5-19-08 (1)** | **9426 (2)** |
| 310:22 | 290:18 346:16 |
| **50 (1)** | |
| 334:13 | |
| **5136 (1)** | |
| 315:13 | |
| **5137 (1)** | |
| 315:14 | |
| **5180 (1)** | |
| 315:11 | |
| **5181 (1)** | |
| 315:12 | |
| **6** | |
| **6 (2)** | |
| 298:16 302:2 | |
| **6.3.2 (1)** | |
| 286:16 | |
| **7** | |
| **7 (2)** | |
| 300:3 303:19 | |
| **7th (1)** | |
| 306:24 | |
| **71 (9)** | |
| 317:15,20,21 322:2 | |
| 322:12,22 334:3,9 | |
| 334:11 | |
| **7499 (2)** | |
| 305:22 346:23 | |
| **7500 (2)** | |
| 305:23 346:23 | |
| **7533 (2)** | |
| 315:7 347:16 | |
| **7534 (2)** | |
| 315:8 347:16 | |
| **787 (3)** | |
| 236:11 237:14 238:7 | |
| **8** | |
| **8 (1)** | |
| 300:12 | |
| **8th (1)** | |
| 306:25 | |
| **9** | |
| **9 (7)** | |
| 278:3,5,13 284:12 | |
| 285:21 300:21 | |
| 303:17 | |
| **9th (1)** | |
| 274:2 | |
| **9232 (2)** | |
| 296:17 346:19 | |
| **9233 (2)** | |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                        :
                                                                        :
GUY T. MITCHELL and ROYAL PALM SENIOR                                   :
INVESTORS, LLC,                                                         :
                                                                        :
                                                                        :
                         Plaintiffs,                                    :
                                                                        :          Index No. 08 Civ. 4319 (JES)
            v.                                                          :
                                                                        :
CARBON CAPITAL II, INC.,                                                :
                                                                        :
                         Defendant.                                     :
                                                                        :
                                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - x


**INVOLUNTARY PLAINTIFF ROYAL PALM SENIOR INVESTORS, LLC'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT CARBON CAPITAL II, INC.'S MOTION TO DISMISS**


Phillip Shatz
McCabe & Mack LLP
63 Washington Street
P.O. Box 509
Poughkeepsie, New York 12602-0509
Telephone: (845) 486-6800

*Attorneys for Involuntary Plaintiff*
*Royal Palm Senior Investors, LLC*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 2

I.      The *Hotel 71 v. Mitchell* State Action And The Appointment Of The Honorable
        Albert M. Rosenblatt As Receiver ........................................................................... 2

II.     Carbon's Loan To Royal Palm Senior Investors, LLC ............................................. 2

III.    Carbon Has Taken Inconsistent Positions Regarding The Collateral ....................... 4

IV.     The Agreement Reached At The June 16 Hearing .................................................... 5

ARGUMENT ........................................................................................................................ 7

I.      The Standard of Review ........................................................................................... 7

II.     RPSI Has Pleaded Carbon's Failure To Comply With Numerous Provisions Of UCC
        Article 9 ................................................................................................................. 7

        A.      RPSI Is An "Aggrieved Person" And Has Standing to Raise Carbon's
                Noncompliance With Article 9 ...................................................................... 8

        B.      RPSI Has Stated A Claim That Carbon Failed To Comply With UCC
                Sections 9-620 and 9-621 In Three Distinct Ways ......................................... 9

                1.      There Was No Proper Satisfaction Under UCC Sections 9-620(a) and
                        (c) ..................................................................................................... 9

                2.      RPSI Expressly Refused To Consent To Carbon's Taking After
                        Default And Thus There Was No Acceptance Under Section 9-620 ......... 12

                3.      RPSI Has Stated A Claim That Carbon Failed to Provide The Notice
                        Required Under UCC Sections 9-620(d) and 9-621 ............................... 14

        C.      The Settlement Agreement Is Merely A Disguised Security Device ................. 16

        D.      The Settlement Agreement Works An Improper Waiver Of RPSI's Equitable
                Right Of Redemption And Carbon Failed To Comply With The Redemption
                Procedure Of Section 9-624(c) ................................................................... 17

III.    The Purported Conveyance To Carbon Of  RPSI's Interests In The Collateral Is
        Fraudulent ............................................................................................................ 18

        A.      RPSI's Debtor & Creditor Law Section 273-a Claim ...................................... 19

                1.      RPSI Has Adequately Pleaded A Section 273-a Claim ........................... 19

i

**TABLE OF CONTENTS**
**(cont)**

                                                                                              Page

        2.      RPSI Has Adequately Pleaded The Fraudulent Conveyance Was
                Made For Less Than Fair Consideration ............................................................. 20

    B.      RPSI Has Adequately Pleaded a Debtor & Creditor Law Section 276 Claim ................. 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bausch & Lomb Inc. v. CIBA Vision Corp.*,
  No. 07-CV-6575-CJS, 2008 WL 2827541 (W.D.N.Y. July 21, 2008)......................................7

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ...............................................................................................7

*Conley v. Gibson*,
  355 U.S. 41 (1957) ....................................................................................................7

*Coxall v. Clover Commercial Corp.*,
  4 Misc.3d 654, 781 N.Y.S.2d 567 (Civ. Ct. 2004) ...................................................11

*Dixie Yarns, Inc. v. Forman*,
  906 F. Supp. 929 (S.D.N.Y. 1995) ......................................................................23, 24

*Eberhard v. Marcu*,
  530 F.3d 122 (2d Cir. 2008) ....................................................................................19

*Gafco, Inc. v. H.D.S. Mercantile Corp.*,
  47 Misc.2d 661 (N.Y.C. Civ. Ct. 1965)..................................................................19

*Hotel 71 Mezz Lender, L.L.C. v. Carbon Capital II, Inc.*,
  No. 601720/08 (Ramos, J.)....................................................................................1, 5

*Hotel 71 Mezz Lender, LLC v. Falor*,
  No. 601175/2007 (Sup. Ct., N.Y. County, Ramos, J.) ........................................passim

*In re AppliedTheory Corp.*,
  330 B.R. 362, 364 (Bankr. S.D.N.Y. 2005)............................................................22

*In re Checkmate Stereo and Electronics, Ltd.*,
  9 B.R. 585 (Bankr. E.D.N.Y. 1981) ........................................................................19

*In re Enron Corp.*,
  No. 01-16034, 2005 WL 3873890 (Bankr. S.D.N.Y. June 16, 2005) .......................9

*In re Schwab*,
  347 B.R. 726 (Bankr. D. Nev. 2006).......................................................................16

*In re Sharp Int'l Corp.*,
  302 B.R. 760 (E.D.N.Y. 2003) ...............................................................................20

*In re Silverman Laces, Inc.*,
  No. 01 Civ. 6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)............21, 22

*Indianapolis Morris Plan Corp. v. Karlen*,
   28 N.Y.2d 30, 268 N.E.2d 632 (N.Y. 1971) ..................................................7, 8, 11, 17

*Long Island Trust Co. v. Porta Aluminum, Inc.*,
   49 A.D.2d 579, 370 N.Y.S.2d 166 (2d Dep't 1975) ...............................................11

*Maher v. Alma Realty Co., Inc.*,
   70 A.D.2d 931, 417 N.Y.S.2d 748 (2d Dep't 1979) ...........................................7, 17

*Matter of Russo*,
   1 B.R. 369 (Bankr. E.D.N.Y. 1979) ..................................................................20

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
   910 F. Supp. 913 (S.D.N.Y. 1995) ....................................................................23

*Neshewat v. Salem*,
   365 F. Supp. 2d 508 (S.D.N.Y. 2005) ...........................................................20, 21

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003) ...............................................................11

*Orr v. Kinderhill Corp.*,
   991 F.2d 31 (2d Cir. 1993) .............................................................................19

*Pen Pak Corp. v LaSalle Natl. Bank*,
   240 A.D.2d 384 (2d Dep't 1997) .....................................................................23

*Peugh v. Davis*,
   96 U.S. 332 (1877) ...............................................................................7, 17, 18

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ...........................................................................19

*Superior Leather Co., Inc. v. Lipman Split Co., Inc.*,
   116 A.D.2d 796, 496 N.Y.S.2d 845 (3d Dep't 1986) ............................................21

*Wall Street Assocs. v. Brodsky*,
   257 A.D.2d 526 (1st Dep't 1999) .....................................................................23

## Statutes

N.Y. UCC § 1-203 ............................................................................................16

N.Y. UCC § 9-102(73) .......................................................................................16

N.Y. UCC § 9-109 .......................................................................................16, 17

N.Y. UCC § 9-109(a)(1) ....................................................................................16

N.Y. UCC § 9-109(a)(1), Comment 2 ...................................................................16

N.Y. UCC § 9-311(a) ........................................................................................15

N.Y. UCC § 9-602 ......................................................................................................... 9, 18

N.Y. UCC § 9-602(g) ......................................................................................................... 18

N.Y. UCC § 9-602(h) ......................................................................................................... 19

N.Y. UCC § 9-602(j) ......................................................................................................... 9

N.Y. UCC § 9-610(b) ..................................................................................................... 17, 18

N.Y. UCC § 9-610(c) ......................................................................................................... 18

N.Y. UCC § 9-615 ......................................................................................................... 18

N.Y. UCC § 9-620 ......................................................................................................... passim

N.Y. UCC § 9-620(a)(1) ..................................................................................................... 9

N.Y. UCC § 9-620(c) ..................................................................................................... 9, 10

N.Y. UCC § 9-620(c)(1) ..................................................................................................... 9

N.Y. UCC § 9-620(c)(2) ..................................................................................................... 10

N.Y. UCC § 9-620(d) ................................................................................................ 9, 14, 16

N.Y. UCC § 9-620, Comment 4 ......................................................................................... 10

N.Y. UCC § 9-620, Comment 5 ......................................................................................... 10

N.Y. UCC § 9-621 ......................................................................................................... passim

N.Y. UCC § 9-621(a) ......................................................................................................... 14

N.Y. UCC § 9-622 ......................................................................................................... 10

N.Y. UCC § 9-622(a)(1) ..................................................................................................... 11

N.Y. UCC § 9-622(a)(2) ..................................................................................................... 11

N.Y. UCC § 9-624 ................................................................................................... 7, 9, 17

N.Y. UCC § 9-624(c) ......................................................................................................... 17

N.Y. UCC § 9-625(a) ..................................................................................................... 8, 9

N.Y. UCC § 9-625(b) ......................................................................................................... 15

N.Y. UCC § 9-625, Comment 2 ......................................................................................... 8

NY Debt. & Cred. Law § 273-a ................................................................................. 18, 19, 20

NY Debt. & Cred. Law § 276 ........................................................................................ 18, 19, 22

UCC § 1-201(2) ........................................................................................................... 8

Involuntary Plaintiff Royal Palm Senior Investors, LLC ("RPSI") respectfully submits this memorandum of law in opposition to the motion by Defendant Carbon Capital II, Inc. ("Carbon") to dismiss RPSI's claims.

## PRELIMINARY STATEMENT

This lawsuit concerns Carbon's efforts to establish that it is the owner of the 100% membership interest Royal Palm Senior Investors, LLC ("RPSI") has in Royal Palm Hotel Property, LLC ("RPHP") (the "Collateral"). The Settlement Agreement relied upon by Carbon does not comply with the procedures and rules in the New York Uniform Commercial Code ("UCC"). The Settlement Agreement was executed by Mitchell while he was a defendant in the New York state court lawsuit entitled *Hotel 71 Mezz Lender, L.L.C. v. Falor, et al.*, No. 601175/07 (Ramos, J.) (the "*Hotel 71 v. Mitchell* State Action").

Carbon's basic position is that it did not have to follow the procedures set forth in UCC Section 9-620 to accept collateral in full or partial satisfaction of a debt because Carbon received the conveyance of the Collateral without giving *any value at all*. Carbon claims that because it took the Collateral without any credit to the debtor, the UCC does not apply to it. Carbon's position – that the conveyance allegedly effected by the Settlement Agreement is valid *because* it gave RPSI nothing for its interest in RPHP – is hollow.

Carbon also seeks to dismiss RPSI's adequately pleaded fraudulent conveyance claims under New York's Debtor & Creditor Law Sections 273-a and 276. Carbon moves to dismiss these fraud claims before the parties have engaged in discovery and despite the fact that, among other things, RPSI has pleaded that the Settlement Agreement was entered into with fraudulent intent and inadequate consideration. RPSI's Pleading ¶¶ 89-90, 99-101.

Carbon seeks to mask its conduct by taking flatly inconsistent positions depending on the forum and audience in its effort to somehow "shoehorn" its conduct into a remedy permitted by the UCC. For example, in the New York state court action entitled *Hotel 71 Mezz Lender, L.L.C. v. Carbon Capital II, Inc.*, No. 601720/08 (Ramos, J.) (the "*Hotel 71 v. Carbon* State Action") Carbon asserted in its opposition to Hotel 71 Mezz Lender, L.L.C.'s ("Hotel 71") Order to Show Cause seeking a preliminary injunction

1

that it "merely took possession" of the Collateral.  At other times, including in pleadings filed in this

Court as well as in numerous writings sent to RPSI and to Hotel 71, Carbon claims to own the Collateral.

Carbon's document, the Settlement Agreement, does not purport to give Carbon "mere possession" of the

inchoate Collateral; it purports to *convey* the Membership Interest to Carbon.  *See* Declaration of Nicholas

P. Crowell, served July 18, 2008 ("Crowell Decl."), Ex. 3 (Settlement Agreement §§ 3.2, 6.2.2).

## FACTUAL BACKGROUND

I.    **The *Hotel 71 v. Mitchell* State Action And The
       Appointment Of The Honorable Albert M. Rosenblatt As Receiver**

On October 23, 2007, in connection with the *Hotel 71 v. Mitchell* State Action, the State Court

authorized the sheriff to levy on Mitchell (as manager or as manager of the manager) to attach, pursuant

to CPLR § 6201, his interests in various LLCs, including Royal Palm Senior Investors, LLC and Royal

Palm Hotel Property, LLC.  Affirmation of Phillip Shatz, dated August 1, 2008 ("Shatz Affirm."), Ex. 1

(Order of Attachment).  On March 26, 2008, the State Court granted Plaintiff's motion to appoint former

New York Court of Appeals Judge Albert M. Rosenblatt as receiver (the "Receiver" or "Receiver

Rosenblatt") over all of the personal property of Mitchell (and the other judgment debtors), including all

of the contractual rights and membership interests that Mitchell owns in certain limited liability

companies and other entities.  *See* Shatz Affirm., Ex. 2 and 3 (orders dated April 2 and April 4, 2008

(collectively, the "Receivership Orders")).  Involuntary Plaintiff's Notice of Appearance, Response to

Pleadings, and Claims ("RPSI's Pleading") ¶ 30.  On April 21, 2008, the State Court entered judgment in

the amount of $52 million against Mitchell and four of the other defendants in that suit.  *Id.* ¶ 28.

Receiver Rosenblatt has taken over the management of the Royal Palm Hotel (the "Royal Palm" or the

"Hotel"), stopped the diversion of millions of dollars of cash out of the Hotel into Mitchell's accounts and

is attempting to maximize the value of the Hotel in order to sell it in a commercially reasonable manner

for the benefit of all creditors – including Carbon.

II.   **Carbon's Loan To Royal Palm Senior Investors, LLC**

On February 18, 2005, RPSI executed a promissory note made payable to Carbon evidencing a

mezzanine loan Carbon made to RPSI in the initial principal amount of $24.5 million.  *Id.* ¶ 36.  Carbon and Mitchell entered into a Settlement Agreement on October 24, 2007 – one day *after* Mitchell was served in New York with the Attachment Order in the *Hotel 71 v. Mitchell* State Action, which, among other things, applied to "any interest any of the Defendants[, including Mitchell,] may have in" RPSI and RPHP.  *Id.* ¶ 37.  Mitchell signed the Settlement Agreement as Manager on behalf of RPSI and as an individual guarantor.  *Id.* ¶ 38.

On March 25 and April 1, 2008, Carbon sent RPSI letters notifying RPSI that Carbon had deemed RPSI in default of the Settlement Agreement.  *Id.* ¶ 40.  Carbon now claims to own 100% of RPSI's interest in the Royal Palm Hotel by virtue of sending these letters pursuant to the Settlement Agreement, without any further legal process, foreclosure sale, or notice to any other party.  *Id.* ¶¶ 41-42.  The UCC requires, however, that the debtor actually accept – *after default* – the secured party's proposal to accept the collateral in satisfaction of the debt, and the debtor's acceptance must be authenticated after the default.  Carbon never obtained Mitchell's consent after it sent the March 25 and April 1 default letters.  Carbon's own pleadings acknowledge that Mitchell and RPSI rejected Carbon's efforts to seize control.  *Id.* ¶ 45.  The Settlement Agreement expressly waived any prior defaults "that would not have a material adverse impact on [RPSI's] ability to perform under the terms of this Agreement."  Crowell Decl., Ex. 3 (Settlement Agreement § 3.4).  The Settlement Agreement further provided that Carbon "waives, on a going forward basis, the covenant to pay all amounts due and payable under the Note as and when due and payable, other than the obligation to repay the Debt in its entirety on the Revised Maturity Date," and that, also on a "going forward basis," Carbon waives "as against [RPSI], only, any default or Event of Default that may now or hereafter occur solely on the part of Robert D. Falor or Geoffrey L. Hockman under the terms of the Guaranty."  *Id.* (Settlement Agreement §§ 3.4.1, 3.4.2).

UCC Section 9-620 provides the *only* method whereby a secured creditor may accept collateral in satisfaction of a debt.  Admitting that it did not even attempt to comply with the UCC, Carbon maintains that ownership of Collateral was conveyed to it "automatically."  As Carbon's counsel frankly stated at a State Court hearing on June 16, 2008 (the "June 16 Hearing"), Carbon and Mitchell had no intention of

3

following UCC Section 9-620's process, "[s]o none of the things you need to do to accept collateral in partial or full satisfaction of the loan exists." Shatz Affirm., Ex. 4 at 41:8-17. With consistent audacity, Carbon contends that its debt remains fully intact despite its supposed ownership of the Collateral. *See id.* at 41:18-23. In short, Carbon failed to comply with Section 9-620 of the UCC – it did not make a proposal to accept collateral in satisfaction of its debt and it did not secure any agreement after Carbon sent the March 25 and April 1 default notices.

### III.    Carbon Has Taken Inconsistent Positions Regarding The Collateral

Carbon simultaneously takes two entirely inconsistent positions with respect to the Collateral. On the one hand, Carbon improperly declares itself the owner of 100% of the Collateral through an "automatic" process not permitted by the UCC. At the same time, Carbon declares that it is entitled to foreclose on the Collateral *as collateral* and sell it at a UCC foreclosure sale as a creditor. The Collateral at issue here is the 100% membership interest that RPSI has in Royal Palm Hotel Property, LLC, which is the LLC that holds the deed to the physical Royal Palm Hotel (the Royal Palm Hotel itself is *not* the Collateral). All the while, a real estate broker, Eastdil Secured, LLC, has been attempting to sell the Royal Palm Hotel, previously at Mitchell's and RPSI's direction and now at Receiver Rosenblatt's direction. As evidenced by a recent article in *The Deal* stating that "The [Royal Palm Hotel] is on the block, although it isn't clear who owns it" and further that "exactly who owns the Royal Palm is in dispute" because an "affiliate of BlackRock Inc. [*i.e.* Carbon], which holds a loan for the property it says is in default, wants control," but "Mitchell has resisted" and "[l]awsuits have flown," Carbon's inconsistent positions have confused the marketplace and frustrated the sales efforts. RPSI's Pleading ¶¶ 60-61; *see* Shatz Affirm. ¶ 4, Ex. 5.

Before this Court, Carbon claims that it only took "possession" of the Collateral. *See* Defendant's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff Royal Palm Senior Investors, LLC's Claims, dated July 18, 2008 ("Carbon Motion to Dismiss") at 2 ("Carbon merely took possession of the Collateral"); *see also* Shatz Afffirm., Ex. 4 at 43:5-9. Carbon does not explain how it has gained possession of the inchoate Membership Interests, "possession" of which is impossible, and

4

irrelevant even if it were possible.

However, at every other opportunity, Carbon asserts, consistent with the language of Section 3.2 of the Settlement Agreement, that it is the sole owner of the Collateral and entitled to sole ownership of any surplus. Carbon claims that the Settlement Agreement allows Carbon to retain, under various circumstances, the *entire surplus* from any sale of the Collateral. Crowell Decl., Ex. 3 (Settlement Agreement at § 3.2). Carbon stated to RPSI on April 1, 2008 that "99.9% of Royal Palm's membership interest was automatically conveyed to Carbon II and Carbon II is now the managing member of Royal Palm Hotel Property, LLC." Shatz Affirm., Ex. 6. Similarly, Carbon has also asserted in its pleadings in this Court that "99.9% of [RPSI's] membership in the Royal Palm Hotel was automatically conveyed to Carbon," and that RPSI's "remaining 0.1% membership interest in the Royal Palm Hotel was automatically conveyed to Carbon" as well. Carbon Answer and Counterclaims at 13, ¶ 34. In State Court, Carbon even claimed an interest in the entire surplus only moments after alleging that it only took possession. Shatz Affirm., Ex. 4 at 66:17-21.

Simply put, Carbon attempts to distract this Court from its unmistakable claims that it took title to the Collateral and arrogated to itself any surplus. Carbon clearly hopes that by minimizing its egregious conduct and recasting it as "merely [taking] possession," it can somehow avoid all the requirements of the UCC and misappropriate the surplus.

**IV.    The Agreement Reached At The June 16 Hearing**

The State Court heard oral argument on Hotel 71's motion for a temporary restraining order on June 16, 2008 in connection with the *Hotel 71 v. Carbon* State Action, and Carbon then acknowledged that it does, in fact "want the hundred percent," its counsel stating that "I want it so that I can sell it under the UCC. That is what the forbearance agreement was all about." Shatz Affirm., Ex. 4 at 65:26-66:3. Justice Ramos recognized at the June 16 Hearing that Carbon could not simply take the surplus that a sale

of the Royal Palm Hotel might yield above the amount Carbon is owed.[1]  Nevertheless, when asked by

Justice Ramos about the surplus later in the proceedings, Carbon continued to press its argument that it

somehow has a claim to the surplus.[2]

      Ultimately, the parties reached an agreement at the June 16 Hearing that Receiver Rosenblatt

would be responsible for selling the Royal Palm Hotel.  In facilitating this agreement, the Court explained

that, "in the process of selling it, if we can calm the collateral issue and get it sold effectively, with

everybody on board, as far as to how it's to be sold and what is to be done in terms of the proceeds, and

then fight about it later, then it is just money."  *Id.* at 60:18-24.  Carbon's counsel agreed that Receiver

Rosenblatt would handle the sale of the Royal Palm Hotel, stating at the June 16 Hearing, "I am perfectly

comfortable with Judge Rosenblatt selling [the] property, provided that we are going forward on a[] tight

schedule to get it sold."  *Id.* at 67:5-8.  And, at the close of the June 16 Hearing, when Hotel 71's counsel

noted that he wanted "to make sure that there's not going to be a UCC sale notice now that Judge

Rosenblatt," not Carbon, was to sell the Royal Palm Hotel, Carbon's counsel stated, "We could not even

if we wanted to.  Judge Sprizzo has enjoined us from doing just that.  We would not do that without

coming to your Honor first anyway."  *Id.* at 77:10-17.

---

[1]  The State Court explained this at the June 16 Hearing in an exchange with Hotel 71's counsel:

    MR. WEIGEL: There's still a surplus.  They're claiming that they have somehow they have
eliminated that surplus.

    THE COURT: They can't.

    MR. WEIGEL: Exactly, your Honor.

    THE COURT: It has to be – everything has to be in good faith.  You cannot defeat the judgment.

Shatz Affirm., Ex. 4 at 35:14-21.

[2]  The State Court asked Carbon's counsel to "assume there's a surplus after your obligation . . . what
happens?", to which Carbon's counsel responded, "Well, we can fight about that under the settlement
agreement."  Shatz Affirm., Ex. 4 at 66:17-21.

## ARGUMENT

### I.    The Standard of Review

Carbon moves to dismiss the RPSI's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cause of action.  Carbon fails to meet its heavy burden under this provision.  Carbon's motion should be denied.

Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the factual allegations "must be enough to raise a right to relief above the speculative level."  *Id*. at 1964-65.  "Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Id.* at 1969.  Of course, when "applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party."  *Bausch & Lomb Inc. v. CIBA Vision Corp.*, No. 07-CV-6575-CJS, 2008 WL 2827541, at *2 (W.D.N.Y. July 21, 2008).

### II.    RPSI Has Pleaded Carbon's Failure To
### Comply With Numerous Provisions Of UCC Article 9

RPSI has stated claims that Carbon failed to comply with UCC Sections 9-620, 9-621, and 9-624.  RPSI's Pleading ¶¶ 39-50, 71-86.  Indeed, Carbon has admitted that it did not proceed in accordance with the UCC's provisions regarding the acceptance of collateral in satisfaction of an obligation.  Carbon expressly stated at the June 16 Hearing that "none of the things you need to do to accept collateral in partial or full satisfaction of the loan exists."  Shatz Affirm., Ex. 1 at 41:15-17.  Carbon's attempt to collect more than the amount of its debt violates the well-settled common law rule that "at no time before or after default may the creditor take the collateral for the debt and thus forfeit the debtor's surplus value or equity in the collateral."  *Indianapolis Morris Plan Corp. v. Karlen*, 28 N.Y.2d 30, 35 (N.Y. 1971); *see*

*Maher v. Alma Realty Co., Inc.*, 417 N.Y.S.2d 748, 749 (2d Dep't 1979); *Peugh v. Davis*, 96 U.S. 332, 337 (1877). Section 9-620 of the UCC provides the only lawful path to effectuate transfers of collateral in satisfaction of an obligation owed to a secured party, and Carbon admits it did not follow that provision.

As a matter of law, the Settlement Agreement did not effect a valid transfer to Carbon of title to the Royal Palm and RPSI's interests in RPHP. The purported "conveyance" to Carbon, by its express terms, continued to secure payment of the same debt that Carbon claims RPSI remains obligated to pay. Any such transfer to an existing creditor without fair consideration – or, as here, no consideration whatsoever – is simply void under common law. *See Indianapolis Morris Plan Corp.*, 28 N.Y.2d at 35.

Nor can the Settlement Agreement be validated as a remedy under Article 9 or under any other doctrine under New York law. First, Carbon made no attempt to comply with any UCC rules governing "disposition" of collateral. Second, even if the Settlement Agreement is tested "*post hoc*" for validity under the UCC, a review of the statutory requirements for a retention by a secured party in partial or total satisfaction of the debt demonstrates the complete absence of any of the steps that the UCC mandates be followed. Most notably, despite the purported transfer of property worth millions more than is owed to Carbon, the debt owed to Carbon was not reduced, in whole or in part. RPSI's Pleading ¶ 49, 73-74. This precludes any contention by Carbon that Carbon somehow retained its collateral in satisfaction of the "Obligations" secured thereby as required under Sections 9-620 and 9-621 of the UCC. At the June 16 Hearing, Carbon confirmed that the Collateral was not taken in satisfaction of RPSI's debt:

> THE COURT: When does Carbon contend that the collateral was turned over in full satisfaction of the loan, prior to perfection of the judgment?
>
> MR. GREANEY: It never was turned over in full satisfaction. That is my point.

Shatz Affirm., Ex. 4 at 41:18-23.

**A.    RPSI Is An "Aggrieved Person" And Has
Standing to Raise Carbon's Noncompliance With Article 9**

Section 9-625 – titled "Remedies for Secured Party's Failure to Comply with Article" – expressly provides: "If it is established that a secured party is not proceeding in accordance with this article, a court

may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." UCC § 9-625(a). The Official Comment makes crystal clear who is entitled to seek relief: "Subsections (a) and (b) provide the basic remedies afforded to *those aggrieved* by a secured party's failure to comply with this Article" and "under subsection (a) an *aggrieved person* may seek injunctive relief." *Id.*, Cmt. 2 (emphasis added). Here, RPSI is an "aggrieved person" within the meaning of the UCC. *See* UCC § 1-201(2) (defining "Aggrieved party" as "a party entitled to resort to a remedy"). Moreover, injunctive relief is "'of particular importance when it is applied prospectively before the unreasonable disposition has been concluded.'" *In re Enron Corp.*, No. 01-16034, 2005 WL 3873890, at *10 n.14 (Bankr. S.D.N.Y. June 16, 2005) (quoting comment to predecessor section of § 9-625).

Here, RPSI is entitled to injunctive relief pursuant to Section 9-625(a) because Carbon has clearly failed to proceed in accordance with UCC Sections 9-602, 9-620, 9-621, 9-623, and 9-624. RPSI's Pleading ¶¶ 39-50, 71-86.

### B. RPSI Has Stated A Claim That Carbon Failed To Comply With UCC Sections 9-620 and 9-621 In Three Distinct Ways

Carbon acknowledges that it did not follow any "of the things you need to do to accept collateral in partial or full satisfaction of the loan." Shatz Affirm., Ex. 4 at 41:8-17. In fact, Carbon failed to comply with UCC Section 9-620 in three distinct ways: (1) the Settlement Agreement does not provide for any reduction of borrower RPSI's debt as required by Sections 9-620(a) and (c); (2) RPSI did not sign or otherwise authenticate any offer by Carbon to accept the Collateral in full or partial satisfaction after the March 25 and April 1, 2008 default notices as required by Section 9-620(c); and (3) Carbon made no attempt to notify the requisite parties pursuant to Section 9-620(d) and Section 9-621. RPSI's Pleading ¶¶ 39-50, 71-86. Under Section 9-602, the debtor cannot "waive or vary the rules" mandated by Sections 9-620 and 9-621. *See* UCC § 9-602(j).

#### 1. There Was No Proper Satisfaction Under UCC Sections 9-620(a) and (c)

UCC Section 9-620 expressly provides that "a secured party may accept collateral in full or partial satisfaction of the obligation it secures *only if*: (1) the debtor consents to the acceptance under

subsection (c)." UCC § 9-620(a)(1) (emphasis added). Subsection (c) of Section 9-620 is equally straightforward. With respect to partial satisfaction, "a debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures *only if* the debtor agrees to the terms of the acceptance in a record authenticated *after* default." UCC § 9-620(c)(1) (emphasis added). As for full satisfaction, "a debtor consents to an acceptance of collateral in *full* satisfaction of the obligation it secures *only if* the debtor agrees to the terms of the acceptance in a record authenticated *after* default" or where the secured party sends to the debtor *after* default a proposal regarding the collateral to which the debtor does not object. UCC § 620(c)(2) (emphasis added). Moreover, as the statute expressly states, Section 9-620's procedure is the *only* lawful procedure whereby a secured party may accept collateral in satisfaction of a debt. The proposal contemplated by Section 9-620(c) "need not take any particular form as long as it sets forth the terms under which the secured party is willing to accept collateral in satisfaction." UCC § 9-620, Cmt. 4 (further explaining that a "proposal to accept collateral should specify the amount (or a means of calculating the amount, such as by including a per diem accrual figure) of the secured obligations to be satisfied, state the conditions (if any) under which the proposal may be revoked, and describe any other applicable conditions").

Here, there is no satisfaction, whether partial or total, intended by the Settlement Agreement. Neither the Settlement Agreement nor Carbon's March 25 and April 1, 2008 notices endeavor to set forth *any* terms under which Carbon was willing to accept the Collateral in satisfaction of RPSI's debt. RPSI's Pleading ¶¶ 40-43, 47. Moreover, Carbon nowhere states how much of RPSI's debt Carbon's purported taking of the Collateral satisfies, and Carbon confirmed at the June 16 Hearing that no satisfaction of RPSI's debt occurred. Shatz Affirm., Ex. 4 at 41:18-23. Accordingly, Carbon plainly failed to comply with Section 9-620's satisfaction requirements, and no transfer of ownership interests in the Collateral

from RPSI to Carbon occurred.[3]

Section 9-620's Official Comment states that a "debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation."  UCC § 9-620, Cmt. 5.  And, although Carbon relies on this comment to argue that RPSI has failed to state a claim under Section 9-620 because RPSI purportedly "agreed to voluntarily relinquish possession of the Collateral," *see* Carbon Motion to Dismiss Brief at 10, Carbon completely leaves aside the fact that RPSI *expressly refused* to accept Carbon's taking of RPSI's interests in RPHP.  RPSI's Pleading ¶¶ 45-46.

Carbon's actions here are not limited to mere "acceptance of possession."  Carbon does not merely claim that it took possession of the Collateral in preparation for a commercially reasonable UCC sale.  Carbon claims that it now *owns* 100% of the Collateral and that it has no obligation to pay over any surplus to RPSI's other creditors and owners.  RPSI's Pleading ¶¶ 39, 41.  Indeed, Carbon has held itself out to the world – and indeed to this Court – as *both* a creditor in possession who aims to sell the Royal Palm and, *simultaneously*, as the owner of the Collateral.  RPSI's Pleading ¶¶ 41, 56.  Carbon cannot, therefore, shield itself from the requirements of UCC Section 9-620.  Carbon's reliance on *Long Island Trust Co. v. Porta Aluminum, Inc.*, 49 A.D.2d 579, 370 N.Y.S.2d 166 (2d Dep't 1975) and *Coxall v. Clover Commercial Corp.*, 4 Misc. 3d 654, 781 N.Y.S.2d 567 (Civ. Ct. 2004), is misplaced because, although those decisions recognize that a secured party may take possession of collateral after a default, neither decision purports to overturn the rule set forth in *Indianapolis Morris Plan* that "at no time before or after default may the creditor take the collateral for the debt and thus forfeit the debtor's surplus value

---

[3] UCC Section 9-622 governs the effect of a secured party's proper acceptance of collateral in satisfaction of a debt under Article 9, and it provides that a "secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures: (1) discharges the obligation to the extent consented to by the debtor" and "(2) transfers to the secured party all of a debtor's rights in the

[Footnote continued on next page]

or equity in the collateral." 28 N.Y.2d at 35.

Moreover, it is well-settled New York law that a party who materially breaches a contract cannot then enforce that contract against the other party because one party's material breach excuses the other party from its obligations under the contract. *See, e.g.*, *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 456-57 (S.D.N.Y. 2003). Under the Settlement Agreement, Carbon agreed to pay the Royal Palm Hotel's monthly mortgage payments for the months of October, November and December 2007 and the month of January 2008. RPSI's Pleading ¶ 52. Carbon, however, failed to make any of these payments in breach of its obligations under the Settlement Agreement. *Id.* ¶ 53. This material breach forecloses Carbon's ability to seek any benefits under the Settlement Agreement.

### 2. RPSI Expressly Refused To Consent To Carbon's Taking After Default And Thus There Was No Acceptance Under Section 9-620

UCC Section 9-620(a) requires that the debtor consent to the secured party's acceptance of the collateral in satisfaction of the debt it owes to the secured party *after default*. As RPSI has alleged, Carbon did not make an effort to accept Collateral in satisfaction of its debt after default and RPSI did not accept or authenticate any such offer. RPSI's Pleading ¶ 44, 50. Indeed, as Carbon itself has admitted, RPSI *expressly refused* to agree, after the alleged defaults, that Carbon could take the Collateral. *Id.* ¶ 45. This is not surprising given that Carbon claims that it did not even satisfy one dollar of RPSI's debt when it supposedly took the Collateral. *Id.* ¶ 43.

On March 25, 2008, Carbon sent RPSI a "Termination Event Letter" claiming that RPSI had defaulted on certain obligations under the Settlement Agreement. Shatz Affirm., Ex. 7; *see also* RPSI's Pleading ¶ 40. The Termination Event Letter further declared that Carbon "has the right to foreclose its Collateral pursuant to Section 4.3 of the Settlement Agreement." Shatz Affirm., Ex. 7. Carbon has since claimed that, as a result of the defaults outlined in the Termination Event Letter, Carbon "automatically

---

[Footnote continued from previous page]
    collateral." UCC § 9-622(a)(1)-(2). Thus, only a valid acceptance of the collateral pursuant to
    Article 9's process works a transfer to the secured party of the debtor's interests in the collateral.

replaced [RPSI] as the managing member of the Royal Palm Hotel, 99.9% of [RPSI's] membership in the Royal Palm Hotel was automatically conveyed to Carbon," and, "for the reasons set forth in the Termination Event Letter, [RPSI's] remaining 0.1% membership interest in the Royal Palm Hotel was automatically conveyed to Carbon" as well.  Carbon Answer and Counterclaims at 13, ¶ 34; *see* RPSI's Pleading ¶¶ 39, 45.

Then, on April 1, 2008, Carbon's counsel sent another letter to RPSI stating that, due to RPSI's "failure to either pay to Carbon II the outstanding principal, interest and fees *set forth in the Settlement Agreement*, or cause the sale of the Royal Palm Hotel, or refinance the Loan, Carbon II was now the managing member of the Royal Palm Hotel, and 99.9% of [RPSI's] membership interest in the Royal Palm Hotel had been automatically conveyed to Carbon II."  Carbon Answer and Counterclaims at 13, ¶ 36 (emphasis added); *see* RPSI's Pleading ¶ 45.  The April 1, 2008 letter "further requested that Mitchell, on behalf of [RPSI], execute an enclosed Assignment and Transfer of Membership Interest and cooperate in the execution of any other documents that Carbon II may request to confirm or evidence the transfer of membership interest and management."  Carbon Answer and Counterclaims at 13, ¶ 37.

RPSI, however, refused to consent.  RPSI's Pleading ¶ 45.  Carbon acknowledged that Mitchell continued to hold RPSI out as the managing member of the Royal Palm Hotel.  *Id.* ¶ 46.  Put simply, Carbon failed to obtain the required consent after the supposed default by Mitchell and RPSI under the Settlement Agreement.

Carbon now argues that the Settlement Agreement itself – entered into months before the March 25, 2008 and April 1, 2008 default letters were issued – somehow provides the requisite "consent after default" by RPSI.  This argument is wrong for at least three reasons.  First, as Carbon itself has previously explained in its pleadings in this Court and in the State Court, Carbon's April 1, 2008 letter was sent to notify RPSI that, due to RPSI's "failure to either pay to Carbon II the outstanding principal, interest and fees *set forth in the Settlement Agreement*, or cause the sale of the Royal Palm Hotel, or refinance the Loan, Carbon II was now the managing member of the Royal Palm Hotel, and 99.9% of [RPSI's] membership interest in the Royal Palm Hotel had been automatically conveyed to Carbon II."  Carbon

13

Answer and Counterclaims at 13, ¶ 36 (emphasis added); *see* RPSI's Pleading ¶ 45.  In order to satisfy UCC Section 9-620, Carbon must therefore obtain RPSI's consent to a transfer of the Collateral in an authenticated record after RPSI's March 25, 2008 default *under the Settlement Agreement*.  Indeed, the Settlement Agreement waived all prior defaults so the loan was not in default at the time the Settlement Agreement was signed.  The default notice letters refer to RPSI's breach of its obligations *under the Settlement Agreement*.  RPSI's Pleading ¶ 40; Crowell Decl., Ex. 3 (Settlement Agreement § 3.4); Shatz Affirm., Ex. 6, 7.

Second, as alleged, RPSI did not consider the Settlement Agreement as providing such consent, as demonstrated by the fact that, in response to Carbon's March 25 and April 1, 2008 notices of default, RPSI took the position that its interests in RPHP had *not* automatically transferred to Carbon.  RPSI's Pleading ¶¶ 45-46.

Third, based on its actions after RPSI's default under the Settlement Agreement, *Carbon itself* did not view the Settlement Agreement as the authenticated record providing RPSI's consent to the transfer of Collateral.  As noted, the April 1, 2008 letter "requested that Mitchell, on behalf of [RPSI], execute an enclosed Assignment and Transfer of Membership Interest and cooperate in the execution of any other documents that Carbon II may request to confirm or evidence the transfer of membership interest and management."  Carbon Answer and Counterclaims at 13, ¶ 37.  Of course, if Carbon viewed the Settlement Agreement as the requisite authenticated record embodying RPSI's consent to the transfer of the Collateral, the "Assignment and Transfer of Membership Interest" and "any other documents that Carbon II may request to confirm or evidence the transfer of membership interest and management" would be superfluous.  Thus, given that at the time neither RPSI nor Carbon viewed the Settlement Agreement as providing RPSI's requisite consent to the transfer under the UCC, Carbon should not now be heard to argue that it served that purpose.

### 3.    RPSI Has Stated A Claim That Carbon Failed to Provide The Notice Required Under UCC Sections 9-620(d) and 9-621

Carbon makes no effort in its dismissal papers to argue that it complied with the UCC's notice

requirements. Carbon does not claim that any party, let alone Hotel 71, ever received the notice it was entitled to receive under Article 9 of Carbon's purported attempt to accept the Collateral. *See* RPSI's Pleading ¶¶ 78-81. For this reason alone Carbon's motion to dismiss should be denied.

The effectiveness of a secured party's acceptance under Section 9-620 of collateral in satisfaction of a debt turns on whether the secured party provided notice of its intended actions to the proper parties pursuant to Section 9-621. *See* UCC §§ 9-620(d), 9-621. Section 9-621(a) "specifies three classes of competing claimants to whom the secured party must send notification of its proposal: (i) those who notify the secured party that they claim an interest in the collateral, (ii) holders of certain security interests and liens who have filed against the debtor, and (iii) holders of certain security interests who have perfected by compliance with statute (including a certificate-of-title statute), regulation, or treaty described in Section 9-311(a)." UCC § 9-621, Cmt. 2. As the drafters of the UCC noted, "this section contains no 'safe harbor,' which excuses an enforcing secured party from notifying certain secured parties and other lienholders" because "Section 9-620 permits the debtor and secured party to set the amount of credit the debtor will receive for the collateral subject only to the requirement of good faith."[4] *Id.* The importance of proper notification in the context of Section 9-620 is, thus, further heightened, and the "holder of a security interest who is entitled to notification under this section but does not receive it has the right to recover under Section 9-625(b) any loss resulting from the enforcing secured party's noncompliance with this section." *Id.*

Carbon made no effort to inform any other entity of its intention to appropriate the Collateral from RPSI. RPSI's Pleading ¶¶ 78-81. To the contrary, though Carbon knew of Hotel 71's interest no later than January 9, 2008 when it received a subpoena from Hotel 71, Carbon concealed its efforts to take

---

[4] For reasons explained throughout this brief, Carbon has repeatedly not acted in good faith. Carbon's failure to proceed in good faith here not only amounts to a violation of New York's fraudulent conveyance laws, but also runs afoul of "a basic principle running throughout" the UCC, *i.e.*, that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or

[Footnote continued on next page]

the Collateral.  RPSI's Pleading ¶ 81.

Carbon appeared before the State Court at a March 26, 2008 hearing in the *Hotel 71* action regarding the appointment of Receiver Rosenblatt and knew of Hotel 71's interest in the Hotel and the various Royal Palm entities when it sent its letter to RPSI on April 1, 2008, in which Carbon claimed that the Collateral had been "automatically conveyed" to Carbon.  RPSI's Pleading ¶ 42.  Carbon's March 25, 2008, letter to RPSI declared that it "has the right to foreclose its Collateral," but it was not until its April 1, 2008, letter to RPSI, *after* the March 26 hearing held by the State Court at which Carbon appeared, that Carbon declared that the Collateral had been "automatically conveyed" to Carbon."  Carbon Answer and Counterclaims at 13, ¶ 37; Shatz Affirm., Ex. 2, 3.  Carbon cannot claim that it was unaware of Hotel 71's interest in the Collateral.

Rather than disclose its intention to take all of the Collateral, Carbon included a confidentiality provision in its Settlement Agreement with RPSI that barred the parties from disclosing, except in certain circumstances, "the terms or conditions of this Agreement or any document executed in connection herewith."  RPSI's Pleading ¶ 81; Crowell Decl., Ex. 3 (Settlement Agreement at § 10.14.).  Carbon's failure to notify Hotel 71 – a party with a financial interest in the Hotel –  is another failure to comply with Article 9, specifically Sections 9-620(d) and 9-621.  RPSI's Pleading ¶ 81.

### C.    The Settlement Agreement Is Merely A Disguised Security Device

Section 9-109(a)(1) provides that UCC Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract," and, as the Official Comment makes clear, "all consensual security interests in personal property and fixtures are covered by this Article, except for transactions excluded by subsections (c) and (d)."  UCC § 9-109(a)(1), Cmt. 2.  Moreover, when a security interest is created, Article 9 "applies *regardless of the form of the transaction*

---

[Footnote continued from previous page]

enforcement."  UCC § 1-203 & Cmt.  Indeed, as the State Court stated at the June 16 Hearing: "everything has to be in good faith."  Shatz Affirm., Ex. 4 at 35:19-20.

or the name that parties have given to it." *Id.* (emphasis added); *see also* UCC § 9-102(73) (defining the

term "Security agreement" in part as "an agreement that creates or provides for a security interest").

Thus, any purported conveyance of the Collateral under the Settlement Agreement by its lawful

and beneficial owner to Carbon if the debt owed to Carbon was not paid in full by March 31, 2008, is

merely a disguised security device, not a valid transfer of beneficial ownership. *See* UCC § 9-109(a)(1),

Cmt. 2; *see also In re Schwab*, 347 B.R. 726, 738 (Bankr. D. Nev. 2006) (stating in connection with UCC

§ 9-109 that "Article 9 looks to substance over form"). Although drafted as a conveyance, there can be

no doubt that the Settlement Agreement is a security device because the purported transfer of the

Collateral only was to occur if the debt owed to Carbon had not been paid. The Settlement Agreement

here, therefore, was merely a security device providing Carbon with at most a security interest in the

Collateral, and a breach of the Settlement Agreement cannot result in Carbon obtaining equitable title to

the Collateral. Thus, as a matter of law, Carbon could have at most a security interest in the Collateral,

not ownership. In addition, not only is any transfer of any interest in the Collateral under the Settlement

Agreement to Carbon void as a fraudulent conveyance and by virtue of Section 9-109, but there is a

substantial issue as to whether any remaining security interest Carbon had in the Collateral merged out of

existence at the point in time it improperly sought to vest title to the Collateral in itself.

D.  **The Settlement Agreement Works An Improper Waiver Of**
    **RPSI's Equitable Right Of Redemption And Carbon Failed To**
    **Comply With The Redemption Procedure Of Section 9-624(c)**

Carbon's attempt to collect more than the amount of its debt violates the well-settled common

law rule that "at no time before or after default may the creditor take the collateral for the debt and thus

forfeit the debtor's surplus value or equity in the collateral." *Indianapolis Morris Plan Corp.*, 28 N.Y.2d

at 35; *see Maher*, 417 N.Y.S.2d at 749. The UCC establishes the process whereby the debtor may waive

its right to redeem its surplus equity. Section 9-624(c) provides that the waiver may "*only*" be

accomplished by an agreement "entered into and authenticated *after* default." UCC § 9-624(c) (emphasis

added). That did not happen here.

Carbon again argues that the Settlement Agreement itself provides the requisite consent required

by UCC Section 9-624, but, for the reasons outlined in Section II(B)(2), *supra*, the Settlement Agreement served no such purpose. The Settlement Agreement makes no reference to Section 9-624. Crowell Decl., Ex. 3. Further, RPSI *expressly refused* to consent to waive its right of redemption after Carbon alleged that RPSI defaulted under the Settlement Agreement (RPSI's Pleading ¶¶ 45, 77, 85), and Section 9-620 requires such consent to work an effective transfer under Section 9-622. Carbon's purported taking of 100% of RPSI violates the common law rule set forth long ago in *Peugh v. Davis*, 96 U.S. 332, 337 (1877).

Moreover, although UCC Section 9-610(b) requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable," Carbon's actions here have been commercially *unreasonable*. UCC Section 9-602 provides that the debtor cannot "waive or vary the rules" mandated by Section 9-610(b).[5] UCC § 9-602(g). Carbon's actions also violate the rule that a secured party may not purchase collateral of this type through a private sale. *See* UCC § 9-610(c). Indeed, Carbon does not even purport to purchase the Collateral; it gave no consideration in the Settlement Agreement other than allowing Mitchell to continue to use the Royal Palm as his own personal piggy bank for six months, and then Carbon, in effect, gifted the Collateral to itself through RPSI's default under a private, secret agreement. Carbon simply cannot lawfully do this. *See id.* ("A secured party may purchase collateral . . . at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.").

III. **The Purported Conveyance To Carbon Of RPSI's Interests In The Collateral Is Fraudulent**

Contrary to Carbon's unsupported arguments, Plaintiff has stated a claim for both an actual and constructive fraudulent conveyance under New York Debtor & Creditor Law §§ 273-a and 276.

A.     **RPSI's Debtor & Creditor Law Section 273-a Claim**

1.     **RPSI Has Adequately Pleaded A Section 273-a Claim**

Carbon attempts to assert that its fraudulent conveyance is shielded from this Court because (1) it "was not Mitchell, but RPSI that conveyed the membership interests," and "RPSI was not a defendant in the Hotel 71 action," thus RPSI cannot allege "that it was a defendant in an action for money damages or that a judgment in such action had been docketed against it"; and (2) "RPSI has not alleged that a final judgment has been rendered against it that remains unsatisfied." Carbon Motion to Dismiss at 15.

Carbon overlooks the well-settled rule of New York law that, in actions to void a fraudulent conveyance, "substance will not give way to form," and "technical considerations will not prevent substantial justice from being done." *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993). Courts have explained that the "facts are not to be atomized. Where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications," and a "clear pattern of purposeful conduct will support a finding of actual intent to defraud." *In re Checkmate Stereo and Electronics, Ltd.*, 9 B.R. 585, 612-13 (Bankr. E.D.N.Y. 1981) (internal quotation marks omitted); *see Gafco, Inc. v. H.D.S. Mercantile Corp.*, 47 Misc.2d 661, 665 (N.Y.C. Civ. Ct. 1965) (explaining that "mere adroitness of technique should not be permitted to obscure the real facts" because "[w]hether a transaction constitutes a fraudulent transfer must be determined from its intent and effect and not from its form; a court will look at the results and not at the devious ways by which they were accomplished"). Carbon argues that this Court should ignore the fact that Mitchell directly caused the fraudulent transfer to Carbon – in contravention of New York courts' long-standing recognition that, because fraudulent conveyances can take an infinity of forms, the mere existence of a cunning form will not defeat a valid claim.

Carbon's argument elevates form over substance in contravention of settled New York law.

---

[Footnote continued from previous page]

5   Indeed, Section 9-602 also bars the debtor from waiving the requirements of Section 9-615(f) regarding the procedures for allocating the proceeds and surplus proceeds from a disposition of the

[Footnote continued on next page]

Mitchell clearly effected the Settlement Agreement between RPSI and Carbon.  RPSI's Pleading ¶ 65.

Mitchell signed the Settlement Agreement in his capacity as member-manager of RPSI.  RPSI's Pleading

¶ 38.  Mitchell was and is the majority shareholder in RPSI.  Accordingly, RPSI has stated a claim to void

the Settlement Agreement as a fraudulent conveyance effected *by Mitchell* that conveyed *Mitchell's*

*property* in a manner that violated New York Debtor & Creditor Law Section 273-a (as well as Section

276, as explained *infra*).  Carbon cites no case to the contrary.[6]

### 2. RPSI Has Adequately Pleaded The Fraudulent Conveyance Was Made For Less Than Fair Consideration

Carbon next argues that RPSI has not adequately pleaded that the conveyance lacked adequate

consideration.  Carbon Motion to Dismiss at 15.  Under Section 273-a of the Debtor and Creditor Law, a

conveyance made for less than fair consideration while a lawsuit is pending is conclusively deemed

fraudulent if judgment is entered and returned unsatisfied.  *See Matter of Russo*, 1 B.R. 369, 378-79

(Bankr. E.D.N.Y. 1979).  ("The legislature intended to give creditors an additional weapon to set aside a

conveyance made without fair consideration, by a debtor who was a defendant in an action for money

damages if he failed to satisfy the judgment.  It created an irrebuttable presumption of fraudulent intent

irrespective of the grantor's solvency or his actual intent.").  Carbon does not contest that at all relevant

times Mitchell was a defendant in the *Hotel 71 v. Mitchell* State Action.  Nor does Carbon claim that

Hotel 71's judgment has been satisfied.

---

[Footnote continued from previous page]
    collateral.  *See* UCC § 9-602(h).

  [6]  The Receiver has standing to assert fraudulent conveyance claims under the Debtor & Creditor Law because he has not only assumed the management interests of RPSI, but he is also the Receiver of a creditor, Hotel 71.  *See Eberhard v. Marcu*, 530 F.3d 122, 132-33 (2d Cir. 2008) ("We agree with the Seventh Circuit's analysis and hold that a receiver's standing to bring a fraudulent conveyance claim will turn on whether he represents the transferor only or also represents a creditor of the transferor," and where the receiver represents a creditor as well as the transferor, the receiver has standing.) (*quoting Scholes v. Lehmann*, 56 F.3d 750, 752-55 (7th Cir. 1995) (Posner, J.) ("The appointment of the receiver removed the wrongdoer from the scene.  The corporations were no more Douglas's [the controlling individual of the corporations] evil zombies.  Freed from his spell they became entitled to

[Footnote continued on next page]

Carbon did not give adequate consideration.  RPSI's Pleading ¶¶ 94-95.  Carbon claims that, as a matter of law, it provided adequate consideration for 100% of the membership interests in RPHP *without even discharging one dollar of RPSI's debt* to Carbon.  Carbon is wrong.  A transfer must satisfy "three elements to [be] 'fair consideration' under [the New York Debtor & Creditor Law]: first, the recipient of the debtor's property must either convey property or discharge an antecedent debt in exchange; second, the exchange must be for a fair equivalent; and third, the exchange must be 'in good faith.'"  *In re Sharp Int'l Corp.*, 302 B.R. 760, 779 (E.D.N.Y. 2003); *see also Neshewat v. Salem*, 365 F. Supp. 2d 508, 519-20 (S.D.N.Y. 2005).

Carbon claims to have taken 100% of the membership interests in RPHP without even discharging one dollar of RPSI's debt to Carbon.  Thus, this purported conveyance to Carbon was made for unfair consideration.  *See Neshewat*, 365 F. Supp. 2d. at 520-21.  In addition, the agreement was not made in good faith.  RPSI's Pleading ¶ 101.  The Settlement Agreement with Carbon – purporting to allow Carbon to take the entirety of RPSI's interest in the Royal Palm upon a default – was signed *the day after* Mitchell, the manager of RPSI, was served with the Order of Attachment in the *Hotel 71 v. Mitchell* State Action.  RPSI's Pleading ¶ 37.  Knowing that Hotel 71 was going to get the benefit of his interest in the Hotel, Mitchell used the time afforded by the Settlement Agreement to take approximately $3.8 million and secret it in the Cook Islands.  Shatz Affirm., Ex. 8 at 337:24-342:18.  That is not "in good faith."  *See Superior Leather Co., Inc. v. Lipman Split Co., Inc.*, 116 A.D.2d 796, 797, 496 N.Y.S.2d 845, 846 (3d Dep't 1986) (an "indispensable component of fair consideration is good faith on the part of the judgment debtor who makes a conveyance").

In its motion, Carbon makes the same meritless argument that it employed in the State Court at the June 16 Hearing, diverting attention from the provision that it added in the Settlement Agreement under which it claims to have the rights not only to repayment of its loan, but to the *entire surplus* from

---

[Footnote continued from previous page]

the return of the moneys . . . that Douglas had made the corporations divert to unauthorized

[Footnote continued on next page]

the sale of the Collateral.  Carbon claims that RPSI "conveyed nothing to Carbon that it had not already

pledged as part of the original loan," and that the "Settlement Agreement simply provided the mechanics

for Carbon II to take possession of the Collateral in order to ensure that its eventual disposition proceeded

in an orderly and expeditious manner."  Carbon Motion to Dismiss Brief at 16-17.  Carbon does not even

mention the provision of the Settlement Agreement, with no precursor in the Loan Agreement, that

purports to allow Carbon to retain, under some circumstances, the *entire surplus* from any sale of the

Collateral.  Crowell Decl., Ex. 3 (Settlement Agreement at § 3.2).  Carbon added this provision in the

Settlement Agreement and now purports to be entitled to far more than its original loan with interest – and

yet bewilderingly claims that it was entitled to the entire surplus under the original Loan Agreement.

Carbon's claim is empty, and flatly contradicted by the documents, and Section 3.2 of the

Settlement Agreement demonstrates – under the very cases Carbon relies on to argue that the

consideration was fair – that the transaction lacked adequate consideration in light of Carbon's claim to

the entire surplus and its failure to reduce the debt owed to it.  Carbon relies on *In re Silverman Laces,*

*Inc.*, No. 01 Civ. 6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) (quoted in *In re*

*AppliedTheory Corp.*, 330 B.R. 362, 364 (Bankr. S.D.N.Y. 2005)) in arguing that its decision to "forbear

from immediately pursuing its remedies" and to "extend RPSI's obligations under the Loan Agreement

pursuant to the terms of the Settlement Agreement" constitutes fair consideration under the Debtor &

Creditor Law.  Carbon Motion to Dismiss at 16.  Judge Chin reasoned in *In re Silverman Laces, Inc.* that

the creditor's waiver of "its rights to immediately pursue its remedies" and to "extend [the debtor's]

obligations" in return for a "security interest in [the debtor's] inventory" was fair consideration in light of

the fact that "[a]lthough the inventory was worth more than twice the amount of the debt [the debtor]

owed to [the creditor, *the creditor] could recover against the inventory only to the extent of [the debtor's]*

*defaulted obligations and thus any inventory beyond that would remain the [debtor's] property*."  *In re*

---

[Footnote continued from previous page]
    purposes.").

*M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6 (emphasis added).  That the creditor was not entitled to collect more than the debtor's debt in the new agreement was critical to the finding of fair consideration, with the Court reiterating that the debtor "did not give up more than it received, for if [the creditor] foreclosed on the inventory, *it would not be entitled to the value of the entire inventory*," rather, it "would *only* be entitled to the amounts due on the loans, and *the balance of the proceeds from a sale of the inventory would revert* to" the debtor.  *Id.* (emphasis added).

### B.   RPSI Has Adequately Pleaded a Debtor & Creditor Law Section 276 Claim

RPSI has more than adequately alleged actual fraud under Section 276 of the Debtor & Creditor Law.  RPSI's Pleading ¶¶ 68, 81, 99-101.  Under Section 276, any transfer made with actual intent to hinder or delay creditors is deemed fraudulent.  *See* N.Y. Debtor & Creditor Law § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").  Despite the fact that the allegations of the Complaint are taken as true for purposes of this motion to dismiss, Carbon claims that there is insufficient evidence of Mitchell and Carbon's actual fraudulent intent.  Carbon is wrong.  The Complaint plainly alleges actual fraudulent intent.  RPSI's Pleading ¶¶ 68, 81, 99-101.

Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, New York law recognizes "badges of fraud," *i.e.*, circumstances so commonly associated with fraudulent transfers "that their presence gives rise to an inference of intent."  *Pen Pak Corp. v. LaSalle Natl. Bank*, 240 A.D.2d 384, 386 (2d Dep't 1997) (quoting *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995)).  These "badges" include (1) inadequacy of consideration; (2) a transfer conducted in secrecy; (3) a transfer to an insider; and (4) a transfer during the pendency of litigation.  *See Wall Street Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999).

The purported transfer to Carbon of RPSI's interests in the Collateral wears many badges of fraud.  First, the consideration furnished by Carbon was clearly inadequate.  RPSI Pleading ¶ 89.  Second, the Settlement Agreement was a secret document with a confidentiality provision barring the parties from

23

disclosing, except in certain circumstances, "the terms or conditions of this Agreement or any document executed in connection herewith." *Id.* ¶¶ 78, 80-81; Crowell Decl., Ex. 3 (Settlement Agreement at § 10.14.). Third, the transfer was to an insider, the senior mezzanine lender. RPSI's Pleading ¶ 36. Fourth, the alleged transfer took place on October 24, 2007 – the day after Mitchell was served with the Order of Attachment and during the pendency of the *Hotel 71 v. Mitchell* State Action. *Id.* ¶ 37, 100. Thus, Carbon's argument that these many badges of fraud are insufficient to survive a motion to dismiss is completely without merit.

Carbon's reliance on *Dixie Yarns, Inc. v. Forman*, 906 F. Supp. 929 (S.D.N.Y. 1995), for its argument that RPSI's Section 276 claim fails to adequately allege a lack of good faith is unavailing. There, in analyzing a Section 273-a claim (not a Section 276 claim, where the court explained that its Section 273-a analysis was informed by the statutory explanation of "fair consideration" in Section 272 of the Debtor & Creditor Law[7]), Judge Haight explained that "[b]ad faith is established as a matter of law" because the "Forman defendants were aware . . . that a major commercial claim was pending against the corporation," they "commenced their withdrawals from [the corporation] very shortly thereafter," and "months after this Court entered judgment on the award, the Forman defendants arranged to have account debtors of [the corporation] pay significant amounts to the individual defendants directly or to a company to which defendant Arthur Forman controlled." *Dixie Yarns, Inc.*, 906 F. Supp. at 937. "Lastly," the Court continued, "one month before [the corporation] ceased operations altogether, Arthur Forman caused [the corporation] to transfer to him all of the Company's remaining inventory," and, as here,

> the nature of the transaction is consistent with the pattern clearly established by the evidence adduced during discovery: a systematic acquisition by the Forman defendants of all of [the corporation's] assets, with the consequence that [the corporation] is unable to make any payment on plaintiff's judgment against it.

---

[7] Section 272 of the Debtor & Creditor Law provides that "[f]air consideration is given for property, or obligation," (a) when "in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied, or," (b) when "such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

*Id.* (quoting *Orr v. Kinderhill Corp.*, Judge Haight noting, "I use the 'pattern' advisedly because, as the Second Circuit instructs in *Orr v. Kinderhill Corp.*, . . . 'an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications'"). Just as in *Dixie Yarns, Inc.*, the pattern of activities here demonstrates the Settlement Agreement was not entered into in good faith.

## CONCLUSION

For all of the foregoing reasons, Carbon's motion to dismiss should be denied.

Dated:  Poughkeepsie, New York
       August 1, 2008

                                    Respectfully submitted,

                                      By: _____
                                      Phillip Shatz
                                      McCabe & Mack LLP
                                      63 Washington Street
                                      P.O. Box 509
                                      Poughkeepsie, New York 12602-0509
                                      Telephone: (845) 486-6800

                                      *Attorneys for Involuntary Plaintiff*
                                      *Royal Palm Senior Investors, LLC*