```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
ROYAL PALM SENIOR INVESTORS,    :
LLC and GUY T. MITCHELL,        :
                                :
            Plaintiffs,         :
                                :
      v.                        :
                                :
CARBON CAPITAL II, INC.,        :
                                :
                                :
            Defendant.          :
-------------------------------x
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/7/09
```

08 Cv. 4319 (BSJ)

**OPINION AND ORDER**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Plaintiffs Royal Palm Senior Investors, LLC ("RPSI") and its manager, Guy Mitchell ("Mitchell") (collectively, "Plaintiffs"), brought this action against defendant Carbon Capital II, Inc. ("Carbon Capital" or "Defendant"). Carbon Capital counterclaimed against Plaintiffs alleging breach of contract and seeking a declaratory judgment, and attorneys' fees and costs. Currently before the Court is Carbon Capital's motion to dismiss RPSI's Notice of Appearance, Response to Pleadings, and Claims (the "Complaint") and Carbon Capital's motion for summary judgment on its counterclaims against Mitchell. For the reasons that follow, the Court GRANTS Carbon Capital's motion to dismiss and its motion for summary judgment on its counterclaims.

## BACKGROUND[1]

On February 18, 2005, RPSI entered into a Loan Agreement with Carbon Capital, evidenced by a Promissory Note executed in favor of Carbon Capital (the "Note"). Pursuant to the Loan Agreement, Carbon Capital loaned RPSI $24,545,813.00 (the "Loan") to purchase the Royal Palm Hotel (the "Hotel") in Miami, Florida. The Note contains RPSI's "unconditional[] promise[]" to pay the entire principal amount of the Loan by March 9, 2007, plus contractually agreed upon interest, costs, and expenses. (Greaney Decl. Ex. 2, at 1.) As the only collateral for the Loan, RPSI pledged its membership interests in Royal Palm Hotel Properties, LLC (the "Membership Interests"), which owned the Hotel (the "Pledge Agreement").

Also on February 18, 2005, in conjunction with the execution of the Note and Loan Agreement, Mitchell entered into a Guaranty Agreement with Carbon Capital, whereby Mitchell "irrevocably and unconditionally" agreed that he would be liable as a primary obligor for all of RPSI's obligations to Carbon Capital under the Note and Loan Agreement ("RPSI's Guaranteed Obligations"). (Id. Ex. 5 § 1.1.) The Guaranty Agreement further provides that

---

[1]    The factual summary that follows is based primarily on the following: Mitchell's Second Amended Complaint, dated October 1, 2008; Defendant's Answer to Second Amended Complaint, dated October 14, 2008; Defendant's Statement of Undisputed Material Facts, dated October 14, 2008; RPSI's Response to Defendant's Statement, dated November 12, 2008; Mitchell's Response to Defendant's Statement, dated November 19, 2008; and the declarations in support thereof. Except where specifically referenced, no further citation to these sources will be made.

2

Mitchell's obligation would arise "immediately upon demand" by Carbon Capital.  (Id. § 1.5.)

When the Loan matured on March 9, 2007, RPSI defaulted under the Loan Agreement by failing to repay the entirety of the outstanding balance due to Carbon Capital.  By letter dated June 11, 2007, Carbon Capital demanded payment of the full amount of the Loan from Mitchell.  Mitchell made no payment in response to this demand.  Instead, on October 24, 2007, Carbon Capital, RPSI, and Mitchell entered into a Settlement Agreement, whereby Carbon Capital waived "any Event of Default existing as of the date hereof" and agreed to forbear from exercising its rights and remedies under the Loan Agreement in exchange for RPSI's promise that, by March 31, 2008, it would (1) pay Carbon Capital the amount set forth in the Settlement Agreement, (2) sell the Hotel, or (3) refinance the Loan.  (Id. Ex. 8 § 3.4.)  If RPSI failed to perform, then 99.9% of the Membership Interests would automatically transfer to Carbon Capital.  Also on October 24, 2007, Mitchell signed a Reaffirmation of the Guaranty Agreement, which applied the terms of the Guaranty Agreement to the Settlement Agreement.

On March 25, 2008, Carbon Capital sent a letter to Mitchell ("Termination Event Letter") contending that RPSI's failure to comply with certain obligations under the Settlement Agreement constituted a "Termination Event,"[3] which entitled Carbon Capital

---

[3]   A Termination Event occurs if, among other things, RPSI "fail[s] to perform, observe or comply with any covenant, agreement or term contained in [the Settlement Agreement] in any material respect."  (Greaney Decl. Ex. 8 § 3.3.1.)

3

to exercise its rights and remedies under the Settlement Agreement and resulted in RPSI's default.   (Id. Ex. 10, at 1.)   The Settlement Agreement provides that, upon the occurrence of a Termination Event, the automatic conveyance of 99.9% of the Membership Interests increases to 100%.[4]   In addition, RPSI failed to pay the outstanding debt owed to Carbon Capital, sell the Hotel, or refinance the Loan by March 31, 2008, the revised maturity date. On April 1, 2008, Carbon Capital sent a letter to Mitchell confirming that the Membership Interests automatically conveyed to Carbon Capital and requesting that Plaintiffs document the automatic transfer of those interests.

In December 2008, Carbon Capital noticed a foreclosure sale of the Membership Interests for January 6, 2009.   By Order dated December 31, 2008, the Part I judge denied Plaintiffs' emergency application to stay the pending foreclosure sale.   By Order dated January 3, 2009, the Part I judge denied RPSI's request for a temporary restraining order enjoining the same sale.   Thus, on January 5, 2009, RPSI tendered an Assignment and Transfer of the

---

Specifically, the Termination Event Letter stated that RPSI failed to comply with (1) its obligation under Section 6.3.2 of the Settlement Agreement to enter into a replacement Cash Management Agreement with Wachovia Bank on terms acceptable to Carbon Capital; (2) its obligation under Section 8 of the Settlement Agreement to enter into a Replacement Management Agreement for a Qualified Manager approved by Carbon Capital; and (3) its obligations under Sections 6.3.3 and 7.1 of the Settlement Agreement to obtain certain opinions of counsel.

[4]   In the absence of a Termination Event, the Settlement Agreement provides that the automatic conveyance of 99.9% of the Membership Interests increases to 100% if, by October 1, 2008, the Hotel is not sold, or the Loan is not refinanced.

4

entirety of the Membership Interests to Carbon Capital, which became owner and managing member of the Hotel.

On January 6, 2009, the day of the scheduled foreclosure sale, counsel for R. Donahue Peebles ("Peebles"), who has a minority equity interest in RPSI, filed on behalf of RPSI a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida, which automatically stayed the foreclosure sale. The bankruptcy petition was dismissed as improperly filed because, among other reasons, Peebles was not the managing member of RPSI at the time he filed the petition and, therefore, did not have the authority to make such a filing. As of the date of this Opinion and Order, a foreclosure sale has not yet occurred.

## MOTION TO DISMISS

### I. Standard

In deciding a motion to dismiss, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001). In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (internal quotation marks omitted); see also Ashcroft v. Iqbal, 129

5

S.Ct. 1937, 1949 (2009) (declining to limit Bell Atl. Corp. holding
to the antitrust context).  Although such motions are addressed to
the face of the pleadings, the court may consider also (1)
documents attached to or incorporated by reference in the
complaint, see Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)
(citations omitted); (2) documents "integral" to and relied upon in
the complaint, even if not attached or incorporated by reference,
see Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d
69, 72 (2d Cir. 1995); (3) public disclosure documents required by
law to be, and that have been, filed with the SEC, see Kramer v.
Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991); and (4) facts
of which judicial notice properly may be taken under Rule 201 of
the Federal Rules of Evidence, see Chambers v. Time Warner, Inc.,
282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks
omitted).

## II.  Application

        This lawsuit concerns Carbon Capital's efforts to establish
that, pursuant to the Settlement Agreement, it became owner of 100%
of the Membership Interests as of April 1, 2008.  In the Complaint,
RPSI argues that the Settlement Agreement did not effect a valid
transfer of the collateral in satisfaction of a debt.  First, RPSI
alleges that Carbon Capital did not make a proposal to accept the
Membership Interests in satisfaction of its debt, notify the
requisite parties, or secure RPSI's consent to such acceptance, in

violation of New York Uniform Commercial Code ("N.Y. U.C.C.")
Sections 9-620 and 9-621.  Second, RPSI alleges that the Settlement
Agreement improperly waived its right to surplus equity under N.Y.
U.C.C. Section 9-615 and its right to redeem the collateral under
N.Y. U.C.C. Section 9-623.  Third, RPSI argues that the conveyance
of the Membership Interests to Carbon Capital was fraudulent under
the actual and presumptive fraud provisions of Sections 273-a and
276 of the New York Debtor and Creditor Law ("N.Y. D.C.L.") and
therefore, the Court should void the conveyance.  Finally, RPSI
argues that Carbon Capital breached its obligations under the
Settlement Agreement and therefore, cannot seek any benefits under
the same.  Carbon Capital moves to dismiss these claims.  The Court
addresses each claim in turn.

### A.  N.Y. U.C.C. Sections 9-620 and 9-621

The N.Y. U.C.C. expressly permits a secured creditor to take
possession of the collateral protecting its security interest after
the debtor defaults on its obligation.  See U.C.C. 9-609(a)(1).
Here, the Settlement Agreement effectively requires RPSI to
transfer the Membership Interests to Carbon Capital upon default.
On January 5, 2009, Mitchell, on behalf of RPSI, executed an
Assignment and Transfer of the Membership Interests to Carbon
Capital.   In effect, the Settlement Agreement transferred
possession of the collateral to Carbon Capital so that Carbon

Capital could preserve the value of the collateral and prepare for its ultimate disposition.

Once the creditor takes possession of the collateral, the creditor has three options after default. First, the secured party may simply sue on the note itself; in other words, it "may reduce a claim to judgment . . . by any available judicial procedure . . . ." N.Y. U.C.C. § 9-601(a)(1). Carbon Capital has not sought a judicial sale of the Membership Interests, and therefore, did not choose this remedy.

Second, the secured party "*may* accept collateral in full or partial satisfaction of the obligation it secures." N.Y. U.C.C. § 9-620(a) (emphasis added). Acceptance of the collateral normally completely satisfies the debt. See id. § 9-622. By its terms, the statute makes the election to retain the collateral in satisfaction of the debt optional with the creditor and it provides that the option must be exercised by written notice to the debtor. See id. § 9-621. As the Official Comments make clear, a "secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation." Id. § 9-620, cmt. 5. In fact, courts have declined to apply this remedy when the secured creditor, wishing it not to apply, did not fulfill its procedural prerequisites. See Warnaco, Inc. v. Farkas, 872 F.2d 539, 544-45 (2d Cir. 1989); S. M.

8

Flickinger Co. v. 18 Genesee Corp., 71 A.D.2d 382, 385, 423 N.Y.S.2d 73, 76 (App. Div. 4th Dep't 1979); In re Nardone, 70 B.R. 1010, 1016-17 (D. Mass. 1987). Since it is undisputed that the Settlement Agreement did not set forth any terms by which Carbon Capital would accept the collateral in satisfaction of the debt and Carbon Capital did not send written notice of any intention to do so, the Court declines to apply this remedy.

Third, the secured creditor "may sell, lease, license, or otherwise dispose of any or all of the collateral" by a "commercially reasonable" public or private proceeding. N.Y. U.C.C. § 9-610(a). After doing so, it must account to the debtor for any surplus, and the debtor is liable for any deficiency. Id. § 9-615(d). In addition, the secured creditor must give the debtor notice of when the sale or other disposition will take place. Id. § 9-611. The secured creditor can buy the collateral itself at any public sale, but it cannot buy it at a private sale unless the collateral is "of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." Id. § 9-610(c).

It is clear that Carbon Capital chose to pursue this remedy. Rather than retaining the collateral for its own use, Carbon Capital noticed a UCC foreclosure sale scheduled for January 6, 2009, in which it would "sell, lease, license, or otherwise dispose" of the Membership Interests. After reviewing hundreds of

9

pages of competing documents and hearing oral argument, the Part I judge concluded that Carbon Capital "fully advertised [the sale] in the New York Times, the Wall Street Journal, and the Miami Herald, etc., in a manner wholly reasonable." Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc., No. 08 Civ. 4319 (S.D.N.Y. filed Jan. 5, 2009) (order denying RPSI's application for a temporary restraining order). Accordingly, RPSI's claims under Sections 9-620 and 9-621 must be dismissed.

### B.   N.Y. U.C.C. Sections 9-615 and 9-623

The Settlement Agreement and RPSI's subsequent default thereunder established Carbon Capital's right to possess and dispose of the collateral in a commercially reasonable manner, leaving RPSI with two rights with respect to the collateral: a right to redeem the collateral, see N.Y. U.C.C. § 9-623, and a right to any surplus proceeds from its disposition, id. § 9-615(d)(1). Pursuant to the Settlement Agreement, RPSI agreed that it would not interfere with any foreclosure proceedings, (Greaney Decl. Ex. 8 § 4.3), and waived certain rights with respect to the collateral, including the right to any surplus proceeds from any sale that closes after October 1, 2008. (Id. § 3.2.) RPSI claims that the Settlement Agreement improperly waived those rights.[5]

---

[5]   It is unclear which, if any, claims RPSI is actually pursuing. In the Complaint, RPSI claims that it did not waive its right to redeem collateral under Section 9-624(c). RPSI's Memorandum of Law in Opposition to Carbon Capital's Motion to Dismiss, however, fails to address its right to redeem collateral, and instead addresses RPSI's right to redeem surplus proceeds from sale of the collateral. Nevertheless, the Court considers both claims.

First, a debtor in default has a right to surplus equity resulting from the secured creditor's disposal of the collateral. See N.Y. U.C.C. § 9-615(d)(1). A debtor's right to surplus equity cannot be waived. See id. § 9-602(e). As the Official Comments explain:

> [I]n the context of rights and duties after default, our legal system traditionally has looked with suspicion on agreements that limit the debtor's rights and free the secured party of its duties . . . 'no mortgage clause has ever been allowed to clog the equity of redemption.' The context of default offers great opportunity for overreaching. The suspicious attitudes of the courts have been grounded in common sense.

Id. § 9-602, cmt. 2. Therefore, the Court declares that RPSI retains its right to surplus equity, if any, notwithstanding the waivers contained in the Settlement Agreement.

Second, a debtor in default has the right to redeem the collateral under Section 9-623. In order to redeem collateral, a debtor must tender "fulfillment of all obligations secured by the collateral," and "the reasonable expenses and attorney's fees" incurred by the secured party in preparing for its disposition. Id. § 9-623(b). A debtor's right of redemption exists until the secured party "has disposed of collateral or entered into a contract for its disposition." Id. § 9-623(c). A debtor may waive its right to redeem the collateral, but "only by an agreement to that effect entered into and authenticated after default." Id. § 9-624(c). The Settlement Agreement, which was entered into before RPSI's default thereunder, did not waive RPSI's right to redeem the

11

collateral.   Nevertheless, RPSI has not demonstrated that Carbon Capital interfered with its right to redeem the collateral, as RPSI has not complied with the statutory requirements to do so.   RPSI may redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the reasonable expenses and attorney's fees incurred by Carbon Capital before Carbon Capital disposes of the collateral or enters into a contract for its disposition.   Because RPSI fails to demonstrate that Carbon Capital has interfered with its rights under N.Y. U.C.C. Section 9-615 or Section 9-623, these claims must be dismissed.

## C.   **N.Y. D.C.L. Section 273-a**

RPSI claims that the Settlement Agreement's conveyance of the Membership Interests to Carbon Capital ran afoul of N.Y. D.C.L. Section 273-a and should therefore be voided.   Section 273-a provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration."   N.Y. D.C.L. § 273-a.   Thus, in order to state a claim under Section 273-a, RPSI must establish that (1) the conveyance was made without fair consideration; (2) at the time of the conveyance, the conveyor was a defendant in an action for money damages or a judgment in such action had been docketed against it; and (3) a final judgment has been rendered against the conveyor that remains unsatisfied.   See Lippe v.

12

Bairnco Corp., 229 B.R. 598, 603 (S.D.N.Y. 1999) (citations omitted); Dixie Yarns, Inc. v. Forman, 906 F. Supp. 929, 935 (S.D.N.Y. 1995). The parties dispute whether Mitchell or RPSI conveyed the Membership Interests, with RPSI arguing that Mitchell made the conveyance and Carbon Capital arguing that RPSI made the conveyance. Although Mitchell actually signed the Settlement Agreement and was a manager and majority shareholder of RPSI at that time, it is clear that Mitchell signed the Settlement Agreement on behalf of RPSI and that RPSI actually made the conveyance. RPSI has not alleged that, at the time of the conveyance, it was a defendant in an action for money damages, or that a final judgment had been rendered against it that remained unsatisfied. Because RPSI fails to establish the second or third elements of a claim under Section 273-a, this claim must be dismissed.

## D. N.Y. D.C.L. Section 276

In addition, RPSI claims that Mitchell conveyed the Membership Interests to Carbon Capital in order to defraud creditors in another action, Hotel 71 Mezz Lender, LLC. v. Falor, No. 07 Civ. 601175, in violation of N.Y. D.C.L. Section 276. N.Y. D.C.L. Section 276 declares fraudulent "[e]very conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." N.Y. D.C.L. § 276. A party seeking to set aside a fraudulent

13

conveyance under N.Y. D.C.L. Section 276 must plead an actual intent to defraud with particularity sufficient to meet the heightened standard of Rule 9(b). See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 315 (S.D.N.Y. 1999). Nevertheless, because direct proof of fraudulent intent is usually difficult to obtain, such intent may be inferred from circumstantial evidence, or "badges of fraud." Id. This evidence may consist of (1) the inadequacy of consideration received in the allegedly fraudulent conveyance, (2) the close relationship between parties to the transfer, (3) information that the transferor was rendered insolvent by the conveyance, (4) suspicious timing of transactions or existence of a pattern after the debt had been incurred or a legal action against the debtor had been threatened, or (5) the use of fictitious parties. See Stratton Oakmont, 234 B.R. at 315-16 (citing In re Kaiser, 722 F.2d 1574, 1582-83 (2d Cir. 1983)); In re Kovler, 249 B.R. 238, 244-45 (S.D.N.Y. 2000).

RPSI fails to adequately plead facts from which the Court could infer that Mitchell intended to defraud the Hotel 71 creditors. In February 2005, RPSI pledged the Membership Interests as the only collateral for the Loan. When RPSI defaulted under the Loan Agreement, Carbon Capital could have taken immediate possession of the Membership Interests pursuant to N.Y. U.C.C. Section 9-609. Instead, the parties entered into the Settlement Agreement, which merely extended RPSI's time to comply with its

14

obligations under the Loan Agreement and provided for the automatic transfer of possession of the Membership Interests to Carbon Capital in the event of default. The Settlement Agreement was coincidentally signed the day after Mitchell was served with an Attachment Order in the Hotel 71 action which, among other things, applied to Mitchell's interest in RPSI and Royal Palm Hotel Properties. The Complaint contains no allegations, aside from its timing, to indicate that the Settlement Agreement was not entered into in good faith. The mere fact that Mitchell was served with an Attachment Order in another action the day before the signing of the Settlement Agreement in this case does not overcome the conclusory nature of the allegation and does not suggest fraudulent intent. Since RPSI has not adequately pled a fraudulent conveyance under N.Y. D.C.L. Section 276, this claim must be dismissed.

## E. RPSI's Claim that Carbon Capital Materially Breached the Settlement Agreement

RPSI claims that Carbon Capital materially breached the Settlement Agreement by failing to pay the Hotel's monthly mortgage payments from October 2007 through January 2008. The Settlement Agreement provides that Carbon Capital shall "cause the payment" of the subject mortgage payments if (1) RPSI satisfied "all conditions precedent to [Carbon Capital's] obligations hereunder," (2) "no Termination Event has occurred," and (3) "available funds from operations after payment of items contemplated by the Cash

15

Management Agreement are insufficient to fully pay" the monthly mortgage payments. On March 25, 2008, Carbon Capital sent a Termination Event Letter to Mitchell contending that RPSI failed to comply with its obligations (1) under Section 6.3.2 of the Settlement Agreement to enter into a replacement Cash Management Agreement with Wachovia Bank on terms acceptable to Carbon Capital; (2) under Section 8 of the Settlement Agreement to enter into a Replacement Management Agreement for a Qualified Manager approved by Carbon Capital; and (3) under Sections 6.3.3 and 7.1 of the Settlement Agreement to obtain certain opinions of counsel.

RPSI does not contest that it failed to comply with these obligations. Instead, RPSI argues that Carbon Capital waived its obligations under these sections. More specifically, RPSI argues that, "[b]y the explicit terms of the Settlement Agreement, Carbon Capital waived Royal Palm's obligation to comply with Sections 6.3.2 and 6.3.3." (First Am. Compl. ¶ 23.) In addition, RPSI argues that by working with the Hotel's management to aggressively monitor the Hotel's overall financial performance, Carbon Capital waived RPSI's obligation to comply with Sections 7.1 and 8 of the Settlement Agreement.

The Loan Agreement provides that any waiver, in order to be effective, must be in writing and "signed by the party against whom enforcement is sought," (Greaney Decl. Ex. 1 § 10.4), and that any delay by Carbon Capital "in insisting upon strict performance of

16

any term" of the Loan Documents is not a waiver.  (Id. § 10.5.)
These "no waiver" clauses were incorporated into the Settlement
Agreement, which provides that the parties "acknowledge that the
Debt and the Loan Documents are valid and binding liabilities and
obligations of Borrower and Guarantors."  (Id. Ex. 8 § 2.2.)

Since Carbon Capital did not waive RPSI's obligations under
these sections in writing and RPSI failed to comply with the same,
a Termination Event occurred.  Therefore, Carbon Capital was not
required to pay the Hotel's monthly mortgage payments from October
2007 through January 2008 and this claim must be dismissed.  The
Court, therefore, GRANTS Carbon Capital's motion to dismiss the
Complaint.

## MOTION FOR SUMMARY JUDGMENT

### I.    Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary
judgment is appropriate when the evidence "show[s] that there is no
genuine issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law."  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 247 (1986).  A fact is material if it
"might affect the outcome of the suit under the governing law."
Id. at 248.  A factual dispute is genuine when "the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  Id.  The role of a court in ruling on such a
motion "is not to resolve disputed issues of fact but to assess

17

whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).   The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party.   See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994).

## II.  Application

Carbon Capital argues that the Court should grant summary judgment on its counterclaims for (1) declaratory judgment, (2) breach of contract, and (3) attorneys' fees and costs.   The Court addresses each of these counterclaims in turn.

### A.  Declaratory Judgment Counterclaim

First, Carbon Capital moves for summary judgment on its declaratory judgment counterclaim pursuant to the Settlement Agreement.   Carbon Capital seeks a declaratory judgment that it was entitled to 100% of the Membership Interests as of April 1, 2008 and, thereby, could assume ownership and management responsibilities of the Hotel at that time.

Under New York law, a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will

18

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to a proceeding." Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992) (citation omitted). Moreover, a declaratory judgment is a proper method "for settling justiciable disputes as to contract rights and obligations." Kalisch-Jarcho, Inc. v. City of New York, 72 N.Y.2d 727, 731, 734 (1988).

Pursuant to the clear and unambiguous terms of the Settlement Agreement, RPSI agreed that, by March 31, 2008, it would (1) pay Carbon Capital the amount set forth in the Settlement Agreement, (2) sell the Hotel, or (3) refinance the Loan. (Greaney Decl. Ex. 8 § 3.4.) If RPSI failed to perform, then 99.9% of the Membership Interests would automatically transfer to Carbon Capital. It is undisputed that RPSI failed to comply with any of these obligations by March 31, 2008.

First, the Court must determine whether RPSI's failure to comply with any of its obligations under the Settlement Agreement was justified. In the First Amended Complaint, RPSI argued that it would have sold the Hotel to Hyatt, but that Carbon Capital interfered with the sale. On July 1, 2008, Judge Sprizzo held a preliminary injunction hearing, during which the primary focus was whether Carbon Capital interfered with the Hyatt transaction. Judge Sprizzo adjourned the hearing and allowed the parties to conduct discovery of Hyatt to determine whether there was any merit

to Mitchell's claim.  Judge Sprizzo instructed Mitchell's counsel to withdraw the claim if there was no evidence of interference. (See id. Ex. 13.)  After completing discovery of Hyatt, Mitchell withdrew his motion for preliminary injunction by letter to the Court dated August 15, 2008.

RPSI does not offer any further justification for its failure to comply with any of these obligations under the Settlement Agreement.  Therefore, the Court concludes that RPSI is liable to Carbon Capital under the Settlement Agreement and that, at the very least, 99.9% of the Membership Interests automatically transferred to Carbon Capital on April 1, 2008.  Furthermore, as previously discussed, a Termination Event occurred in March 2008.  As a result, the automatic conveyance of 99.9% of the Membership Interests increased to 100% pursuant to the Settlement Agreement.

In sum, RPSI is liable to Carbon Capital under the Settlement Agreement and 100% of the Membership Interests automatically conveyed to Carbon Capital on April 1, 2008, entitling Carbon Capital to assume ownership and management responsibilities of the Hotel at that time.  Accordingly, the Court GRANTS Carbon Capital's motion for summary judgment on its declaratory judgment counterclaim.

**B.  Breach of Contract Counterclaim**

Second, Carbon Capital moves for summary judgment on its breach of contract counterclaim against Mitchell.  In return for

20

Carbon Capital's agreement to loan funds to RPSI, Mitchell "irrevocably and unconditionally" agreed that he would be liable as a primary obligor for all of RPSI's Guaranteed Obligations. (Greaney Decl. Ex. 5 § 1.1.) Carbon Capital asserts that Mitchell breached the Guaranty Agreement by failing to pay RPSI's Guaranteed Obligations due and owing under the Note and Loan Agreement.

To establish a prima facie case of default on a guaranty, Carbon Capital must provide proof of a valid guaranty and of Mitchell's failure to make payment, despite proper demand. See Brookman & Brookman, P.C. v. Schiavoni, 245 A.D.2d 93, 665 N.Y.S.2d 419 (App. Div. 1st Dep't 1997). There is no dispute that the Guaranty Agreement was a valid and unconditional guaranty, and that Mitchell failed to make payment. Mitchell argues, however, that (1) Carbon Capital did not make the formal demand required to trigger Mitchell's duty to pay RPSI's Guaranteed Obligations, and (2) that there are genuine issues of material fact regarding the amount, if any, that he may owe Carbon Capital under the Guaranty Agreement.

## 1. Carbon Capital's demand for payment from Mitchell under the Guaranty Agreement

The Note states that the "Borrower and all others who may become liable for the payment of . . . the Debt" expressly waive the requirement of "presentment and demand for payment" and "all other notices of any kind" prior to the debt becoming due and

21

payable. (Greaney Decl. Ex. 2, at 2.) This waiver is muddled by conflicting treatment in the Guaranty Agreement. The Guaranty Agreement states that Mitchell waives "demands and notices of every kind . . . ." (Id. Ex. 5 § 1.7.) The Guaranty Agreement, however, also states that Mitchell's duty to pay RPSI's Guaranteed Obligations arises "immediately upon demand" by Carbon Capital. (Id. § 1.5.)

Nevertheless, by letter dated June 11, 2007, Carbon Capital made a formal demand for payment from Mitchell under the Guaranty Agreement after RPSI's default under the Loan Agreement (the "2007 Demand"). (Id. Ex. 7 (stating that "[d]emand is hereby made, pursuant to Section 1.5 of the Guaranty, that you pay the Guaranteed Obligations owed to [Carbon Capital] in full.")) Therefore, regardless of the Court's interpretation of the Note and Guaranty Agreement, Carbon Capital demanded payment from Mitchell as guarantor.

Mitchell argues, however, that the 2007 Demand was nullified by the express terms of the Settlement Agreement, which provides that "Lender hereby waives any Event of Default existing as of [October 24, 2007] . . . ." (Id. Ex. 8 § 3.4.) Thus, Mitchell argues that because Carbon Capital did not make a second demand after RPSI failed to perform its obligations under the Settlement Agreement, Carbon Capital failed to satisfy a condition precedent to Mitchell's performance under the Guaranty Agreement.

22

The Court finds that the 2007 Demand gave Mitchell sufficient notice that his performance was due under the Guaranty Agreement. The 2007 Demand was unequivocal in stating that the Loan was in default and that the "full amount" was due on June 15, 2007.  (Id. Ex. 7, at 1.)  The 2007 Demand informed Mitchell how to determine the total amount due and referred to the Loan Agreement, which clearly states that interest would continue to accumulate until the debt was paid in full.  By letters dated March 25 and April 1, 2008, Carbon Capital informed Mitchell that RPSI had failed to comply with its obligations under the Settlement Agreement and that, therefore, the Loan was in default.  The waiver in the Settlement Agreement could not have induced Mitchell to await a second, redundant demand letter.  Mitchell knew that Carbon Capital claimed the debt was due and that interest would accrue until payment.

In sum, there is ample evidence that Carbon Capital adequately demanded payment from Mitchell under the unconditional terms of the Guaranty Agreement and that payment was not forthcoming. Therefore, the Court GRANTS Carbon Capital's motion for summary judgment on its breach of contract counterclaim.

### 2. Mitchell's purported waiver of his right to assert a breach of duty of good faith and fair dealing defense

Mitchell argues that Carbon Capital breached its duty of good faith and fair dealing and that the amount, if any, that he owes

23

under the Guaranty Agreement should be adjusted to account for these breaches, which impaired the Hotel's market value and will diminish or eliminate the amount of proceeds from its sale. Carbon Capital argues that it had no such duty, as Mitchell waived his right to assert this defense under the Guaranty Agreement.

The Guaranty Agreement provides in pertinent part that:

> The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

(Greaney Decl. Ex. 5 § 1.4.)  Thus, Mitchell can assert his breach of duty of good faith and fair dealing defense only if the defense cannot be waived under the N.Y. U.C.C. or New York common law.

The N.Y. U.C.C. provides that "the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement."  N.Y. U.C.C. § 1-102(3).  Mitchell argues that the N.Y. U.C.C. should apply to the agreements because they are governed by Article 9 of the N.Y. U.C.C., which applies to "a transaction . . . that creates a security interest in personal property or fixtures by contract . . . ."  Id. § 9-109(a)(1).  The N.Y. U.C.C. governs the Pledge Agreement between RPSI and Carbon Capital, as it creates a security interest in a corporate entity that owns commercial real property rather than a direct pledge of

24

the underlying real property.   See id. § 9-109.   Under ordinary circumstances, the N.Y. U.C.C. does not govern a guaranty agreement, which is merely a guaranty to pay an underlying debt and does not itself create a security interest as it does not secure a note by any specific personal property or fixtures of the guarantor.   See id.

While the Court could not find and the parties did not cite to any precedent in this Circuit regarding whether a guaranty executed in connection with a N.Y. U.C.C. transaction is itself governed by the N.Y. U.C.C., the prevailing view is that the UCC applies to those guaranties that are ancillary to the UCC transaction.   For example, in Gunter v. True, 416 S.E.2d 768, 771 (Ga. Ct. App. 1992) (internal citation omitted), the court stated:

> [W]e are aware of no case from any jurisdiction in which a guaranty which (1) was executed contemporaneously with a negotiable instrument, (2) was affixed thereto, and (3) applied exclusively to the obligation evidenced thereby was held to fall outside the ambit of the UCC merely because it was written on a separate sheet of paper. Rather, in those cases where a guaranty pertaining to a negotiable instrument has been held to fall outside the ambit of . . . the UCC, the agreement creating it has truly been separate from the instrument itself, often encompassing other obligations or future extensions of credit.

In determining whether a guaranty agreement is ancillary to the UCC transaction, courts in other jurisdictions look to evidence of whether the guaranty was executed as a part of the same transaction, see id. at 770-71, relates exclusively to the

transaction, see id. at 771, and was an "integral part[]" of the transaction, Commerce Bank of St. Louis, N.A. v. Wright, 645 S.W.2d 17, 20-21 (Mo. Ct. App. 1982). In addition, courts consider whether the guaranty was executed contemporaneously with, see id. at 21, or "in simultaneous contemplation" of, the UCC transaction. Tresslar Co. v. Fritts, 665 S.W.2d 314, 316 (Ky. Ct. App. 1984).

By contrast, those cases finding that a guaranty executed in connection with a UCC transaction falls outside the ambit of the UCC usually concern agreements which are "truly [] separate." See Gunter, 416 S.E.2d at 771. In such cases, the guaranty continued after the term of the UCC transaction or contained terms beyond its scope. See Fed. Deposit Ins., Corp. v. Nobles, 901 F.2d 477, 478 (5th Cir. 1990) (continuing guaranty guaranteeing "any and all indebtedness"); Uniwest Mortgage Co. v. Dadecor Condos., Inc., 877 F.2d 431, 434 (5th Cir. 1989) (guaranty of both present loan and "all future indebtedness" unconnected with loan at issue); Simpson v. MBank Dallas, N.A., 724 S.W.2d 102, 104-06 (Tex. App. 1987) (multiple loans secured by single guaranty); Simpson v. Milne, 677 P.2d 365, 369 (Colo. Ct. App. 1983) (guaranty referred to all debts "now or hereafter made, incurred, or created").

In the instant case, the Guaranty Agreement was executed on the same day as the Note, the Loan Agreement, and the Pledge Agreement (collectively, the "Loan Documents"). The Guaranty Agreement relates exclusively to the Loan Documents, contains the

26

same terms as the Loan Documents, and binds Mitchell to guaranty only RPSI's Guaranteed Obligations negotiated therein. Mitchell's obligation under the Guaranty Agreement is dependent upon RPSI's payment and performance under the Loan Documents. An integral part of the Loan Agreement, the Guaranty Agreement specifically states that "[Carbon Capital] is not willing to make the Loan . . . to [RPSI] unless [Mitchell] unconditionally guarantees payment and performance . . . ." (Greaney Decl. Ex. 5, at 1.) Furthermore, the Loan Agreement referenced the Guaranty Agreement and "all other documents now or hereafter executed and/or delivered in connection with the Loan," clearly evidencing the parties' understanding that the Loan Documents and the contemporaneous Guaranty Agreement were part of the same transaction. (Id. Ex. 1, at 11.)

The Court finds that, under the circumstances, the Guaranty Agreement was so closely interrelated with the Loan Documents that all are governed by the provisions of the UCC. Consequently, Mitchell could not waive his right to assert Carbon Capital's breach of duty of good faith and fair dealing as a defense under the Guaranty Agreement. See Centerbank v. Dowcom, Inc., 1993 Conn. Super. LEXIS 3024, *3-4 (Conn. Super. Ct. Nov. 17, 1993) (applying the UCC to a guaranty and holding that a lender's duty of good faith to third parties, such as guarantors, who "are not strangers to the transaction," cannot be waived) (internal quotation marks and citation omitted).

27

### 3.  Carbon Capital's alleged breach of duty of good faith and fair dealing

Having determined that Mitchell could not waive his right to assert Carbon Capital's breach of duty of good faith and fair dealing as a defense, the Court proceeds to evaluate the merits of Mitchell's claim.  Mitchell argues that Carbon Capital breached its duty of good faith and fair dealing by (1) failing to make mortgage payments on behalf of the Hotel from October 2007 through January 2008 as required by the Settlement Agreement, and by (2) "intentionally instigating bad publicity" about the Hotel, which impaired its market value.  (Second Am. Compl. ¶¶ 40-41.)  As previously discussed, Carbon Capital was not required to pay the Hotel's monthly mortgage payments from October 2007 through January 2008.  Therefore, Carbon Capital's failure to make those payments does not constitute a breach of its duty of good faith and fair dealing.

In support of his claim that Carbon Capital "intentionally instigated bad publicity" about the Hotel, Mitchell cites two newspaper articles.  First, Mitchell cites a <u>Miami Herald</u> article dated April 9, 2008, which publicized Carbon Capital's allegations against RPSI in the original state court litigation.  In addition, Mitchell cites a <u>Miami Herald</u> article dated June 19, 2008, which publicized Carbon Capital's motion for contempt against Mitchell. The article also quoted a statement made in Court on June 10, 2008 by counsel to Carbon Capital that "Mitchell is stealing from the

28

till, for all intents and purposes." <u>Royal Palm Senior Investors,</u>
<u>LLC v. Carbon Capital II, Inc.</u>, No. 08 Civ. 4319 (S.D.N.Y. filed
June 18, 2008) (transcript of June 10, 2008 hearing on Carbon
Capital's motion to hold Mitchell in contempt).   Both articles
contain information derived from transcripts and filings that were
publicly available at the time of publication, or immediately
thereafter.   In addition, Mitchell fails to show that Carbon
Capital intended to impair the market value of the Hotel, or that
either article had such effect.   In fact, it defies logic and
common sense to assert that Carbon Capital would intentionally
impair the market value of the Hotel, which is the only collateral
for its $24,545,813.00 loan to RPSI.

Therefore, Carbon Capital did not breach its duty of good
faith and fair dealing by intentionally instigating negative
publicity about the Hotel, and Mitchell fails to show a genuine
issue of material fact regarding the amount that he owes to Carbon
Capital under the Guaranty Agreement.

## C.   Attorneys' Fees and Costs Counterclaim

Third, Carbon Capital moves for summary judgment on its
counterclaim against Mitchell for attorneys' fees and costs.   The
Guaranty Agreement provides that:

> [i]n the event that Guarantor should breach or fail to
> timely perform any provisions of this Guaranty, Guarantor
> shall, immediately upon written demand by [Carbon
> Capital], pay [Carbon Capital] all costs and expenses
> (including court costs and attorneys' fees) incurred by

29

[Carbon Capital] in the enforcement hereof or the preservation of [Carbon Capital's] rights hereunder.

(Greaney Decl. Ex. 5 § 1.8.)

Because Mitchell is liable to Carbon Capital under the Guaranty Agreement, Carbon Capital is entitled to an award of its costs and expenses incurred in enforcing its rights thereunder. Therefore, the Court GRANTS Carbon Capital's motion for summary judgment on its attorneys fees and costs counterclaim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Carbon Capital's motion to dismiss and its motion for summary judgment on its counterclaims.

SO ORDERED:

BARBARA S. JONES

UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          July 7, 2009

30